JUDGE OETKEN

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

13 CV 5307

|  |  |
|---|---|
| THE HONORABLE OTTO J. REICH and OTTO REICH ASSOCIATES, LLC, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) Civ. No. |
| LEOPOLDO ALEJANDRO BETANCOURT LOPEZ, PEDRO JOSE TREBBAU LOPEZ, and FRANCISCO D'AGOSTINO CASADO, | ) ) ) Jury Trial Demanded ) ECF CASE |
| Defendants. | ) ) |

RECEIVED
JUL 30 2013
U.S.D.C. S.D. N.Y.
CASHIERS

### COMPLAINT

Plaintiffs, the Honorable Otto J. Reich and Otto Reich Associates, LLC, by and through

their attorneys Smith Valliere PLLC, for their Complaint against Defendants Leopoldo Alejandro

Betancourt Lopez, Pedro Jose Trebbau Lopez, and Francisco D'Agostino Casado, allege as

follows:

### NATURE OF THE ACTION

1.      The Honorable Otto J. Reich ("Ambassador Reich") is the former U.S.

Ambassador to Venezuela.  Over his long and distinguished career, Ambassador Reich served in

prominent positions in the U.S. Department of State, focusing on Latin America and the

Caribbean.  For his work as Ambassador, Reich was awarded the highest commendations of the

U.S. Department of State.  Over his many decades of public service, Ambassador Reich focused

on the cultures of corruption that plague many governments in Latin America.  In particular,

Ambassador Reich has repeatedly spoken out against the corruption that flourished in Venezuela under the regime of Hugo Chavez, which continues to exist today.

2.      Since his retirement from government service in 2004, Ambassador Reich has continued to publicly condemn corruption in Venezuela, and assist those who believe, like he does, in democracy, transparent government, and open markets.  Ambassador Reich has written numerous articles, delivered speeches, and offered congressional testimony throughout the United States on the problems facing many Latin American countries.  Through his company Otto Reich Associates, LLC ("ORA"), Ambassador Reich has also consulted with a number of pro-democracy and anti-corruption organizations and individuals throughout the United States, assisting them in their public relations and business efforts here and abroad.  Many of those individuals and organizations are based in the United States and are vocal opponents of the current regime in Venezuela.

3.      Defendants are U.S. residents who have amassed enormous fortunes through an illicit scheme to secure energy-industry contracts in Venezuela for their U.S.-based companies, Derwick Associates USA LLC and Derwick Associates Corporation ("Derwick Associates"). Known in the press as the "ChavezKids," "BoliBoys," and "the mafiosi of the Fifth Republic," Defendants Leopoldo Alejandro Betancourt Lopez ("Betancourt"), Pedro Jose Trebbau Lopez ("Trebbau"), and Francisco D'Agostino Casado ("D'Agostino) have profited wildly from the corrupt and anti-democratic Chavez regime.

4.      Derwick Associates' "business model" is simple.  From the United States, Defendants offer multi-million dollar kickbacks to public officials in Venezuela in exchange for the award of energy-sector construction contracts.  Once the contracts are secured for Derwick Associates (and the money ultimately transferred into bank accounts in New York), Defendants

skim millions off the top, which they deposit in U.S. banks. Defendants then subcontract out the actual work to be performed on site to other U.S.-based companies, including one based in Missouri. Defendants run their illegal scheme from their homes and offices in New York and through their U.S.-based companies. The scheme has been a huge financial boon to Defendants Betancourt, Trebbau, and D'Agostino, all of whom enjoy lifestyles of extreme wealth in the United States.

5.     While rampant public corruption is a reality in Venezuela, not everyone stands silent. In recent years, a number of respected individuals and institutions in the United States have begun to speak out against the "ChavezKids" and their ilk, unwilling to allow the continued fleecing of Venezuela. Fearing exposure, Defendants have gone to extreme lengths to conceal their illegal actions, using abusive business practices, threats of legal action in the U.S. courts, and other improper means to silence their opponents and send an unmistakable message of intimidation to anyone who might expose their illegal practices and alter the status quo.

6.     In September, 2012, Derwick Associates and its principals Betancourt and Trebbau filed a lawsuit in Florida state court against Banco Venezolano de Credito S.A. ("Banco Venezolano"), one of the oldest and most respected banks in Venezuela, which does business in the United States. The leaders of Banco Venezolano are known as vocal critics of the Chavez regime – so much so that Banco Venezolano refuses to do business with the Venezuelan government. Derwick Associates accused the bank, its President and Board Chairman Oscar Garcia Mendoza, and others of defaming Derwick Associates by financing an anti-Chavez, anti-Derwick website, thus damaging Defendants' reputation. Tellingly, Defendants did not commence suit in Venezuela but, rather, in the United States, thus facilitating the rapid spread of information about their lawsuit via the Internet. By commencing suit in Florida, Defendants also

sought to alleviate concerns raised by their private banks and money managers in New York, who were presumably growing worried about holding Defendants' accounts. In their suit, Defendants sought the outrageous sum of *$300 million*, a clear effort to bully the bank into quiescence, prevent others from threatening to expose their scheme, and provide comfort to Defendants' New York bankers that the allegations being spread about them were false.

7.     To Defendants' surprise, Banco Venezolano fought the lawsuit vigorously. Demonstrating the seriousness of their efforts to defend themselves, Banco Venezolano sought to retain Ambassador Reich and his U.S.-based consultancy, ORA, to, among other things, help defend against Defendants' allegations.

8.     Ambassador Reich's potential engagement by Banco Venezolano was a direct threat to Defendants' campaign of intimidation against the bank (and others). The union of a respected financial institution and a highly-regarded individual, both of whom had spent decades rallying against the corrupt status quo in Venezuela and foreigners who benefited therefrom, posed too great a threat to Defendants' scheme. And so, Defendants embarked upon an unlawful effort to drive a wedge between Banco Venezolano and Ambassador Reich. Defendants Betancourt, Trebbau, and D'Agostino conspired to discredit Ambassador Reich in the eyes of Banco Venezolano in the most effective way they knew how – tying Ambassador Reich to Derwick Associates.

9.     In a series of telephone calls placed from New York in late 2012, Defendants and their agents told officials of Banco Venezolano and others in the small Venezuelan émigré community in the U.S., that Ambassador Reich was working for Derwick Associates. That, of course, was blatantly false.

10.     Nevertheless, the fraud worked.  Once Banco Venezolano heard that its potential consultant was working for the people who were suing it (and who had profited from the corrupted Chavez regime), Banco Venezolano pulled out of final negotiations with ORA.  At the same time, another client of ORA, a well-regarded U.S.-based businessman named Eligio Cedeño ("Cedeño") (who himself has long been an enemy of the corrupt Chavez regime) also terminated his relationship with Ambassador Reich's consulting group.  Cedeño, like the bank, had been told by Defendants that Ambassador Reich was working for Derwick Associates. Taken together, the loss of those relationships cost ORA a substantial amount of money.  More importantly, Defendants tarnished the reputation of an American citizen who has spent decades decrying people like Betancourt, Trebbau and D'Agostino.

11.     Defendants' scheme to bribe foreign public officials from their lap of luxury in the United States, and cover up their actions here in the United States, violates federal law, specifically the Racketeering and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq*.  Defendants engaged in a pattern of racketeering activity that violated, among other laws, the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, and the federal wire fraud statute, 18 U.S.C. § 1343.  Defendants' racketeering activity is ongoing and will continue to harm other victims unless halted by judicial intervention.

12.     Defendants' actions also constitute a violation of various state laws.  Defendants intentionally sought to destroy ORA's U.S.-focused business relationships with Banco Venezolano and Eligio Cedeño by spreading knowingly false information.  Defendants' willful and malicious actions have caused substantial damage to Ambassador Reich's reputation and business, and intentionally interfered with ORA's existing and potential business relationships.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1332 (diversity jurisdiction); and 18 U.S.C. § 1964 (Racketeering Influenced and Corrupt Organizations Act).  The amount in controversy here exceeds $75,000.

14.     This Court has supplemental jurisdiction over the state causes of action pursuant to 28 U.S.C. § 1367(a), as those state law causes of action arise out of the same nucleus of operative facts which support the federal claims.

15.     Venue is proper in the Southern District of New York under 18 U.S.C. § 1965 and 28 U.S.C. § 1391, in that each Defendant owned property, conducted business, and/or has been found in the Southern District of New York during the relevant time periods.  A substantial portion of the communications, transactions, and events underlying Plaintiffs' claims occurred in this judicial district.

## PARTIES

### *Plaintiffs Otto J. Reich and Otto Reich Associates, LLC*

16.     Plaintiff Otto J. Reich is a citizen of the United States.  He is domiciled in the State of Virginia.

17.     Plaintiff ORA is a Virginia limited liability company with its principal place of business located at 1001 Pennsylvania Avenue, 11th Floor, Washington, DC.  ORA regularly conducts business in the Southern District of New York, and conducted business in this judicial district during the relevant time periods as described in this Complaint.  Ambassador Reich is the founder and principal of ORA.

