## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| THE HONORABLE OTTO J. REICH and OTTO REICH ASSOCIATES, LLC, | ) ) ) |  |
| Plaintiffs, | ) ) | Civ. No. 13 CV 5307 |
| v. | ) ) | Jury Trial Demanded |
| LEOPOLDO ALEJANDRO BETANCOURT LOPEZ, PEDRO JOSE TREBBAU LOPEZ, and FRANCISCO D'AGOSTINO CASADO, | ) ) ) ) | ECF CASE |
| Defendants. | ) ) ) |  |

_____ )

## FIRST AMENDED COMPLAINT

Plaintiffs, the Honorable Otto J. Reich and Otto Reich Associates, LLC, by and through their attorneys Smith Valliere PLLC, for their First Amended Complaint against Defendants Leopoldo Alejandro Betancourt Lopez, Pedro Jose Trebbau Lopez, and Francisco D'Agostino Casado, allege as follows:

## NATURE OF THE ACTION

1.     The Honorable Otto J. Reich ("Ambassador Reich") is the former U.S. Ambassador to Venezuela.  Over his long and distinguished career, Ambassador Reich served in prominent positions in the U.S. Department of State, focusing on Latin America and the Caribbean.  For his work as Ambassador, Reich was awarded the highest commendations of the U.S. Department of State.  Over his many decades of public service, Ambassador Reich focused on the cultures of corruption that plague many governments in Latin America.  In particular,

Ambassador Reich has repeatedly spoken out against the corruption that flourished in Venezuela under the regime of Hugo Chavez, which continues to exist today.

2.     Since his retirement from government service in 2004, Ambassador Reich has continued to publicly condemn corruption in Venezuela and around the world, and assist those who believe, as he does, in democracy, transparent government, and the rule of law. Ambassador Reich has written numerous articles, delivered speeches, and offered congressional testimony throughout the United States on the problems facing many Latin American countries. Through his company Otto Reich Associates, LLC ("ORA"), Ambassador Reich has also consulted with a number of pro-democracy and anti-corruption organizations and individuals throughout the United States, assisting them in their public relations and business efforts here and abroad.  Many of those individuals and organizations are based in the United States and are vocal opponents of the current regime in Venezuela.

3.     Defendants are U.S. residents who have amassed enormous fortunes through an illicit scheme to secure energy-industry contracts in Venezuela for their various U.S.-based companies, Derwick Associates USA LLC and Derwick Associates Corporation (together with these companies' predecessors, successors, assigns and affiliates, "Derwick Associates"). Known in the press as the "ChavezKids," "BoliBoys," and "the mafiosi of the Fifth Republic," Defendants Leopoldo Alejandro Betancourt Lopez ("Betancourt"), Pedro Jose Trebbau Lopez ("Trebbau"), and Francisco D'Agostino Casado ("D'Agostino) have profited wildly from their ongoing illegal bribery scheme designed to exploit for their personal financial gain the corrupt and anti-democratic Chavez regime.

4.     Derwick Associates' "business model" is simple.  From their home base of operations in the United States, Defendants offer multi-million dollar kickbacks to public

officials in Venezuela in exchange for the award of energy-sector construction contracts. Once

the contracts are secured for themselves and Derwick Associates (and the money ultimately

transferred into bank accounts in New York), Defendants skim millions off the top, which they

deposit in U.S. banks. Defendants then subcontract out the actual work to be performed on site

to other U.S.-based companies, including one based in Missouri. Thus, Defendants' primary and

ongoing business is improperly obtaining energy-sector contracts through bribery. Any

legitimate work done pursuant to those contracts is performed by others. Defendants run their

illegal scheme from their homes and offices in New York, through various agents, and through

their U.S.-based companies and relationships. Defendants secured their first contract in 2009

and continue to actively "court" Venezuelan and other government officials responsible for

awarding new contracts. Recently, Derwick Associates registered with the United States

government to engage in lobbying activities in the United States.

     5.     Defendants' pattern of racketeering activity has been a huge financial boon to

Defendants Betancourt, Trebbau, and D'Agostino, all of whom enjoy lifestyles of extreme

wealth in the United States.

     6.     While rampant public corruption is a reality in Venezuela, not everyone stands

silent. In recent years, a number of respected individuals and institutions in the United States

have begun to speak out against the "ChavezKids" and their ilk, unwilling to allow the continued

fleecing of Venezuela. Fearing exposure, Defendants have taken extreme measures to conceal

their ongoing unlawful actions. Among other actions, Defendants have committed wire fraud,

while deploying abusive business practices, threats of lawsuits in U.S. courts, and other improper

means to silence their opponents. Defendants' efforts in this regard send an unmistakable

message of intimidation to anyone who might expose their illegal practices and alter the status quo.

7.    In September 2012, when Defendants became convinced that Banco Venezolano de Credito S.A. ("Banco Venezolano") was threatening to expose their criminal activities, Derwick Associates and two of its principals, Betancourt and Trebbau, each individually, filed related civil lawsuits for defamation in Florida and in New York against, among others, Banco Venezolano.  Banco Venezolano is one of the oldest and most respected banks in Venezuela, which does business in the United States.  The leaders of Banco Venezolano are known as vocal critics of the Chavez regime – so much so that Banco Venezolano refuses to do business with the Venezuelan government.

8.    In the Florida lawsuit, *Derwick Associates Corp., et al. v. Venezolano de Credito, S.A., et al.*, No. 12-36297-CA-11 (Cir. Ct. 11th Dist. Miami-Dade Co.) (hereinafter, the "Florida Defamation Suit"), Derwick Associates, Betancourt and Trebbau accused Banco Venezolano, its President and Board Chairman Oscar Garcia Mendoza, and others of defaming Derwick Associates by financing an anti-Chavez, anti-Derwick website, thus allegedly damaging Defendants' reputation.  In sum and substance, the "anti-Derwick" statements posted on the Internet and purportedly repeated in various news outlets attacked Defendants' youth and inexperience and accused them of illegally amassing enormous fortunes arising from their obscene and illegal business arrangements with the Venezuelan government.  The Florida and New York defamation suits were commenced as an effort to quell the public uprising against Defendants' corrupt activities.  Tellingly, Defendants did not commence suit in Venezuela but, rather, in the United States, thus facilitating the rapid spread of information about their lawsuit via the Internet.

9.      In the Florida Defamation Suit, Defendants sought the outrageous sum of *$300 million*, a clear effort to bully the bank into quiescence, prevent others from threatening to expose their scheme, and provide comfort to Defendants' New York bankers and money managers who had undoubtedly heard the allegations that were the subject of the Florida Defamation Suit and were presumably growing worried about holding Defendants' funds and accounts.

10.     To Defendants' surprise, Banco Venezolano fought the Florida Defamation Suit vigorously.  Soon after that lawsuit was commenced, the bank sought immediate discovery including the deposition of a representative of Derwick Associates concerning its allegations of wrongful conduct, namely, the alleged defamatory statements.  That deposition was scheduled to occur on December 19, 2012, but no representative of Derwick Associates appeared for the deposition.  Instead, Derwick Associates moved for a stay of discovery and protective order. Needless to say, it is atypical for an earnest plaintiff to seek to stay discovery and thus intentionally delay its opportunity to prove its case.

11.     When Defendants learned that Banco Venezolano sought to retain Ambassador Reich and his U.S.-based consultancy, ORA, to, among other things, help defend against Defendants' allegations in the Florida Defamation Suit, Defendants reacted by committing multiple acts of wire fraud in an attempt to prevent the disclosure and termination of their illegal conspiracy.

12.     Ambassador Reich's potential engagement by Banco Venezolano was a direct threat to Defendants' then-existing, multi-year and ongoing pattern of racketeering as well as their related campaign of intimidation against Banco Venezolano (and others).  The union of a respected financial institution, on the one hand, and a highly-regarded and well-connected former

U.S. government official, on the other hand, both of whom had spent decades rallying against the corrupt status quo in Venezuela and the foreigners who benefited therefrom, posed an immediate threat of revealing Defendants' unlawful activities.  Defendants understood the significance of a business alliance between Banco Venezolano and Ambassador Reich, which Defendants feared might reveal the unholy alliance between Defendants and certain Venezuelan government officials.  Given the actual and perceived risk of exposure, Defendants embarked upon an unlawful effort to drive a wedge between Banco Venezolano and Ambassador Reich.  Defendants Betancourt, Trebbau, and D'Agostino conspired to discredit Ambassador Reich in the eyes of Banco Venezolano in the most effective way they knew how – tying Ambassador Reich to Derwick Associates.

13.     In a series of telephone calls placed from or caused to be placed from New York in late 2012, Defendants and their agents (at Defendants' direction) fraudulently told officials of Banco Venezolano and others in the small Venezuelan émigré community in the U.S. that Ambassador Reich was working for Derwick Associates.  That was blatantly false and was known by Defendants to be false.

14.     Nevertheless, the fraud worked.  Once Banco Venezolano heard that its potential consultant was working for the people who were suing it (and who had profited from the corrupt Chavez regime), Banco Venezolano pulled out of its agreement with ORA.  At the same time, another client of ORA, a well-regarded U.S.-based businessman named Eligio Cedeño ("Cedeño") (who himself has long been an enemy of the corrupt Chavez regime) also terminated his contractual and financial relationship with ORA.  Cedeño, like the bank, had also been told (falsely) by Defendants that Ambassador Reich was working for Derwick Associates, including in connection with a project in Panama.  Taken together, the loss of those agreements and

business relationships cost Plaintiffs a substantial amount of money and property.  Additionally, Defendants tarnished the reputation of an American citizen who has spent decades decrying corrupt business practices of individuals like Betancourt, Trebbau and D'Agostino.

15.     Defendants' scheme to bribe foreign public officials from their lap of luxury in the United States, and cover up their actions here in the United States, violates federal law, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*  Defendants engaged in a pattern of racketeering activity that violated, among other laws, the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, and the federal wire fraud statute, 18 U.S.C. § 1343.  Defendants' racketeering activity is ongoing.

16.     Defendants' actions also constitute a violation of various state laws.  Defendants intentionally targeted ORA and specifically sought to deprive Ambassador Reich and ORA of their business property and cash through a fraudulent scheme designed to perpetrate lies about Ambassador Reich and ORA, thereby interfering with and destroying Plaintiffs' U.S.-based and U.S.-focused business arrangements with Banco Venezolano and Eligio Cedeño.  Defendants' willful and fraudulent actions have caused substantial damage to Ambassador Reich's and ORA's business and property.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1332 (diversity jurisdiction); and 18 U.S.C. § 1964 (Racketeer Influenced and Corrupt Organizations Act).  The amount in controversy here exceeds $75,000.

18.     Further, pursuant to 18 U.S.C. § 1965(b), the ends of justice require that the Court exercise personal jurisdiction over any Defendant who claims not to have contacts with this

forum.  Defendants engaged in a multi-district conspiracy to defraud and discredit Ambassador

Reich.  This Court has personal jurisdiction over most, if not all, of the alleged co-conspirators,

and each and every one of the alleged co-conspirators here has previously availed themselves of

the courts in New York to vindicate their legal rights.

19.     This Court has supplemental jurisdiction over the state causes of action pursuant

to 28 U.S.C. § 1367(a), as those state law causes of action arise out of the same nucleus of

operative facts, which support the federal claims.

20.     Venue is proper in the Southern District of New York under 18 U.S.C. § 1965 and

28 U.S.C. § 1391, in that each Defendant owns property, conducted business, and/or has been

found in the Southern District of New York during the relevant time periods.  A substantial

portion of the communications, transactions, and events underlying Plaintiffs' claims occurred in

this judicial district.

## PARTIES

### *Plaintiffs Otto J. Reich and Otto Reich Associates, LLC*

21.     Plaintiff Otto J. Reich is a citizen of the United States.  He is domiciled in the

State of Virginia.

22.     Plaintiff ORA is a Virginia limited liability company with its principal place of

business located at 1001 Pennsylvania Avenue, 11th Floor, Washington, DC.  ORA regularly

conducts business in the United States including in New York, Florida, Maryland and Virginia.

ORA and Ambassador Reich regularly conduct business in the Southern District of New York,

and conducted business in this judicial district during the relevant time periods as described in

this First Amended Complaint.  Ambassador Reich is the founder and principal of ORA.

Ambassador Reich is and always has been the sole owner and member of ORA.

23.     At all relevant times, Plaintiffs were "persons" within the meaning of that term as defined by 18 U.S.C. § 1961(3).

***Defendants Betancourt, Trebbau, and D'Agostino***

24.     Defendant Leopoldo Alejandro Betancourt Lopez ("Betancourt") is a citizen of Venezuela who resides primarily in the United States.  Betancourt was born in February 1980 and is 33 years old.  He is a graduate of Suffolk University in Boston, Massachusetts.  On the date of the first energy contract awarded to Derwick Associates, Betancourt was only 29 years old.

25.     Upon information and belief, during the relevant time period, Betancourt owned a home located at the famous Olympic Tower, 641 Fifth Avenue, Penthouse 6, New York, New York 10022, where he continues to reside today.  Betancourt also, upon information and belief, owns real and other property in Florida.  Upon information and belief, during the relevant time period (and continuing today), Betancourt regularly conducted business from New York, including from his home in New York and offices located at 450 Park Avenue, New York, New York 10022.

26.     Defendant Pedro Jose Trebbau Lopez ("Trebbau") is a citizen of Venezuela who resides primarily in the United States.  Trebbau was born in September 1983 and is 30 years old.  He is a graduate of Boston College in Massachusetts.  On the date of the first energy contract awarded to Derwick Associates, Trebbau was only 26 years old.

27.     Upon information and belief, during the relevant time period (and continuing today), Trebbau regularly conducted business from New York, including from offices located at 450 Park Avenue, New York, New York 10022.  During the relevant time period (and continuing today), Trebbau owned property in Florida.

28.     Defendant Francisco D'Agostino Casado ("D'Agostino") is a dual citizen of Venezuela and Spain who resides primarily in New York, New York.  D'Agostino graduated from Boston College in Massachusetts.  Upon information and belief, during the relevant time period (and continuing today), D'Agostino owned a home located at 82 Elm Street, Southampton, New York 11968.  Upon information and belief, D'Agostino currently resides at 10 East 75th Street, New York, New York 10021 and formerly resided in the Penthouse Apartment at 807 Park Avenue, New York, New York.

29.     During the relevant time period (and continuing today), D'Agostino regularly conducted business from New York.  Upon information and belief, D'Agostino conducted business in New York from his homes in New York and from offices located at 450 Park Avenue, New York, New York 10022.  According to a U.S. Securities and Exchange Commission filing, D'Agostino is the owner of a U.S. investment company with offices in New York City.

### *Defendants are Subject to Jurisdiction in New York*

30.     This Court has personal jurisdiction over Defendant D'Agostino, who resides in New York, and who was served personally with the Summons and Complaint (the "Original Complaint") in this action at his home located at 82 Elm Street, Southampton, New York.  As long as this Court has personal jurisdiction over any one Defendant, it has jurisdiction over each other Defendant alleged to be part of the RICO conspiracy.

31.     Defendant Betancourt only evaded personal service in New York as a result of his quick-thinking doorman.  When the professional process server attempted to serve him at his 641 Fifth Avenue residence on July 31, 2013, the doorman admitted that Defendant Betancourt "was home."  Only after discovering that the process server was there to serve legal papers, did the

doorman say that Betancourt was "not home."  Betancourt's longtime New York corporate

counsel, who is located in Manhattan, subsequently accepted service on Betancourt's behalf.

32.    Even absent personal service on D'Agostino, Defendants have minimum contacts

with New York sufficient to subject them to general jurisdiction in this forum.  As detailed more

fully below, each Defendant owns property, conducts business, and/or has been found in New

York during the relevant time periods.  New York is also where a substantial portion of the

communications, transactions, and events underlying Plaintiffs' lawsuit occurred.  Each

Defendant has engaged in a continuous and systematic course of doing business in this forum.

33.    Defendants are also subject to specific jurisdiction in this forum for many reasons,

not the least of which is that each Defendant and/or his agent has purposefully availed himself of

the privilege of transacting business within the state.

34.    Indeed, Defendants should reasonably expect to be haled into court in this forum

having invoked the benefits and protections of the New York courts and New York State laws.[1]

On September 24, 2012, less than two weeks after commencing the Florida Defamation Suit,

Defendants Betancourt and Trebbau and Derwick Associates commenced a related litigation in

New York State court alleging, among other things, claims for defamation like in the Florida

Defamation Suit.  *See Derwick Associates Corp., et al. v. John Does 1-10* (Supreme Court of the

---

[1]      D'Agostino is no stranger to the New York courts.  In *D'Agostino v. 813 Park Avenue Holdings, LLC, et al.* (Supreme Court of the State of New York, County of New York), Index No. 160750/13 (the "Park Avenue Action"), D'Agostino is currently seeking over $325,000 plus treble damages and attorneys' fees concerning a lease dispute over his former penthouse residence at 807 Park Avenue, New York, New York.  D'Agostino is being represented by New York lawyer Lawrence E. Fabian ("Fabian') who has represented and presumably been paid by D'Agostino in the Park Avenue Action and various other suits over the last six years.  It has been reported that, on or about October 2007, Fabian represented D'Agostino in a $100,000 breach of contract action arising from D'Agostino's lease of a waterfront home in Sag Harbor, New York.  D'Agostino also availed himself of the jurisdiction of this Court in *D'Agostino v. American Express Centurion Services Corp.* (United States District Court for the Southern District of New York), Civ. No. 09 CV 4683, where he alleged violations of the federal Truth in Lending Act arising from an alleged improper charge of $65,000 on D'Agostino's American Express Centurion Card (also known as the "AmEx Black Card," which is reportedly one of the most exclusive charge cards in the world).  Fabian represented D'Agostino in that lawsuit.

