# EXHIBIT F

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 12-36297 CA 11

DERWICK ASSOCIATES CORPORATION,
LEOPOLDO ALEJANDRO BETANCOURT
LOPEZ and PEDRO TREBBAU LOPEZ,

Plaintiffs,

v.

VENEZOLANO DE CREDITO, S.A.,
BANCO UNIVERSAL, OSCAR GARCIA MENDOZA,
RAFAEL ALFONZO HERNANDEZ, CESAR BRICEÑO
LOPEZ, VENECREDIT SECURITIES INC., OSCAR
JOSE GARCIA-NEVETT, JOEL ALEJANDRO
CLORALT FLORES, THE Z COMPANY.COM, INC.
and JOHN DOES 1-10,

Defendants.

______________________________________/

**FIRST AMENDED COMPLAINT**

Plaintiffs Derwick Associates Corporation ("Derwick"), Leopoldo Alejandro Betancourt Lopez ("Betancourt") and Pedro Trebbau Lopez, ("Trebbau") (collectively, "plaintiffs"), by and through their attorneys, Kasowitz, Benson, Torres & Friedman LLP, for their First Amended Complaint against defendants Venezolano De Credito, S.A., Banco Universal ("Banco Venezolano"), Oscar Garcia Mendoza ("Garcia Mendoza"), Rafael Alfonzo Hernandez ("Alfonzo Hernandez"), Cesar Briceño Lopez ("Briceño Lopez"), Venecredit Securities Inc. ("Venecredit"), Oscar Jose Garcia-Nevett ("Garcia-Nevett"), Joel Alejandro Cloralt Flores ("Cloralt"), The Z Company.com, Inc. ("The Z Company") and John Does 1-10 (collectively, "defendants"), allege, upon personal knowledge as to themselves and otherwise upon information and belief, as follows:

## NATURE OF ACTION

1. This action arises from defendants' intentional, unlawful and malicious public campaign to defame and damage plaintiffs by disseminating knowingly false information about Derwick's two principal shareholders and directors, Betancourt and Trebbau, and Derwick's business practices. Defendants' egregious disinformation campaign falsely and maliciously accuses plaintiffs of committing serious crimes, including but not limited to, money laundering, fraud, extortion, theft of hundreds of millions of dollars and partnering with corrupt politicians to profit from "illicit businesses."

2. Defendants, conspiring and acting in concert, have executed their defamatory campaign against plaintiffs by, among other things, posting egregiously false and defamatory statements concerning plaintiffs on the Internet website www.Wikianticorrupcion.org (the "WAC Website"), for the intentional, unlawful and malicious purpose of attempting to injure and destroy plaintiffs' personal, professional and business reputations. Defendant Garcia Mendoza and his cohorts at Banco Venezolano have recently escalated this campaign by, among other things, enlisting reporters and bloggers to publish false, misleading and defamatory articles about plaintiffs in print and electronic media, which are then used as "sources" in other articles, and on websites such as Wikipedia, to disparage further plaintiffs and destroy their reputations.

3. Defendants have continued to disseminate false and malicious rumors widely in the market in the United States, Europe and South America, including, for example, rumors that, as a result of their numerous "crimes," plaintiffs' are being pursued and investigated by law enforcement authorities in the United States and other countries, in a transparent attempt to destroy plaintiffs' relationships with their key U.S. business suppliers and banks. Defendants' defamatory statements have been repeated literally hundreds of times on other Internet sites,

Twitter and various news outlets, including an August 10, 2012 two-page article in Reporte Diario de la Economia, a well-respected and widely read Venezuelan financial newspaper, and on a Wikipedia page created by defendants to defame, harass and disparage plaintiffs.

4. Defendant Garcia Mendoza, the mastermind of this defamatory campaign, is the President and Chairman of the Board of Directors and Executive Committee of defendant Banco Venezolano. Garcia Mendoza launched this campaign from Miami, Florida. He also serves as a director of Novopayment Inc. ("Novopayment"), a Florida-based company. Through intermediaries, defendant Garcia Mendoza has expressly threatened to use his vast resources and influence, and any means necessary to destroy Derwick, Betancourt, Trebbau and anyone else associated with Derwick.

5. Defendant Garcia Mendoza, along with his co-conspirators, enlisted Florida residents, including defendants Cloralt, The Z Company and Garcia-Nevett, to register and build the WAC Website, and to create and implement the defamation campaign. Defendant Cloralt registered the domain name for the WAC Website while he was residing in Florida and working for the Florida-based defendant The Z Company.

6. In furtherance of the defamation campaign, defendant Garcia-Nevett attended a meeting in Miami, Florida in December 2012 during which he supplied false information of criminal wrongdoing, prepared by Garcia-Nevett and defendant Briceño Lopez, to a former U.S. government official in an attempt to cause U.S. authorities to initiate an investigation based on that false information. The express purpose of that misinformation was to harm plaintiffs' business interests in the U.S. and reputations with U.S. governmental authorities.

7. Defendant Garcia Mendoza, among other things, secretly initiated and has diverted corporate funds and misappropriated other resources from companies with which he is associated,

including Banco Venezolano, to control, direct, manage, and finance the operation of defendants' continued defamation campaign. He secretly used defendant Briceño Lopez, Secretary of Banco Venezolano's Board of Directors and Executive Committee, to serve as the executor and organizer of the campaign, and as the WAC Website's webmaster.

8. Another of Garcia Mendoza's co-conspirators, defendant Alfonzo Hernandez, a Banco Venezolano director, actively has participated in the campaign to disseminate false and defamatory information in furtherance of defendants' malicious attempt to injure and destroy plaintiffs. For example, on October 6, 2012, defendant Alfonzo Hernandez made false and defamatory statements in a meeting with the owner of a prominent Venezuelan newspaper and senior personnel of the Venezuelan American Chamber of Commerce ("Venamcham"), one of the most influential U.S.-Venezuelan organizations promoting bi-lateral trade. During this meeting, Alfonzo Hernandez stated that, among other things, plaintiffs are "corrupt", involved in "criminal activities," and have earned money from "dishonest businesses." Alfonzo Hernandez made these false and defamatory statements with the malicious intent of seeking to destroy plaintiffs' professional and business reputations.

9. In mid-September 2012, plaintiffs' counsel informed the WAC Website's Internet administrator and hosting companies of the false and defamatory information on that website and also provided to them a copy of the original Complaint in this action. As a result, on October 10, 2012, certain of the defamatory pages on the WAC Website were rendered inaccessible to the public.

10. In response, defendants altered and intensified their defamation campaign. They actively have conspired, and acted in concert with "bloggers" and a small number of compliant reporters, to republish and continue to disseminate through various other print and electronic

media, the false and defamatory information that originally was posted on the WAC Website, which has stated that it is under construction ("Página en Construcción") since on or about November 5, 2012. Defendants enlisted these "bloggers" and reporters by agreeing to compensate them in exchange for their dissemination of false and disparaging statements about plaintiffs.