18.     At all relevant times, Plaintiffs were "persons" within the meaning of that term as defined by 18 U.S.C. § 1961(3).

*__Defendants Betancourt, Trebbau, and D'Agostino__*

19.     Defendant Leopoldo Alejandro Betancourt Lopez ("Betancourt") is a citizen of Venezuela who resides primarily in the United States.  Upon information and belief, during the relevant time period, Betancourt owned a home located at Olympic Tower, 641 Fifth Avenue, Penthouse 1, New York, New York 10022, and currently owns property in Florida.  Upon information and belief, during the relevant time period (and continuing today), Betancourt regularly conducted business from New York, including from offices located at 450 Park Avenue, New York, New York 10022.

20.     Defendant Pedro Jose Trebbau Lopez ("Trebbau") is a citizen of Venezuela who resides primarily in the United States.  Upon information and belief, during the relevant time period (and continuing today), Trebbau regularly conducted business from New York, including from offices located at 450 Park Avenue, New York, New York 10022.  Upon information and belief, during the relevant time period (and continuing today), Trebbau owned property in Florida.

21.     Defendant Francisco D'Agostino Casado ("D'Agostino") is a dual citizen of Venezuela and Spain and a lawful permanent resident of the United States who resides in New York, New York.  Upon information and belief, during the relevant time period (and continuing today), D'Agostino owned a home located at 82 Elm, Southampton, New York 11968.  D'Agostino also owns property located at 10 East 75th Street, New York, New York 10021.  Upon information and belief, during the relevant time period (and continuing today), D'Agostino regularly conducted business from New York, including from offices located at 450 Park

Avenue, New York, New York 10022.  According to a U.S. Securities and Exchange

Commission filing, D'Agostino is the owner of a U.S. investment company with offices in New

York.

## DETAILED ALLEGATIONS

*Former Ambassador Otto Reich is a Distinguished*
*Individual Who Has Been Outspoken About Corruption in Venezuela*

22.     United States Ambassador Reich was born in Cuba.  In 1960, shortly after Fidel

Castro came to power, he moved to the United States with his family.  After college, he joined

the U.S. Army, serving as a lieutenant in the U.S. Army's 3rd Civil Affairs Group (Airborne),

Panama Canal Zone.

23.     From 1981 to 1983, Ambassador Reich was Assistant Administrator of the U.S.

Agency for International Development (USAID) in charge of U.S. economic assistance to Latin

America and the Caribbean.  From 1983 to 1986, he served as Special Advisor to the Secretary

of State, where he directed the Office of Public Diplomacy for Latin America and the Caribbean.

24.     From 1986 to 1989, Ambassador Reich served as U.S. Ambassador to Venezuela.

For his work as Ambassador, Reich was awarded the highest commendations of the U.S.

Department of State.  In 1991 and 1992, as a private citizen and at the request of President

George H. W. Bush, Ambassador Reich served as Alternate U.S. Representative to the United

Nations' Human Rights Commission in Geneva.  During his long career, Ambassador Reich has

also served as Washington Director of the Council of the Americas, Community Development

Coordinator for the City of Miami, and International Representative of the State of Florida

Department of Commerce.

25.     In 2001, Ambassador Reich was appointed by President George W. Bush to be the Assistant Secretary of State for Western Hemisphere Affairs.  In 2003, he became the President's Special Envoy for Western Hemisphere Initiatives, and a Senior Staff member of the National Security Council.  Ambassador Reich retired from government service in June 2004.

26.     Following his exit from government service, Ambassador Reich focused full-time on ORA, which is a Washington, D.C.-based consulting firm providing government relations, trade, investment, and anti-corruption advice, primarily to U.S.-based clients.  ORA's services are sought mainly by U.S.-based businesses and organizations with operations in Latin America, who believe similarly to Ambassador Reich that foreign corruption is a threat to their honest business efforts, and who seek to protect themselves against undue influence by foreign public officials, and need assistance navigating industries in which competitors may be benefiting from corruption.

27.     Ambassador Reich appears regularly in the U.S. media, and has spoken extensively about the political situation in Venezuela, including about public corruption in the Venezuelan energy sector.  Ambassador Reich has described himself as "very critical of the organized crime enterprise misruling Venezuela."[1]

### *Derwick Associates*

28.     At all relevant times, Defendants Betancourt, Trebbau, and D'Agostino worked together as each other's agents and partners, and were the owners and/or officers, directors, or operators of Derwick Associates USA LLC and Derwick Associates Corporation, and these entities' predecessors, successors, assigns and affiliates ("Derwick Associates").  These

---

[1]     Otto J. Reich, "Rebutting Maduro's Malicious Allegations," Americas Forum, March 19, 2013, *available at* http://www.americas-forum.com/otto-reich-rebutting-maduros-malicious-allegations/ (last accessed July 1, 2013).

individual defendants direct, control and coordinate virtually all aspects of global strategy, as well as the day-to-day activities of Derwick Associates, from D'Agostino's offices at 450 Park Avenue, New York, New York 10022, as well as from the homes of Betancourt and D'Agostino in New York.  It is from these locations that decisions are made concerning Derwick Associates.

29.     Derwick Associates holds itself out as being in the business of providing engineering, procurement and construction services involving power plants to the government of Venezuela.  Yet, Derwick Associates itself lacks the technology and engineering wherewithal to engage in such large scale, heavy duty industrial projects.  By its own admission, Derwick Associates relies heavily on several U.S.-based companies, including General Electric, Pratt & Whitney, and ProEnergy Services, LLC to provide the materials and services needed to construct the power plants.  Derwick Associates has a website, which is displayed in English.

30.     During the relevant time period, Derwick Associates USA LLC ("Derwick Associates USA") was registered as a Florida Limited Liability Company, FEI/EIN No. 274195456.  Derwick Associates USA has a place of business located at 1050 Lee Wagener Boulevard, Suite 200-201, Fort Lauderdale, FL 33315.

31.     During the relevant time period, Defendant Betancourt was on file with the State of Florida as Derwick Associates USA's registered agent, and Defendants Betancourt and Trebbau were on file with the State of Florida as Manager/Members of Derwick Associates USA.

32.     Upon information and belief, during the relevant time period, D'Agostino was an owner of Derwick Associates, and he remains an owner of Derwick Associates.

33.     Defendants direct the activities of Derwick Associates.  In a court filing in Miami-Dade County, Florida, in the matter of *Derwick Associates Corp., et al. v. Venezolano de*

*Credito, S.A., et al.*, No. 12-36297-CA-11 (Cir. Ct. 11th Dist. Miami-Dade Co.) (hereinafter, the "Defamation Suit"), Defendant Betancourt stated that he is "co-founder and President of Derwick ... [and] is responsible for the origination, structuring and execution of all Derwick projects, and has primary responsibility for the management of Derwick's relationships with its clients, suppliers, and regulators."

34.     Defendant Trebbau stated that he is "co-founder and Vice President of Derwick ... [and] has primary responsibility for the supervision of operations of all projects, and is directly responsible for the execution of large EPC contracts in Venezuela ... [and] managing the day-to-day relationships with Derwick's international banks."  The main bank referred to by Trebbau is the New York-based, J.P. Morgan.

35.     At all relevant times, Defendants were "persons" as that term is defined in the RICO statute, 18 U.S.C. § 1961(3).

36.     At all relevant times, Defendants operated enterprises that were engaged in interstate commerce.

***Corruption in Venezuela's Government Contracting and
Energy Sector and U.S.-Based Efforts to Exploit the Same***

37.     Bribing public officials is illegal in Venezuela.  Nevertheless, the country has become a breeding ground for public corruption, especially when it comes to the awarding of public contracts.  As noted by the U.S. Department of State and others:

- The U.S. Department of State recognizes Venezuela as being corrupt and of risk to companies seeking to do business there.  As stated in its *2013 Investment Climate Statement* on the country, the State Department warns U.S. businesses that "Venezuela's regulatory system lacks transparency and suffers from corruption," and notes that "Venezuela has not adopted

the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions."[2]

- Venezuela is ranked number 165 out of 176 nations in the world in Transparency International's 2012 *"Corruption Index"*; in other words, Venezuela is one of the ten worst countries in the world in terms of public corruption. Transparency International also described Venezuela's public budget transparency as "minimal."[3]

- As noted by the U.S. Department of State, "[i]n 2012, Venezuela ranked 174 out of 177 in the Heritage Foundation's Index of Economic Freedom."[4]

- In 2012, the *New York Times* noted that "[t]he story of how power failures can plague Venezuela even though it boasts some of the world's greatest natural gas reserves and massive hydroelectric dams is the Chávez years in miniature — *a heady cocktail of ideological rigidity, corruption and mismanagement.*"[5]

38.     The U.S. government has identified and acted on many U.S.-based kickback schemes designed to exploit the Venezuelan market. Indeed, unwilling to tolerate bribery and kickbacks by U.S.-connected persons operating in Venezuela, the U.S. government has acted to hold such people accountable. For instance, in 2008, the SEC brought a civil enforcement action against a foreign unit of Siemens in the Southern District of New York, alleging violations of the Foreign Corrupt Practices Act for paying bribes to government officials who "had influence over" the public contracting process in Venezuela to build metro transit lines.