State of New York, County of New York), Index No. 653345/12 (hereafter, the "New York Defamation Suit").  That action was brought against "John Does 1-10" who were defined as "unknown defendant co-conspirators [of the bank defendants in the Florida Defamation Suit] who participated in the conspiracy and campaign to disseminate false and defamatory information about" Betancourt, Trebbau and Derwick Associates.  Like the Florida Defamation Suit, the New York Defamation Suit sought damages for "egregiously false and defamatory statements" allegedly posted by those defendants and that were "intended to … destroy [Betancourt, Trebbau and Derwick Associates'] current and prospective business and banking relationships, which are indispensable to the operation, expansion and success of Derwick."

35.     Plaintiffs' claims here put squarely at issue Defendants' allegedly unlawful business practices, which were also at the factual heart of the Florida and New York defamation suits.

36.     Betancourt, Trebbau and Derwick Associates hired a New York law firm to represent their interests in the Florida Defamation Suit and the New York Defamation Suit (the "New York Counsel").  In fact, simultaneously with the filing of the Florida complaint and the issuance of the summonses, New York Counsel filed motions for *pro hac vice* on behalf of three of their New York lawyers demonstrating that both the Florida and New York defamation suits (and all strategies and decisions concerning the same) would be assessed in and executed from New York.  Upon information and belief, in connection with that representation, Defendants Betancourt and Trebbau executed retainer agreements in at least their personal capacities with New York Counsel; paid legal fees to New York Counsel in New York in U.S. dollars; and regularly communicated with New York Counsel either in person at their attorneys' offices in

New York or through phone calls, electronic mail or facsimile communications directed to New York.

37.     Upon information and belief, virtually all legal work undertaken in connection with the Florida and New York Defamation Suits was conducted primarily, if not exclusively, by Betancourt and Trebbau's New York Counsel.  Thus, all decisions concerning the commencement, prosecution and eventual settlement of the claims brought in the Florida and New York defamation suits were made by New York Counsel in New York.  Such strategic decisions would have included, at the most basic level, who to sue, where to sue, when to sue, an evaluation of potential claims and likely defenses, an assessment and determination of damages (*$300 million* in the Florida Defamation Suit), discovery to be sought and how best to respond to discovery demands, and, of course, settlement recommendations and negotiations.  New York Counsel also would have recommended and evaluated potential experts to be retained by Betancourt, Trebbau and Derwick Associates and developed a list of likely candidates.  Upon information and belief, such New York-based discussions certainly would have included mention of Ambassador Reich who would have been on the "short list" of potential experts to be considered or otherwise addressed.

38.     Prior to October 2013, New York Counsel represented Betancourt in this litigation.  Although Betancourt has since retained yet another New York law firm, New York Counsel continue to monitor this case, including by sending an attorney from the firm to observe this Court's conference on December 17, 2013.

39.     Further, upon information and belief, each Defendants is a principal of Derwick Associates and, thus, Derwick Associates' contacts with New York are attributable to each Defendant where Derwick Associates engaged in purposeful activities in New York; Derwick

Associates' activities were performed for the personal benefit of each of the Defendants and with the knowledge and consent of each of the Defendants; and each of the Defendants exercised, operated and managed Derwick Associates.

40.     On or about December 23, 2013, Defendants Betancourt and Trebbau moved to dismiss the Original Complaint in this action pursuant to, among other things, Rule 12(b)(2) of the Federal Rules of Civil Procedure.  Noticeably absent from these Defendants' submissions were sworn affidavits by either of them contesting the jurisdiction of this Court.  Tellingly, neither Betancourt nor Trebbau submitted a sworn statement attesting that, among other things, they have no presence in New York, do not own property in New York, do not have a bank account in New York, have not transacted business within New York, have not supplied or received goods or services within New York, have not solicited business in New York, and/or have not engaged in any persistent course of conduct or derived revenue from New York.

## DETAILED ALLEGATIONS

### *Former Ambassador Otto Reich is a Distinguished Individual Who Has Been Outspoken About Corruption in Venezuela*

41.     United States Ambassador Reich was born in Cuba.  In 1960, shortly after Fidel Castro came to power, he moved to the United States with his family.  After college, he joined the U.S. Army, serving as a lieutenant in the U.S. Army's 3rd Civil Affairs Group (Airborne), Panama Canal Zone.

42.     From 1981 to 1983, Ambassador Reich was Assistant Administrator of the U.S. Agency for International Development (USAID) in charge of U.S. economic assistance to Latin America and the Caribbean.  From 1983 to 1986, he served as Special Advisor to the Secretary of State, where he directed the Office of Public Diplomacy for Latin America and the Caribbean.

43.    From 1986 to 1989, Ambassador Reich served as U.S. Ambassador to Venezuela. For his work as Ambassador, Reich was awarded the highest commendations of the U.S. Department of State.  In 1991 and 1992, as a private citizen and at the request of President George H. W. Bush, Ambassador Reich served as Alternate U.S. Representative to the United Nations' Human Rights Commission in Geneva.  During his long career, Ambassador Reich has also served as Washington Director of the Council of the Americas, Community Development Coordinator for the City of Miami, and International Representative of the State of Florida Department of Commerce.

44.    In 2001, Ambassador Reich was appointed by President George W. Bush to be the Assistant Secretary of State for Western Hemisphere Affairs.  In 2003, he became the President's Special Envoy for Western Hemisphere Initiatives, and a Senior Staff member of the National Security Council.  Ambassador Reich retired from government service in June 2004.

45.    Following his exit from government service, Ambassador Reich focused full-time on ORA, which is a Washington, D.C.-based consulting firm providing government relations, trade, investment, and anti-corruption advice, primarily to U.S.-based clients.  ORA's services are sought mainly by U.S.-based businesses and organizations with operations in Latin America, who believe similarly to Ambassador Reich that foreign corruption is a threat to their honest business efforts, and who seek to protect themselves against undue influence by foreign public officials, and need assistance navigating industries in which competitors may be benefiting from corruption.  Indeed, Ambassador Reich markets himself as a fighter of corruption in Latin America.  On ORA's website, it states that "ORA also protects corporations from the constant threat of corruption throughout [Latin America].  We use our experience and knowledge of U.S.

policy to defend clients' interests against improper business practices and undue influence by public and private officials."[2]

46.     Ambassador Reich appears regularly in the U.S. media, and has spoken extensively about the political situation in Venezuela, including about public corruption in the Venezuelan energy sector.  Ambassador Reich has described himself as "very critical of the organized crime enterprise misruling Venezuela."[3]

***Derwick Associates is a U.S.-based Enterprise that is Managed and Directed from the United States by Defendants Betancourt, Trebbau, and D'Agostino***

47.     At all relevant times, Defendants Betancourt, Trebbau, and D'Agostino worked together as each other's agents and partners, and were the owners and/or officers, directors, or operators of Derwick Associates USA LLC and Derwick Associates Corporation, and these entities' predecessors, successors, assigns and affiliates ("Derwick Associates").

48.     As part of their pattern of racketeering activity, Defendants direct, control and coordinate virtually all aspects of global strategy, as well as the day-to-day activities of Derwick Associates, from their offices and homes in New York and Florida, including from 450 Park Avenue, New York, New York 10022.  It is from these locations that decisions are made concerning Derwick Associates.

49.     In a court filing in the Florida Defamation Suit, Defendant Betancourt stated that he is "co-founder and President of Derwick … [and] is responsible for the origination, structuring and execution of all Derwick projects, and has primary responsibility for the management of Derwick Associates' relationships with its clients, suppliers, and regulators."

---

[2]     *See* ORA's website, *available at* http://www.ottoreich.com/www.ottoreichassociates.com/Capabilities_%26_Services.html (last accessed January 12, 2014).

[3]     *See* Otto J. Reich, "Rebutting Maduro's Malicious Allegations," Americas Forum, March 19, 2013, *available at* http://www.americas-forum.com/otto-reich-rebutting-maduros-malicious-allegations/ (last accessed January 9, 2014).

50.     Also in the Florida Defamation Suit, Defendant Trebbau stated that he is "co-founder and Vice President of Derwick … [and] has primary responsibility for the supervision of operations of all projects, and is directly responsible for the execution of large EPC contracts in Venezuela … [and] managing *the day-to-day relationships with Derwick's international banks*" (emphasis added).  Upon information and belief, the banks with which Trebbau has "day-to-day relationships" are the New York-based J.P. Morgan, which has its headquarters on Park Avenue in New York, New York, and the Davos Financial Group, which is located on Park Avenue in New York, New York.

51.     Derwick Associates holds itself out as being in the business of providing engineering, procurement and construction services involving power plants to the government of Venezuela.  Yet, Derwick Associates itself lacks the technology and engineering wherewithal to engage in or evaluate such large-scale, heavy duty industrial projects.  By Defendants' own admissions, Derwick Associates relies heavily on several U.S.-based companies, including General Electric, Pratt & Whitney, and ProEnergy Services, LLC ("ProEnergy Services") to provide the materials and services needed to construct the power plants.

52.     ProEnergy Services, the company believed to do all the actual construction and operation of Derwick Associates' facilities, has long been headquartered in Missouri and has since 2008 been licensed to do business in New York.  General Electric is a New York Stock Exchange-traded company headquartered in Connecticut.  Pratt & Whitney is based in Connecticut and is owned by United Technologies, another New York Stock Exchange-traded company.

53.     During the relevant time period, Derwick Associates USA LLC ("Derwick Associates USA") was registered as a Florida Limited Liability Company, FEI/EIN

No. 274195456.  Derwick Associates USA has a place of business located at 1050 Lee Wagner Boulevard, Suite 200-201, Fort Lauderdale, Florida 33315.

54.    During the relevant time period, Defendant Betancourt was on file with the State of Florida as Derwick Associates USA's registered agent, and Defendants Betancourt and Trebbau were on file with the State of Florida as Manager/Members of Derwick Associates USA.

### *Corruption in Venezuela's Government Contracting and Energy Sector*

55.    Bribing public officials is illegal in Venezuela.  Nevertheless, the country has become a breeding ground for public corruption, especially when it comes to the awarding of public contracts.  As noted by the U.S. Department of State and others:

- The U.S. Department of State recognizes Venezuela as being corrupt and of risk to companies seeking to do business there.  As stated in its *2013 Investment Climate Statement* on the country, the State Department warns U.S. businesses that "Venezuela's regulatory system lacks transparency and suffers from corruption," and notes that "Venezuela has not adopted the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions."[4]

- Venezuela is ranked number 165 out of 176 nations in the world in Transparency International's 2012 "*Corruption Index*"; in other words, Venezuela is one of the eleven worst countries in the world in terms of public corruption.  Transparency International also described Venezuela's public budget transparency as "minimal."[5]

- As noted by the U.S. Department of State, "[i]n 2012, Venezuela ranked 174 out of 177 in the Heritage Foundation's Index of Economic Freedom."[6]

- In 2012, *The New York Times* noted that "[t]he story of how power failures can plague Venezuela even though it boasts some of the world's greatest

---

[4]      *See* United States Department of State, *2013 Investment Climate Statement – Venezuela, available at* http://www.state.gov/e/eb/rls/othr/ics/2013/204759.htm (last accessed January 9, 2014).

[5]      *See* Transparency International *2012 Corruption Index*, *available at* http://www.transparency.org/country#VEN_DataResearch_SurveysIndices (last accessed January 9, 2014).

[6]      *See* United States Department of State, *2013 Investment Climate Statement – Venezuela*, *available at* http://www.state.gov/e/eb/rls/othr/ics/2013/204759.htm (last accessed January 9, 2014).

natural gas reserves and massive hydroelectric dams is the Chávez years in miniature — a heady cocktail of ideological rigidity, corruption and mismanagement."[7]

56.     The U.S. government has identified and acted on many U.S.-based kickback schemes designed to exploit the Venezuelan market.  Indeed, unwilling to tolerate bribery and kickbacks by U.S.-connected persons operating in Venezuela, the U.S. government has acted to hold such people accountable.  For instance, in 2008, the SEC brought a civil enforcement action against a foreign unit of Siemens in the Southern District of New York, alleging violations of the Foreign Corrupt Practices Act for paying bribes to government officials who "had influence over" the public contracting process in Venezuela to build metro transit lines.

57.     In May 2013, the U.S. Department of Justice filed criminal charges in the Southern District of New York against two U.S.-based broker-dealers, Alberto Clarke Bethancourt and Jose Alejandro Hurtado, for conspiring to pay bribes to a Venezuelan public official in exchange for financial trading business.  According to the U.S. government, "defendants in this case allegedly paid huge bribes so that foreign business would flow to their firm … defendants' arrests lay bare a web of bribery and corruption in which employees of a U.S. broker-dealer allegedly generated tens of millions of dollars through transactions in order to fund kickbacks to a Venezuelan government official in exchange for her directing the Venezuelan economic development bank's financial trading business to their employer."[8]  In

---

[7]        *See, e.g.,* "Full of Gas," *The New York Times/International Herald Tribune*, Sept. 21, 2012, *available at* http://latitude.blogs.nytimes.com/2012/09/21/chavezs-electric-power-problem/ (last accessed January 9, 2014) (emphasis added).  Besides corruption in the public contracting sector, the Venezuelan government suffers from corruption in its justice and police systems.  For instance, the U.S. Department of State warns travelers that "the criminal threat level for Caracas [is] CRITICAL," due in part to "poorly paid and often corrupt police [and] an inefficient politicized judiciary."  U.S. Department of State, *Venezuela 2012 Crime and Safety Report*, *available at* https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=13038 (last accessed January 9, 2014).

[8]        *See* U.S. Department of Justice Press Release, May 7, 2013, *available at* http://www.justice.gov/opa/pr/2013/May/13-crm-515.html (last accessed January 9, 2014).

August 2013, Alberto Clarke Bethancourt and Jose Alejandro Hurtado pleaded guilty in New York federal court (Southern District of New York) for their roles in the bribery schemes.

58.     On October 14, 2013, it was reported that two Spanish officials were charged with approving $30 million in kickbacks to two former Venezuelan military officers, in exchange for their assistance in securing Venezuela's purchase of eight military vessels.  According to the report, the contract prices for the vessels were massively inflated to supply the money needed to fund the kickbacks.[9]

59.     Things are no different today in Venezuela's energy sector, which is rife with opportunity for parties willing to "pay to play."

***Defendants, From the United States and Through***
***<u>Derwick Associates, Exploit the Opportunity for Corruption in Venezuela</u>***

60.     Defendants use Derwick Associates to secure inflated public contracts in Venezuela, paying public officials large payments in exchange for awarding them contracts, and unjustly enriching themselves in the process.

61.     In the Florida Defamation Suit discussed above, Defendants Betancourt and Trebbau admit that "[b]etween 2009 and 2010, Derwick [Associates] submitted more than 25 bids on EPC projects and received EPC contracts on twelve of those projects."

62.     The truth, of course, is far more complicated (and much less flattering to Defendants).  As discussed in more detail below, from 2009 to 2010, Derwick Associates obtained at least a dozen energy-sector contracts valued at approximately *$1 billion* from agencies of the Venezuelan government, secured via illegal bribes, kickbacks and other unlawful activities, all in violation of United States law.

---

[9]     *See* El Universal, Former Spanish officials charged with payment of kickbacks in Venezuela," October 14, 2013, *available at* <u>http://english.eluniversal.com/economia/131014/former-spanish-officials-charged-with-payment-of-kickbacks-in-venezuel</u> (last accessed January 9, 2014).

63.     Because the factual particulars concerning Defendants' illicit schemes are peculiarly within the knowledge, possession and control of Defendants (and their co-conspirators), and because Defendants have every incentive to keep their transactions secret so as to prevent criminal prosecution and enable them to continue their profiteering, it is impossible to plead the granular details of Defendants' scheme.  Indeed, commentators have noted that an essential characteristic of a bribery scheme and corruption is maintaining the secrecy of the scheme:  "[corruption] is obviously a dangerous and seductive form of immorality:  it is difficult to detect, for it is in the interest alike of the giver and the receiver of the corrupt gift to keep the thing secret." [10]

64.     However, Plaintiffs have been able to uncover enough information to allege the following facts concerning Defendants' U.S.-conceived and executed pattern of racketeering activity.

### A.  Petroleos de Venezuela, S.A.

65.     Petroleos de Venezuela, S.A. ("PDVSA") is the Venezuelan state-owned corporation responsible for the nation's energy production.

66.     PDVSA has come under heavy scrutiny for years regarding its disorganization, inefficiency, and corruption, and has been the subject of multiple U.S. securities enforcement and civil litigation proceedings concerning bribes and kickbacks given to or solicited by PDVSA officials:

- In 2012, a court-appointed receiver in Connecticut filed suit in U.S. District Court for the District of Connecticut, alleging that the head of a U.S. asset management company paid millions of dollars in kickbacks to a senior PDVSA official in exchange for approval of certain financial transactions with the PDVSA.  *Carney v. Illarramendi, et al.,* No. 12-cv-00165 (D. Conn. 2012).