11. In addition, defendants have launched a false and defamatory Wikipedia page concerning plaintiffs that is accessible to the public, including Florida residents, on the Internet at http://en.wikipedia.org/wiki/Derwick_Associates. Wikipedia is a free Internet encyclopedia that can be edited by anyone with access to the site. It is one of the largest and most popular websites on the Internet, with an estimated 365 million readers worldwide.

12. Defendants also recruited a freelance writer, who occasionally writes for several prominent U.S. publications, to spread false and defamatory information about plaintiffs. On November 15, 2012, that individual sent an unsolicited and extremely misleading and factually inaccurate e-mail to one of plaintiffs' key business suppliers in the United States. The e-mail falsely implied that Derwick had been misrepresenting the nature of the services that it provides to the energy sector in Venezuela, falsely asserted that Derwick's role in certain power plant projects was as an "intermediary," and maliciously recited the lies that Garcia Mendoza has been attempting to disseminate concerning allegations that Derwick was involved in "money laundering" and "overbilling."

13. Defendants' false and defamatory campaign is clearly intended to disparage plaintiffs and to destroy their current and prospective supplier, banking and other business relationships, which are essential to the operation, expansion and success of Derwick. Defendants' willful actions have caused substantial, irreparable and clear damage and harm to plaintiffs' reputation and business, and are continuing to cause harm.

14. Defendants are liable for their tortious, false and defamatory statements concerning plaintiffs' business and reputation and for all the damages proximately caused to their reputation and business by defendants' egregious misconduct. While the full extent of those damages will be established at the trial of this action, those damages exceed $300 million. Plaintiffs also are entitled to injunctive relief enjoining defendants from continuing their malicious defamatory conspiracy and campaign.

## THE PARTIES

15. Plaintiff Derwick is in the business of offering and providing engineering, procurement and construction ("EPC") services to power plant companies in Venezuela and other countries in South America. Those services include, among other things, the procurement of power plant equipment, such as turbines, from major U.S. and European companies, such as General Electric, Pratt & Whitney, Rolls Royce, Wood Group and ProEnergy Services. Derwick employs over 100 professionals, and its contractors and subcontractors employ over 2,000 people.

16. Derwick's Board of Directors includes Betancourt, Trebbau, Edgard Romero Lazo, Iker Candina, Orlando Alvarado and Domingo Xavier Guzman Lopez.

17. Plaintiff Betancourt, the co-founder and President of Derwick, resides in Venezuela and holds a Bachelor's degree in international economics from Suffolk University in Massachusetts.

18. Plaintiff Trebbau, co-founder and Vice-President of Derwick, resides in Venezuela and graduated with honors and a degree in Biochemistry from Boston College.

19. Defendant Banco Venezolano is incorporated under the laws of Venezuela, the location of its principal place of business, and has transacted business in Florida, directly or indirectly, for over a decade. In 2001, Banco Venezolano obtained authorization to transact

business in Florida through an international representative office, and from 2001 through at least 2006, maintained a business address at 1111 Brickell Avenue, Suite 1575, Miami, Florida.

20. Defendant Garcia Mendoza is Banco Venezolano's President, Chairman of Banco Venezolano's Board of Directors and Executive Committee, and a significant shareholder of Banco Venezolano. Garcia Mendoza resides in Venezuela, but maintains substantial business interests in Florida, including, but not limited to: (a) serving as a director of Florida-based Novopayment; and (b) serving as a director of Florida-based Campo Claro Investments Inc. ("Campo Claro"). Campo Claro was incorporated in Florida on May 12, 2011, invested in real estate in Miami in July 2011, and maintains a registered office at 1200 S. Pine Island Road, Plantation, Florida. Garcia Mendoza is a distant relative of Betancourt.

21. Defendant Alfonzo Hernandez, a shareholder and director of Banco Venezolano, resides in Venezuela but maintains substantial business interests in Florida, including: (a) serving as a manager of Alfistais LLC, which was incorporated in Florida on October 11, 2010, and is located at 3801 Bridgewood Drive, Boca Raton, Florida, and (b) ownership of real estate in Florida, including property located at 1105 West Cypress Drive, Pompano Beach, Florida.

22. Defendant Briceño Lopez is the Secretary of Banco Venezolano's Board of Directors and Executive Committee, and served as executor and organizer of the defamatory campaign against plaintiffs, including the WAC Website's webmaster. Briceño Lopez conducts business on behalf of Banco Venezolano in Florida, and prepared and provided false information of criminal wrongdoing by plaintiffs to former U.S. government officials and their assistants in Miami, Florida. The original Complaint in this action was served on Briceño Lopez during a recent trip to Miami, Florida on December 4, 2012.

23. Defendant Venecredit is a broker-dealer that was incorporated by defendant Banco Venezolano under the laws of the State of Florida in 2001. From 2001 through at least 2006, Banco Venezolano operated Venecredit as a wholly-owned affiliate. Venecredit continues to maintain a business address at 1111 Brickell Avenue, Suite 1575, Miami, Florida. Banco Venezolano and Venecredit currently do business through a web of companies, including VBT Holdings Ltd. and VBT Bank & Trust Ltd.

24. Defendant Garcia-Nevett, the son of Garcia Mendoza, resides in Florida, and owns property located at 63 South Prospect Drive, Coral Gables, Florida. Garcia-Nevett maintains substantial business interests in Florida, including: (a) serving as a director of Florida-based Venecredit; (b) serving as a director of Florida-based Novopayment; (b) serving as a director of Florida-based Campo Claro; and (c) serving as a manager of Florida-based GG Press, LLC. Garcia Mendoza's brother, Germán Garcia-Velutini, is a director of Banco Venezolano and the Chairman of the Board of Venecredit.

25. Defendant Cloralt, who attended Florida International University and was a resident of Florida from at least 2007 through 2012, is a software engineer employed by defendant The Z Company. Cloralt continues to engage in substantial and not isolated business activities in Florida including: (a) serving as software engineer for defendant The Z Company and, in connection with his work for defendant The Z Company, registering the WAC Website; (b) serving as a manager with Fivewaves, LLC, a company with its principal place of business at 2102 Brickell Ave., Unit 2302, Miami, Florida; and (c) together with certain of the founders of defendant The Z Company, launching in 2009 an online Miami start-up -- Worsterer.com. He currently resides in California.

26. Defendant The Z Company is incorporated under the laws of Florida with its principal place of business at 1545 Southwest 23rd St., Miami, Florida. The Z Company has

transacted business in Florida since 2009. According to the Florida Department of State, The Z Company was registered as a domestic, for-profit corporation on June 15, 2009. Its Articles of Incorporation provide that the company was formed "for the purposes of creating online software, online properties and consulting." The President, Vice President and Secretary of The Z Company all reside in Florida.