---

[2]      United States Department of State, *2013 Investment Climate Statement – Venezuela, available at* http://www.state.gov/e/eb/rls/othr/ics/2013/204759.htm (last accessed July 29, 2013).

[3]      Transparency International *2012 Corruption Index, available at* http://www.transparency.org/country#VEN_DataResearch_SurveysIndices (last accessed July 29, 2013).

[4]      United States Department of State, *2013 Investment Climate Statement – Venezuela, available at* http://www.state.gov/e/eb/rls/othr/ics/2013/204759.htm (last accessed July 29, 2013).

[5]      *See, e.g.,* Francisco Toro, "Full of Gas," *The New York Times/International Herald Tribune,* Sept. 21, 2012, *available at* http://latitude.blogs.nytimes.com/2012/09/21/chavezs-electric-power-problem/ (last accessed July 29, 2013) (emphasis added). Besides corruption in the public contracting sector, the Venezuelan government suffers from corruption in its justice and police systems. For instance, the U.S. Department of State warns travelers that "the criminal threat level for Caracas [is] CRITICAL," due in part to "poorly paid and often corrupt police [and] an inefficient politicized judiciary." U.S. Department of State, *Venezuela 2012 Crime and Safety Report, available at* https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=13038 (last accessed July 29, 2013).

39.     Only two months ago, the U.S. Department of Justice filed criminal charges in the

Southern District of New York against two U.S.-based broker-dealers, Alberto Clarke

Bethancourt and Jose Alejandro Hurtado, for conspiring to pay bribes to a Venezuelan public

official in exchange for financial trading business.  According to the U.S. government,

"defendants in this case allegedly paid huge bribes so that foreign business would flow to their

firm … defendants' arrests lay bare a web of bribery and corruption in which employees of a

U.S. broker-dealer allegedly generated tens of millions of dollars through transactions in order to

fund kickbacks to a Venezuelan government official in exchange for her directing the

Venezuelan economic development bank's financial trading business to their employer."[6]

40.     Things are no different in Venezuela's energy sector, which is ripe with

opportunity for parties willing to "pay to play."

### *Defendants, From the United States and Through Derwick*
### *Associates, Exploit the Opportunity for Corruption in Venezuela*

41.     Defendants use Derwick Associates to secure inflated public contracts in

Venezuela, paying public officials large payments in exchange for awarding them contracts, and

unjustly enriching themselves in the process.

42.     In the Defamation Suit discussed above, Defendants Betancourt and Trebbau

admit that "[b]etween 2009 and 2010, Derwick [Associates] submitted more than 25 bids on

EPC projects and received EPC contracts on twelve of those projects."

43.     The truth, of course, is far more complicated (and much less flattering to

Defendants).  As discussed in more detail below, from 2009 to 2010, Derwick Associates

obtained at least a dozen energy-sector contracts valued at approximately *$1 billion* from

---

[6]      U.S. Department of Justice Press Release, May 7, 2013, *available at*
http://www.justice.gov/opa/pr/2013/May/13-crm-515.html (last accessed July 21, 2013).

agencies of the Venezuelan government, secured via illegal bribes, kickbacks and other unlawful activities, all in violation of United States law.

44.     Because the factual particulars concerning Defendants' illicit schemes are peculiarly within the possession and control of Defendants (and their co-conspirators), and because Defendants have every incentive to keep their transactions secret so as to prevent criminal prosecution and enable them to continue their profiteering, it is impossible to plead the granular details of Defendants' scheme.  However, Plaintiffs have been able to uncover the following facts concerning Defendants' U.S.-conceived and executed scheme.

## A.  Petroleos de Venezuela, S.A.

45.     Petroleos de Venezuela, S.A. ("PDVSA") is the Venezuelan state-owned corporation responsible for the nation's energy production.

46.     PDVSA has come under heavy scrutiny for years regarding its disorganization, inefficiency, and corruption, and has been the subject of multiple U.S. securities enforcement and civil litigation proceedings related to bribes and kickbacks given to or solicited by PDVSA officials:

- In 2012, a court-appointed receiver in Connecticut filed suit in U.S. District Court for the District of Connecticut, alleging that the head of a U.S. asset management company paid millions of dollars in kickbacks to a senior PDVSA official in exchange for approval of certain financial transactions with the PDVSA.  *Carney v. Illarramendi, et al.,* No. 12-cv-00165 (D. Conn. 2012).

- In 2010, the Securities and Exchange Commission filed suit against Joe Summers, a U.S.-based operations manager for a BVI-based oil drilling company, for authorizing payments to PDVSA officials in exchange for drilling contracts, in violation of the Foreign Corrupt Practices Act.  *SEC v. Summers*, No. 10-cv-02786 (S.D. Tex. Aug. 5, 2010).

- In 2009, the Securities and Exchange Commission filed suit against Bobby Benton, a U.S.-based operations manager for an oil drilling company, for

authorizing payments to PDVSA officials in exchange for drilling contracts, in violation of the Foreign Corrupt Practices Act. *SEC v. Benton*, No. 09-cv-03963 (S.D. Tex. Dec. 10, 2009).

- In 2008, PDVSA was sued by a Miami-based food company, which alleged that PDVSA cancelled contracts with it after the company refused to pay $2 million in bribes.

47.     In 2010, PDVSA's penchant for corruption again asserted itself in connection with its solicitation of construction contracts. In mid-2010, PDVSA awarded contracts to Derwick Associates for the construction of four power plants in Venezuela. The plants in question were to be located in the cities of Las Morochas, Barinas, El Furrial, and El Morichal.

48.     These contracts were not the subject of a public bidding process – a tell-tale mark of impropriety. Indeed, in its resource manual for combatting foreign bribery by U.S.-based businesses, the Criminal Division of the U.S. Department of Justice and the Enforcement Division of the U.S. Securities and Exchange Commission specifically highlighted non-public bids as a common red-flag for bribery of foreign officials.[7]

49.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino agreed amongst themselves to attempt to entice and influence Venezuelan officials to award the contracts to Derwick Associates by way of offering kickbacks to those officials. Upon securing the inflated contracts, Derwick Associates would subcontract out the work to various U.S.-based companies, including Missouri-based ProEnergy Services, LLC, who would do substantially all of the actual construction. Derwick Associates, having done almost nothing beyond merely procuring the contracts, would keep a substantial percentage of the contract proceeds for itself.

---

[7]     U.S. Department of Justice, *FCPA: A Resource Guide to the Foreign Corrupt Practices Act, available at* http://www.justice.gov/criminal/fraud/fcpa/guide.pdf (last accessed July 29, 2013).

50.     Defendants would later brag to their friends and acquaintances in the United

States that Derwick Associates secured these contracts by giving kickbacks to the right

people.  For instance, in November, 2012, while in the United States, D'Agostino told a friend

that "of course" Derwick Associates paid kickbacks to secure its energy contracts; he noted that

in Venezuela, "you always have to pay" what D'Agostino called "consulting fees," in order to

secure the contracts.  Of note, the U.S. Department of Justice has declared that payments to

foreign officials to influence their decisions violate the Foreign Corrupt Practices Act even if

they are accounted for as "consulting fees."  U.S. Department of Justice, *FCPA:  A Resource*

*Guide to the Foreign Corrupt Practices Act*, *available*

*at*  http://www.justice.gov/criminal/fraud/fcpa/guide.pdf (last accessed July 29, 2013) ("[b]ribes

are often concealed under the guise of legitimate payments, such as commissions or consulting

fees").

51.     Although the exact details of the PDVSA kickback scheme (including the amount

of the kickback and the dates it was offered and paid) remain shrouded in secrecy given its

illegality, it is believed that through an individual named Francisco Convit-Guruceaga ("Convit-

Guruceaga") (who is Defendant Betancourt's first cousin, and is also a part owner of Derwick

Associates), Defendants Betancourt, Trebbau, and D'Agostino contacted Nervis Villalobos

("Villalobos"), a former Vice Minister of Energy, about obtaining the contracts to build the

plants.

52.     Upon information and belief, Convit-Guruceaga, pursuant to Defendants'

instructions, told Villalobos to extend an offer of a substantial payment on their behalf to Rafael

Ramirez ("Ramirez"), President of PDVSA, in order to award the construction contracts to

Derwick Associates.  Upon information and belief, Villalobos did so, and Ramirez accepted the

offer.

     53.    As a result, PDVSA awarded the following four contracts to Derwick Associates:

- On April 30, 2010, PDVSA awarded to Derwick Associates the contract for the Las Morochas facility;

- On November 21, 2010, PDVSA awarded to Derwick Associates the contract for the El Furrial facility;

- On November 21, 2010, PDVSA awarded to Derwick Associates the contract for the El Morichal facility; and

- On November 23, 2010, PDVSA awarded to Derwick Associates the contract for the Barinas I facility.