---

[10]     *See, e.g.*, LISSACK AND HORLICK ON BRIBERY, § 1.18, at 6 (2011) (citation omitted).

- In 2010, the Securities and Exchange Commission filed suit against Joe Summers, a U.S.-based operations manager for a BVI-based oil drilling company, alleging that he authorized payments to PDVSA officials in exchange for drilling contracts, in violation of the Foreign Corrupt Practices Act. *SEC v. Summers*, No. 10-cv-02786 (S.D. Tex. Aug. 5, 2010).

- In 2009, the Securities and Exchange Commission filed suit against Bobby Benton, a U.S.-based operations manager for an oil drilling company, for authorizing payments to PDVSA officials in exchange for drilling contracts, in violation of the Foreign Corrupt Practices Act. *SEC v. Benton*, No. 09-cv-03963 (S.D. Tex. Dec. 10, 2009).

- In 2008, PDVSA was sued by a Miami-based food company, which alleged that PDVSA cancelled contracts with it after the company refused to pay $2 million in bribes.

67.     In 2010, PDVSA's penchant for corruption again asserted itself in connection with its solicitation of construction contracts.  In mid-2010, PDVSA awarded contracts to Derwick Associates for the construction of four power plants in Venezuela.  The plants in question were to be located in the cities of Las Morochas, Barinas, El Furrial, and El Morichal.

68.     These contracts were not the subject of a public bidding process – a tell-tale mark of impropriety.  Indeed, in its resource manual for combatting foreign bribery by U.S.-based businesses, the Criminal Division of the U.S. Department of Justice and the Enforcement Division of the U.S. Securities and Exchange Commission specifically highlighted non-public bids as a common red-flag for bribery of foreign officials.[11]

69.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino agreed amongst themselves to attempt to entice and influence Venezuelan officials to award the contracts to Derwick Associates by way of offering kickbacks to those officials.  Upon securing the inflated contracts, Derwick Associates would subcontract out the work to various U.S.-based companies, including Missouri-based and New York-licensed ProEnergy Services, who would

---

[11]     *See* U.S. Department of Justice, *FCPA:  A Resource Guide to the Foreign Corrupt Practices Act*, *available at* http://www.justice.gov/criminal/fraud/fcpa/guide.pdf (last accessed January 9, 2014).

do substantially all of the actual construction.  Derwick Associates, having done nothing beyond illegally procuring the contracts, would keep a substantial percentage of the contract proceeds for itself and its principals.

70.     Although the exact details of the PDVSA kickback scheme (including the amount of the kickback and the dates it was offered and paid) remain shrouded in secrecy given the nature of the crimes, it is believed that through an individual named Francisco Convit-Guruceaga ("Convit-Guruceaga") (who is Defendant Betancourt's first cousin and also a part owner of Derwick Associates), Defendants Betancourt, Trebbau, and D'Agostino contacted Nervis Villalobos ("Villalobos"), a former Vice Minister of Energy, about obtaining the contracts to build the plants.

71.     Upon information and belief, Convit-Guruceaga, pursuant to Defendants' instructions, told Villalobos to extend an offer of a substantial payment on their behalf to Rafael Ramirez ("Ramirez"), President of PDVSA, in order to award the construction contracts to Derwick Associates.  Upon information and belief, Villalobos did so, and Ramirez accepted the offer.  Upon information and belief, according to flight manifest records, Nervis Villalobos has flown on Derwick Associates' private jet to and from Venezuela.[12]

72.     As a result, PDVSA awarded the following four contracts to Derwick Associates:

- On April 30, 2010, PDVSA awarded to Derwick Associates the contract for the Las Morochas facility;

- On November 21, 2010, PDVSA awarded to Derwick Associates the contract for the El Furrial facility;

- On November 21, 2010, PDVSA awarded to Derwick Associates the contract for the El Morichal facility; and

---

[12]     *See* Cesar Batiz, *La Historia intima de Derwick,* October 12, 2012, Últimas Noticias, *available at* http://settysoutham.files.wordpress.com/2012/12/yahoo-cache-on-la-historia-c3adntima-de-de-idad-c3baltimas-noticias.pdf (last accessed January 12, 2014).

- On November 23, 2010, PDVSA awarded to Derwick Associates the contract for the Barinas I facility.

73.     The final contract prices were never publicly released by the Venezuelan government.  However, it has been reported that the final contract price for the Barinas I facility was $242.3 million.

74.     Upon receipt of the contracts, Defendants subcontracted with a U.S. company to perform the work, the Missouri-based and New York-licensed ProEnergy Services.  Upon information and belief, the monies that Derwick Associates received from the contracts were wired to accounts at J.P. Morgan and Davos Financial Group in New York, and were used, in turn, to pay millions of dollars in kickbacks to Ramirez.

## B.  CORPOELEC

75.     CORPOELEC stands for Corporación Eléctrica de Venezuela.  CORPOELEC is the successor entity to Electricidad de Caracas.  It is the state-owned entity responsible for supplying power to the Venezuelan capital of Caracas.  It was created in 2007 via the merger of a number of Venezuelan state-owned power companies.

76.     Like PDVSA, CORPOELEC has been widely recognized as a target for exploitation by corrupt public officials.  For instance, *The Economist* observed that "[t]entative efforts to tame corruption [in Venezuela's energy sector] have [] been undermined … On [Hugo Chávez's] watch, [Chávez's brother] had led the electricity ministry as well as Corpoelec, the graft-riddled state-run electricity giant."[13]  CORPOELEC's "graft-riddled" nature asserted itself in 2009 with its solicitation of construction contracts.[14]

---

[13]     *See* The Economist, *A Circus Without a Ringmaster*, June 6, 2013, *available at* http://www.economist.com/news/americas/21580477-radicals-former-soldiers-and-cuban-spies-jostle-control-venezuelan-ring-circus (last accessed January 9, 2014).

[14]     *Id.*

77.     In mid-to-late 2009, CORPOELEC awarded contracts to Derwick Associates for the construction of energy generating plants known as Raisa I and II, Guarenas I and II, Picure, and Margarita, each located in and around Caracas.  Those contracts were not the subject of a public bidding process, which is a tell-tale mark of impropriety.[15]

78.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino set out to offer millions of dollars in kickbacks to CORPOELEC officials in exchange for awarding the contracts to Derwick Associates.  Upon securing the inflated contracts, Derwick Associates would then subcontract out the work to another U.S. company, Missouri-based and New York-licensed ProEnergy Services, which would do substantially all of the actual work.  Derwick Associates, having done almost nothing, would keep a substantial percentage of the contract proceeds for itself.

79.     Although the exact details of the kickback scheme (including the amount of the kickback and the dates it was offered and paid) remain necessarily shrouded in secrecy given the nature of the crimes, it is believed that Defendant Trebbau approached Javier Andres Alvarado Pardi ("Pardi") (son of Javier Alvarado Ochoa, former Venezuelan Minister of Electrical Development, and a childhood friend of the Defendants), about awarding the contracts to Derwick Associates.  Trebbau offered Pardi a substantial kickback in exchange for his assistance in securing the contracts for Derwick Associates.

80.     Upon information and belief, that offer was accepted, and as a result, CORPOELEC awarded Derwick Associates the following five contracts:

- On October 2, 2009, CORPOELEC awarded to Derwick Associates the contract for the Picure facility;

---

[15]     *See* U.S. Department of Justice, *FCPA:  A Resource Guide to the Foreign Corrupt Practices Act*, *available at* http://www.justice.gov/criminal/fraud/fcpa/guide.pdf (last accessed January 9, 2014).

- On November 23, 2009, CORPOELEC awarded to Derwick Associates the contract for the La Raisa I facility;

- On November 30, 2009, CORPOELEC awarded to Derwick Associates the contract for the La Raisa II;

- On March 11, 2010, CORPOELEC awarded to Derwick Associates the contract for the Guarenas I facility; and

- On October 4, 2010, CORPOELEC awarded to Derwick Associates the contract for the Guarenas II facility.

81.     During this time period, Derwick Associates was also awarded a portion of the contract for the facility in Margarita, Venezuela, although no public information exists regarding when that contract was awarded.

82.     The final contract prices have not been publicly disclosed by the Venezuelan government.  However, media reports have noted that CORPOELEC accepted a $240 million bid from Derwick Associates for construction of the Picure facility; a $242.3 million bid from Derwick Associates for construction of the La Raisa I facility, a $142.2 million bid from Derwick Associates for construction of the La Raisa II facility, and a $253.6 million bid from Derwick Associates for construction of the Guarenas I and II facilities.

83.     Upon information and belief, the monies that Derwick Associates received from the contracts were wired to accounts at J.P. Morgan and Davos Financial Group in New York, and were used, in turn, to pay millions of dollars in kickbacks to Pardi.

84.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino plan to continue their "courting" of CORPOELEC officials.  On April 23, 2013, the Venezuelan government authorized CORPOELEC to award new contracts to construct power plants and to buy various energy-related goods and services.

85.    Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino are at present attempting to obtain such contracts for Derwick Associates, and intend to offer substantial illegal payments to government officials in exchange for contract awards.

86.    Upon information and belief, as an apparent personal favor to Pardi, the son of the former Venezuelan Minister of Electrical Development, on or about May 21, 2010, Defendants allowed Pardi to list Derwick Associates' U.S. office address and telephone number as the shipping address and contact number in connection with his importation into the United States of an exotic luxury sports from the Dominican Republic.  The nature of this nepotistic conduct providing such "value" to the son of a foreign government official appears similar to the type of conduct that the United States Securities and Exchange Commission is investigating in connection with J.P. Morgan's "Sons and Daughters" hiring program, as reported in *The New York Times* and the *Wall Street Journal*.[16]

### C.  <u>Corporacion Venezolana de Guayana</u>

87.    Corporacion Venezolana de Guayana ("CVG") is a state-owned entity which controls energy production in the Guayana region in southeast Venezuela.

88.    In late 2009, CVG awarded two contracts to Derwick Associates for the construction of energy plants in Puerto Ordaz, Venezuela, named Sidor Planta A and Sidor Planta B.  The contracts were not the subject of a public bidding process.

89.    Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino set out to offer millions of dollars in kickbacks to CVG officials in exchange for awarding the contracts to Derwick Associates.  Upon securing the inflated contracts, Derwick Associates

---

[16]    "JPMorgan Hiring Put China's Elite on an Easy Track," August 29, 2013, *The New York Times*, *available at* http://dealbook.nytimes.com/2013/08/29/jpmorgan-hiring-put-chinas-elite-on-an-easy-track/ (last accessed January 12, 2014); "J.P. Morgan Emails Note Hire's Family Ties," December 8, 2013, *The Wall Street Journal*, *available at* http://online.wsj.com/news/articles/SB10001424052702303560204579246674206332380 (last accessed January 12, 2014).

would then subcontract out the work to another U.S. company, Missouri-based and New York-licensed ProEnergy Services, who would do substantially all of the actual work. Derwick Associates, having done almost nothing, would keep a substantial percentage of the contract proceeds for itself.

90.     Although the exact details of the kickback scheme (including the amount of the kickback and the dates it was offered and paid) remain necessarily shrouded in secrecy, it is believed that through the above-mentioned intermediary Convit-Guruceaga, Defendants Betancourt, Trebbau, and D'Agostino contacted Rodolfo Sanz ("Sanz"), the Venezuelan Minister of Basic Industries and Mining.

91.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino together authorized Convit-Guruceaga to offer Sanz a substantial payment in order to obtain the contracts. Convit-Guruceaga did so. Betancourt later personally negotiated with Sanz over the terms of the payment. Upon information and belief, Sanz accepted the offer, and as a result, CVG awarded Derwick Associates the contracts.

92.     On November 30, 2010, CVG awarded to Derwick Associates the contract for the Sidor Planta A facility.

93.     Further, upon information and belief, during this time period, Derwick Associates was also awarded the contract for the Sidor Planta B facility, although no public information exists regarding when that contract was awarded.

94.     The final contract prices have not been publicly disclosed by the Venezuelan government. However, media reports have revealed that CVG accepted a $920 million bid from Derwick Associates for the Sidor Planta B facility.

95.     Upon information and belief, the monies that Derwick Associates received from the contracts were wired to accounts at J.P. Morgan and Davos Financial Group in New York, and were used, in turn, to pay millions of dollars in kickbacks to Sanz.

***D'Agostino Has Admitted that Defendants Pay***
***Illegal Bribes To Secure the Energy Contracts***

96.     Defendants have bragged to their friends and acquaintances in the United States that Derwick Associates secured the Venezuelan energy-sector contracts by giving kickbacks to the right people.

97.     For instance, in November, 2012, while in the United States, D'Agostino told a friend that "of course" Derwick Associates paid kickbacks to secure its energy contracts; he noted that in Venezuela, "you always have to pay" what D'Agostino called "consulting fees," in order to secure the contracts.  Of note, the U.S. Department of Justice has declared that payments to foreign officials to influence their decisions violate the Foreign Corrupt Practices Act even if they are accounted for as "consulting fees."  U.S. Department of Justice, *FCPA:  A Resource Guide to the Foreign Corrupt Practices Act*, *available at* http://www.justice.gov/criminal/fraud/fcpa/guide.pdf (last accessed January 9, 2014) ("[b]ribes are often concealed under the guise of legitimate payments, such as commissions or consulting fees").[17]

98.     After the Original Complaint in this matter was filed, agents of Defendant D'Agostino approached Ambassador Reich and made statements that, at a minimum, confirmed

---

[17]     At the 22nd National Forum on the Foreign Corrupt Practices Act (November 17, 2009), Lanny A. Breuer, former U.S. Assistant Attorney General, Criminal Division, Department of Justice stated:  "We are all here today to consider a law enforcement challenge of truly global dimensions.  The word 'bribe' is, of course, known throughout the world.  In the United States, it has been called a pay-off, a kickback, hush money, payola, and a sweetener.  It is sometimes concealed behind what is called a commission, a reward, a finder's fee, a gratuity, or a 'thank you'."  Lanny A. Breuer, Address at the 22nd National Forum on the Foreign Corrupt Practices Act (November 17, 2009), *available at* http://online.wsj.com/public/resources/documents/111709breuerremarks.pdf (last accessed January 13, 2014).

not only that D'Agostino had access to information only available to those at the highest levels of management of Derwick Associates and accessible only on a "need to know" basis, but that such information would be damning to Defendants Betancourt and Trebbau in this litigation.

99.    In August 2013, Ambassador Reich had lunch in Washington, D.C. with a former Venezuelan government official (the "Emissary") who claimed to be an agent of Defendant D'Agostino.  The Emissary had flown to the United States on the private jet of D'Agostino's father-in-law.  At their meeting, the Emissary told Ambassador Reich that if he would dismiss D'Agostino from the lawsuit, D'Agostino would provide Ambassador Reich with information about Defendants Betancourt and Trebbau that would substantiate the allegations set forth in Plaintiffs' case.

**The Projects Undertaken by Derwick Associates**
**Were Grossly Overbilled and are of Poor Quality**

100.    A hallmark feature of corruption in government contracting or procurement is the supplying of low-quality goods or underperforming services at inflated prices.  That is exactly what has happened with the projects undertaken by Derwick Associates.

101.    In September 2013, the preliminary results of a major study undertaken by a respected energy expert (the "Energy Expert") were made public, showing gross overbilling in the construction and operation of energy-sector projects in Venezuela, including on projects by Derwick Associates.

102.    The Energy Expert is a mechanical engineer specializing in industrial oil, gas, and electricity projects who has worked for years in the Venezuelan energy sector.  Upon information and belief, in the 1980's, the Energy Expert immigrated to the United States, where he worked for energy utilities, and today he consults on risk-management projects for public utilities concerning maintenance, operations, and safety issues.

103.    The Energy Expert reviewed previously undisclosed information regarding the costs of certain Derwick Associates' energy projects, and compared those costs to what the projects *should have* cost, had the projects been awarded based on competitive, transparent bidding processes.

104.    The Energy Expert developed estimates for what the projects would have cost had the contracts not been grossly inflated by Defendants as a result of their pattern of racketeering activity.

105.    The Energy Expert estimated that the contract prices for the projects awarded to Derwick Associates exceeded, by approximately *$2.9 billion,* the amount that the projects should have cost.

106.    In September 2013, the Energy Expert released updated results confirming the gross overbilling and underperformance by Derwick Associates.  Based upon his updated results, he estimates that Derwick Associates grossly overcharged for every project they were awarded, some projects by over 300%.

107.    The Energy Expert found that the average overbill by Derwick Associates on the projects analyzed was over 200%.  In other words, the average Derwick Associates energy contract was approximately *three times* more expensive than it should have been.

108.    It has been reported that Derwick Associates' projects have also been plagued by delays and underperformance.  According to the Energy Expert, the majority of the projects undertaken by Derwick Associates are either years late in completion, only partially completed, or entirely non-functional:

- For the CORPOELEC project in Guarenas, the Energy Expert estimates that, at market rates, the project should have cost approximately $90 million. According to government records, Derwick Associates was awarded a

31

contract for $253.6 million.  Only 80 of the promised 156 megawatts are currently functional.