27. Defendants John Does 1-10 are unknown defendant co-conspirators who, in addition to the above-named defendants, participated in the conspiracy and campaign to disseminate false and defamatory information about plaintiffs on the WAC Website and through other means. Because the names of defendants John Does 1-10 currently are unknown, plaintiffs assert the claims against those defendants under such fictitious names. As soon as plaintiffs learn their identities, plaintiffs will amend or, if necessary, seek leave to amend this First Amended Complaint and add them as defendants in this action.

## JURISDICTION AND VENUE

28. The Court has jurisdiction over this matter because the amount in controversy exceeds $15,000, exclusive of interest, costs and attorneys' fees.

29. Jurisdiction is also proper in this Court pursuant to § 48.193(2), Fla. Stat., because, among other things, defendants, individually and through their agents, are engaged in substantial and not isolated activities within the State of Florida and they own, manage, direct, operate and/or control several Florida entities and/or own real and personal property in Miami-Dade County, Florida, and pursuant to § 48.193(1)(b), Fla. Stat., because defendants committed tortious acts in Miami-Dade County, Florida.

30. Venue is proper in this Court pursuant to §§ 47.011, 47.021 and/or 47.051, Fla. Stat.

## FACTS

### A. Overview of Derwick

31. Derwick is engaged in the business of offering and providing engineering, procurement and construction ("EPC") services to power plant companies in Venezuela and other countries in South America. In or about June 2007, Betancourt and Trebbau co-founded Derwick. Each owns a 50% share in the company. Betancourt serves as Derwick's President, Trebbau serves as Derwick's Vice-President, and both serve on Derwick's Board of Directors.

32. Betancourt manages a team of over one hundred professionals who are operating in connection with fifteen different projects throughout Venezuela. He also is responsible for the origination, structuring and execution of all Derwick projects, and has primary responsibility for the management of Derwick's relationships with its clients, suppliers and regulators.

33. Betancourt has many years of professional experience in energy sales, extensive deal experience, and engineered some of the largest and most complex energy/EPC transactions in Venezuela. Before co-founding Derwick, Betancourt served as a Director for BGB/GESCA ("BGB"), a Venezuela-based affiliate of Japan-based Kawasaki Heavy Industries Ltd., one of the world's largest manufacturers of heavy energy equipment. During his tenure at BGB, Betancourt was involved in the purchase, sale and installation of more than thirteen turbines throughout Venezuela, generating over $20 million in revenue. Betancourt also was appointed an external consultant for Gazprom and Gazprombank for their operations in the Andean Region.

34. In or about January 2007, Betancourt left BGB to launch his own company for purposes of engaging in the EPC services business serving the Venezuelan and foreign energy markets.

35. Betancourt subsequently recruited plaintiff Trebbau, who has extensive experience in the energy industry in Venezuela, including the procurement and sale of electrical equipment capable of generating in excess of 2,000 megawatts of energy. Trebbau has primary responsibility for the supervision of operations of all projects, and is directly responsible for the execution of large EPC contracts in Venezuela. Trebbau is also responsible for establishing strategic alliances with international engineering, procurement and construction firms and, together with Derwick's Chief Financial Officer, Orlando Alvarado ("Alvarado"), managing the relationships with Derwick's international banks.

36. Before joining Derwick, Trebbau was Product Researcher and Project Manager for Procter & Gamble de Venezuela. Trebbau was the project leader for Procter & Gamble's first global initiative for Latin America.

37. Other members of Derwick's core management team have many years of leadership experience in EPC, private financing and related energy services businesses. Derwick's Directors of Operations, Edgard Romero Lazo ("Romero Lazo") and Iker Candina ("Candina"), together have more than 30 years of experience in the Venezuelan energy sector. Romero Lazo formerly served as Director of Operations for Petrolago (one of the largest EPC firms in Latin America), the President of Petrosuministros (a general EPC contractor with over 20 years of experience developing civil and energy related projects), and as a Director of Energy and Petroleum for the Chamber of Engineers in Venezuela. Candina, among other things, formerly served for more than seven years with the Venezuelan national oil company, and served in a senior position working in the largest oil refinery in Venezuela.

38. Derwick's Chief Financial Officer, Alvarado, has extensive structured and leveraged finance experience. He was responsible for structuring over $10 billion in bond

underwriting for corporate and governmental entities. Alvarado has worked on over thirty capital markets, syndicated loans, structured and bilateral loans and acquisition finance transactions across the region, advised and financed some of the highest profile energy acquisitions in Latin America in 2006 and 2007, and was responsible for recommending the approval and supervising the management and surveillance of over $2 billion in loans to Latin American companies.

## B. Derwick's Strategy and Initial Success

39. Derwick's commencement of operations in Venezuela coincided with an increasing demand for thermal energy equipment as a result of the accelerated increase in energy consumption within the country that could not be met entirely by the country's hydroelectric power plants. The original equipment manufacturers ("OEMs" or "suppliers") of the thermal energy plant equipment, large multi-national corporations, however, generally were reluctant to conduct business directly with the Venezuelan-controlled entities that controlled the Venezuelan energy industry because of the credit risk and a refusal to accept the payment terms of those entities. Under those payment terms, the energy companies typically would pay only 10% of the value of the equipment as a down payment and would not pay the remaining 90% until approximately one year after delivery of the equipment.

40. Because it was a new entrant in the energy market, Derwick conducted a comprehensive analysis of the market and its competitors and developed a strategy specifically tailored to attempt to develop and increase its industry market share. As part of that strategy, Derwick formulated and submitted aggressively-priced bids for contracts from the different government-controlled entities in the energy industry and also agreed, as part of its bid package, to assume the credit risks that were discouraging many of its competitors from bidding on projects.

41. Derwick's strategy, while successful, involved considerable risks. To participate in these transactions, Derwick first needed to procure the energy equipment from one of the few major OEMs with the capability and capacity to supply the necessary equipment. To place an order to "reserve" a standard turbine from one of those OEMs, Derwick generally was required to purchase and provide the OEM a surety bond for approximately $500,000 in exchange for a one-month exclusivity period. During that period, Derwick contractually was required either to sell the equipment to a third-party or, if unable to obtain a purchaser before expiration of the one-month deadline, forfeit $500,000.

42. Derwick often was required to purchase the bond and reserve the equipment during the time that its bid was being evaluated by the government-controlled entities and without any assurance that it would be awarded the contract. With respect to each transaction, therefore, Derwick faced a risk of forfeiting $500,000.

43. In addition, Derwick invested substantially in developing the capacity to expand the scope of its services to include EPC and operation and maintenance work. Thus, another important element of Derwick's strategy was to offer and provide installation services for all of the equipment that it procured and sold. Very few of Derwick's competitors agreed to provide similar services to clients after the sale of the equipment. This was a critical and invaluable service for clients for many reasons. Among other things, it obviated the need for additional discussions or negotiations concerning warranties and guarantees for the equipment.