     54.    The final contract prices were never publicly released by the Venezuelan

government.  Upon receipt of the award, Defendants subcontracted with a U.S. company to

perform the work.  Upon information and belief, the monies that Derwick Associates received

from the contracts were wired to accounts at J.P. Morgan and Davos Financial Group in New

York, and were used, in turn, to pay millions of dollars in kickbacks to Ramirez.

     55.    At all relevant times, Defendants' personal banker at J.P. Morgan was Eduardo

Travieso ("Travieso"), a Vice President in the Private Banking Division who was located in New

York, New York.  On March 21, 2013, according to a required U.S. regulatory filing with

FINRA, Travieso separated from J.P. Morgan following allegations that Travieso had potentially

committed violations of investment-related statutes, fraud, or failure to supervise in connection

with investment-related statutes, arising from certain undisclosed customer interactions by

Travieso.  In the filing, J.P. Morgan has stated publicly that "Mr. Travieso acted in a manner that

is inconsistent with the Firm's policies and procedures," and had "fallen short of the standards"

of financial industry employees.

### B. CORPOELEC

56.     CORPOELEC stands for Corporación Eléctrica de Venezuela.  CORPOELEC is the successor entity to Electricidad de Caracas.  It is the state-owned entity responsible for supplying power to the Venezuelan capital of Caracas.  It was created in 2007 via the merger of a number of Venezuelan state-owned power companies.

57.     Like the PDVSA, CORPOELEC has been widely recognized as a target for exploitation by corrupt public officials.  For instance, *The Economist* observed that "[t]entative efforts to tame corruption [in Venezuela's energy sector] have [] been undermined ... On [Hugo Chávez's] watch, [Chávez's brother] had led the electricity ministry as well as Corpoelec, the graft-riddled state-run electricity giant."[8]  CORPOELEC's "graft-riddled" nature asserted itself in 2009 with its solicitation of construction contracts.

58.     In mid-to-late 2009, CORPOELEC awarded contracts to Derwick Associates for the construction of energy generating plants known as Raisa I and II, Guarenas I and II, Picure, and Margarita, each located in and around Caracas.  Those contracts were not the subject of a public bidding process.

59.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino set out to offer millions of dollars in kickbacks to CORPOELEC officials in exchange for awarding the contracts to Derwick Associates.  Upon securing the inflated contracts, Derwick Associates would then subcontract out the work to another U.S. company, Missouri-based ProEnergy Services, LLC, which would do substantially all of the actual work.  Derwick

---

[8]      The Economist, *A Circus Without a Ringmaster*, June 6, 2013, *available at* http://www.economist.com/news/americas/21580477-radicals-former-soldiers-and-cuban-spies-jostle-control-venezuelan-ring-circus (last accessed July 29, 2013).

Associates, having done almost nothing, would keep a substantial percentage of the contract proceeds for itself.

60.    Defendants would later brag to their friends and acquaintances in the United States that Derwick Associates secured these contracts by giving kickbacks to the right people. For instance, in November, 2012, while in the United States, D'Agostino told a friend that "of course" Derwick Associates paid kickbacks to secure its energy contracts; he noted that in Venezuela, "you always have to pay" what D'Agostino called "consulting fees," in order to secure the contracts.  Of note, the U.S. Department of Justice has declared that payments to foreign officials to influence their decisions violate the Foreign Corrupt Practices Act even if they are accounted for as "consulting fees."  U.S. Department of Justice, *FCPA:  A Resource Guide to the Foreign Corrupt Practices Act*, *available at*  http://www.justice.gov/criminal/fraud/fcpa/guide.pdf (last accessed July 29, 2013) ("[b]ribes are often concealed under the guise of legitimate payments, such as commissions or consulting fees").

61.    Although the exact details of the kickback scheme (including the amount of the kickback and the dates it was offered and paid) remain necessarily shrouded in secrecy given its illegality, it is believed that Defendant Trebbau approached Javier Andres Alvarado Pardi ("Pardi") (son of Javier Alvarado Ochoa, former Venezuelan Minister of Electrical Development, and a childhood friend of the Defendants), about awarding the contracts to Derwick Associates.  Trebbau offered Pardi a substantial kickback in exchange for his assistance in securing the contracts for Derwick Associates.

62.    Upon information and belief, that offer was accepted, and as a result, CORPOELEC awarded Derwick Associates the following five contracts:

- On October 2, 2009, CORPOELEC awarded to Derwick Associates the contract for the Picure facility;

- On November 23, 2009, CORPOELEC awarded to Derwick Associates the contract for the La Raisa I facility;

- On November 30, 2009, CORPOELEC awarded to Derwick Associates the contract for the La Raisa II;

- On March 11, 2010, CORPOELEC awarded to Derwick Associates the contract for the Gaurenas I facility; and

- On October 4, 2010, CORPOELEC awarded to Derwick Associates the contract for the Gaurenas II facility.

63.    During this time period, Derwick Associates was also awarded a portion of the contract for the facility in Margarita, Venezuela, although no public information exists regarding when that contract was awarded.

64.    The cost of these contracts is not publicly known; media reports have noted, however, that CORPOELEC accepted a $130 million bid from Derwick Associates for construction of the Picure facility, and a $211 million bid from Derwick Associates for construction of the Guarenas I and II facilities.

65.    Upon information and belief, the monies that Derwick Associates received from the contracts were wired to accounts at J.P. Morgan and Davos Financial Group in New York, and were used, in turn, to pay millions of dollars in kickbacks to Pardi.

66.    Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino plan to continue their "courting" of CORPOELEC officials. On April 23, 2013, the Venezuelan government authorized CORPOELEC to award new contracts to construct power plants and to buy various energy-related goods and services.

67.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino are at present attempting to obtain such contracts for Derwick Associates, and intend to offer substantial payments to government officials in exchange for contract awards.

### C. Corporacion Venezolana de Guayana

68.     Corporacion Venezolana de Guayana ("CVG") is a state-owned entity which controls energy production in the Guayana region in southeast Venezuela.

69.     In late 2009, CVG awarded two contracts to Derwick Associates for the construction of energy plants in Puerto Ordaz, Venezuela named Sidor Planta A and Sidor Planta B.  The contracts were not the subject of a public bidding process.

70.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino set out to offer millions of dollars in kickbacks to CVG officials in exchange for awarding the contracts to Derwick Associates.  Upon securing the inflated contracts, Derwick Associates would then subcontract out the work to another U.S. company, Missouri-based ProEnergy Services, who would do substantially all of the actual work.  Derwick Associates, having done almost nothing, would keep a substantial percentage of the contract proceeds for itself.

71.     Defendants would later brag to their friends and acquaintances in the United States that Derwick Associates secured these contracts by giving kickbacks to the right people.  For instance, in November, 2012, while in the United States, D'Agostino told a friend that "of course" Derwick Associates paid kickbacks to secure its energy contracts; he noted that in Venezuela, "you always have to pay" what D'Agostino called "consulting fees," in order to secure the contracts.  Of note, the U.S. Department of Justice has declared that payments to foreign officials to influence their decisions violate the Foreign Corrupt Practices Act even if they are accounted for as "consulting fees."  U.S. Department of Justice, *FCPA: A Resource*

*Guide to the Foreign Corrupt Practices Act*, *available*

*at* http://www.justice.gov/criminal/fraud/fcpa/guide.pdf (last accessed July 29, 2013) ("[b]ribes are often concealed under the guise of legitimate payments, such as commissions or consulting fees").

72.     Although the exact details of the kickback scheme (including the amount of the kickback and the dates it was offered and paid) remain necessarily shrouded in secrecy, it is believed that through the above-mentioned intermediary Convit-Guruceaga, Defendants Betancourt, Trebbau, and D'Agostino contacted Rodolfo Sanz ("Sanz"), the Venezuelan Minister of Basic Industries and Mining.

73.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino together authorized Convit-Guruceaga to offer Sanz a substantial payment in order to obtain the contracts.  Convit-Guruceaga did so.  Betancourt later personally negotiated with Sanz over the terms of the payment.  Upon information and belief, Sanz accepted the offer, and as a result, CVG awarded Derwick Associates the contracts.

74.     On November 30, 2010, CVG awarded to Derwick Associates the contract for the Sidor Planta A facility.

75.     Further, upon information and belief, during this time period, Derwick Associates was also awarded the contract for the Sidor Planta B facility, although no public information exists regarding when that contract was awarded.

76.     Upon information and belief, the monies that Derwick Associates received from the contracts were wired to accounts at J.P. Morgan and Davos Financial Group in New York, and were used, in turn, to pay millions of dollars in kickbacks to Sanz.

*Multiple Parties, Including the United States Government, Have*
*Investigated the Manner in Which Derwick Associates Secured the Contracts*

77.     The incredible manner in which Derwick Associates secured more than *a billion*

*dollars* in complex energy construction contracts in such a short time has drawn scrutiny from

the United States government and numerous media sources.