- For the CORPOELEC project La Raisa I, the Energy Expert estimates that, at market rates, the project should have cost approximately $110 million. According to government records, Derwick Associates was awarded a contract for $242.3 million.  Originally set for completion in December 2010, only 95 of the promised 180 megawatts are currently functional.

- For the CORPOELEC project La Raisa II, the Energy Expert estimates that, at market rates, the project should have cost approximately $62 million. According to government records, Derwick Associates was awarded a contract for $142 million.  Only 40 of the promised 90 megawatts are currently functional.

- For the CORPOELEC project Picure, the Energy Expert estimates that, at market rates, the project should have cost approximately $95 million. According to government records, Derwick Associates was awarded a contract for $240 million.  Originally set for completion in August 2010, only 100 of the promised 132 megawatts are currently functional.

- For the CORPOELEC project Margarita, the Energy Expert estimates that, at market rates, the project should have cost approximately $102.9 million. According to government records, Derwick Associates was awarded a contract for $337.7 million.  Originally set for completion in November 2011, only 120 of the promised 170 megawatts are currently functional.

- For the CVG project Sidor, the Energy Expert estimates that, at market rates, the project should have cost approximately $528 million.  According to government records, Derwick Associates was awarded a contract for $920 million.  None of the promised 880 megawatts are currently (or have ever been) functional.

109.    The Energy Expert also reviewed and analyzed projects that Derwick Associates was awarded by PDVSA under the PDVSA's umbrella "Autosuficiencia" program, which is a program to make the PDVSA itself completely self-supplying when it comes to power generation.  The Energy Expert estimates that the various projects – in which Derwick Associates took part – should have cost approximately $789.9 million at market rates.  However, the Energy Expert's research revealed that PDVSA awarded contracts worth $2.1 billion.

110.     According to the Energy Expert, only 287.5 of the promised 1354 megawatts needed for PDVSA's "Autosuficiencia" program are currently functional (despite being scheduled for completion in October 2010).

111.     Charging a premium for substandard goods is a classic way to build enough "padding" into a contract to pay kickbacks (and make an illicit profit).  Inflated government contract prices and underperformance on government contracts are tell-tale signs of public corruption.  The Washington, D.C.-based International Anti-Corruption Resource Center, whose mission it is to attack and thwart public corruption, has noted that inflated contract prices and underperformance on contract specifications are two "red flags" indicative of the existence of bribery and kickback schemes with respect to government contracts.[18]

112.     Based on the contract prices awarded to Derwick Associates, the Venezuelan government appears to have paid substantially above market value for purportedly "new" equipment.  Upon information and belief, the overbilling by Derwick Associates for its energy-sector contracts went not only to line the pockets of Defendants Betancourt, Trebbau, and D'Agostino, but to pay the kickbacks to government officials necessary to secure the contracts.

113.     The Energy Expert is not the only industry expert to question the projects undertaken by Derwick Associates.  For instance, an individual named Gustavo Coronel ("Coronel"), an oil-industry veteran who claims over 35 years of experience in the industry, has written extensively regarding Derwick Associates' lack of manpower, expertise, and capital needed to engage in the type of projects Derwick Associates claims it engages in.  Coronel has noted that Derwick Associates' small size (15 employees at the time of his writing), lack of

---

[18]     *See Summary of Fraud and Corruption Cases in International Development Projects*, February 6, 2012, *available at* http://iacrc.org/fraud-and-corruption/summary-of-fraud-and-corruption-cases-in-international-development-projects/ (last accessed January 13, 2014).

experience, and lack of capital is not "compatible with the magnitude, complexity and sophistication of the projects Derwick has been doing."[19]

***Defendants' Business Operations Have Drawn Interest***
***From Many Reputable Parties, Including the United States Government***

114.   The incredible manner in which Derwick Associates (being operated by such young and inexperienced owners, operators and managers) secured more than *a billion dollars* in complex energy construction contracts in such a short time has drawn interest from the United States government and numerous media sources.

115.   Information has emerged from publicly-available sources that individuals associated with the Federal Bureau of Investigation have recently conducted inquiries into Derwick Associates' activities.[20]   Upon information and belief, the Department of Homeland Security and the Treasury Department have also made inquiries into Derwick Associates' activities.   Further, upon information and belief, the United States Securities and Exchange Commission's New York Regional Office is currently conducting an inquiry into the activities of Derwick Associates.

116.   In addition, a number of mainstream English and Spanish-language publications have published articles detailing the suspicious manner in which these contracts were awarded to Derwick Associates, and recount allegations that Derwick Associates secured these contracts via improper payments to Venezuelan officials.   For instance:

- Cesar Batiz, an award-winning reporter at the Spanish-language publication *Últimas Noticias*, reported that Derwick Associates had received these immense contracts despite the lack of any sort of track record, and the lack of experience of its managers.

---

[19]     *See* Coronel's website; for instance http://lasarmasdecoronel.blogspot.com/2013/09/about-transparency-derwick-and-pdvsa.html (last accessed January 9, 2014).

[20]     *See* Posting to Infodio, September 12, 2012, *available at* http://infodio.com/content/fbi-looking-derwick-associates (last accessed January 9, 2014) (Derwick Associates' "claims of proven track record, experience, business methods and so on have been grossly exaggerated and just don't stack up," and noting that FBI has on multiple occasions visited the website after having searched for the term "Derwick.").

Batiz also wrote a piece exploring the questions surrounding suppliers of electricity equipment in Venezuela that were likely overcharging (including Derwick Associates in that group).

- A number of postings written by a *Christian Science Monitor* correspondent at the website *Setty's Notebook* recounted the allegations against Derwick Associates regarding the contracts; the website editor later received a letter from Derwick Associates' attorneys threatening legal action.[21]

117. For his work exposing Derwick Associates, Batiz was awarded an honorable mention at the Latin American Conference on Investigative Journalism in March, 2012, and was awarded an honorable mention for the Peruvian Latin American Award for Investigative Journalism.

118. Batiz's work was highlighted in a book published in July 2013 entitled, *Estado Delincuente: Como actúa la delincuencia organizada en Venezuela* ("*Rogue State: How Organized Crime Operates in Venezuela*," in English), by authors Carlos Tablante ("Tablante") and Marcos Tarre ("Tarre"). Tablante is a former governor, senator and cabinet minister of Venezuela. *Rogue State* chronicles how the Venezuelan state has been thoroughly corrupted by individuals like Defendants.

119. Derwick Associates is discussed in *Rogue State*. Tablante and Tarre discuss multiple transactions benefitting Derwick Associates, including: (a) the sale by Derwick of Rolls Royce Trent 60 machines for $34.6 million each, where a Rolls Royce press release in 2010 ascribes a cost of only $18.3 million per machine (p. 186), and (b) the purchase of four thermoelectric power plants from the United States to be installed in Sidor, Venezuela, to begin operating in 2010 (p. 204). According to the authors, "not one kilowatt" has been produced by

---

[21]      *See* Posting to Setty's Notebook, October 12, 2012, *available at*
http://settysoutham.wordpress.com/2012/10/12/derwick-associates-censorship/ (last accessed January 9, 2014) (Derwick Associates "has had incredible success in the three years since it was founded, gaining hundreds of millions of dollars in contracts to procure generating turbines and other materials and to then build electricity plants. Press reports have raised questions about exactly how Derwick got so big, so fast.")

the four Sidor power plants (p. 205).  One has been installed but is not in use; a second is inactive and abandoned at Sidor; and the fate of the other two is unknown (*id*.).  The book also discusses how the Davos Financial Group's affiliate (discussed herein) receives transfers of funds arising from bribery transactions.

120.    Alek Boyd, columnist for Colombia's *Semana* magazine and editor of the Infodio website (www.infodio.com), has written a number of articles on his news website detailing allegations of improper payments by Defendants and Derwick Associates in the securing of the aforementioned energy contracts.  As described by Boyd, "Derwick Associates is a fine example of a cast of criminal enterprises that have flourished under Hugo Chavez's galloping and irresponsible waste."[22]

121.    Even *The New York Times* has implicitly questioned the business practices of Defendants in a September 12, 2012 article discussing various financial "scandals," where "ghost companies" landed energy "contracts worth hundreds of millions of dollar … at shamelessly inflated prices."

122.    Newspaper articles, blog entries and the like are often relied upon as a credible source of information by United States government officials for launching criminal investigations.  On this topic, Lanny Breuer, former U.S. Assistant Attorney General for the Criminal Division of the U.S. Department of Justice, has stated:

> Although many of these cases come to us through voluntary disclosures, which we certainly encourage and will appropriately reward, I want to be clear:  the majority of our cases do not come from voluntary disclosures.  They are the result of pro-active investigations, whistleblower tips, newspaper stories, referrals from

---

[22]    *See* Posting to Infodio, March 10, 2012, *available at* http://infodio.com/content/derwick-associates-exhibit-x-venezuelas-corrupt-criminals (last accessed January 9, 2014).

our law enforcement counterparts in foreign countries, and our Embassy personnel abroad, among other sources.[23]

123.    Defendants' corruption is so blatant that it is becoming uncomfortable even to some members of the Venezuelan regime.  On or about October 31, 2013, a former mayor and police chief named Freddy Bernal, a central figure in the regime, gave an interview on a pro-regime television station in Venezuela where he called for an investigation into Derwick Associates, citing specifically Defendants' ostentatious New York properties and other expenditures.[24]

### Defendants' Ongoing Campaign of Concealment

124.    In order to perpetuate their illegal scheme and avoid criminal prosecution, Defendants must deter or cut short any investigation into their activities.  Over the last year, Defendants have targeted journalists, media outlets, private citizens, and former government officials in the United States.  Defendants use lawsuits and threats to sue, apply political and financial pressure, and use abusive business tactics, all in order to ensure that critics of the ChavezKids are severely and swiftly punished and others made afraid to come forward.

125.    The *pièce de résistance* in Defendants' campaign of concealment was the very public Florida Defamation Suit filed in September 2012 by Defendants Betancourt, Trebbau, and Derwick Associates in the Circuit Court of Miami, Florida.  The Florida Defamation Suit sought damages in excess of *$300 million* from Banco Venezolano, one of the oldest and most respected banks in Venezuela with offices in the United States, and its President, Oscar Garcia Mendoza

---

[23]    Lanny A. Breuer, Address at the 22nd National Forum on the Foreign Corrupt Practices Act (November 17, 2009), a*vailable at* http://online.wsj.com/public/resources/documents/111709breuerremarks.pdf (last accessed January 13, 2014).

[24]    *See* Posting to Setty's Notebook, October 23, 2013, *available at* http://settysoutham.wordpress.com/2013/10/23/chavista-freddy-bernal-calls-for-investigation-of-derwick-associates/ (last accessed January 10, 2014).

("Garcia Mendoza"), a vocal opponent of the Chavez regime and one of the few bankers in

Venezuela who refuses to do business with the Venezuelan government.

126.    In addition to suing Banco Venezolano in Florida, Defendants Betancourt,

Trebbau, and Derwick Associates filed the New York Defamation Suit in New York state court,

alleging, among other things, claims for defamation tracking those alleged in the Florida

Defamation Suit.  *See Derwick Associates Corp., et al. v. John Does 1-10* (Supreme Court of the

State of New York, County of New York), Index No. 653345/12.  The New York Defamation

Suit, like the Florida Defamation Suit, was voluntarily withdrawn by Defendants.

127.    The Florida Defamation Suit alleged that Banco Venezolano, its chairman Garcia

Mendoza, and another director created and spread defamatory information concerning Derwick

Associates and its founders on an Internet website named wikianticorrupcion.org.  Defendants

claimed that statements concerning Derwick Associates' unscrupulous business methods on the

website "have been repeated hundreds of times on other Internet sites, Twitter, and various news

outlets," entitling them to hundreds of millions of dollars in damages.

128.    In their initial complaint (the "Defamation Complaint"), Defendants Betancourt

and Trebbau alleged that Garcia Mendoza and Banco Venezolano caused the

wikianticorrupcion.org website to publish allegations that, among other things, Defendants

Betancourt and Trebbau, through Derwick Associates:

- "Launder[ed] the money originating from oil and electricity corruption and join[ed] illegal financial deals."

- "Found[ed] another Venezuelan financial entity through which they continued to launder the money that was the product of their crimes."

- "Were involved in the theft of 500 million dollars from another Venezuelan corporation, Corporacion Venezolana de Guayana (CVG)."

- "Stole the amount of one point three billion dollars ($1.3 BILLION) from CVG."

- "Are part of a 'criminal group' that have amassed a 'pot … [of] up to about two billion dollars (US\$ 2.0 billion) … through which [they] launder money by making investments.'"

129.   The Defamation Complaint also accused Garcia Mendoza and Banco Venezolano of causing the wikianticorrupcion.org website to publish statements that Betancourt, as "the gang's boss, would be the owner of most of the so-called pot, circa \$800 million, which he has put into international banks," and that "[Derwick's] entire fortune was made in less than three years and with absolutely high profile, trampling on and threatening even journalists with total impunity, while [Betancourt] was supported by his good relationships with police officers, public prosecutors, governors and ministers."

130.   The Florida Defamation Suit, which was brought in the United States and not in Venezuela, was widely reported in the news media and on the Internet given the parties involved and the enormous amount of damages being sought.  Indeed, news of the Florida Defamation Suit traveled quickly and had the chilling effect Defendants desired – on everyone but, apparently, the Banco Venezolano defendants.

131.   Certain of the Banco Venezolano defendants moved forward on the opportunity to engage in discovery in the Florida Defamation Suit.  During discovery, Betancourt and Trebbau (and Derwick Associates) would have been required to produce documents (including emails and financial documents) and sit for depositions concerning the substance of the alleged defamatory statements, *i.e.*, their business practices.

132.   Through discovery and trial, each of Betancourt, Trebbau and D'Agostino (through Derwick Associates) would have had the opportunity to pursue a legal process that, ostensibly, could have cleared their sullied reputations.  Rather than pursue the discovery process and prove their claims, each of Betancourt, Trebbau and D'Agostino (through Derwick Associates) moved for a stay of discovery and, then, opted to settle the case.  Indeed, Defendants

agreed to voluntarily dismiss the Florida Defamation Suit in April 2013 – mere months after it was commenced – and before any material discovery could take place.

133.     It has been reported that Betancourt, Trebbau, and Derwick Associates agreed to settle their $300 million Florida Defamation Suit without having received payment of even a single dollar from Banco Venezuela or anyone else.

134.     Although it has been reported that Banco Venezolano, Garcia Mendoza, and the other defendants in the Florida Defamation Suit filed a motion to dismiss the Florida Defamation Suit, those documents (as well as all other substantive documents in the case) had disappeared as of July 2013 from the public case file in Miami-Dade County.  Some of these materials have now apparently reappeared.

135.     In or about October 2012, Defendants' New York-based counsel in the Florida and New York defamation suits sent letters to (a) Mr. Steven Bodzin, now a correspondent for *Monocle* and the *Christian Science Monitor*, and the editor of the website http://settysoutham.wordpress.com; (b) Mr. Robert Bottome, President of Veneconomia; and (c) Mr. Miguel Octavio, who Defendants wrongfully claimed was the author of the blogspot http://venepiramides.blogspot.com, threatening legal action if those individuals did not remove from their websites articles concerning Derwick Associates (and Defendants).

***Defendants Intentionally Spread False Information***
***To Destroy ORA's Business Relationship with Banco Venezolano***

136.     In October and November 2012, shortly after the Florida Defamation Suit was commenced, Banco Venezolano entered into negotiations with ORA to assist in defending against the claims made in the Florida Defamation Suit and to provide unrelated business and consulting services to Banco Venezolano in the United States.

137.    Banco Venezolano was very interested in retaining Ambassador Reich in part because he has repeatedly spoken out against the types of schemes from which Defendants have profited (and, upon information and belief, which Defendants were trying to cover up by suing Banco Venezolano).  To illustrate, in a recent article in the Miami Herald, Ambassador Reich wrote:

> In Chávez's Venezuela, [] a politically favored group (some with no previous experience in complex sectors such as energy and finance) were able to accumulate [] fortunes that allow them to purchase luxury mansions in the U.S. … most of the culprits live in or come regularly to this country … They use U.S. banks to move money and to maintain their extravagant properties  … To cover their tracks and attempt to enjoy the privilege of living in our country, some 'Boligarchs' have launched lawsuits against honest Venezuelan businessmen in American courts. The purpose is to create a smokescreen to hide behind, and prevent the U.S. government from expelling the real offenders … [amassing their wealth from the] illegitimate awards of government contracts, from kickbacks and other gifts to government officials and from other unethical and immoral activities.[25]

138.    Banco Venezolano also sought ORA's assistance in connection with the claims made against it by Betancourt, Trebbau, and Derwick Associates, including investigation into Derwick Associates' business practices in the United States.

139.    This would have been a significant business relationship for ORA with an important institutional client.  By late November 2012, negotiations between the bank and ORA had advanced to the stage that the parties understood that ORA would charge $20,000 per month for consulting services, to commence immediately.  The agreed-upon contract was to be project-based, with the initial project estimated to last at least six months.  Additional amounts were to

---

[25]    *See* Otto J. Reich and Ezequiel Vasquez-Ger, "Venezuela's Chavez and his U.S. Business Partners," *Miami Herald*, *available at* http://www.miamiherald.com/2013/03/02/3262092/venezuelas-hugo-chavez-and-his.html#storylink=cpy (last accessed January 9, 2014).

be provided by Banco Venezolano to cover up to $20,000 per month in out-of-pocket expenses such as meals, travel, hotels, and the like.