44. These services also provided increased certainty regarding performance of the equipment, which is critical in large-scale energy projects. Typically, if the sale and installation services are provided by different companies and a problem arises, it is difficult to identify the genesis of the problem. The seller of the equipment may blame the installer, and the installer of

the equipment may blame the seller. Derwick recognized that the nature of the market presented an opportunity to provide EPC services that would supply substantial and unparalleled value for the client.

45. Further, because capital and financing from banks and other financial institutions was difficult to obtain when Derwick was formed, Betancourt raised the funds required to operate the business and implement the Derwick strategy by mortgaging a large percentage of the Betancourt family's long-held real estate and personal assets.

46. In short, Derwick's considerable success in obtaining several significant energy equipment contracts was attributable to, among other things, the preparation and submission of creative and highly-competitive bids that were tailored specifically to each contract, more competitive lead times, Derwick's willingness to assume risks that many of its other competitors avoided, and the expansion of its services to include EPC, and operation and maintenance work.

C. **The Venezuelan Energy Crisis of 2009**

47. Venezuela is one of the world's largest generators of -- and historically has been heavily dependent on -- hydroelectric energy. In 2009, one of the worst droughts in decades crippled the power plants that supplied most of Venezuela's energy, plunging cities into darkness and forcing severe rationing to avert nationwide blackouts and paralysis. That crisis further increased the need and demand for the development of new thermal energy power plants. The development of such plants, however, was hindered by the complex, regulatory process governing the submissions of bids, and the granting of contracts, for the engineering, procurement and construction of those new plants.

48. In response to this national crisis, on February 8, 2010, the Venezuelan government declared an "energy emergency" and enacted a special decree known as Gaceta Oficial 39.363,

which, among other things, relaxed certain of the existing onerous and time-consuming bidding procedures and regulations that governed all purchases of power equipment by the government-controlled entities. At that time, Derwick was uniquely positioned to assist in ameliorating the energy crisis because it had developed a strong track record in the Venezuelan energy market, a strong relationship of trust with the OEMs in the United States and Europe, and also had developed extensive experience in the procurement of thermal plant turbines and related energy equipment on a reliable and expeditious basis.

49. During this time, Derwick participated in the competitive bidding process with respect to EPC of thermal power plants as well as the operation and maintenance of those plants. Because of its significant competitive advantage, including, among other things, the strength of its execution in connection with the provision of procurement services and absence of many competitors capable or willing to provide the full range of engineering, procurement and construction services, Derwick was successful during that bidding process. Between 2009 and 2010, Derwick submitted more than 25 bids on EPC projects and received EPC contracts on twelve of those projects.

50. Derwick's strategy with respect to the EPC bids was an extension of its successful earlier strategy with respect to its procurement work: Derwick offered the clients competitively priced bids, accepted the credit risk and payment terms associated with the contracts, and included broad warranties and guarantees with respect to sales and installation of power equipment.

51. Derwick's completion rate on its EPC contracts is one of the highest in the industry in Venezuela. Despite its relatively recent entry into the market, Derwick is now widely recognized as one of the top EPC contractors in the country.

D. **Defendants' Defamatory WAC Website**

52. Defendants' conspiracy and campaign to spread false and defamatory information concerning Derwick, Betancourt and Trebbau, began as isolated attacks on Facebook, Twitter and e-mail, but rapidly escalated to a highly-organized and aggressive conspiracy and campaign to defame plaintiffs and anyone associated with Derwick.

53. On June 29, 2012 and August 2, 2012, articles containing numerous false and defamatory statements concerning plaintiffs were posted on the WAC Website.

54. The WAC Website was founded and is financed, operated and controlled by defendant Garcia Mendoza, and the defendant co-conspirators affiliated with Banco Venezolano. To ensure further defendants' direction and control over the content of the WAC Website, Garcia Mendoza installed Briceño Lopez, the Secretary of the Board of Directors for Banco Venezolano and its Executive Committee, to serve as the WAC Website's webmaster. As webmaster, Briceño Lopez exercised virtually complete control of the content over the website and also in many instances managed the administrative access, which effectively enables the webmaster to restrict those who may have access to the website for any purposes.

55. The WAC Website is being hosted in a virtual server operated by Page.ly, which is located in a data center owned by Firehost.com, a cloud-hosting company based in Dallas, Texas. Page.ly is owned by Obu Web Technologies, Inc. The WAC Website was registered through Domains By Proxy, an Internet company owned by GoDaddy.com.

56. Until recently, the WAC Website was being exploited by the defendants to disseminate anonymously their egregiously false and defamatory information against plaintiffs on the Internet with the clear expectation that they would be able to escape all responsibility and

accountability for the enormous harm they were willfully inflicting upon Derwick, Betancourt and Trebbau.

57. Defendant Garcia Mendoza and the other co-conspirator defendants, directly or indirectly, through intermediaries such as the webmaster Briceño Lopez, wrote, reviewed and posted the defamatory articles to the WAC Website, whose sole and unlawful purpose was to attempt to destroy the reputation, integrity and business of plaintiffs.

58. The defamatory statements made publicly by defendants about plaintiffs on the WAC Website (a copy of which, including English translations, are attached hereto as Exhibit A) include, but are not limited to, the following:

(a) Plaintiffs "*launder[ed] the money originating from oil and electricity corruption*[1] and join[ed] *illegal financial deals*" through their "associat[ion] ... with **Caesar Camejo** to purchase **Casa Propia**." (bold emphasis in original)

(b) After Casa Propia closed in 2010, plaintiffs "found another Venezuelan financial entity through which they continued to *launder the money that was the product of their crimes*."

(c) Plaintiffs "were involved in the **theft of 500 million dollars**" from another Venezuelan corporation, Corporacion Venezolana de Guayana (CVG). (emphasis in original)

(d) Plaintiffs have "*stole[n] the amount of* **one point three billion dollars ($1.3 BILLION)**" from CVG. (bold emphasis in original)

(e) Plaintiffs are part of a "*criminal group*" that have amassed a "pot ... [of] up to about two billion dollars (US$ 2.0 billion) ... through which [they] *launder money* by making investments."

(f) Betancourt, as "the gang's boss, would be the owner of the most so-called *pot*, circa $800 million, which he has put into international banks...."

(g) "At the present time, [plaintiffs] are out of the country, as it seems that they are being investigated by the intelligence agencies. However, because of [plaintiffs'] relationships with high government officials and the Public Prosecutor's Office, and also due to the immense amount of money that they

[1] All emphasis is supplied, unless otherwise stated.

have available for bribes, this investigation would appear to be frozen. That's is [sic] not the case with the U.S. intelligence agencies, which follow the trail."