78.     Information has emerged from publicly-available sources that individuals

associated with the Federal Bureau of Investigation have recently conducted inquiries into

Derwick Associates' activities.[9]  Upon information and belief, the Department of Homeland

Security and the Treasury Department have also made inquiries into Derwick Associates'

activities.  Further, upon information and belief, the United States Securities and Exchange

Commission's New York Regional Office is currently conducting an inquiry into the activities of

Derwick Associates.

79.     In addition, a number of mainstream English and Spanish-language publications

have published articles detailing the suspicious manner in which these contracts were awarded to

Derwick Associates, and recount allegations that Derwick Associates secured these contracts via

improper payments to Venezuelan officials.  For instance:

- Cesar Batiz, a prominent reporter at the Spanish-language publication Últimas Noticias, reported that Derwick Associates had received these immense contracts despite the lack of any sort of track record, and the lack of experience of its managers, Defendants Betancourt and Trebbau.  Batiz also wrote a piece exploring the questions surrounding suppliers of electricity equipment in Venezuela that were likely overcharging (including Derwick Associates in that group).

- A number of postings written by a Bloomberg correspondent at the website *Setty's Notebook* recounted the allegations against Derwick

---

[9]     Posting to Infodio, September 12, 2012, *available at* http://infodio.com/content/fbi-looking-derwick-associates (last accessed July 29, 2013) (Derwick Associates' "claims of proven track record, experience, business methods and so on have been grossly exaggerated and just don't stack up," and noting that FBI has on multiple occasions visited the website after having searched for the term "Derwick.").

Associates regarding the contracts; the website editor later received a letter from Derwick Associates' attorneys threatening legal action.[10]

- Alek Boyd, columnist for Columbia's *Semana* magazine, has written a number of articles on his news website detailing allegations of improper payments by Defendants and Derwick Associates in the securing of the aforementioned energy contracts; as described by Boyd, "Derwick Associates is a fine example of a cast of criminal enterprises that have flourished under Hugo Chavez's galloping and irresponsible waste."[11]

80.     Even the *New York Times* has implicitly questioned the business practices of Defendants in a September 12, 2012 article discussing various financial "scandals," where "ghost companies" landed energy "contracts worth hundreds of millions of dollar … at shamelessly inflated prices."

### *Defendants' Campaign of Concealment*

81.     In order to perpetuate their illegal scheme and avoid criminal prosecution, Defendants must prevent any investigation into their activities.  Over the last year, Defendants have targeted journalists, media outlets, private citizens, and former government officials in the United States.  Defendants use lawsuits and threats to sue, apply political and financial pressure, and use abusive business tactics, all in order to ensure that critics of the ChavezKids are severely and swiftly punished and others made afraid to come forward.

---

[10]     Posting to Setty's Notebook, October 12, 2012, *available at* http://settysoutham.wordpress.com/2012/10/12/derwick-associates-censorship/ (last accessed July 29, 2013) (Derwick Associates "has had incredible success in the three years since it was founded, gaining hundreds of millions of dollars in contracts to procure generating turbines and other materials and to then build electricity plants. Press reports have raised questions about exactly how Derwick got so big, so fast.")

[11]     Posting to Infodio, March 10, 2012, *available at* http://infodio.com/content/derwick-associates-exhibit-x-venezuelas-corrupt-criminals (last accessed July 29, 2013) ("Betancourt Lopez and the activities of his Derwick Associates can only stand scrutiny in Hugo Chavez kangaroo courts.  The minute independent prosecutors in the USA start investigating how Derwick Associates came about its sudden fortune, much explanations will have to be forthcoming.  Money laundering and corruption are, after all, crimes in most jurisdictions, and when questions about the allegations published by Batiz and wikianticorrupcion.org start being bandied in court it will be extremely interesting to hear what Betancourt and his mates have to say.")

82.     In or about October 2012, Defendants' counsel in the Defamation Action sent letters to Mr. Steve Bodzin, a Bloomberg correspondent and editor of the website http://settysoutham.wordpress.com; Mr. Robert Bottome, President of Veneconomia; and Mr. Miguel Octavio, author of the blogspot http://venepiramides.blogspot.com, threatening legal action if those individuals did not remove from their websites articles concerning Derwick Associates (and Defendants).

83.     In or about November 2012, Defendants' New York-based counsel in the Defamation Suit sent a letter to *Forbes Magazine* in New York which, upon information and belief, was preparing to publish an article about Derwick Associates.  Fearing legal action, *Forbes Magazine* declined to go forward with the piece.

84.     The *piece de resistance* in Defendants' campaign of concealment was the very public Defamation Suit filed in September 2012 by Defendants Betancourt, Trebbau, and Derwick Associates in the Circuit Court of Miami, Florida.  The Defamation Suit sought damages in excess of *$300 million* from Banco Venezolano, one of the oldest and most respected banks in Venezuela with offices in the United States, and its President, Oscar Garcia Mendoza ("Garcia"), a vocal opponent of the Chavez regime and one of the few bankers in Venezuela who will not do business with the Venezuelan government.

85.     The Defamation Suit alleged that Banco Venezolano, its chairman Garcia, and another director created and spread defamatory information concerning Derwick Associates and its founders on an Internet website named wikianticorrupcion.org.  Defendants claimed that statements concerning Derwick Associates' unscrupulous business methods on the website "have been repeated hundreds of times on other Internet sites, Twitter, and various news outlets," entitling them to hundreds of millions of dollars in damages.

86.    In their initial complaint (the "Defamation Complaint"), Defendants Betancourt

and Trebbau alleged that Garcia and Banco Venezolano caused the wikianticorrupcion.org

website to publish allegations that, among other things, Defendants Betancourt and Trebbau,

through Derwick Associates:

- "Launder[ed] the money originating from oil and electricity corruption and join[ed] illegal financial deals."

- "Found[ed] another Venezuelan financial entity through which they continued to launder the money that was the product of their crimes."

- "Were involved in the theft of 500 million dollars from another Venezuelan corporation, Corporacion Venezolana de Guayana (CVG)."

- "Stole the amount of one point three billion dollars ($1.3 BILLION) from CVG."

- "Are part of a 'criminal group' that have amassed a 'pot … [of] up to about two billion dollars (US$ 2.0 billion) … through which [they] launder money by making investments.'"

87.    The Defamation Complaint also accused Garcia and Banco Venezolano of

causing the wikianticorrupcion.org website to publish statements that Betancourt, as "the gang's

boss, would be the owner of most of the so-called pot, circa $800 million, which he has put into

international banks," and that "[Derwick's] entire fortune was made in less than three years and

with absolutely high profile, trampling on and threatening even journalists with total impunity,

while [Betancourt] was supported by his good relationships with police officers, public

prosecutors, governors and ministers."

88.    The Defamation Suit, which was brought in the United States and not in

Venezuela, was widely reported in the news media and on the Internet given the parties involved

and the enormous amount of damages being sought.  Indeed, news of the Defamation Suit

traveled quickly and had the chilling effect Defendants desired – on everyone but apparently the Banco Venezolano defendants.

89.     Upon information and belief, the Banco Venezolano defendants filed a motion to dismiss Defendants' allegations in the U.S. courts.  And, because truth is the ultimate defense to defamation, the Banco Venezolano defendants moved forward toward the opportunity to engage in discovery in the Defamation Suit.  During discovery, Betancourt and Trebbau (and Derwick Associates) would have been required to produce documents (including emails and financial documents) and sit for depositions concerning the substance of the alleged defamatory statements, *i.e.*, their business practices.

90.     Through discovery and trial, each of Betancourt, Trebbau and D'Agostino (through Derwick Associates) would have had the opportunity to pursue a legal process that, ostensibly, could have cleared their sullied reputations.   Rather than pursue the discovery process and prove up their claims, each of Betancourt, Trebbau and D'Agostino opted to settle the case.  Indeed, Defendants agreed to dismiss their lawsuit in April 2013 – mere months after it was commenced – and before any material discovery could take place.

91.     It has been reported that Betancourt, Trebbau, and Derwick Associates agreed to settle their $300 million Defamation Suit without having received payment of even a single dollar from Banco Venezuela or anyone else.

92.     Although it has been reported that Banco Venezolano, Garcia, and the other defendants in the Defamation Suit filed a motion to dismiss the Defamation Suit, those documents (as well as all other substantive documents in the case) are currently missing from the public case file in Miami-Dade County.

*Defendants Intentionally Spread False Information*
*To Destroy ORA's Business Relationship with Banco Venezolano*

93.     In October and November, 2012, shortly after the Defamation Suit was

commenced, Banco Venezolano entered into negotiations with ORA to assist in defending

against the claims made in the Defamation Suit and to provide unrelated business and consulting

services to Banco Venezolano in the United States.