140.    As the former United States Ambassador to Venezuela, Ambassador Reich is a well-respected individual within the Venezuelan émigré community, with an impressive and impeccable reputation.  Equally important, Ambassador Reich has a wealth of contacts and relationships throughout the United States/Venezuelan community and, as such, was well positioned to uncover the details of Defendants' pattern of racketeering activity.  Defendants, having learned of his negotiations with Banco Venezolano, were determined to prevent Banco Venezolano from engaging Ambassador Reich, whom Defendants perceived would be a threat not only to the successful prosecution of their claims against Banco Venezolano but, more importantly, to their ability to conduct "business as usual."  ORA's retention by Banco Venezolano would have substantially strengthened the legal positions of Banco Venezolano and dramatically altered public opinion (both in the United States and abroad) concerning the alleged merits of Defendants' Defamation Suits.  Ambassador Reich's agreement to formally assist Banco Venezolano in its defense would have sent a clear message throughout the Venezuelan émigré community in the United States and to those in Venezuela who were closely following the Defamations Suits that the truth would come out.

141.    In late November 2012, one of Defendants' agents in Washington, D.C. tried to persuade Ambassador Reich not to do business with the Banco Venezolano, and instead to provide ORA's services to Derwick Associates, promising Ambassador Reich "a lot of money." Ambassador Reich would not be bought off by the Defendants and refused to work for Derwick Associates.

142.    Not dissuaded, Defendants persisted in their attempts to woo Ambassador Reich.

Defendants wanted Ambassador Reich on their team and not aligned with Banco Venezolano.

Several days later, on December 6, 2012, Defendants' agent again tried to "persuade"

Ambassador Reich to work for them.  Again, Ambassador Reich refused to join forces with

Defendants.

143.    On December 7, 2012, Ambassador Reich was scheduled to meet with a

representative of Banco Venezolano named Cesar Briceño ("Briceño") at the office of Banco

Venezolano's U.S. attorneys in Miami, Florida.

144.    *On the same day as the meeting with Ambassador Reich,* Defendants caused

Derwick Associates to file an Amended Complaint in the Florida Defamation Suit and, upon

information and belief, to serve Cesar Briceño (a representative of Banco Venezolano) with legal

papers when he arrived at the Miami airport.  The Amended Complaint named Briceño as a

defendant and alleged that Briceño had met in Miami in "December 2102" with a "former U.S.

government official" for the alleged purpose of "provid[ing] false information of criminal

wrongdoing by [Defendants]" to that "former U.S. government official."  The meeting

referenced in the Amended Complaint as having occurred in "December 2012," was the

December 7, 2012 meeting between Ambassador Reich and Briceño.  In other words, the

Amended Complaint described a meeting that *had yet to occur* when the Amended Complaint

was filed.  A lawyer for Derwick Associates later confirmed to Banco Venezolano's lawyer that

the reference in the Amended Complaint to a "former government official" was indeed meant to

refer to Ambassador Reich.

145.    The motive and objective of including that piece of information in the Amended

Complaint (filed on the same day as the meeting in Miami) was to give Banco Venezolano the

false impression that Ambassador Reich was a "double agent" working for Derwick Associates, and that Ambassador Reich had shared the location and timing of his December 7, 2012 meeting with Briceño with Derwick Associates in order to allow legal papers to be served upon Briceño.

146.    That was not true.  Ambassador Reich never worked for, or with, Derwick Associates, and never acted on their behalf in any regard.  Moreover, Ambassador Reich does not know how Defendants knew of his December 7, 2012 meeting with Briceño.  He did not provide Defendants with that information.

147.    Defendants continued to try to drive a wedge between ORA and Banco Venezolano, this time successfully.  Shortly after Ambassador Reich's meeting with Briceño in Miami, Betancourt and Trebbau, who are believed to have been in New York then, placed a call to their partner (and Betancourt's cousin) Convit-Guruceaga.  They instructed Convit-Guruceaga to call Joaquin Urbano Berrizbeitia ("Urbano"), one of Banco Venezolano's largest shareholders, who also sits on the Banco Venezolano board of directors.  Defendants directed Convit-Guruceaga to (falsely) tell Urbano that "Otto Reich is working for us."

148.    On or about December 20, 2012, Convit-Guruceaga placed the call, and conveyed that false information to Urbano.  Urbano then relayed that message to Banco Venezolano's leadership.  As a result, the bank (including its board of directors) believed that Ambassador Reich was working for Derwick Associates, *the party that was suing it for $300 million*.  Banco Venezolano also came to believe (falsely) that Ambassador Reich was working for and/or affiliated with an enterprise (Derwick Associates) that had profited wildly from the corruption of Venezuela's energy sector.

149.    The communication that "Otto Reich is working for us" was false, and each Defendant (and Convit-Guruceaga, who is not a defendant to this action) knew it was false when it was made.

150.    In or about the last week of December 2012, Banco Venezolano ceased all communications with Ambassador Reich as a result of the false information conveyed to it.  A major business and contractual relationship worth at least $20,000 per month, was lost.

***Defendants Intentionally Spread False Information,***
***Which Destroyed Plaintiffs' Business and Contractual Relationship with Eligio Cedeño***

151.    In October 2010, two years prior to the Florida Defamation Suit, ORA was hired by an individual named Eligio Cedeño ("Cedeño") to provide consulting services.  Cedeño resides full time in the United States.

152.    At one point, Cedeño was a prominent Venezuelan citizen involved in the financial industry.  In 2003, Cedeño served as President for Banco Canarias de Venezuela C.A., a financial institution based in Caracas, Venezuela.  Cedeño was also an outspoken opponent of the Venezuelan government, specifically the regime of Hugo Chavez, and he supported a number of anti-Chavez figures in Venezuela.

153.    In 2007, Cedeño was arrested by the Chavez government and held as a political prisoner for more than two years without trial.  He was freed upon recommendation by the United Nations Working Group on Arbitrary Detention.  Immediately upon his release, Cedeño fled to Miami, Florida, and requested political asylum in the United States.  He was granted asylum in May 18, 2011.[26]

---

[26]    *See* "U.S. Grants Asylum to Chavez Opponent," *Wall Street Journal*, May 19, 2011, *available at* http://online.wsj.com/article/SB10001424052748704281504576331681585940852.html (last accessed January 9, 2014).

154.     Following his arrival in the United States in 2010, Cedeño retained ORA to consult on government relations affairs, specifically regarding Cedeño's status as a vocal opponent of the Chavez regime, as well as to assist Cedeño's efforts to re-establish his business affairs in his new home, the United Sates.

155.     The agreement between ORA and Cedeño called for the payment of $20,000 per month to ORA.  Cedeño paid this amount monthly beginning in 2010.  Pursuant to the contract between ORA and Cedeño, the business relationship was to continue indefinitely.

156.     Given his long experience with the Venezuelan government and finance industry, Cedeño knew that Defendants were accused of engaging in corrupt activities in Venezuela, including bribery of energy-sector officials in exchange for government contracts, as described above.

157.     In late 2012, during their campaign to undermine Ambassador Reich's relationship with Banco Venezolano, Defendants Betancourt, Trebbau, and D'Agostino learned that Cedeño was a client of ORA.  Defendants agreed amongst themselves to (falsely) tell Cedeño that Ambassador Reich was working for Derwick Associates.

158.     Defendants knew that if Cedeño was falsely convinced that ORA was working or otherwise associated with Derwick Associates, Cedeño would terminate his consulting contract with ORA, and word would continue to spread (including to Banco Venezolano) and throughout the U.S.-based marketplace that Ambassador Reich and ORA served, that Otto Reich was aligned with Derwick Associates.

159.     To effectuate the scheme, Defendant Betancourt placed a telephone call in November 2012 from what is believed to be his home in New York, to Cedeño, who was then in Miami.

46

160.     During that conversation, Defendant Betancourt told Cedeño that ORA had been retained by Derwick Associates to offer consulting services.  Defendant Betancourt further told Cedeño that Derwick Associates had an ongoing arrangement with Ambassador Reich for a proposed business venture in Panama.  Neither of those statements was true.

161.     Upon information and belief, at or about the same time, Eloy Montenegro ("Montenegro"), who is Defendant Trebbau's father-in-law made phone calls to Cedeño and/or his agents in which Montenegro stated, in sum and substance, that "Otto Reich is working for Derwick."  At the time that Montenegro communicated this false information, he was acting as an agent of not only Trebbau, but for the other Defendants.

162.     Days after his telephone conversation with Defendant Betancourt, Cedeño terminated his agreement with ORA.

163.     At that time, Ambassador Reich was unaware that Betancourt had called Cedeño and relayed false information to him concerning Ambassador Reich's alleged relationship with Derwick Associates.  As such, Ambassador Reich could do nothing to counter the false statements made to Cedeño.

164.     In a later phone conversation between Ambassador Reich and Cedeño, Ambassador Reich learned what Cedeño had been (falsely) told about the "relationship" between Plaintiffs and Derwick Associates, and about Ambassador Reich's purported "business venture" in Panama with Betancourt.  Even though this information was proven to be false, Cedeño continued to question Ambassador Reich's allegiances.  In fact, before the Original Complaint was filed, Cedeño made specific reference to Betancourt's project in Panama, asking Ambassador Reich again whether he was sure "you weren't in Panama" at a particular time.

***Defendant D'Agostino is a Founder, Owner, Operator
and Agent of Derwick Associates, and Directs its Activities***

165.     While Betancourt and Trebbau are the public faces of Derwick Associates,

Defendant D'Agostino, upon information and belief, is a founder, owner and operator of the

company, and directs and manages its daily activities.  Upon information and belief, initial

financing for Derwick Associates was procured by D'Agostino through the use of his family's

monies.

166.     Prior to the commencement of this lawsuit, D'Agostino had acknowledged and

admitted to being a key player and member of Derwick Associates' inner circle.

167.     For instance, in late 2012, a human rights advocate and respected journalist (the

"*Forbes* Writer") was preparing to publish a story about Derwick Associates in *Forbes*

magazine.

168.     Prior to publication of the piece, the *Forbes* Writer sent a November 15, 2012

email to ProEnergy Services inquiring about "the role of Derwick and the cost of the [energy]

project" and commenting that "[t]here are numerous published allegations in Venezuela

regarding overbilling by Derwick as well as more sensational allegations of money laundering."

169.     As alleged more thoroughly above, ProEnergy Services is the U.S.-based

company that does substantially all of the engineering, construction, and operation of the

facilities for which Derwick Associates contracted with the Venezuelan government.  The

Derwick Associates-ProEnergy relationship is even mentioned in the 2013 book, *Rogue State:*

*How Organized Crime Operates in Venezuela.*

170.     Within days of sending the email to ProEnergy Services, the *Forbes* Writer

received several text messages and telephone calls from Defendant D'Agostino.  The *Forbes*

Writer, who knew D'Agostino from childhood, had not spoken to D'Agostino in *at least a decade*.

171.    In his conversation with the *Forbes* Writer, D'Agostino spoke about the business of Derwick Associates.  He also inquired about the article that the *Forbes* Writer was working on about Derwick Associates, and attempted to dissuade the *Forbes* Writer from publishing the piece.

172.    In an attempt to convince the *Forbes* Writer that Derwick Associates is a legitimate and law-abiding company, D'Agostino offered to share with the *Forbes* Writer, Derwick Associates' contracts with the Venezuelan government as well as its contracts with ProEnergy Services.  D'Agostino also agreed to disclose Derwick Associates' audited financial statements.  Defendants Betancourt and Trebbau have publicly maintained for years that Derwick Associates' contracts with the Venezuelan government are "confidential." D'Agostino's offer to share those contracts (and Derwick Associates' audited financial statements) with the *Forbes* Writer proves (at a minimum) that D'Agostino is a key player within Derwick Associates who possesses intimate knowledge of Derwick Associates' business.  If D'Agostino were not a key player or member of Derwick Associates' inner circle, be it as a founder, de facto owner, operator, manager, agent or the equivalent, he would not have had access to documents that Defendants Betancourt and Trebbau have publicly maintained are "confidential" nor would he have access to Derwick Associates' financials.

173.    Shortly before November 20, 2012, D'Agostino invited the *Forbes* Writer to dinner in Los Angeles, California, to meet with him and Betancourt.  D'Agostino agreed to bring with him the Derwick Associates' contracts and financials.

174.     On or about November 20, 2012, *Forbes* magazine in New York received a letter from Betancourt, Trebbau, and Derwick Associates' New York counsel in the Florida and New York Defamation Suits, warning them not to publish the *Forbes* Writer's piece.  Fearing legal action, *Forbes* magazine declined to go forward with the piece.

175.     A similar letter was sent by Betancourt, Trebbau, and Derwick Associates' New York counsel to *The Huffington Post*, with whom the *Forbes* Writer had previously published articles.

176.     The *Forbes* Writer and D'Agostino thereafter exchanged a number of text messages.  Those text messages would later be referenced in an Amended Complaint filed by Derwick Associates, Betancourt, and Trebbau in the Florida Defamation Suit – evidence that D'Agostino was working with Betancourt, Trebbau and Derwick Associates in their legal efforts and that D'Agostino had supplied the *Forbes* Writer's text messages to their New York legal counsel.

177.     Upon information and belief, at Defendants' request, Montenegro also pressured the *Forbes* Writer in connection with the ultimately scuttled *Forbes* piece.

### *Defendants' Conspiracy was Conceived and Orchestrated in the* <u>*United States and Involves Predominately United States Enterprises*</u>

178.     As discussed herein, as part of their pattern of racketeering activity, Defendants direct, control and coordinate virtually all aspects of global strategy, as well as the day-to-day activities of Derwick Associates, from the United States.

#### Defendants Admit in Formal Documents Publicly-Filed With The <u>United States Government that Derwick Associates is a U.S. Business</u>

179.     In December 2013, Derwick Associates hired a U.S.-based lobbying firm, the Volkov Law Group LLC (the "Volkov Group"), to represent and advance its business interests in

the United States.  Defendants' retention of the Volkov Group reflects that they are actively

seeking new business with other domestic and foreign governments and entities in a manner

consistent with their past business practices.

180.    The Volkov Group formally filed the required LD-1 Disclosure Form on behalf of

Derwick Associates with the United States Government.  In response to a question on the LD-1

Disclosure Form concerning "foreign entities," Derwick Associates represented that there are *no*

*foreign entities* that (i) hold at least 20% equitable ownership in Derwick Associates or any

affiliated organization; (ii) directly or indirectly, in whole or in major part, plan, supervise,

control, direct, finance or subsidize the activities of Derwick Associates or any affiliated

organization; and (iii) are affiliated with Derwick Associates or any affiliated organization that

has a direct interest in the outcome of the lobbying activity.

181.    The Volkov Law Group is part of a group of companies that includes the Volkov

Energy Consulting Group.  According to its website, the Volkov Energy Consulting Group

"guides energy clients through the global political, business and organizational landscape to

produce bottom-line results."  Upon information and belief, Defendants retained the Washington,

D.C.-based Volkov Law Group to guide them "through the global political, business and

organizational [energy-contracting] landscape."

182.    In a press release issued on November 9, 2013 in the United States by a U.S.-

based press agent (Brandon Hopkins) using a U.S.-based press release service (PRWeb),

Derwick Associates announced that Betancourt and Trebbau had met with the government of

Spain to potentially supply power plants to that country.  In the U.S.-issued press release, Derwick Associates expressed an interest in continuing their energy business in Spain.[27]

Defendants Rely Heavily on
U.S.-based Businesses to Construct the Power Plants

183.    By Defendants' own admissions, Derwick Associates relies heavily on several U.S.-based companies, including General Electric, Pratt & Whitney, and ProEnergy Services to provide the materials and services needed to construct the power plants.

Defendants Use New York based J.P. Morgan and Davos
Financial to Funnel Their Illicit Profits into the United States

184.    Upon information and belief, the profits realized under the contracts by Defendants were funneled through J.P. Morgan and Davos Financial in New York (along with other financial institutions).

185.    At all relevant times, Defendants' personal banker at J.P. Morgan was an individual named Eduardo Travieso ("Travieso"), a Vice President in the Private Banking Division who was located in New York, New York.

186.    It has been reported that while at J.P. Morgan, Travieso was tasked by Derwick Associates to obscure the source of their ill-gotten gains.[28]  The scheme worked like this:  after wire transfers from Venezuela placed significant funds in Derwick Associates' accounts, Travieso would buy – and then almost immediately sell – significant quantities of bonds, and then wire the money out of Derwick Associates' account (most often to Derwick Associates' accounts at Davos Financial Group), thus obscuring the true source of the funds.

---

[27]    *Available at*
http://www.prweb.com/releases/DerwickAndAssociates/PowerPlantSpain/prweb11297806.htm (last accessed January 12, 2014).