(h) Plaintiffs, "*without a tender*" *improperly obtained* "*contracts for over 3 billion dollars*."

(i) Plaintiffs profited from numerous "*obscene illegal business*."

(j) Plaintiffs are part of "[a] *new group of private sector criminals* in association with corrupt government employees..."

(k) Plaintiffs have engaged in "*illegal activities*" that have generated "*illegal earnings* for the brokers, among them, relatives of Betancourt" that may amount to "close to 60 million dollars."

(l) "This entire fortune was made in less than three years and with absolutely high profile, trampling on and *threatening even journalists with total impunity*, while [Betancourt] was supported by his good relationships with police officers, public prosecutors, governors and ministers."

(m) Plaintiffs *committed* "*crimes*" by operating two companies at the same time and "buy[ing] [oil] shipments below international prices..."

(n) Betancourt purchased a hunting estate for "**$24 million dollars** ... through the same company that he *scammed the country* with during the electricity emergency: **Derwick Associates!**" (emphasis in original)

(o) A "gang led by [Betancourt] ... [i]n the most public manner, as if it concerned a legal business ... is *trafficking in coltan*." (Mining the mineral coltan, a vital raw material for high-tech manufacturers worldwide, is illegal in Venezuela.)

(p) "Through the **Listo Shipping Co 1 s.a.** ... [Plaintiffs] purchased a cargo ship which not only transported diesel to the Caribbean islands for illegal sale, but it also smuggled shipments of coltan [tantalite] from Guyana."

(Together, the statements identified in sub-sections (a) through (p) of this paragraph are referred to as the "WAC Defamatory Statements.")

59. In addition to making the WAC Defamatory Statements, defendants published Betancourt's photograph, personal address and passport number on the WAC Website -- and similar personal information of Derwick's other board members -- in connection with the dissemination of their egregious falsehoods.

60. Each of the WAC Defamatory Statements is patently and egregiously false.

61. Until recently, the WAC Website was publicly accessible from any internet search engine on every web browser, and had been accessed by users in Miami-Dade County and throughout the State of Florida.

62. Defendants' use of the WAC Website to defame third parties violated the express terms of the Usage Policies of Page.ly, Firehost.com, GoDaddy.com and Domains By Proxy. Defendants' posting and tweeting of defamatory information from the WAC Website also violated the express terms of the Usage Policy of Twitter.

63. On or about September 21, 2012, plaintiffs' counsel notified Domains By Proxy of the WAC Website's exploitation of its network and services to further their malicious and defamatory campaign against plaintiffs. In response to plaintiffs' communication, Domains By Proxy cancelled the WAC Website's private registration on or about September 28, 2012 and disclosed to plaintiffs that WAC Website's registrant was an individual located in Panama supposedly named "Ricardo Cordoba."

64. Domains By Proxy also disclosed that the contact information for the WAC Website's registrant was "joel@thezcompany.com," which is defendant Cloralt's e-mail address with defendant The Z Company. Within minutes of the disclosure of his true identity, defendant Cloralt sent an angry e-mail to Domains By Proxy, protesting that his identity -- and thus his affiliation with the WAC Website -- was disclosed to plaintiffs' counsel. Cloralt evidently used the fictitious name "Ricardo Cordoba" in an attempt to conceal his identity and unlawful conduct.

65. In late September and early October 2012, plaintiffs' counsel notified Page.ly and Obu Web of defendants' posting of false and defamatory material on the WAC Website, and

requested their assistance in suspending service to the WAC Website as required under their published policies.

66. On October 10, 2012, Page.ly advised plaintiffs that it had made access to the web pages containing the WAC Defamatory Statements "private," and had "remove[d] the site owner as author," meaning that the false and defamatory posts from the WAC Website were restricted from public access. Nonetheless, many of defendants' WAC Defamatory Statements remain publicly accessible through blogs and other sites, which have republished those statements. For example, on August 10, 2012, Reporte Diario de la Economia, a financial Venezuelan newspaper, dedicated two full pages of the newspaper to repeating and further disseminating defendants' WAC Defamatory Statements. Those statements now have been disseminated beyond the anonymous blogosphere to the general population and the U.S. (including Miami-Dade County) and international media. (A copy of Reporte Diario de la Economia's article, including an English translation, is attached hereto as Exhibit B.) Since on or about November 5, 2012, the WAC Website has stated that it is under construction ("Página en Construcción").

67. In addition, on August 10, 2012, Daniela Portugnuolo, the wife of defendant Briceño Lopez, repeatedly "tweeted" a virtual recitation of certain of the WAC Defamatory Statements under the assumed Twitter account name "daniporta." (A copy of Ms. Portugnuolo's Tweets, including an English translation, is attached hereto as Exhibit C.)

68. Garcia Mendoza similarly has used his Twitter account to disseminate defendants' WAC Defamatory Statements. For example, since the initial publication of the WAC Defamatory Statements, Garcia Mendoza repeatedly has sent Tweets defaming plaintiffs and containing a link to the WAC Website to important international business leaders. (A copy of Garcia Mendoza's Tweets, including an English translation, is attached hereto as Exhibit D.) Garcia Mendoza also

has met with and enlisted a number of reporters and bloggers to further disseminate the WAC Defamatory Statements.

69. On September 21, 2012, the New York Times published an article concerning, among other things, purported "scandals" in Venezuela relating to "ghost companies" landing "contracts worth hundreds of millions of dollars to supply gas turbines and other equipment at shamelessly inflated prices," which contained a direct link to the WAC Website and the WAC Defamatory Statements.

70. Defendants' false and defamatory statements regarding plaintiffs thus continue to remain available to millions of Internet users and any person who runs a search on any Internet search engine using the names of any of the plaintiffs.

71. Plaintiffs have no means of removing these egregiously false and defamatory statements from the WAC Website and the Internet.

72. Moreover, absent an injunction, defendants easily can transfer the contents of the WAC Defamatory Statements to another website and re-post and/or republish the defamatory material at any time.

**E. <u>Escalation of the Defamatory Campaign</u>**

73. In recent months, defendants have intensified their efforts to spread false and defamatory information concerning plaintiffs.

74. One of Garcia Mendoza's co-conspirators, defendant Alfonzo Hernandez, a member of Banco Venezolano's Board of Directors, in particular has made repeated malicious attempts to injure and destroy Derwick's business relationships critical to the company's operations. He engaged in a letter writing campaign to Derwick's banks, falsely accusing Derwick of, among other things, "money laundering," and requesting that the banks take adverse action with respect to

Derwick's corporate checking accounts and launch an investigation into Derwick's allegedly "criminal" conduct.