94.     Banco Venezolano was very interested in retaining Ambassador Reich in part

because he has repeatedly spoken out against the types of schemes from which Defendants have

profited (and, upon information and belief, which Defendants were trying to cover up by suing

Banco Venezolano).  To illustrate, in a recent article in the Miami Herald, Ambassador Reich

wrote:

> In Chávez's Venezuela, [] a politically favored group (some with no previous
> experience in complex sectors such as energy and finance) were able to
> accumulate [] fortunes that allow them to purchase luxury mansions in the U.S.
> … most of the culprits live in or come regularly to this country … They use
> U.S. banks to move money and to maintain their extravagant properties … To
> cover their tracks and attempt to enjoy the privilege of living in our country,
> some 'Boligarchs' have launched lawsuits against honest Venezuelan
> businessmen in American courts. The purpose is to create a smokescreen to
> hide behind, and prevent the U.S. government from expelling the real
> offenders … [amassing their wealth from the] illegitimate awards of
> government contracts, from kickbacks and other gifts to government officials
> and from other unethical and immoral activities.[12]

95.     Banco Venezolano also sought ORA's assistance in connection with the claims

made against it by Betancourt, Trebbau, and Derwick Associates, including investigation into

Derwick Associates' business practices in the United States.

---

[12]     Otto J. Reich and Ezequiel Vasquez-Ger, "Venezuela's Chavez and his U.S. Business Partners," *Miami Herald*, *available at* http://www.miamiherald.com/2013/03/02/3262092/venezuelas-hugo-chavez-and-his.html#storylink=cpy (last accessed July 29, 2013).

96.     This would have been a significant business relationship for ORA with an important institutional client.  By late November, 2012, negotiations between the bank and ORA had advanced to the stage that the parties understood that ORA would charge $20,000 per month for consulting services, to commence immediately.  The contract was to be project-based, with the initial project estimated to last at least six months.  Additional amounts were to be provided by Banco Venezolano to cover up to $20,000 per month in out-of-pocket expenses such as meals, travel, hotels, and the like.

97.     Defendants, having learned of the negotiations, were determined to prevent Banco Venezolano from engaging ORA.  During the first week of December, 2012, one of Defendants' agents in Washington, D.C. tried to persuade Ambassador Reich to stop negotiating with the bank, and instead to provide ORA's services to Derwick Associates, promising Ambassador Reich "a lot of money."  Ambassador Reich refused to be bought off by Defendants.

98.     Several days later, on December 6, 2012, that same agent again tried to buy off Ambassador Reich.  Again, Ambassador Reich refused to join forces with Defendants.

99.     On December 7, 2012, Ambassador Reich was scheduled to meet with a representative of Banco Venezolano named Cesar Briceño ("Briceño") at the office of Banco Venezolano's attorneys in Miami, Florida.

100.     *On the same day as the meeting with Ambassador Reich,* Defendants caused Derwick Associates to file an Amended Complaint in the Defamation Suit and, upon information and belief, to serve Briceño with legal papers when he arrived at the Miami airport.  The Amended Complaint named Briceño as a defendant and alleged that Briceño had met in Miami in December 2102 with a "former government official."  A lawyer for Derwick Associates later

confirmed to Banco Venezolano's lawyer that the reference in the Amended Complaint to a "former government official" was indeed meant to refer to Ambassador Reich.

101.    The objective of including that piece of information in the Amended Complaint (filed on the same day as the meeting in Miami) was to give Banco Venezolano the false impression that Ambassador Reich was a "double agent" working for Derwick Associates, and that Ambassador Reich had shared the location and timing of his December 7, 2012 meeting with Briceño with Derwick Associates in order to allow legal papers to be served upon Briceño.

102.    That was not true.  Ambassador Reich never worked for, or with, Derwick Associates, and never acted on their behalf in any regard.  Moreover, Ambassador Reich does not know how Defendants knew of his December 7, 2012 meeting with Briceño.  He did not provide Defendants with that information.

103.    Defendants tried one more time to drive a wedge between ORA and Banco Venezolano, this time successfully.  Shortly after Ambassador Reich's meeting with Briceño in Miami, Betancourt and Trebbau, who are believed to have been in New York at the time, placed a call to their partner (and Betancourt's cousin) Convit-Guruceaga.  They instructed Convit-Guruceaga to call Joaquin Urbano Berrizbeitia ("Urbano"), one of Banco Venezolano's largest shareholders, who also sits on the Banco Venezolano board of directors.  Defendants directed Convit-Guruceaga to (falsely) tell Urbano that "Otto Reich is working for us."

104.    On or about December 20, 2012, Convit-Guruceaga placed the call, and conveyed that false information to Urbano.  Urbano then relayed that message to Banco Venezolano's leadership.  As a result, the bank (including its board of directors) believed that Ambassador Reich was working for Derwick Associates, *the party that was suing it for $300 million.*  Banco

Venezolano also came to believe (falsely) that Ambassador Reich was working for an enterprise (Derwick Associates) that had profited wildly from the corruption of Venezuela's energy sector.

105.    The communication that "Otto Reich is working for us" was false, and each Defendant (and Convit-Guruceaga, who is not a defendant to this action) knew it was false when it was made.

106.    In or about the last week of December, 2012, Banco Venezolano ceased all communications with Ambassador Reich as a result of the false information conveyed to it. A major business relationship – that was in final negotiations – worth at least $20,000 per month, was lost.

### *Defendants Intentionally Spread False Information, Which Destroyed ORA's Business Relationship with Eligio Cedeño*

107.    In October 2010, two years prior to the Defamation Suit, ORA was hired by an individual named Eligio Cedeño ("Cedeño") to provide consulting services. Cedeño resides full time in the United States.

108.    At one point, Cedeño was a prominent Venezuelan citizen involved in the financial industry. In 2003, Cedeño served as President for Banco Canarias de Venezuela C.A., a financial institution based in Caracas, Venezuela. Cedeño was also an outspoken opponent of the Venezuelan government, specifically the regime of Hugo Chavez, and he supported a number of anti-Chavez figures in Venezuela.

109.    In 2007, Cedeño was arrested by the Chavez government and held as a political prisoner for more than two years without trial. He was freed upon recommendation by the United Nations Working Group on Arbitrary Detention. Immediately upon his release, Cedeño

fled to Miami, Florida, and requested political asylum in the United States.  He was granted asylum in May 18, 2011.[13]

110.    Following his arrival in the United States in 2010, Cedeño retained ORA to consult on government relations affairs, specifically regarding Cedeño's status as a vocal opponent of the Chavez regime, as well as to assist Cedeño's efforts to re-establish his business affairs in his new home, the United Sates.

111.    The agreement between ORA and Cedeño called for the payment of $20,000 per month to ORA.  Cedeño paid this amount monthly beginning in 2010.  Pursuant to the agreement between ORA and Cedeño, the business relationship was to continue indefinitely.

112.    Given his long experience with the Venezuelan government and finance industry, Cedeño was well aware that Defendants were accused of engaging in corrupt activities in Venezuela, including payments to energy-sector officials in exchange for government contracts, as described above.

113.    In mid-2012, during their campaign to undermine Ambassador Reich's relationship with Banco Venezolano, Defendants Betancourt, Trebbau, and D'Agostino learned that Cedeño was a client of ORA.  Defendants agreed amongst themselves to (falsely) tell Cedeño that Ambassador Reich was working for Derwick Associates.

114.    Defendants knew that if Cedeño was falsely convinced that ORA was working with Derwick Associates, Cedeño would terminate his consulting relationship with ORA, and word would continue to spread (including to Banco Venezolano) and throughout the U.S.-based

---

[13]    *See* Meriam Jordan and Darcy Crowe, "U.S. Grants Asylum to Chavez Opponent," *Wall Street Journal*, May 19, 2011, *available at* http://online.wsj.com/article/SB10001424052748704 28150457633168158594089852.html (last accessed July 29, 2013).

marketplace that Ambassador Reich and ORA served, that Otto Reich was aligned with Derwick Associates.

115.    To effectuate the scheme, Defendant Betancourt placed a telephone call in November, 2012 from what is believed to be his home in New York, to Cedeño, who was then in Miami.

116.    During that conversation, Defendant Betancourt told Cedeño that ORA had been retained by Derwick Associates to offer consulting services. Defendant Betancourt further told Cedeño that Derwick Associates had an ongoing arrangement with Ambassador Reich for a proposed business venture in Panama. Neither of those statements was true.

117.    On or about November 30, 2012 (just days after his telephone conversation with Defendant Betancourt), Cedeño terminated his professional relationship with ORA.

118.    At that time, Ambassador Reich was unaware that Betancourt had called Cedeño and relayed false information to him concerning Ambassador Reich's alleged relationship with Derwick Associates. As such, Ambassador Reich could do nothing to counter the false statements made to Cedeño.

119.    In a later phone conversation between Ambassador Reich and Cedeño, Ambassador Reich learned what Cedeño had been (falsely) told about the "relationship" between ORA and Derwick Associates, and about the "business venture" in Panama with Betancourt.

## FIRST CLAIM FOR RELIEF

### *Racketeer Influenced and Corrupt Organizations Act*
### *18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d)*

120.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 119, inclusive, as if fully set forth herein.