[28]    *See* Posting to Infodio, October 2, 2013, available at
http://infodio.com/021013/eduardo/travieso/derwick/associates/jp/morgan (last accessed January 12, 2014); Posting to Infodio, July 31, 2013, available at http://infodio.com/310713/eduardo/travieso/jp/morgan/derwick/associates (last accessed January 12, 2014).

187.    On March 21, 2013, according to a required U.S. regulatory filing with FINRA, Travieso separated from J.P. Morgan following allegations that Travieso had potentially committed violations of investment-related statutes, fraud, or failure to supervise in connection with investment-related statutes, arising from certain undisclosed customer interactions by Travieso.  In the filing, J.P. Morgan has stated publicly that "Mr. Travieso acted in a manner that is inconsistent with the Firm's policies and procedures," and had "fallen short of the standards" of financial industry employees.

188.    Travieso was not only Derwick Associates' banker; he was and remains a personal friend of the Defendants.  Indeed, Travieso helped at least one of them secure real property in New York and also procure financing from United States banks.

189.    According to public documents, Defendant Betancourt currently resides at the Olympic Tower, 641 Fifth Avenue, Penthouse 6, New York, New York 10022.  The Olympic Tower is considered one of the top full-service white glove luxury buildings in New York City, and is a symbol of the financial empire of the late Greek shipping magnate Aristotle Onassis and his wife, the former First Lady Jacqueline Kennedy.  Sale documents filed with the New York City Department of Finance, Office of the City Register, indicate that Penthouse 6 was purchased on November 23, 2010 by a company named BL 641 Fifth LLC.  Upon information and belief, "BL" in the company name stands for "Betancourt Lopez."  Upon information and belief, Defendant Betancourt is the effective owner of Penthouse 6, and he (or one of his corporate entities) has been paying and continues to pay New York real estate taxes on that property.

190.    Penthouse 6 is subject to a $5.85 million mortgage *financed by J.P. Morgan.* David Levine, an attorney with the New York law firm, Platte, Klarsfeld, Levine & Lachtman, is identified on the mortgage documents as the "Manager" of BL 641 Fifth, LLC and, upon

information and belief, has been paid in U.S. dollars by Defendant Betancourt for his New York-focused services as manager of BL 641 Fifth, LLC.

191.    The Real Property Transfer Report filed with the State of New York for Penthouse 6 indicates that an individual named Eduardo Travieso signed as *"Buyer"* for BL 641 Fifth LLC.  Upon information and belief, when he signed that document, Travieso *worked for J.P. Morgan Securities LLC* in New York.  In other words, Travieso (for the benefit of Betancourt) appears to have been on both sides of the mortgage finance transaction, *i.e.*, as the buyer of the real property *and* as the financier of the acquisition.

192.    Upon information and belief, Defendants also use Davos Financial Advisors, LLC (d/b/a Davos Financial Group), a financial services firm that maintains offices in New York and Florida, to move their ill-gotten funds.

193.    According to S.E.C. filings, Davos Financial Advisors, LLC is headquartered in the United States at 2665 S. Bayshore Drive, Suite 810, Coconut Grove, Florida, 33133.  That location is also registered as the headquarters of two other businesses managed by David Osio – Davos Mortgage Investors, LLC, and Carraven, LLC.  According to its website, Davos Financial Group maintains offices in New York at 405 Park Avenue, 17th Floor, New York, NY 10022.

194.    In publicly-filed documents, Derwick Associates claims that, in order for it to participate in the Venezuelan energy market, it was required to purchase and provide a U.S.-based original equipment manufacturer with a surety bond for approximately U.S. $500,000 in exchange for a one-month exclusivity period.  During that period, Derwick Associates says that it was contractually required either to sell the equipment to a third party or, if unable to obtain a

purchaser, forfeit the $500,000 amount of the surety bond.[29]  Upon information and belief, the

negotiations, paperwork, financing efforts and the other conduct necessary to agree-upon and

memorialize such transactions here in the United States reflect the U.S.-based focus of

Defendants' business efforts as well as their reliance on U.S.-based businesses.

> Derwick Associates And the Defendants
> Market Their Business Activities in the U.S.

195.    Derwick Associates promotes its business in the United States to prospective

clients.  Upon information and belief, in a recent project proposal to the dictatorship of

Suriname, Derwick Associates claimed in a PowerPoint presentation to have constructed the

Harry D. Mattison Power Plant in Tontitown, Arkansas.

196.    Derwick Associates and Defendants also employ U.S.-based public relations

firms to create "good press" about Defendants and the company and its affiliates in the United

States where Derwick Associates' business and banking relationships are located.

197.    Defendants have retained and caused to be paid at least two U.S.-based press

release services to distribute positive press pieces about Defendants and Derwick Associates:  PR

Newswire, which is a U.S.-based business with its headquarters in New York City, and PRWeb,

which is a U.S.-based business with offices in Virginia, Maryland and Washington, D.C.  Press

releases issued on behalf of PRWeb and PR Newswire are sent to journalists in New York City,

including at *The New York Times*.

198.    That Defendants continue to self-promote their business interests here in the

United States by issuing English language press releases via a U.S.-based public relations

company with a California phone number, and availing themselves of the New York media

---

[29]    Of note, the currency of Venezuela is the Venezuelan Bolivar; yet, Defendants, in their court filings,
discuss their business practices in U.S. Dollars (and not Bolivars) lending further proof to the U.S.-based nature of
Defendants' business.

market reflects that Defendants have substantial business interests that they wish to protect and

advance in the United States.

199.    Within the past six months alone, Defendants have issued the following press

releases in the United States concerning Derwick Associates:

- On January 10, 2014, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets about how Defendants work to "meet the needs of the Venezuelan people." The press release referenced Betancourt and Trebbau, and acknowledged that they intend to continue to seek out business in Venezuela as opportunities are presented. *See* January 10, 2014, PR Newswire, Media Contact: Brandon Hopkins, AfterHim Media LLC, (559) 871-1613, brandonchopkins@gmail.com, *available at h*ttp://m.prnewswire.com/news-releases/derwick-associates-continues-to-meet-the-needs-of-the-venezuelan-people-239623871.html (last accessed January 12, 2014).

- On January 9, 2014, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets about an "award" they supposedly received. The press release referenced Betancourt and Trebbau and, then, quotes from an unnamed "representative with Derwick." *See* December 31, 2013, PR Newswire, Media Contact: Brandon Hopkins, AfterHim Media LLC, (559) 871-1613, brandonchopkins@gmail.com, *available at* http://m.prnewswire.com/news-releases/derwick-associates-wins-capital-award-for-best-latin-american-initiative-238240221.html (last accessed January 12, 2014).

- On December 31, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets that they are looking "to bring [their] unique brand of experience" to Spain. Defendants stated that their business "experience" makes them "uniquely qualified for this opportunity to expand." *See* January 9, 2014, PRWeb, Contact: Brandon Hopkins SunsetReputation.com, (559) 871-1613, *available at* http://www.prweb.com/releases/Pedro-Trebbau-Lopez/Derwick-Associates/prweb11477028.htm (last accessed January 12, 2014) ("Derwick Associates looks to expand").

- On December 26, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets about Betancourt's views of Derwick Associates' business. *See* December 26, 2013, PRWeb, Contact: Brandon Hopkins SunsetReputation.com, (559) 871-1613, *available at* http://www.prweb.com/releases/Leopoldo-Alejandro/Betancourt-Lopez-Derwick/prweb11443299.htm (last accessed January 12, 2014).

- On December 25, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets about how Derwick Associates' business experience has supposedly been well documented.  *See* December 25, 2013, PRWeb, Contact: Brandon Hopkins SunsetReputation.com, (559) 871-1613, *available at* http://www.prweb.com/releases/FranciscoConvitGuruceaga/Derwick_Associates/prweb11443290.htm (last accessed January 12, 2014).

- On November 9, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets that "the directors of Derwick Associates have expressed an interest in taking their projects overseas."  *See* "Derwick Associates Looking to Build Power Plants in Spain," November 9, 2013, PRWeb, Contact: Brandon Hopkins SunsetReputation.com, (559) 871-1613, *available at* http://www.prweb.com/releases/DerwickAndAssociates/PowerPlantSpain/prweb11297806.htm (last accessed January 12, 2014).

- On November 6, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets about how Defendants intend to continue "power plant construction in 2014."  *See* November 6, 2013, PRWeb, Contact: Brandon Hopkins SunsetReputation.com, (559) 871-1613, *available at* http://www.prweb.com/releases/DerwickAssociates/Venezuela-Power-Plant-Job/prweb11297808.htm (last accessed January 12, 2014).

- On November 5, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets that "Derwick is seeking opportunities abroad."  *See* "Derwick Associates to Seek Investment Opportunities in Spain," November 5, 2013, PRWeb, Contact: Brandon Hopkins SunsetReputation.com (559) 871-1613, *available at* http://www.prweb.com/releases/Derwick-Associates/Spain-Expansion/prweb11297809.htm (last accessed January 12, 2014).

200.     Upon information and belief, Derwick Associates employs online "reputation managers" to cultivate a positive online reputation for Derwick Associates (and, by extension, Defendants) in the United States.  Such "reputation managers" create search-result clutter that has the effect of obscuring negative information about Derwick Associates and Defendants should an individual enter search terms like, for example, "Derwick Associates," "Alejandro Betancourt," "Pedro Trebbau," or "D'Agostino" into search engines such as Google.

201.    Upon information and belief, Derwick Associates employs the services of an individual named Rafael Eladio Núñez Aponte a/k/a "RaFa" to manage their online reputations and orchestrate smear campaigns against their opponents.  "RaFa" openly admits that he was formerly a U.S.-based hacker convicted of hacking the website of the United States Air Force, for which he was later convicted and imprisoned.  Upon information and belief, "RaFa" now heads the online reputation company called "Clean Perception," which has an office in Florida; "RaFa" is an owner of the website Primicias24.com, which is discussed more fully below.

202.    Notably, Defendants' reputation-protecting efforts focus mostly on the English-language media in the United States – the only place Defendants care about protecting their reputation and projecting an air of legitimacy.

203.    Upon information and belief, Defendants have also retained FTI Consulting, a U.S.-based business advisory firm with an office in New York, to conduct investigative-type services, and a California-based business known as Sunset Reputation, which also appears to be in the business of reputation management.

Unusual Media Events Suggest That Defendants
May Be Trying to Manipulate the U.S. Media

204.    On September 27, 2013, an article about Derwick Associates was published on *Forbes* magazine's website by an individual named Hilary Kramer ("Kramer").[30]  Kramer's piece on Forbes.com was highly solicitous of Derwick Associates, claiming without attribution that Derwick Associates secured its energy-sector contracts cleanly despite their acknowledged "political connections," and purporting that Derwick Associates' contracts were audited by a company named RSM International.

---

[30]    *See* Hilary Kramer, "Changing Balance of Power May Unlock Venezuela's Markets," September 26, 2013, Forbes.com, *formerly available at* http://www.forbes.com/sites/hilarykramer/2013/09/26/changing-balance-of-power-may-unlock-venezuelas-markets/

205.     The *very next day*, in a highly unusual move, *Forbes* pulled the piece from its

website without comment.  The piece has not been reposted.  Kramer later issued an apology for

the piece via her personal Twitter account, claiming that she was "looking at [Derwick] purely

from a stock-picker's perspective," even though Derwick Associates, of course, does not issue

public stock.  *Forbes'* act of pulling the piece suggests that Defendants or one of their agents was

responsible for its preparation and publication in the U.S. media.

Derwick Associates Uses the U.S. Court System
And U.S. Laws To Protect its Business Interests

206.     Derwick Associates also uses the U.S. court system, including the New York

courts, to protect its U.S.-based economic and financial interests.  Indeed, within the last two

years, and in response to perceived threats to its business, Derwick Associates commenced two

related legal actions in the United States in state courts in New York and in Florida.  In New

York, Defendants Betancourt and Trebbau and Derwick Associates sued a group of unknown

conspirators whom they alleged to be acting in concert with Banco Venezolano and the other

defendants in the Florida Defamation Suit.  Derwick Associates retained legal counsel in New

York to represent its interests in both of those litigations and, upon information and belief, that

same New York law firm continues today to represent Derwick Associates' interests.

Derwick Associates Owns Property in the United
States and Employs Individuals in the United States

207.     Upon information and belief, Derwick Associates owns at least two private jets

that are registered in the United States.  According to published reports, Derwick Associates

owns a Falcon 2000 business jet with tail number N229DA.  The registrant for the plane in the

United States database is CSC Trust Co. of Delaware Trustee, but other registries available

online list the registrant as Derwick Associates under "OpName" for the plane.  There is also a

Cessna 550 jet with United States tail number N300CS registered to CSC Trust Company of Delaware that lists Derwick Associates under "OpName."  "OpName" refers to "operator name."

208.    Upon information and belief, Defendants employ an individual named Gilbert Deleaud ("Deleaud"), who resides in Florida, to fly their private jets.  According to Federal Aviation Administration flight records, between December 20, 2010 and June 8, 2013, the aircraft bearing identification number N229DA, arrived in or departed from airports within the United States, including Teterboro Airport in New Jersey, no less than 185 times.  According to its website, Teterboro Airport is less than 12 minutes from midtown Manhattan.  Teterboro is the main private jet airport serving Manhattan, which has been described as "synecdochical for the New York Dream" and "a landmark of the social geography mapped by "Page Six," *Fortune*, and *Gossip Girl*."[31]

209.    Deleaud is a registered agent for EOE Management Inc., a company registered in Florida on January 9, 2013.  The registered address for EOE Management Inc. is 1100 Lee Wagner Blvd, Suite 349, Ft Lauderdale, FL.  That is the building next door to 1050 Lee Wagner Boulevard, Suite 349, Ft Lauderdale, FL, which – as noted above – is where Derwick Associates USA, LLC is located.  Upon information and belief, Deleaud also shares a home with an individual named Massiel Hernandez, who is listed on public documents as a registered agent for Derwick Associates USA, LLC.

---

[31]     *See* "Teterboro Airport, Ground Zero for the Private-Jet Backlash," July 20, 2009, *New York Magazine*, *available at* http://nymag.com/daily/intelligencer/2009/07/teterboro_airport_ground_zero.html (last accessed January 12, 2014).

Derwick Associates has a United States Contact Number
And an English Language Website that is Accessible in the United States

210.    Derwick Associates' electronic mail signature as used by at least Defendant

Trebbau specifically references www.derwick.com (which is a website published in English) and

lists a "USA Direct" phone number (1-786-266-7703).

211.    Derwick Associates' website can also be found at www.derwickassociates.com,

which is displayed in English, which further demonstrates that their business is U.S.-based; the

native language in Venezuela is not English, but Spanish.

***Within Days of the Original Complaint Being Filed,
Ambassador Reich and ORA Suffer Online Attacks***

212.    It cannot be a coincidence that on August 2, 2013, only days after the Original

Complaint in this action was filed, various websites associated with Ambassador Reich and ORA

(including www.americas-forum.com; www.ottoreich.com and www.ezequielvazquez.com)

were taken offline in what appears to be an intentional denial-of-service attack.

213.    That same day, the Infodio website, known for writing about the corruption of

Derwick Associates, was also taken offline in what appears to have been an intentional denial-of-

service (hacking) attack.

214.    Also that day, an ORA employee witnessed attempts to hack his email via

"phishing" scams.  "Phishing" scams are attempts to get the target to click on a dangerous

website or enter a password (which would then allow the hacker to infiltrate the user's

computer).  The attempts to hack Ambassador Reich and his employees emails continued into

the third week of August.

***Following the Commencement of this Lawsuit, Several
People Referenced in the Original Complaint Were
<u>Targeted and Subjected to Personal Ridicule and Attack</u>***

215.    After the filing of the Original Complaint in this litigation, Ambassador Reich and

at least three individuals referenced in the Original Complaint as having been perceived as

critical of Defendants and/or Derwick Associates were clumsily smeared in various media outlets

in outlandish ways.

Ambassador Reich is Accused of Being an
<u>Assassin, a "Mercenary" and a "Professional Terrorist"</u>

216.    On or about September 25, 2013, the President of Venezuela, Nicolás Maduro,

stated publicly that the reason he did not attend the General Assembly of the United Nations in

New York City was because of unspecified "provocations" against him by Ambassador Reich.[32]

In response to these unfounded allegations, the United States Department of State issued a

statement categorically rejecting allegations of U.S. government involvement in any plots to

harm Venezuelan officials or to destabilize the Venezuelan government.

217.    On or about November 21, 2013, Primicias24.com, a pro-Venezuelan government

website, posted a 47-page "special report" that purports to show that Garcia Mendoza and

Ambassador Reich are in cahoots to destabilize Venezuela.  Referring to Ambassador Reich as a

"mercenary" and "professional terrorist," the Primicias24.com report claims that Ambassador

Reich's lawsuit against Derwick Associates is one part of a larger campaign to overthrow the

government of Venezuela (the "Primicias24 Report").[33]  Upon information and belief, the

---

[32]     *See* "Venezuelan Leader, Citing Plot, Skips U.N.," *Wall Street Journal*, September 25, 2013, *available at*
http://online.wsj.com/news/articles/SB10001424052702304795804579097852798627702 (last accessed January 9,
2014).

[33]     *See* Primicias24.com, *available at* http://www.primicias24.com/nacionales/plan-to-overthrow-Nicolás-
maduro-by-destroying-pdvsa/ (last accessed January 9, 2014).