75. Moreover, on October 6, 2012, Alfonzo Hernandez reiterated certain of the WAC Defamatory Statements in a meeting with certain of Venezuela's most well-known media and business people. During this meeting, which was attended by the owner of El Nacional, one of the most prominent Venezuelan newspapers, and top officials from Venemcham, the United States-Venezuelan Chamber of Commerce and one of the most influential U.S.-Venezuelan organizations promoting bi-lateral trade, Alfonzo Hernandez stated, among other things, that plaintiffs are "corrupt," involved in "criminal activities," and have earned money from "dishonest businesses." Alfonzo Hernandez made these false and defamatory statements with the malicious intent of seeking to destroy plaintiffs' professional and business reputations.

76. In addition, defendants have enlisted the services of several reporters and "bloggers" affiliated with Garcia Mendoza with access to foreign and domestic print and electronic media, to continue their conspiracy and highly coordinated defamation campaign against plaintiffs and others associated with Derwick.

a. **<u>The Internet Blog Attacks Against Plaintiffs</u>**

77. On October 16, 2012, an article appeared on an Internet blog (the "Blog"), which contained certain of the same false and defamatory material that had been posted on the WAC Website, including falsely suggesting, among other things, that plaintiffs unlawfully had secured contracts through a corrupt, non-bidding process.

78. Later that same day, the Blog posted another article concerning plaintiffs, which also repeated certain of the false and defamatory statements that were posted on the WAC Website. That article falsely implied that plaintiffs have "useful connections" to corrupt

businessmen and politicians, and falsely reported that Betancourt was involved in the disappearance of $500 million he purportedly wired to one of these individuals. The article also reiterated the WAC Website's false and defamatory statement that plaintiffs received ill-gotten profits due to overcharging customers.

79. On November 15, 2012, a freelance writer aligned with Garcia Mendoza, who claimed that he was writing a "Forbes blog" concerning Derwick and that he had a deadline of November 23, 2012, sent an unsolicited and extremely misleading and factually inaccurate e-mail to one of Derwick's key suppliers (the "November 15 e-mail").

80. The November 15 e-mail falsely implied that Derwick has been misrepresenting the nature of the services that it provides to the energy sector in Venezuela, falsely asserted that Derwick's role in certain power plant projects was merely as an "intermediary," and maliciously recited the lies that Garcia Mendoza has been attempting to disseminate concerning allegations that Derwick was involved in "money laundering" and "overbilling." Such an unsolicited and misleading communication to such a critical Derwick business supplier from such a highly-respected publication such as Forbes, obviously was extremely injurious to Derwick and its founders.

81. On the following date, November 16, 2012, the same individual sent another e-mail to Derwick's supplier forwarding the November 15 e-mail he sent the day before and requesting a response to his inquiry.

82. On November 19, 2012, the Blog posted another article entitled "Hugo Chavez using proxies to prosecute critics in US Courts," which, among other things, praised Garcia Mendoza, referred to Derwick as a "fly-by-night company," reiterated the false and defamatory statements concerning plaintiffs' "inexperience and lack of track record" and the "scandal

involving a 'lost' $500 million wire." The Blog also falsely stated that this action (referring to the original Complaint) was filed at the direction of Hugo Chavez "for financial and political reasons." This blogger also boasted that he "collaborated" with reporter Cesar Batiz for his article.

83. In a November 20, 2012 letter (the "Forbes letter"), plaintiffs' counsel informed Forbes Magazine of the false, misleading and defamatory statements referenced in the November 15 e-mail and requested that Forbes not publish those allegations until it fact-checked all sources with extreme care and gave plaintiffs a fair opportunity to respond to any allegations of unlawful conduct. Immediately after the submission of this letter, the author of the November 15 e-mail sent two e-mails to plaintiffs' counsel stating, among other things, that he is "not bound by any exclusive arrangement to write for Forbes ... [has] written for a myriad of publications and will find a suitable venue if [he] deem[s] there is a story -- or a series of stories -- that may interest [his] readers."

84. Less than 24 hours later, in a transparent reference to the Forbes letter, the Blog posted a defamatory article concerning plaintiffs and certain purportedly "threatening letters from ... [plaintiffs' counsel]," stating that he "had been talking about Derwick [sic] fraud to ... other sources."

85. Two days later, on November 23, 2012, the author of the November 15 e-mail sent plaintiffs' counsel another e-mail, stating that "before the end of the year," he would be submitting articles concerning plaintiffs to several publications for consideration, including the Miami New Times, Moscow's Pravda, La Gaceta de Guinea Ecuatorial (based in Malabo), Ny Tid (based in Oslo), and the Irish Times, and derisively stating that plaintiffs' counsel may want to send letters to those publications "to get out ahead of things."

86. At approximately the same time, the author of the November 15 e-mail sent a threatening text message to a colleague of Derwick's President, referring to plaintiffs as "gangsters" for having notified Forbes Magazine and others about the false and defamatory statements in the November 15 e-mail, and promising to wage "war" against Derwick. The substance and tone of these messages demonstrates the complete absence of any journalistic integrity and reinforces the conclusion that the author is merely a proxy of Garcia Mendoza.

87. The confluence of these events underscore that Garcia Mendoza is using the author of the Blog and the author of the November 15 e-mail as proxies to disseminate the false and defamatory statements concerning plaintiffs.

b. **The Defamatory Wikipedia Page**

88. On or about November 25, 2012, without plaintiffs' knowledge or consent, a false and defamatory "Wikipedia" page concerning plaintiffs appeared on the Internet (the "Wikipedia Page"). The Wikipedia Page, located at http://en.wikipedia.org/wiki/Derwick_Associates, cites as purported support, specious and biased sources that merely repeat the false and defamatory statements against Derwick that have been disseminated by Garcia Mendoza and his co-conspirators, including, but not limited to, the following:

(a) Neither Derwick nor any of its directors had any previous experience constructing or supplying materials for power plants.

(b) Proper procedures were not followed in the awarding of contracts to Derwick in connection with the offering and providing of EPC services to power plant companies in Venezuela.

(c) "There also appeared to be cases of multiple billing by Derwick for the same parts."

(d) Derwick acted improperly by selling equipment in the marketplace even though it is not a "legally recognized commercial representative" of a manufacturer.

(e) Derwick failed to meet completion dates with respect to certain of its contracts and received inflated profits.

(f) "According to prosecutors, former Venezuelan government minister Rodolfo Sanz, currently president of CVG, made a phone call from Derwick's office in the Pyramid Building in which he arranged a deposit of $500 million in the Gazprom Bank of Lebanon."

(g) Derwick was accused of not paying its workers.

(Together, the statements identified in sub-sections (a) through (g) of this paragraph are referred to as the "Wikipedia Defamatory Statements").

89. Each of the Wikipedia Defamatory Statements is patently false and extremely injurious to Derwick and its founders.

90. Plaintiffs have attempted to remove the Wikipedia Page by, among other things, contacting Wikipedia and its General Counsel to notify them of its false and defamatory content. Plaintiffs have no means of removing these egregiously false and defamatory statements from the Wikipedia Page and the Internet. The Wikipedia Page currently remains active and accessible on the Internet.