121.   Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act,

18 U.S.C. §§ 1961-68 ("RICO"), are brought against each and every Defendant.  Plaintiffs are

"persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).  Each Defendant is a

"person" within the meaning of 18 U.S.C. § 1963(1).  Each Defendant conducted or participated

in, directly or indirectly, and agreed to conspire to conduct, the affairs of enterprises through a

pattern of racketeering activity.

122.   Specifically, Defendants conducted, participated in, and agreed to conspire to

conduct the affairs of RICO Enterprises I and II, both based in the United States, as described

below, by engaging in predicate acts in violation of the Travel Act, 18 U.S.C. § 1952(a) and (b);

the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*; and the federal wire fraud

statute, 18 U.S.C. § 1343.

### *RICO Enterprise I - Derwick Associates*

123.   RICO Enterprise I is Derwick Associates, an "enterprise" within the meaning of

18 U.S.C. § 1961(4).

124.   At all times, Defendants were the founders, officers, and managers of Derwick

Associates, and directed, controlled and coordinated its activities from offices located at 450

Park Avenue, New York, New York and their homes in New York.

125.   Each Defendant agreed to and did conduct and participate in the conduct of the

enterprise's affairs through a pattern of racketeering activity discussed above, to wit, the

solicitation and payment from the United States of Venezuelan officials for purposes of securing

energy-industry contracts, transmission of the ill-gotten gains via wire to and from bank accounts

in the United States, and the silencing, via wire fraud and other methods, of those (like

Ambassador Reich) who were critical of Derwick Associates' illicit methods and could expose their illegal scheme.

126.     Pursuant to and in furtherance of their fraudulent scheme, and as discussed above, Defendants committed multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b); the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*; and the federal wire fraud statute, 18 U.S.C. § 1343.

### RICO Enterprise II - Association-In-Fact

127.     RICO Enterprise II is an association-in-fact between Defendants Betancourt, Trebbau, D'Agostino, and non-party Convit-Guruceaga.

128.     At all relevant times, up to and including the present day, the members of RICO Enterprise II operated as a continuing unit.

129.     At all times, Defendants and non-party Convit-Guruceaga directed, controlled and coordinated the activities of RICO Enterprise II from offices located at 450 Park Avenue, New York, New York and from Defendants' homes in New York.  Upon information and belief, the members of RICO Enterprise II communicate with each other by phone, text messages and e-mail on a daily basis and have done so for the duration of the racketeering activity alleged, and have met often in New York and Florida.

130.     Each individual involved in RICO Enterprise II agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity discussed above, to wit, the solicitation and payment from the United States of Venezuelan officials for purposes of securing energy-industry contracts, transmission of the ill-gotten gains via wire to and from bank accounts in the United States, and actions constituting wire fraud.

131.   Pursuant to and in furtherance of their fraudulent schemes, Defendants Betancourt, Trebbau, D'Agostino, and non-party Convit-Guruceaga committed multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18 U.S.C. § 1343.

### *Predicate Acts – Travel Act*

132.   The Travel Act prohibits the use of interstate or foreign commerce to "promote," "manage," or "carry on" unlawful activity.  18 U.S.C. § 1952(a).  Bribery is a form of illegal activity.

133.   As set forth in the preceding paragraphs, Defendants, through RICO Enterprises I and II, intentionally made and conspired to use the mail and other facilities in interstate and foreign commerce; with intent to facilitate the promotion, management, establishment, or carrying on, of unlawful activities (to wit, bribery in violation of the laws of the United States); and thereafter performed additional acts in furtherance of the specified unlawful activities.

134.   As set forth in the preceding paragraphs, Defendants, through RICO Enterprises I and II, intended to and did engage in unlawful activities, namely, the bribery of Venezuelan public officials; Defendants used wire communications (including communications via telephone) originating from the United States and traveled to and from the United States and Venezuela to further these schemes; and Defendants accepted and transmitted their ill-gotten gains to and from bank accounts in the United States, including accounts at JP Morgan Chase Bank and Davos Financial Group.

*Predicate Acts - FCPA*

135.   The Foreign Corrupt Practices Act ("the FCPA") prohibits a U.S. concern from using the U.S. mails or wires to bribe foreign officials to effectuate business.  15 U.S.C. § 78dd-1, *et seq.*

136.   As set forth in the preceding paragraphs, Defendants, through RICO Enterprises I and II, intentionally made and conspired to make use of the instrumentalities of interstate commerce corruptly in furtherance of offers and payments of money to Venezuelan public officials, knowing that such money was offered and paid to wrongfully influence such foreign officials in their official capacity in order to secure improper advantages in order to assist in obtaining business; to wit, the contracts described above.

137.   As set forth in the preceding paragraphs, Defendants, through RICO Enterprises I and II, used wire communications (including communications via telephone, internet and e-mail) originating from the United States on numerous occasions to further these U.S.-based fraudulent schemes, and transmitted their ill-gotten gains to and from bank accounts in the United States, including accounts at JP Morgan Chase Bank and Davos Financial Group.

*Predicate Acts – Wire Fraud*

138.   As set forth in the preceding paragraphs, Defendants, through RICO Enterprises I and II, intentionally and knowingly made and conspired to make materially false statements to Cedeño, officials from Banco Venezolano, and others, regarding Ambassador Reich and ORA; to wit, that Ambassador Reich and ORA were personally and professionally associated with Derwick Associates and/or its individual members.

139.   Defendants' scheme to defraud was calculated to deprive Ambassador Reich and ORA of large sums of money and to destroy Ambassador Reich's and ORA's reputation and

relationships with Cedeño and Banco Venezolano, thereby obtaining an improper benefit for Defendants by forever preventing the association of Ambassador Reich and ORA with Cedeño and Banco Venezolano.  The union of Ambassador Reich, Cedeño and Banco Venezolano would have been fatal to Defendants' ability to perpetuate their unlawful scheme.  By taking steps to prevent that association, Defendants preserved their ability to continue securing energy-sector contracts through improper means.

140.    As set forth in the preceding paragraphs, Defendants, through RICO Enterprises I and II, used wire communications (including communications via telephone) in interstate commerce to further this fraudulent scheme in violation of 18 U.S.C. § 1343, by relaying false information to Cedeño and Banco Venezolano who relied upon said information to Plaintiffs' harm.

### *Pattern of Related Racketeering Acts*

141.    Defendants engaged in the racketeering activity and commission of predicate acts as described in this Complaint repeatedly, beginning in 2009 and continuing at least through December 2012.

142.    As set forth in the preceding paragraphs, Defendants have committed at least two acts of racketeering activity in the past ten years; to wit, multiple payments to Venezuelan officials in order to secure energy sector contracts; multiple transfers of illicitly derived funds to accounts in the United States; and multiple calls placed by telephone from the United States in order to undermine the business of ORA, each as discussed in this Complaint in violation of the federal wire fraud statute.

143.    Upon information and belief, Defendants will continue to make fraudulent statements and commit acts that constitute the basis of violations of the Travel Act, the FCPA, and the federal wire fraud statute.

144.    Defendants, through RICO Enterprises I and II, which are located in the United States, implemented the racketeering acts described in this Complaint to conduct their regular business activities.

*Pattern – Relatedness*

145.    As set forth in the preceding paragraphs, Defendants' racketeering acts are related by a similar purpose, participants, method of commission, and are otherwise interrelated by distinguishing characteristics and are not isolated events.

146.    Defendants' pattern of racketeering activities are united by a common purpose – to wit, securing monetary benefits for themselves in the United States via the bribery of Venezuelan officials for purposes of securing energy-industry contracts, and to cover up their illicit scheme by causing harm to those who would speak out or work against it.

147.    Defendants' pattern of racketeering acts have or had similar participants: Betancourt, Trebbau, D'Agostino (both individually and as members of Derwick Associates) and Convit-Guruceaga.

148.    Defendants' pattern of racketeering acts have or had similar methods of commission – to wit:  offers of money made by themselves, or their intermediaries from the United States, to Venezuelan officials in exchange for government energy-sector contracts, and telephone calls to individuals or institutions (either made by themselves or via intermediaries) to

convey false information about the association of Ambassador Reich and ORA with Derwick Associates.

### *Pattern – Continuity*

149.    As set forth in the preceding paragraphs, Defendants' racketeering acts took place repeatedly during a defined period of time, and threaten to repeat themselves in the future.

150.    Following Derwick Associates' founding in 2009, Defendants and their associates repeatedly engaged in behavior violating federal law, as described in the preceding paragraphs, from 2009 until 2012.  During that time period, Defendants offered payments on at least twelve contracts in violation of 15 U.S.C. § 78dd-1, and transferred the ill-gotten funds to the United States in violation of 18 U.S.C. § 1952(a) and (b).  Further, on no fewer than two occasions in 2012, Defendants and their associates conspired to commit wire fraud in violation of 18 U.S.C. § 1343 in connection with their intention to harm Ambassador Reich and ORA and prevent any investigation into their illicit scheme.