Primicias24 Report, which has been translated into English, is housed in a Google drive in the United States.[34]

218.    Primicias24.com regularly promotes articles that appear to be little more than press releases about "good works" done by Derwick Associates,[35] and gives prominent placement to smears and attacks on Derwick Associates' enemies.  Indeed, Primicias24.com appears to be little more than a mouthpiece for rhetoric by the Defendants.

219.    According to publicly-available information, Primicias24.com is a U.S.-hosted website operated by Dynadot.com, located in San Mateo, California.[36]  But Dynadot.com does not actually have anything to do with Primicias24.com; rather, Dynadot.com is a company whose business is to help hide the true identity of a website operator.[37]

> Oscar Garcia Mendoza is Accused of Plotting the
> Attempted Assassination of Several Venezuelan Government Officials

220.    Plaintiffs' Original Complaint makes numerous references to Garcia Mendoza who was the President and Board Chairman of Banco Venezolano when the Florida Defamation Suit was commenced.  *See* Original Complaint, ¶¶ 6, 84-87, 92.

221.    In an article originally published on September 23, 2013 on the U.S.-hosted online "news" site Primicias24.com, Garcia Mendoza is accused of plotting to kill Miguel Rodríguez Torres, a Major General in the Venezuelan Army and Director of the National

---

[34]      *Id.*

[35]      For instance, Primicias24.com regularly tweets about "news items" like Derwick Associates' donations to social causes.  *See, e.g.,* https://twitter.com/primicias24/status/250265614357233665 (tweet regarding Derwick donation) (last accessed January 9, 2014).

[36]      *See* http://www.whois.com/whois/primicias24.com (last accessed January 9, 2014).

[37]      *See* Dynadot.com website, *available at* http://www.dynadot.com/domain/privacy.html (last accessed January 9, 2014) ("When someone does a Whois lookup for your domain, your personal email address, phone number, and mailing address are all replaced with Dynadot's domain privacy contact information.").

Bolivarian Intelligence Service (SEBIN), as well as the Minister of the Interior, Justice and Peace of Venezuela.[38]

> Alek Boyd is Accused of Contracting
> AIDS and Intentionally Spreading the Disease

222.    In the Original Complaint, Plaintiffs reference Alek Boyd as one of several authors who have published articles detailing allegations of improper payments by Defendants and Derwick Associates in the securing of the energy-sector contracts.  *See* Original Complaint, ¶ 79.

223.    In an article originally published on September 28, 2013 on Primicias24.com, Boyd was accused of contracting AIDS from a transsexual and deliberately spreading the disease to various men and women around the world.[39]  On September 30, 2013, Primicias24.com published another piece accusing Boyd of spreading AIDS and sleeping with "boys," and in the same piece defended the honor of Derwick Associates, characterizing the company as honest and unfairly maligned by Boyd.[40]

224.    Primicias24.com regularly re-publishes those smears, including tweets linking to the articles.  Indeed, Primicias24.com tweeted a link to the articles on Garcia Mendoza and Boyd as late as November 13, 2013.

> A Banco Venezolano Shareholder
> and Director Suffers a Major Invasion of Privacy

225.    Rafael Alfonzo ("Alfonzo") was a defendant in the Florida Defamation Suit. When that suit was commenced, he was a shareholder and director of Banco Venezolano.

---

[38]      *See* Primicias24.com, *available at* http://primicias24.com/nacionales/oscar-garcia-mendoza-thor-halvorssen-y-leopoldo-lopez-planean-asesinar-al-ministro-rodriguez-torres/ (last accessed January 9, 2014).

[39]      *See* Primicias24.com, *available at* http://www.primicias24.com/actualidad/alek-boyd-has-aids/ (last accessed January 9, 2014).

[40]      *See* Primicias24.com, *available at* http://www.primicias24.com/nacionales/carlos-herrera-respuesta-al-sicario-homosexual-y-enfermo-de-alek-boyd/ (last accessed January 9, 2014).

226.    On or about October 10, 2013, a video was posted on the website Vimeo.com (and republished in a Panama-based newspaper) of Alfonzo.[41]  The video, captioned "My Little Camera Sees Everything," shows Mr. Alfonzo's bedroom, and contains footage of Mr. Alfonzo reading and sleeping.  It appears that a spycam was placed in Mr. Alfonzo's bedroom to surreptitiously record him.

227.    Upon information and belief, the smears and the other actions undertaken by Primicias24.com were directed by Defendants, for the express purpose of undermining those individuals whom Defendants believe to be critical of Defendants.

## FIRST CLAIM FOR RELIEF

### *Racketeer Influenced and Corrupt Organizations Act*
### *18 U.S.C. § 1962(c)*

228.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 227, inclusive, as if fully set forth herein.

229.    Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), are brought against each and every Defendant.  Plaintiffs Ambassador Reich and ORA are each "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).  Defendants Betancourt, Trebbau and D'Agostino are each a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1962(c) who each individually conducted, participated in, engaged in, and operated and managed the affairs of various enterprises through a pattern of racketeering activity.

---

[41]     *See* Posting to Infodio, October 17, 2013, *available at* http://infodio.com/node/556 (last accessed January 9, 2014).

230.     Specifically, Defendants Betancourt, Trebbau and D'Agostino conducted, participated in, and agreed to conspire to conduct the affairs of RICO Enterprises I, II, III, IV, V and VI through a pattern of racketeering activity.

231.     Defendants' enterprises are based in the United States, and the activities of Defendants' enterprises affect interstate and foreign commerce.  As described below, Defendants operate and manage their enterprises through acts of racketeering in violation of the Travel Act, 18 U.S.C. § 1952(a) and (b); the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*; and the federal wire fraud statute, 18 U.S.C. § 1343.

### *RICO Enterprise I – Derwick Associates*

232.     RICO Enterprise I (also referred to herein as "Derwick Associates") is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) and consists of the following members:  Derwick Associates USA LLC and Derwick Associates Corporation, and these entities' predecessors, successors, assigns and affiliates.  The members of Derwick Associates have the common purpose of advancing and protecting the economic interests of Betancourt, Trebbau and D'Agostino.  The members of Derwick Associates are all related in that they are all controlled, operated and managed by, or are the alter egos of Betancourt, Trebbau and D'Agostino.  Derwick Associates possesses sufficient longevity to achieve its purpose(s) in that it has secured more than $1 billion in government contracts, continues to secure additional government contracts, and continues to defend and advance the reputations and business practices of its principals:  Betancourt, Trebbau and D'Agostino.

233.     As set forth above, Betancourt, Trebbau and D'Agostino were the founders, officers, and managers of Derwick Associates, and at all relevant times have directed, controlled and coordinated the activities of Derwick Associates from their New York offices and homes,

including from 450 Park Avenue, New York, New York.  Upon information and belief, Betancourt, Trebbau and D'Agostino communicate with each other by phone, text messages and e-mail on a daily basis and have done so for the duration of the racketeering activity alleged, and have met often in New York and Florida.

234.    Betancourt, Trebbau and D'Agostino agreed to and did conduct and participate in the conduct of Derwick Associates' affairs through a pattern of racketeering activity discussed above, to wit, the solicitation and payment from the United States of Venezuelan officials for purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and from bank accounts in the United States, and the silencing, via wire fraud and other methods, of those (like Ambassador Reich) who were critical of or otherwise posed an actual or perceived threat to Derwick Associates' illicit methods and who could expose their illegal scheme.

235.    Pursuant to and in furtherance of their fraudulent scheme, and as discussed above, Derwick Associates committed multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b); the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*; and the federal wire fraud statute, 18 U.S.C. § 1343.

### *RICO Enterprise II – Betancourt, Trebbau and D'Agostino*

236.    RICO Enterprise II, which is alleged in the alternative, is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) and consists of the following members: Betancourt, Trebbau, D'Agostino, and non-party Convit-Guruceaga.  The members of RICO Enterprise II have the common purpose of advancing and protecting their personal mutual economic interests and the business of Derwick Associates.  The members of RICO Enterprise II are all related in that they are all business partners, associates or colleagues seeking to secure energy-sector contracts, including from the Venezuelan government, through Derwick

Associates.  RICO Enterprise II possesses sufficient longevity to achieve its purpose(s) in that it has secured more than $1 billion in government contracts, continues to secure additional government contracts, and continues to defend and advance the reputations and business practices of Betancourt, Trebbau, D'Agostino, non-party Convit-Guruceaga and Derwick Associates.

237.    At all relevant times, Betancourt, Trebbau, D'Agostino and non-party Convit-Guruceaga directed, controlled, operated, managed and coordinated the activities of RICO Enterprise II from their New York offices and homes, including from 450 Park Avenue, New York, New York.  Upon information and belief, the members of RICO Enterprise II communicate with each other by phone, text messages and e-mail on a daily basis and have done so for the duration of the racketeering activity alleged, and have met often in New York and Florida.

238.    Betancourt, Trebbau, D'Agostino and non-party Convit-Guruceaga agreed to and did conduct and participate in the conduct of the affairs of RICO Enterprise II through a pattern of racketeering activity discussed above, to wit, the solicitation and payment from the United States of Venezuelan officials for purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and from bank accounts in the United States, and actions constituting wire fraud.

239.    Pursuant to and in furtherance of their fraudulent scheme, Defendants Betancourt, Trebbau, D'Agostino, and non-party Convit-Guruceaga committed multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18 U.S.C. § 1343.

### *RICO Enterprise III – Betancourt and Trebbau*

240.     RICO Enterprise III, which is alleged in the alternative, is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) and consists of the following members: Betancourt and Trebbau.  The members of RICO Enterprise III have the common purpose of advancing and protecting their personal mutual economic interests and the business of Derwick Associates.  The members of RICO Enterprise III are all related in that they are all business partners, associates or colleagues seeking to secure energy-sector contracts, including from the Venezuelan government, through Derwick Associates.  RICO Enterprise III possesses sufficient longevity to achieve its purpose(s) in that it has secured more than $1 billion in government contracts, continues to secure additional government contracts, and continues to defend and advance the reputations and business practices of Betancourt and Trebbau.

241.     At all relevant times, Betancourt and Trebbau directed, controlled, operated, managed and coordinated the activities of RICO Enterprise III from their New York offices and homes including from 450 Park Avenue, New York, New York.  Upon information and belief, the members of RICO Enterprise III communicate with each other by phone, text messages and e-mail on a daily basis and have done so for the duration of the racketeering activity alleged, and have met often in New York and Florida.

242.     Betancourt and Trebbau agreed to and did conduct and participate in the conduct of the affairs of RICO Enterprise III through a pattern of racketeering activity discussed above, to wit, the solicitation and payment from the United States of Venezuelan officials for purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and from bank accounts in the United States, and actions constituting wire fraud.

243.     Pursuant to and in furtherance of their fraudulent scheme, Defendants Betancourt and Trebbau committed multiple related acts constituting violations of the Travel Act, 18 U.S.C.

§ 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal

wire fraud statute, 18 U.S.C. § 1343.

### *RICO Enterprise IV – Betancourt*

244.     RICO Enterprise IV, which is alleged in the alternative, consists of Betancourt, an

individual who constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).  Trebbau

and D'Agostino individually conducted, participated in, engaged in, and operated and managed

the affairs of Betancourt through a pattern of racketeering activity within the meaning of 18

U.S.C. § 1962(c).

245.     Trebbau and D'Agostino's said pattern of racketeering activity consisted of

multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the

Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18

U.S.C. § 1343.  In particular, as set forth above, Trebbau and D'Agostino, through Betancourt,

engaged in the solicitation and payment from the United States of Venezuelan officials for

purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and

from bank accounts in the United States, and actions constituting wire fraud.

### *RICO Enterprise V – Trebbau*

246.     RICO Enterprise V, which is alleged in the alternative, consists of Trebbau, an

individual who constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).  Betancourt

and D'Agostino individually conducted, participated in, engaged in, and operated and managed

the affairs of Trebbau through a pattern of racketeering activity within the meaning of 18 U.S.C.

§ 1962(c).

247.     Betancourt and D'Agostino's said pattern of racketeering activity consisted of

multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the

Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18 U.S.C. § 1343.  In particular, as set forth above, Betancourt and D'Agostino, through Trebbau, engaged in the solicitation and payment from the United States of Venezuelan officials for purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and from bank accounts in the United States, and actions constituting wire fraud.

### *RICO Enterprise VI – D'Agostino*

248.    RICO Enterprise VI, which is alleged in the alternative, consists of D'Agostino, an individual who constituted an enterprise within the meaning of 18 U.S.C. § 1961(4). Betancourt and Trebbau individually conducted, participated in, engaged in, and operated and managed the affairs of D'Agostino through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

249.    Betancourt and Trebbau's said pattern of racketeering activity consisted of multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18 U.S.C. § 1343.  In particular, as set forth above, Betancourt and Trebbau, through D'Agostino, engaged in the solicitation and payment from the United States of Venezuelan officials for purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and from bank accounts in the United States, and actions constituting wire fraud.

### *Predicate Acts – Travel Act*

250.    The Travel Act prohibits the use of interstate or foreign commerce to "promote," "manage," or "carry on" unlawful activity.  18 U.S.C. § 1952(a).  Bribery is a form of illegal activity.

251.   As set forth in the preceding paragraphs, Betancourt, Trebbau and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI intentionally made and conspired to use the mail and other facilities in interstate and foreign commerce; to promote, manage, establish, and carry on, their unlawful activities (to wit, bribery in violation of the laws of the United States); and thereafter performed additional acts in furtherance of the specified unlawful activities.

252.   As set forth in the preceding paragraphs, Betancourt, Trebbau and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI intended to and did engage in unlawful activities, namely, the bribery of Venezuelan public officials; Betancourt, Trebbau and D'Agostino used wire communications (including communications via telephone) originating from the United States and traveled to and from the United States and Venezuela to further their pattern of racketeering activity; and Betancourt, Trebbau and D'Agostino accepted and transmitted their ill-gotten gains to and from bank accounts in the United States, including accounts at J.P. Morgan Chase Bank and Davos Financial Group.

### *Predicate Acts – FCPA*

253.   The Foreign Corrupt Practices Act ("the FCPA") prohibits a person from using the U.S. mails or wires to bribe foreign officials to effectuate business.  15 U.S.C. §§ 78dd-1, *et seq*.

254.   As set forth in the preceding paragraphs, Betancourt, Trebbau and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI, knowingly and intentionally made and conspired to make use of the instrumentalities of interstate commerce corruptly in furtherance of offers and payments of money to Venezuelan public officials, knowing that such money was offered and paid, to wrongfully influence such foreign officials in their official capacity in order

to secure improper advantages to assist in obtaining business; to wit, the contracts described above.

255.     As set forth in the preceding paragraphs, Betancourt, Trebbau and D'Agostino through RICO Enterprises I, II, III, IV, V and VI, used wire communications (including communications via telephone, internet and e-mail) originating from the United States on numerous occasions to further these U.S.-based fraudulent activities, and transmitted their ill-gotten gains to and from bank accounts in the United States, including accounts at J.P. Morgan Chase Bank and Davos Financial Group.

### *Predicate Acts – Wire Fraud*

256.     As set forth in the preceding paragraphs, Betancourt, Trebbau and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI, intentionally and knowingly made and conspired to make materially false statements, known by them to be false, to Cedeño, officials from Banco Venezolano, and others, regarding Ambassador Reich and ORA; to wit, that Ambassador Reich and ORA were personally and professionally associated with Derwick Associates and/or its individual members, with the intent that Banco Venezolano, Cedeño and others would rely on those false statements.

257.     Betancourt, Trebbau and D'Agostino's scheme to defraud was calculated to deprive Ambassador Reich and ORA of large sums of money and property, and to destroy Ambassador Reich's and ORA's business reputation and relationships with Cedeño and Banco Venezolano, thereby obtaining an improper benefit for Betancourt, Trebbau and D'Agostino by forever preventing the association of Ambassador Reich and ORA with Cedeño and Banco Venezolano.  The union of Ambassador Reich, Cedeño and Banco Venezolano would have been fatal to Betancourt, Trebbau and D'Agostino's ability to perpetuate their unlawful scheme.  By

taking steps to prevent that association, Betancourt, Trebbau and D'Agostino preserved their ability to continue securing energy-sector contracts through improper means.

258.    As set forth in the preceding paragraphs, Betancourt, Trebbau and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI, used wire communications (including communications via telephone) in interstate commerce to further this fraudulent scheme in violation of 18 U.S.C. § 1343, by relaying false information to Cedeño and Banco Venezolano who relied upon said information to Plaintiffs' harm.

### *Pattern of Racketeering Activity*

259.    Betancourt, Trebbau and D'Agostino engaged in a pattern of racketeering activity as described in this First Amended Complaint that began in 2009 and continued at least through December 2012.  Moreover, Betancourt, Trebbau and D'Agostino's pattern of racketeering has become a regular way in which Defendants conduct their ongoing business and poses a threat of indefinite duration.

260.    As set forth in the preceding paragraphs, Betancourt, Trebbau and D'Agostino have committed at least two acts of racketeering activity in the past ten years; to wit, multiple payments to Venezuelan officials in order to secure energy-sector contracts; multiple transfers of illicitly derived funds to accounts in the United States; and multiple calls placed by telephone from the United States in order to undermine the business of ORA, each as discussed in this First Amended Complaint in violation of the federal wire fraud statute.