91. This unlawful conduct already has caused substantial harm to Derwick, and will continue to do so if the defendants and their proxies are permitted to reiterate these false and defamatory statements on, among other places, the Internet.

92. As a result of all of the foregoing false and defamatory statements, certain of the banking relationships of Derwick, its directors and shareholders have been materially affected. Defendants' unlawful and malicious overall objective is to attempt to disrupt Derwick's important business relationships and to prevent Derwick from continuing to conduct business and to fulfill its contractual obligations and thereby attempt to destroy the company.

93. As a direct result of defendants' outrageous, unlawful and malicious conduct and absent the intervention of this Court: (a) plaintiffs' well-earned goodwill, reputation, business

relationships and prospective business relationships will continue to be harmed, if not destroyed, (b) plaintiffs' rights will continue to be violated, and (c) Derwick will continue to suffer the loss of substantial business and its prospective business opportunities will be irreparably harmed.

## COUNT I

## (DEFAMATION OF DERWICK)

94. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 93, inclusive, as if fully set forth herein.

95. Defendants published false and defamatory statements about Derwick.

96. The false and defamatory statements concerning Derwick, including the WAC Defamatory Statements and the Wikipedia Defamatory Statements, constitute defamation and/or defamation *per se*.

97. The false and defamatory statements published by defendants regarding Derwick, as reasonably understood, impugn the integrity and competence of Derwick, discredit Derwick's business methods, undermine the confidence of the public and Derwick's clients and prospective clients in Derwick's business, discourage Derwick clients and prospective clients from seeking Derwick's services, and injure Derwick in its business.

98. Defendants knew or reasonably should have known that the statements, including each of the WAC Defamatory Statements and the Wikipedia Defamatory Statements, were false at the time they were posted to the WAC Website, were false at the time they were disseminated through other print and electronic media, and continue to be false and defendants have no evidence to the contrary.

99. The false and defamatory statements concerning Derwick were made maliciously, knowingly, willfully and in conscious disregard of Derwick's rights, and were specifically intended to -- and did -- cause damage to Derwick's reputation and business.

100. Derwick has suffered, and continues to suffer, immediate and substantial damages as a result of these defamatory statements.

101. By reason of the foregoing, Derwick is entitled to compensatory damages in an amount to be determined at trial, but not less than $200 million.

102. Derwick also will seek leave to plead punitive damages pursuant to § 768.72, Fla. Stat.

**COUNT II**

**(DEFAMATION OF BETANCOURT)**

103. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 93, inclusive, as if fully set forth herein.

104. Defendants published false and defamatory statements about Betancourt.

105. The false and defamatory statements concerning Betancourt, including the WAC Defamatory Statements and the Wikipedia Defamatory Statements, constitute defamation and/or defamation *per se*.

106. The false and defamatory statements published by defendants regarding Betancourt, as reasonably understood, impugn the integrity and competence of Betancourt, discredit Betancourt's method of conducting business, undermine the confidence of the public and Derwick's clients and prospective clients in Betancourt and his business as President of Derwick, discourage Derwick clients and prospective clients from seeking Derwick's services, injure Betancourt's reputation and thereby Derwick in its business.

107. Defendants knew or reasonably should have known that the statements, including each of the WAC Defamatory Statements and the Wikipedia Defamatory Statements, were false at the time they were posted to the WAC Website, were false at the time they were disseminated through other print and electronic media, and continue to be false, and defendants have no evidence to the contrary.

108. The false and defamatory statements concerning Betancourt were made maliciously, knowingly, willfully and in conscious disregard of Betancourt's rights, and were specifically intended to -- and did -- cause damage to Betancourt's character, reputation and business.

109. Betancourt has suffered, and continues to suffer, immediate and substantial damages as a result of these defamatory statements.

110. By reason of the foregoing, Betancourt is entitled to compensatory damages in an amount to be determined at trial, but not less than $50 million.

111. Betancourt also will seek leave to plead punitive damages pursuant to § 768.72, Fla. Stat.

**COUNT III**

**(DEFAMATION OF TREBBAU)**

112. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 93, inclusive, as if fully set forth herein.

113. Defendants published false and defamatory statements about Trebbau.

114. The false and defamatory statements concerning Trebbau, including the WAC Defamatory Statements and the Wikipedia Defamatory Statements, constitute defamation and/or defamation *per se*.

115. The false and defamatory statements published by defendants regarding Trebbau, as reasonably understood, impugn the integrity and competence of Trebbau, discredit Trebbau's method of conducting business, undermine the confidence of the public and Derwick's clients and prospective clients in Trebbau and his business as Derwick's Director of Operations, discourage Derwick clients and prospective clients from seeking Derwick's services, injure Trebbau's reputation and thereby Derwick in its business.

116. Defendants knew or reasonably should have known that the statements, including each of the WAC Defamatory Statements, were false at the time they were posted to the WAC Website, were false at the time they were disseminated through other print and electronic media, and continue to be false, and defendants have no evidence to the contrary.

117. The false and defamatory statements concerning Trebbau were made maliciously, knowingly, willfully and in conscious disregard of Trebbau's rights, and were specifically intended to -- and did -- cause damage to Trebbau's character, reputation and business.

118. Trebbau has suffered, and continues to suffer, immediate and substantial damages as a result of these defamatory statements.

119. By reason of the foregoing, Trebbau is entitled to compensatory damages in an amount to be determined at trial, but not less than $50 million.

120. Trebbau also will seek leave to plead punitive damages pursuant to § 768.72, Fla. Stat.

## COUNT IV

## (TORTIOUS INTERFERENCE WITH CONTRACT)

121. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 93, inclusive, as if fully set forth herein.

122. Beneficial contractual relationships exist between Derwick and, among others, its clients, suppliers and banks, under which Derwick has legally enforceable rights.

123. Defendants knew of such beneficial contractual relationships between Derwick and these third-parties.

124. By publishing the WAC Defamatory Statements and the Wikipedia Defamatory Statements, and disseminating those statements through other print and electronic media, and using Banco Venezolano's resources, including but not limited to appointing the Secretary of Banco Venezolano's board as the WAC Website's webmaster, defendants intentionally and unjustifiably seek to interfere with Derwick's beneficial contractual relationships by impugning its integrity and competence, discrediting Derwick's business methods, undermining the confidence of the public and Derwick's clients and prospective clients in Derwick's business, deterring Derwick clients and prospective clients from using Derwick's services and injuring Derwick in its business.

125. As a direct and proximate result of defendants' wrongful interference with Derwick's contracts with its clients, suppliers and banks, and various other counterparties, Derwick, Betancourt and Trebbau have suffered, and continue to suffer, immediate and substantial damages, including but not limited to, materially harming their banking relationships and hindering their ability to conduct business and fulfill their present and future contractual obligations.