151.    This behavior represents an ongoing way of conducting Defendants' business and the nature of Defendants' acts themselves imply a threat of continued criminal action, as Defendants intend to continue to violate 15 U.S.C. § 78dd-1, 18 U.S.C. § 1952(a) and (b), and 18 U.S.C. § 1343 to effectuate their scheme, particularly in regards to forthcoming CORPOELEC contracts to construct power plants and buy various energy-related goods and services, as alleged in the preceding paragraphs, and Defendants plan to continuing taking actions to keep others (including Ambassador Reich and ORA) from speaking out against them and their illegal activities in that regard.

*Injury*

152.     As a direct and proximate result of Defendants' willful, knowing, and intentional acts, Ambassador Reich has suffered injury to his reputation and ORA has suffered injuries to its property and businesses including, but not limited to, the loss of existing and future business relationships with Eligio Cedeño and Banco Venezolano, and the loss of the revenue to be derived therefrom, in an amount to be determined at trial but not less than $2,000,000 plus treble damages, attorneys' fees and costs in bringing this action.

## SECOND CLAIM FOR RELIEF

### *Tortious Interference with Prospective Economic Advantage* — *ORA's Relationship with Cedeño*

153.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 152, inclusive, as if fully set forth herein.

154.     ORA had a long-standing business relationship with Cedeño, which continued through 2012.

155.     ORA expected the business relationship to continue indefinitely.

156.     Each Defendant knew of the business relationship between Cedeño and ORA.

157.     Each Defendant took steps to, and did, make or cause others to make false statements to Cedeño concerning ORA and/or Ambassador Reich's alleged association with Derwick Associates and/or Defendants, with the purpose of inducing Cedeño to terminate the business relationship, and to withhold future business from ORA.

158.     Defendants made these false statements to Cedeño with the purpose of inflicting harm upon ORA; specifically, the false statements were made with the purpose of denigrating

ORA's reputation and the integrity of the business thereby causing Cedeño to terminate the business relationship, and withhold any future business, from ORA.

159.    As a direct and proximate cause of Defendants' wrongful interference with the business relationship between ORA and Cedeño, Cedeño terminated his ongoing business relationship with ORA and refused to do future business with ORA.  But for Defendants' wrongful interference, ORA's relationship with Cedeño would have continued into the future.

160.    ORA has suffered substantial damages as a result of Defendants' unlawful interference.

161.    By reason of the foregoing, ORA is entitled to compensatory damages in an amount to be determined at trial, but not less than $1,000,000.

### THIRD CLAIM FOR RELIEF

*Tortious Interference with Prospective Economic Advantage*
*– ORA's Relationship with Banco Venezolano*

162.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 161, inclusive, as if fully set forth herein.

163.    In December, 2012, ORA was in final negotiations with Banco Venezolano to enter into a consulting relationship.  That relationship was to pay ORA no less than $20,000 per month.

164.    Each Defendant knew of the relationship between ORA and Banco Venezolano, and knew that those parties were in final negotiations to begin a consulting relationship.

165.    Defendants Betancourt and Trebbau, with the agreement of Defendant D'Agostino, took steps to, and did, make false statements to officials of Banco Venezolano, with

the purpose of inducing it to terminate the business relationship, and to withhold future business from ORA.

166.     Defendants made false statements to Banco Venezolano with the purpose of inflicting harm upon ORA; specifically, the false statements were made with the purpose of causing Banco Venezolano to terminate negotiations with ORA, and withhold future business from ORA, thereby causing ORA substantial economic damage.

167.     Defendants' actions wrongfully interfered with ORA's relationship with Banco Venezolano.

168.     As a direct and proximate cause of Defendants' wrongful interference with the business relationship between ORA and Banco Venezolano, Banco Venezolano terminated its negotiations with ORA and refused to do future business with ORA.  But for Defendants' wrongful interference, ORA's relationship with Banco Venezolano would have been consummated and continued into the future.

169.     ORA has suffered substantial damages as a result of Defendants' unlawful interference.

170.     By reason of the foregoing, ORA is entitled to compensatory damages in an amount to be determined at trial, but not less than $1,000,000.

## FOURTH CLAIM FOR RELIEF

### *Trade Libel/Injurious Falsehood/Defamation*

171.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 170, inclusive, as if fully set forth herein.

172.     Defendants knowingly published false and derogatory statements about ORA, including that ORA was in business with disreputable individuals and entities, *i.e.*, Defendants Betancourt, Trebbau, D'Agostino, and Derwick Associates.  Defendants knew or should have known that these false statements would denigrate ORA's reputation and discourage others from dealing with ORA.

173.     The false and defamatory statements concerning ORA constitute defamation and/or defamation *per se*.

174.     Defendants published these false statements of fact to third persons with the purpose of inflicting harm upon ORA; specifically, the false statements were published with the purpose of ruining ORA's business reputation, impugning the integrity of the business and causing clients to terminate their business relationships with, and potential clients to withhold future business from, ORA.

175.     Individuals and entities, namely Cedeño and Banco Venezolano, did in fact terminate their business relationships with ORA and/or refuse to do business with ORA because of Defendants' false statements.

176.     Defendants' false and defamatory statements concerning ORA were made maliciously, knowingly, willfully and in conscious disregard of ORA's rights, and were specifically intended to – and did – cause damage to ORA's reputation and business.

177.     ORA has suffered, and continues to suffer, substantial damages as a result of Defendants' defamatory statements.

178.     By reason of the foregoing, ORA is entitled to compensatory and punitive damages in an amount to be determined at trial but not less than $2,000,000.

## FIFTH CLAIM FOR RELIEF

### *Defamation of Ambassador Reich*

179.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 178, inclusive, as if fully set forth herein.

180.    Defendants knowingly published false and defamatory statements about Ambassador Reich, including that Ambassador Reich is personally and professionally associated with, and does business with, disreputable individuals and entities, *i.e.*, Defendants Betancourt, Trebbau, D'Agostino, and Derwick Associates.

181.    The false and defamatory statements concerning Ambassador Reich constitute defamation and/or defamation *per se*.

182.    The false and defamatory statements published by Defendants, as reasonably understood, impugn the integrity, credibility and reputation of Ambassador Reich, and discourage individuals and entities, including potential clients, from associating with him and/or seeking his services, thus injuring him in his business, ORA.

183.    Defendants knowingly and willfully published the false statements of fact with the purpose of inflicting harm upon Ambassador Reich.  By publishing and disseminating the false statements, Defendants intended to besmirch Ambassador Reich's good name and reputation in the community and cause others to terminate their business and other relationships with him and refuse to be associated with him.

184.    Defendants knew or reasonably should have known that the statements were false at the time they were published, and continue to be false today, and Defendants have no evidence to the contrary.

185.   The false and defamatory statements concerning Ambassador Reich were made maliciously, knowingly, willfully and in conscious disregard of Ambassador Reich's rights, and were specifically intended to – and did – cause damage to Ambassador Reich's character, reputation and business.

186.   Ambassador Reich has suffered, and continues to suffer, substantial damages as a result of Defendants' defamatory statements.

187.   By reason of the foregoing, Ambassador Reich is entitled to compensatory and punitive damages in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF

#### *Civil Conspiracy*

188.   Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 187, inclusive, as if fully set forth herein.

189.   Each of the Defendants, together with the others, conspired with respect to Counts II through V and acted in concert to commit unlawful acts.  Defendants conspired to engage in these actions with the unlawful objective of interfering with ORA's business relationships by impugning Ambassador Reich's integrity, credibility and reputation; undermining the confidence of ORA's clients and prospective clients; deterring ORA's clients and prospective clients from using ORA's services; and injuring Ambassador Reich in his livelihood.  Each of the Defendants understood the objectives of the scheme, and accepted them, and was an active and knowing participant in the conspiracy.

190.    Defendants' conspiracy was implemented through the commission of various wrongful and overt acts, including but not limited to, publishing and disseminating false statements about Ambassador Reich and ORA and committing other unlawful acts.

191.    As a direct and proximate result of the operation and execution of the conspiracy committed by Defendants, Plaintiffs have suffered and continue to suffer substantial damages.

192.    By reason of the foregoing, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, but not less than $2,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment against Defendants as follows:

a.  Awarding compensatory damages in an amount to be determined at trial but not less than $2,000,000;

b.  Awarding treble damages as authorized by 18 U.S.C. § 1964;

c.  Awarding punitive damages in an amount to be determined at trial;

d.  Awarding Plaintiffs their costs and disbursements plus attorneys' fees; and

e.  Granting such other relief as the Court deems just and proper.

Dated:  New York, New York
        July 30, 2013

Respectfully submitted,

SMITH VALLIERE PLLC

By:
            Mark W. Smith
            Noelle Kowalczyk
            John D. Castiglione

75 Rockefeller Plaza, 21st Floor
New York, New York 10019
Phone:  (212) 755-5200
Facsimile:  (212) 755-5203
msmith@svlaw.com
nkowalczyk@svlaw.com
jcastiglione@svlaw.com

*Attorneys for Plaintiffs Otto J. Reich
and Otto Reich Associates, LLC*