261.    Upon information and belief, Betancourt, Trebbau and D'Agostino will continue to make fraudulent statements and commit acts that constitute the basis of violations of the Travel Act, the FCPA, and the federal wire fraud statute.

262.    Betancourt, Trebbau and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI, which are located in the United States, implemented the racketeering acts described in this First Amended Complaint to conduct their regular business activities.

### *Pattern – Relatedness*

263.    As set forth in the preceding paragraphs, Betancourt, Trebbau and D'Agostino's racketeering acts are related by a similar purpose, results, participants, victims, and methods of commission, and are otherwise interrelated by distinguishing characteristics and are not isolated events.

264.    Betancourt, Trebbau and D'Agostino's pattern of racketeering activities are united by a common purpose, including but not limited to, securing monetary benefits for themselves in the United States via the bribery of Venezuelan officials for purposes of securing energy-sector contracts, and to cover up their illicit scheme by causing harm to those who would speak out or work against it.

265.    The common results of Betancourt, Trebbau and D'Agostino's pattern of racketeering activity is to secure contracts from the Venezuelan government, to reap ill-gotten and unlawful rewards upon each individual Defendant and to cause harm, including economic harm, to their critics.

266.    Betancourt, Trebbau and D'Agostino's pattern of racketeering acts have or had similar participants:  Betancourt, Trebbau, D'Agostino (both individually and as members of Derwick Associates) and Convit-Guruceaga.

267.    All of Betancourt, Trebbau and D'Agostino's acts of racketeering cause injury to, among others, those targeted by Betancourt, Trebbau and D'Agostino as threats to their continuing ability to engage in their corrupt business practices.

268.     Betancourt, Trebbau and D'Agostino's pattern of racketeering acts have or had similar methods of commission – to wit:  offers of money made by themselves, or their intermediaries from the United States, to Venezuelan officials in exchange for government energy-sector contracts, telephone calls to individuals or institutions (either made by themselves or via intermediaries) to convey false information about the association of Ambassador Reich and ORA with Derwick Associates, and the transmission of false information about other critics of Derwick Associates.

### *Pattern – Continuity*

269.     As set forth in the preceding paragraphs, Betancourt, Trebbau and D'Agostino's racketeering acts took place repeatedly over a substantial period of time, and threaten to repeat themselves in the future.

270.     Following Derwick Associates' founding in 2009, Betancourt, Trebbau and D'Agostino and their agents repeatedly engaged in behavior violating federal law, as described in the preceding paragraphs, from 2009 until 2012.  During that time period, Betancourt, Trebbau and D'Agostino offered payments on at least twelve contracts in violation of 15 U.S.C. §§ 78dd-1, and transferred the ill-gotten funds to the United States in violation of 18 U.S.C. § 1952(a) and (b).  Further, on no fewer than two occasions in 2012, Betancourt, Trebbau and D'Agostino and their agents conspired to, and did in fact commit, wire fraud in violation of 18 U.S.C. § 1343 in connection with their intention to harm Ambassador Reich and ORA and prevent any investigation into their illicit scheme.  Betancourt, Trebbau and D'Agostino's acts of racketeering were continuous to form a pattern of racketeering activity because they extended for a substantial period of time.

271.     Betancourt, Trebbau and D'Agostino's acts of racketeering are also sufficiently continuous because the acts of racketeering activity evidence Betancourt, Trebbau and D'Agostino's ongoing and regular way of conducting Betancourt, Trebbau and D'Agostino's business.  Further, the nature of Betancourt, Trebbau and D'Agostino's acts themselves imply a threat of continued criminal action, as Betancourt, Trebbau and D'Agostino intend to continue to violate 15 U.S.C. §§ 78dd-1, 18 U.S.C. § 1952(a) and (b), and 18 U.S.C. § 1343 to effectuate their scheme, particularly in regards to forthcoming CORPOELEC contracts to construct power plants and buy various energy-related goods and services, as alleged in the preceding paragraphs, and Betancourt, Trebbau and D'Agostino plan to continue taking actions to keep others (including Ambassador Reich and ORA) from speaking out against them or seeking to thwart their illegal activities in that regard.

272.     There can be no suggestion that Defendants do not intend to continue to engage in the illicit pattern of racketeering activity, which is the subject of Plaintiffs' claims.  In addition to retaining a United States-based lobbying firm in or about December 2013, on January 10, 2014, Defendants issued a press release stating that they are looking to expand their business operations in Spain and will also continue to do business in Venezuela should the opportunity arise.[42]

### *Injury*

273.     As a direct and proximate result of, and by reason of, the activities of Betancourt, Trebbau, and D'Agostino, and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, Plaintiffs suffered the loss of existing and future business relationships and contracts with

---

[42]      *Available at* http://m.prnewswire.com/news-releases/derwick-associates-continues-to-meet-the-needs-of-the-venezuelan-people-239623871.html (last accessed January 12, 2014).

Eligio Cedeño and Banco Venezolano, and the loss of property, contracts and the revenue to be derived therefrom, in an amount to be determined at trial but not less than $2,000,000 plus treble damages, attorneys' fees and the costs in bringing this action.

## SECOND CLAIM FOR RELIEF

### Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. § 1962(d)

274.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 273, inclusive, as if fully set forth herein.

275.    Trebbau and/or D'Agostino conspired with Betancourt to conduct or participate, directly or indirectly, in the conduct of the affairs of RICO Enterprises I, II, III, IV, V and/or VI, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  In particular, Trebbau and/or D'Agostino intended to further an endeavor of Betancourt which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating these criminal endeavors.

276.    In the alternative to Paragraph 275, Betancourt and/or D'Agostino conspired with Trebbau to conduct or participate, directly or indirectly, in the conduct of the affairs of RICO Enterprises I, II, III, IV, V and/or VI, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  In particular, Betancourt and/or D'Agostino intended to further an endeavor of Trebbau which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating these criminal endeavors.

277.    In the alternative to Paragraphs 275 and 276, Betancourt and/or Trebbau conspired with D'Agostino to conduct or participate, directly or indirectly, in the conduct of the affairs of RICO Enterprises I, II, III, IV, V and/or VI, through a pattern of racketeering activity

in violation of 18 U.S.C. § 1962(d).  In particular, Betancourt and/or Trebbau intended to further

an endeavor of D'Agostino which, if completed, would satisfy all of the elements of a

substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or

facilitating these criminal endeavors.

278.    Plaintiffs were injured by Betancourt's, Trebbau's and D'Agostino's overt acts

that are acts of racketeering or otherwise unlawful under the RICO statute, which included acts

constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt

Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18 U.S.C. § 1343.

279.    As a direct and proximate result of, and by reason of, the activities of Betancourt,

Trebbau, and D'Agostino, and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs were

injured in their business or property, within the meaning of 18 U.S.C. § 1964(d).  Among other

things, Plaintiffs suffered the loss of existing and future business relationships, property, and

contracts with Eligio Cedeño and Banco Venezolano, and the loss of property, contracts and

revenue to be derived therefrom, in an amount to be determined at trial but not less than

$2,000,000 plus treble damages, attorneys' fees and costs in bringing this action.

### THIRD CLAIM FOR RELIEF

*Tortious Interference with Prospective Economic Advantage*
*– ORA's Relationship with Cedeño*

280.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through

279, inclusive, as if fully set forth herein.

281.    ORA had a long-standing business relationship with Cedeño, which continued

through 2012 and during which time he received payment for services provided.

282.    ORA reasonably expected the business relationship to continue indefinitely.

283.    Each Defendant knew of the business relationship between Cedeño and ORA.

284.     Each Defendant took steps to, and did, make or cause others to make false statements to Cedeño concerning ORA and/or Ambassador Reich's alleged association with Derwick Associates and/or Defendants, with the purpose of inducing Cedeño to terminate the business relationship, and to withhold future business from ORA.

285.     Defendants did so through improper means, including but not limited to, making knowingly false statements to Cedeño with the purpose of inflicting harm upon ORA; specifically, the false statements were made with the purpose of denigrating ORA's reputation and the integrity of the business thereby causing Cedeño to terminate the business relationship, and withhold any future business, from ORA.

286.     Each Defendant is liable to ORA for the actions described herein, which were undertaken in furtherance of an ongoing conspiracy among all Defendants, and each Defendant took steps in furtherance of the conspiracy and each Defendant was aware that his co-conspirators were taking these actions.

287.     As a direct and proximate cause of Defendants' wrongful interference with the business relationship between ORA and Cedeño, Cedeño terminated his ongoing business relationship with ORA and refused to do future business with ORA.  But for Defendants' wrongful interference, ORA's relationship with Cedeño would have continued into the future.

288.     ORA has suffered substantial damages as a result of Defendants' unlawful interference.

289.     By reason of the foregoing, ORA is entitled to compensatory damages in an amount to be determined at trial, but not less than $1,000,000.

## FOURTH CLAIM FOR RELIEF

### *Tortious Interference with Prospective Economic Advantage* *– ORA's Relationship with Banco Venezolano*

290.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 289, inclusive, as if fully set forth herein.

291.     In December 2012, ORA was in final negotiations with Banco Venezolano to enter into a consulting relationship.  That relationship was to pay ORA no less than $20,000 per month.

292.     ORA had a reasonable expectation that a written contract would be memorialized pursuant to its already-negotiated terms.

293.     Each Defendant knew of the relationship between ORA and Banco Venezolano, and knew that those parties were in final negotiations to memorialize their consulting relationship.

294.     Defendants Betancourt and Trebbau, with the agreement of Defendant D'Agostino, took steps to, and did, make false statements to officials of Banco Venezolano, with the purpose of inducing it to terminate its business agreement, and to withhold future business from ORA.

295.     Defendants made false statements to Banco Venezolano with the purpose of inflicting harm upon ORA; specifically, the false statements were made with the purpose of causing Banco Venezolano to terminate negotiations with ORA, and withhold future business from ORA, thereby causing ORA substantial economic damage.

296.     Each Defendant is liable to ORA for the actions described herein, which were undertaken in furtherance of an ongoing conspiracy among all Defendants, and each Defendant

took steps in furtherance of the conspiracy and each Defendant was aware that his co-conspirators were taking these actions.

297.     Defendants' actions wrongfully interfered with ORA's relationship with Banco Venezolano.

298.     As a direct and proximate cause of Defendants' wrongful interference with the business relationship between ORA and Banco Venezolano, Banco Venezolano terminated its arrangement with ORA and refused to do future business with ORA.  But for Defendants' wrongful interference, ORA's agreement with Banco Venezolano would have been memorialized and continued into the future.

299.     ORA has suffered substantial damages as a result of Defendants' unlawful interference.

300.     By reason of the foregoing, ORA is entitled to compensatory damages in an amount to be determined at trial, but not less than $1,000,000.

## FIFTH CLAIM FOR RELIEF

### *Trade Libel/Injurious Falsehood/Defamation*

301.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 300, inclusive, as if fully set forth herein.

302.     Defendants knowingly published false and derogatory statements about ORA, including that ORA was in business with disreputable individuals and entities, *i.e.*, Defendants Betancourt, Trebbau, D'Agostino, and Derwick Associates.  Defendants knew or should have known that these statements were false and that the false statements would denigrate ORA's reputation and discourage others from dealing with ORA.

303.     The false and defamatory statements concerning ORA constitute defamation and/or defamation *per se*.

304.     Defendants published these false statements of fact to third persons with the purpose of inflicting harm upon ORA; specifically, the false statements were published with the purpose of ruining ORA's business reputation, impugning the integrity of the business and causing clients to terminate their business agreements with, and potential clients to withhold future business from, ORA.

305.     Individuals and entities, namely Cedeño and Banco Venezolano, did in fact terminate their business relationships with ORA and/or refuse to do business with ORA because of Defendants' false statements.  But for Defendants' actions those relationships would have continued and ORA's business reputation would not have been damaged.

306.     Defendants' false and defamatory statements concerning ORA were made maliciously, knowingly, willfully and in conscious disregard of ORA's rights, and were specifically intended to – and did – cause damage to ORA's reputation and business.

307.     Each Defendant is liable to ORA for the actions described herein, which were undertaken in furtherance of an ongoing conspiracy among all Defendants, and each Defendant took steps in furtherance of the conspiracy and each Defendant was aware that his co-conspirators were taking these actions.

308.     As a direct and proximate cause of Defendants' wrongful conduct, ORA has suffered, and continues to suffer, substantial damages as a result of Defendants' defamatory statements.

309.     By reason of the foregoing, ORA is entitled to compensatory and punitive damages in an amount to be determined at trial but not less than $2,000,000.

## SIXTH CLAIM FOR RELIEF

### *Defamation of Ambassador Reich*

310.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 309, inclusive, as if fully set forth herein.

311.     Defendants knowingly published false and defamatory statements about Ambassador Reich, including that Ambassador Reich is personally and professionally associated with, and does business with, disreputable individuals and entities, *i.e.*, Defendants Betancourt, Trebbau, D'Agostino, and Derwick Associates.

312.     The false and defamatory statements concerning Ambassador Reich constitute defamation and/or defamation *per se*.

313.     The false and defamatory statements published by Defendants, as reasonably understood, impugn the integrity, credibility and reputation of Ambassador Reich, and discourage individuals and entities, including potential clients, from associating with him and/or seeking his services, thus injuring him in his business, ORA.

314.     Defendants knowingly and willfully published the false statements of fact with the purpose of inflicting harm upon Ambassador Reich.  By publishing and disseminating the false statements, Defendants intended to besmirch Ambassador Reich's good name and reputation in the community and cause others to terminate their business and other relationships with him and refuse to be associated with him.

315.     Defendants knew or reasonably should have known that the statements were false at the time they were published, and continue to be false today, and Defendants have no evidence to the contrary.

316.     The false and defamatory statements concerning Ambassador Reich were made maliciously, knowingly, willfully and in conscious disregard of Ambassador Reich's rights, and

were specifically intended to – and did – cause damage to Ambassador Reich's character, reputation and business.  But for Defendants' actions, Ambassador Reich's character, reputation and business would not have been damaged.

317.    Each Defendant is liable to ORA for the actions described herein, which were undertaken in furtherance of an ongoing conspiracy among all Defendants, and each Defendant took steps in furtherance of the conspiracy and each Defendant was aware that his co-conspirators were taking these actions.

318.    As a direct and proximate cause of Defendants' wrongful conduct, Ambassador Reich has suffered, and continues to suffer, substantial damages as a result of Defendants' defamatory statements.

319.    By reason of the foregoing, Ambassador Reich is entitled to compensatory and punitive damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### *Civil Conspiracy*

320.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 319, inclusive, as if fully set forth herein.

321.    Each of the Defendants, together with the others, conspired with respect to Counts II through V and acted in concert to commit unlawful acts, including acts of bribery, defamation and tortious interference.  Defendants conspired to engage in these actions with the unlawful objective of interfering with ORA's business relationships by impugning Ambassador Reich's integrity, credibility and reputation; undermining the confidence of ORA's clients and prospective clients; deterring ORA's clients and prospective clients from using ORA's services; and injuring Ambassador Reich in his livelihood.  Each of the Defendants understood the

objectives of the scheme, and accepted them, and was an active and knowing participant in the conspiracy.

322.    Defendants' conspiracy was implemented through the commission of various wrongful and overt acts by each Defendant in furtherance of said conspiracy, including but not limited to, publishing and disseminating false statements about Ambassador Reich and ORA and committing other unlawful acts.

323.    As a direct and proximate result of the operation and execution of the conspiracy committed by Defendants, Plaintiffs have suffered and continue to suffer substantial damages.

324.    By reason of the foregoing, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, but not less than $2,000,000.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs request that the Court enter judgment against Defendants as follows:

a.  Awarding compensatory damages in an amount to be determined at trial but not less than $2,000,000;

b.  Awarding treble damages as authorized by 18 U.S.C. § 1964;

c.  Awarding punitive damages in an amount to be determined at trial;

d.  Awarding Plaintiffs their costs and disbursements plus attorneys' fees; and

e.  Granting such other relief as the Court deems just and proper.

Dated: New York, New York
       January 13, 2014

                                          Respectfully submitted,

                                          SMITH VALLIERE PLLC

                                          By:      / s / Mark W. Smith
                                                        Mark W. Smith
                                                        Noelle Kowalczyk

                                          75 Rockefeller Plaza, 21st Floor
                                        New York, New York 10019
                                        Phone:  (212) 755-5200
                                        Facsimile:  (212) 755-5203
                                        msmith@svlaw.com
                                        nkowalczyk@svlaw.com

                                        *Attorneys for Plaintiffs Otto J. Reich*
                                        *and Otto Reich Associates, LLC*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that she caused a true and correct copy of

the foregoing First Amended Complaint to be served on the 13th day of January 2014, via the

Court's electronic filing system and by first-class mail upon all counsel of record.


Dated: January 13, 2014


SMITH VALLIERE PLLC

By: _____
        Noelle Kowalczyk

75 Rockefeller Plaza, 21st Floor
New York, New York 10019
Phone:  (212) 755-5200
Facsimile:  (212) 755-5203
nkowalczyk@svlaw.com

*Attorneys for Plaintiffs Otto J. Reich*
*and Otto Reich Associates, LLC*