126. By reason of the foregoing, Derwick is entitled to compensatory damages in an amount to be determined at trial, but not less than $200 million.

127. Plaintiffs also will seek leave to plead punitive damages pursuant to § 768.72, Fla. Stat.

COUNT V

(TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS)

128. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 93, inclusive, as if fully set forth herein.

129. Plaintiffs have developed and maintain ongoing and existing business relationships with their clients, suppliers, banks and counterparties. Plaintiffs also maintain prospective relationships with potential clients.

130. Defendants had knowledge and are expressly aware of these existing and prospective business relationships.

131. By publishing the WAC Defamatory Statements and the Wikipedia Defamatory Statements, and disseminating those statements through other print and electronic media, and using Banco Venezolano's resources, including but not limited to appointing the Secretary of Banco Venezolano's board as the WAC Website's webmaster, defendants intentionally and unjustifiably sought to interfere with plaintiffs' business relationships by impugning their integrity and competence, discrediting plaintiffs' business methods, undermining the confidence of the public and plaintiffs' clients and prospective clients in plaintiffs' business, deterring plaintiffs' clients and prospective clients from using plaintiffs' services, and by injuring plaintiffs in their business.

132. As a direct and proximate result of defendants' wrongful interference with plaintiffs' business relationships and prospective business relationships with their clients, suppliers, banks, counterparties and potential clients, plaintiffs have suffered, and continue to suffer immediate and substantial damages.

133. By reason of the foregoing, plaintiffs are entitled to compensatory damages in an amount to be determined at trial, but not less than $300 million.

134. Plaintiffs also will seek leave to plead punitive damages pursuant to § 768.72, Fla. Stat.

**COUNT VI**

**(DECEPTIVE AND UNFAIR TRADE PRACTICES)**
**(Fla. Stat. § 501.201-213 (2012))**

135. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 93, inclusive, as if fully set forth herein.

136. By publishing the WAC Defamatory Statements and the Wikipedia Defamatory Statements, and disseminating those statements through other print and electronic media, defendants committed deceptive acts and unfair practices under § 501.201-213, Fla. Stat. by interfering with plaintiffs' business contracts and relationships, impugning their integrity and competence, discrediting plaintiffs' business methods, undermining the confidence of the public and plaintiffs' clients and prospective clients in plaintiffs' business, deterring plaintiffs' clients and prospective clients from using plaintiffs' services, and by injuring plaintiffs in their business.

137. As a direct and proximate result of defendants' malicious and deceptive acts and unfair practices, plaintiffs have suffered, and continue to suffer, immediate and substantial damages.

138. By reason of the foregoing, plaintiffs are entitled to compensatory damages in an amount to be determined at trial, but not less than $300 million.

COUNT VII

(CIVIL CONSPIRACY)

139. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 93, inclusive, as if fully set forth herein.

140. Each of defendants, together with the others, conspired with respect to Counts I through VI and acted in concert to commit unlawful acts. Defendants conspired to engage in these actions with the unlawful objective of interfering with plaintiffs' business relationships by impugning their integrity and competence, discrediting plaintiffs' business methods, undermining the confidence of the public and plaintiffs' clients and prospective clients in plaintiffs' business, deterring plaintiffs' clients and prospective clients from using plaintiffs' services, and injuring plaintiffs in their business. Each of defendants understood the objectives of the scheme, accepted them, and was an active and knowing participant in the conspiracy.

141. Defendants' conspiracy was implemented through the commission of various wrongful and overt acts, including but not limited to, publishing the WAC Defamatory Statements and the Wikipedia Defamatory Statements, and disseminating those statements through other print and electronic media, and using Banco Venezolano's resources to create, control, direct, manage, and finance the operation and maintenance of the WAC Website, and to republish and continue to disseminate through various other print and electronic media the false and defamatory information that had appeared on the WAC Website.

142. As a direct and proximate result of the operation and execution of the conspiracy committed by defendants, plaintiffs have suffered, and continue to suffer immediate and substantial damages.

143. By reason of the foregoing, plaintiffs are entitled to compensatory damages in an amount to be determined at trial, but not less than $300 million.

144. Plaintiffs also will seek leave to plead punitive damages pursuant to § 768.72, Fla. Stat.

## COUNT VIII

## (PRELIMINARY AND PERMANENT INJUNCTION)

145. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 93, inclusive, as if fully set forth herein.

146. Defendants have engaged, and will continue to engage, in this deliberate, extensive and wrongful campaign to defame and damage plaintiffs by disseminating deliberately false claims on the Internet, including the WAC Defamatory Statements and the Wikipedia Defamatory Statements, for the willful and malicious purpose of attempting to destroy plaintiffs' business, business relationships and prospective business relationships.

147. As a result of defendants' egregiously unlawful conduct, plaintiffs' business and reputation has been and continues to be irreparably harmed. Derwick is losing or is being threatened with the loss of business, goodwill, and other harm, each of which cannot be adequately remedied by money damages because of the difficulty of quantifying the damages that have been caused and will continue to be caused by defendants' defamatory, false and malicious conduct.

148. Plaintiffs are entitled to an injunction restraining defendants from their wrongful conduct.

149. Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

150. WHEREFORE, plaintiffs respectfully seek a judgment against defendants as follows:

(a) preliminarily and permanently ordering defendants to remove all material concerning plaintiffs from the WAC Website and the Wikipedia Page;

(b) preliminarily and permanently enjoining defendants from making any public statements that falsely disparage or defame plaintiffs, their business and/or their reputation, on the WAC Website, the Wikipedia Page or through any other medium;

(c) awarding plaintiffs compensatory damages in an amount to be determined at trial plus interest and costs, but not less than $300 million;

(d) awarding plaintiffs the costs and disbursements of this action, together with attorneys' fees; and

(e) granting such other and further relief as is equitable, just and proper.

(f) Plaintiffs also will seek leave to plead punitive damages pursuant to § 768.72, Fla. Stat.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

By: ______________________
Maria H. Ruiz
Florida Bar No. 182923
Ann M. St. Peter-Griffith
Florida Bar No. 0033154

1441 Brickell Avenue,
Suite 1420
Miami, Florida 33131
Telephone: (305) 377-1666
Facsimile: (305) 377-1664
*Attorneys for Plaintiffs*

OF COUNSEL:

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Hector Torres
Brian S. Kaplan
David D. Holahan
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700

*Admitted Pro Hac Vice*

Dated: December 7, 2012

### Certificate of Service

I certify that a copy hereof will be furnished to Venezolano de Credito, S.A., Banco Universal, Oscar Garcia Mendoza and Rafael Alfonzo Hernandez, via personal service or as otherwise allowed by law, immediately if possible or otherwise upon their appearance in this case.

______________________
Ann M. St. Peter-Griffith