UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
THE HONORABLE OTTO J. REICH and    :
OTTO REICH ASSOCIATES, LLC,         :
                                     :
                      Plaintiffs,   :
                                     :             13-CV-5307 (JPO)
            -v-                 :
                                     :           OPINION AND ORDER
LEOPOLDO ALEJANDRO BETANCOURT   :
LOPEZ, PEDRO JOSE TREBBAU LOPEZ, and :
FRANCISCO D'AGOSTINO CASADO,     :
                                     :
                      Defendants. :
------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      Plaintiffs Otto J. Reich, a former ambassador to Venezuela, and his consulting company,

Otto Reich Associates, LLC ("ORA"), allege that the activities of the defendants caused injury to

their property and reputation.  Plaintiffs bring claims under the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1962(c-d) ("RICO"), as well as claims of civil conspiracy,

tortious interference with prospective economic advantage, trade libel, injurious falsehood, and

defamation under New York state common law.  Defendants move for dismissal pursuant to

Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2).  For the reasons that follow, Defendants'

motion is granted in part and denied in part.

**I.     Background**

> **A.     Factual Background**[1]

>> **1.     Parties**

Defendants Leopoldo Alejandro Betancourt Lopez ("Betancourt"), Pedro Jose Trebbau Lopez ("Trebbau"), and Francisco D'Agostino Casado ("D'Agostino") are principals of Derwick Associates USA LLC ("Derwick USA") and Derwick Associates Corporation (together "Derwick Associates").  Betancourt is the official co-founder and president of Derwick Associates, Trebbau is the official co-founder and vice-president, and D'Agostino is a key player in the organization—potentially the unofficial founder, owner, and operator.  Betancourt and Trebbau are Venezuelan citizens and D'Agostino is a dual citizen of Venezuela and Spain. Betancourt and D'Agostino own residential property in New York and reside there for part of the year, including during the time period of the alleged illegal activities.  Derwick USA is incorporated in Florida and Derwick Associates Corporation is a Barbados corporation. However, Defendants conduct and manage the day-to-day affairs of both entities from their office in New York.

Plaintiff Reich is the former U.S. Ambassador to Venezuela.  His professional career has focused on corruption in Latin America.  Since leaving government service in 2004, Reich has managed Plaintiff ORA, a consulting company for anti-corruption organizations and individuals that assists its clients in their public relations and business endeavors.

---

[1] All facts are as alleged in the Complaint, which the Court accepts as true for purposes of this motion.

###### 2.        Derwick Associates' Business Model

Defendants, through Derwick Associates, are in the business of securing high-valued energy-sector contracts from agencies of the Venezuelan government. These contracts are won, the complaint alleges, through the use of bribery and monetary kickbacks and are not obtained through any open bidding process. The average Derwick Associates contract is overbilled by over 200%. Upon securing the inflated contracts, Derwick Associates then subcontracts the work to multiple United States companies, including Missouri-based ProEnergy Services. These subcontractors execute essentially all required construction, but are paid substantially less than the cost of the original contract. Derwick Associates then keeps a significant portion of the proceeds from the originally inflated contract. Plaintiffs specifically identify the following improperly secured contracts: four contracts with the state-owned Petroleos de Venezuela, S.A. ("PDVSA"), five contracts with the state-owned Corporacion Electrica de Venezuela ("CORPOELEC"), and two contracts with the state-owned Corporacion Venezolana de Guayan ("CVG").

Both Derwick Associates and various individuals associated with the corporation have drawn attention from many journalistic publications as well as from the Federal Bureau of Investigation for their questionable business practices. Defendants have attempted to conceal their ongoing illicit scheme, in part, by filing high-stakes lawsuits against critics of the company. In one instance, they filed two defamation lawsuits against Banco Venezolano and its President, Oscar Garcia Mendoza ("Mendoza"), one in Florida and the other in New York state court. Banco Venezolano has the reputation of being highly critical of the current Venezuelan government regime. Derwick Associates has since withdrawn both actions.

3

### 3.      Injury to Plaintiffs

In October and November 2012, following the commencement of the Florida lawsuit, Banco Venezolano entered into negotiations with Reich and ORA to secure assistance in defending against the claims made in the Florida lawsuit and consulting for unrelated business activities.  The agreed-upon rate for such services was $20,000 per month.  In late November 2012, an agent of the Defendants unsuccessfully attempted to bribe Reich to stop providing assistance to Banco Venezolano.  On December 6, 2012, an agent of Defendants attempted to persuade Reich to work on their behalf rather than to continue consulting for Banco Venezolano. Reich rejected both offers.

On December 7, 2012, Reich was scheduled to meet with Cesar Briceño ("Briceño"), a representative of Banco Venezolano, to discuss the ongoing Florida lawsuit. That same day, Derwick Associates amended its complaint in the Florida lawsuit to add an allegation that Briceño met with a former U.S. government official in December 2012, referring to the scheduled December 7 meeting with Reich.  Shortly afterwards, Betancourt and Trebbau called their partner, Convict-Guruceaga, and instructed him to call Joaquin Urbano Berrizbeitia ("Urbano"), a member of Banco Venezolano's Board of Directors, to assert that "Otto Reich is working for us."  (Dkt. No. 29 at ¶ 147.)  Around the last week of December 2012, Banco Venezolano ceased all communications and business with ORA and Reich.

During this effort to harm the relationship between ORA/Reich and Banco Venezolano, Betancourt placed a November 2012 call to Eligio Cedeño ("Cedeño"), another client of ORA since 2010.  During this call, Betancourt falsely informed Cedeño that ORA's consulting services were retained by Derwick Associates.  Within days of the conversation, Cedeño terminated his business with ORA.

### B.    Procedural Background

Plaintiffs filed their initial complaint on July 30, 2013.  On August 1, D'Agostino was personally served while in the state of New York.  On January 14, 2014, Plaintiffs filed the first amended complaint.  Defendants moved to dismiss on February 28, 2014.

## II.    Legal Standard

When considering a Rule 12(b)(6) motion to dismiss, a court is obliged to "accept as true all of the factual allegations contained in the complaint," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 572 (2007), drawing "all inferences in the light most favorable to the non-moving party's favor," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  While Rule 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 555 (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  In other words, a properly stated claim includes a showing of "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 546).

Additionally, all claims of fraud—including those under RICO—must comply with Rule 9(b)'s heightened pleading standard.  *See* Fed. R. Civ. P. 9(b).  To meet the strictures of Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Rule 9(b) also dictates that while the circumstances of the fraud must be pleaded with particularity, "intent, knowledge, and other conditions of a person's mind may be alleged generally."

## III.   Discussion

The operative complaint—the First Amended Complaint—asserts claims under the federal RICO statute (Counts I and II) as well as state law claims for tortious interference with prospective economic advantage (Counts III and IV), trade libel/injurious falsehood/defamation (Count V), defamation (Count VI), and civil conspiracy (Count VII).  Defendants move to dismiss these claims on various grounds.

### A.   Qualifying RICO Predicate Acts

Before the Court can determine whether Plaintiffs have sufficiently pleaded the requisite elements of a RICO claim, it must determine what violations count as predicate acts of racketeering activity.  Plaintiffs allege three types of predicate acts: violations of the Travel Act, 18 U.S.C. § 1952(a) *et seq.*; violations of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1 *et seq.*, and wire fraud under 18 U.S.C. § 1343.  The violations of the Travel Act and FCPA are based upon the allegedly improperly secured contracts between Defendants and PDVSA, CORPOELEC, and CVG.  The violations of the wire fraud statute are based upon the November and December 2012 phone calls to Banco Venezuelo and Cedeño.

With respect to the Travel Act and FCPA violations, RICO provides an exhaustive list of qualifying predicate acts and the latter is notably absent.  *See* 18 U.S.C. § 1961(1).  "The FCPA, unlike the Travel Act, is not a[n] [independent] RICO predicate."  *United States v. Young & Rubicam, Inc.*, 741 F. Supp. 334, 338 (D. Conn. 1990).  While Plaintiffs cite many instances in

which an FCPA violation is considered in a court's analysis of whether a RICO claim has been

properly pleaded, *see Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1063

(3d Cir. 1988); *Rotec Indus. v. Mitsubishi Corp.*, 163 F. Supp. 2d 1268, 1278 (D. Or. 2001);

*Dooley v. United Technologies Cmp.*, 803 F. Supp. 428, 438-40 (D.D.C. 1992), an FCPA

violation is never counted separately and in addition to a violation of the Travel Act.  However,

"FCPA violations [can serve] as a basis for Travel Act violations, which, in turn, are alleged as

predicates for the RICO offense charged."  *Young & Rubicam, Inc.*, 741 F. Supp. at 338.

In this case, the same alleged conduct underlies the violations of both the Travel Act and

the FCPA.  By presenting these as separate and independent predicate acts, Plaintiffs are

impermissibly attempting to double-count this conduct, notwithstanding RICO's requirement

that each predicate act have its own source of conduct.  "[I]t is not proper under RICO to charge

two predicate acts where on[e] action violates two statutes.  A pattern of racketeering activity

requires 'at least two *acts* of racketeering,' not 'at least two statutory offenses."  *Watkins v.*

*Smith*, 12 Civ. 4635 (DLC), 2012 WL 5868395, *4-5 (S.D.N.Y. Nov. 19, 2012), *aff'd*, 2014 WL

1282290 (2d Cir. Apr. 1, 2014) (quoting *United States v. Kragness*, 830 F.2d 842, 860-61 (8th

Cir.1987)).  Therefore, this Court will review the plausibility of the RICO claim based upon the

Travel Act violations (with the FCPA violations subsumed) and the alleged wire fraud.[2]

## B.    Extraterritoriality of RICO

As a general matter, "unless there is the affirmative intention of the Congress clearly

expressed to give a statute extraterritorial effect, [courts] must presume it is primarily concerned

---

[2] As discussed *infra*, it is irrelevant whether the multiple violations of the Travel Act are counted as a single or as multiple predicate acts.  The same is true of the violations of the wire fraud statute.

with domestic conditions." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32 (2d Cir. 2010) (quoting *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2877-78 (2010)). Consequently, "absent an express intention by Congress of extraterritorial effect, a statute applies only domestically." *Id*.

"RICO is silent as to any extraterritorial application." *Id*.; *see also N. S. Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996); *Petroleos Mexicanos v. SK Eng'g & Const. Co. Ltd.*, 2013 WL 3936191, at *2 (S.D.N.Y. July 30, 2013), *aff'd*, 2014 WL 3445747 (2d Cir. July 16, 2014). The Second Circuit has accordingly held that "[t]he RICO statutes do not apply extraterritorially." *Petroleos Mexicanos*, 2013 WL 3936191, at *2; *see also Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 543 (S.D.N.Y. 2013). Similarly, the Second Circuit has rejected the argument that "Congress's adoption of some RICO predicate statutes with extraterritorial reach indicated a congressional intent that RICO have extraterritorial reach for all its predicates." *European Cmty. v. RJR Nabisco, Inc.*, 2014 WL 1613878, at *4 (2d Cir. Apr. 23, 2014) (citing *Norex*, 631 F.3d at 33). Thus, courts may not infer from "the extraterritoriality of certain RICO predicates . . . the extraterritoriality of RICO as a whole." *Id*.

Following *Norex*, some district courts misinterpreted the Circuit's rejection of the argument that "RICO applies extraterritorially *in all of its applications* as a ruling that RICO can never have extraterritorial reach in *any* of its applications." *Id. Cf. European Cmty. v. RJR Nabisco*, *Inc.*, 2011 WL 843957, at *5 (E.D.N.Y. Mar. 8, 2011); *Cedeno v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010). The Second Circuit has recently clarified that it has *not* held that the alleged enterprise *itself* must be domestic in nature. *European Cmty. v. RJR Nabisco, Inc.*, 2014 WL 1613878, at *4. A requirement that defendants must be "associated with a domestic enterprise in order to sustain RICO liability seems [illogical]. Under that standard, if

an enterprise formed in another nation sent emissaries to the United States to engage in domestic
. . . violations of the various RICO predicate statutes, its participants would be immune from
RICO liability merely because the crimes committed in the United States were done in
conjunction with a foreign enterprise." *European Cmty.*, 2014 WL 1613878, at *7; *see also
Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 243 (S.D.N.Y. 2012) ("If the citizenship or
legal auspices under which an enterprise exists were controlling or entitled to substantial weight,
the applicability of the statute in a given case would depend upon a factor unrelated to the
statutory purpose."). Rather, "the focus properly is on the pattern of racketeering activity and its
consequences," not on the enterprise. *Chevron Corp*, 871 F. Supp. 2d at 245.

Defendants commit the same interpretive mistake by limiting their discussion of
extraterritoriality to asserting factual claims such as "Derwick Associates is a Barbados
corporation" or that the defendants "are citizens and nationals of Venezuela." (Dkt. No. 33 at p.
14.) Defendants make little effort to refute the more relevant inquiry: whether the predicate acts
are themselves either sufficiently domestic or apply extraterritorially.

The question, then, is whether "liability or guilt could attach to extraterritorial conduct
under the relevant RICO predicate." *European Cmty.*, 2014 WL 1613878, at *4. Plaintiffs
allege two eligible acts: violation of the Travel Act (which subsumes the violation of the FCPA)
and wire fraud. However, the Second Circuit has already held that both the Travel Act and the
federal wire fraud statute "do not apply extraterritorially." *Id*. at *9. Therefore, Plaintiffs must
"[allege] sufficient domestic conduct" for each of these predicate acts to apply in order to sustain
their application under RICO. *Id*.

In this respect, Plaintiffs allege: that Defendants engaged "in unlawful activities, namely,
the bribery of Venezuelan public officials . . . [by using] wire communications (including

communications via telephone) originating from the United States and traveled to and from the United States"; that Defendants "accepted and transmitted their ill-gotten gains to and from bank accounts in the United States"; that they directed "the day-to-day activities of Derwick Associates from the United States"; that they used "wire communications (including communications via telephone) in interstate commerce to . . . [relay] false information to Cedeño and Banco Venezolano who relied upon said information to Plaintiffs' harm"; and that they are believed to have placed these telephone calls from within the United States. (Dkt. No. 29 at ¶¶ 149, 159, 178, 252, 258.) These allegations are sufficient to render the underlying conduct "domestic" enough to be actionable under RICO.

While Defendants focus upon the many international aspects of the alleged scheme and challenge the truth of Plaintiffs' factual allegations, such arguments are unavailing. As for the first, while the scheme in question has many international aspects, "if domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is violated even if some further conduct contributing to the violation occurred outside the United States." *European Cmty.*, 2014 WL 1613878, at *10. As long as enough domestic conduct exists to fulfill the requirements of both the Travel Act and wire fraud, it is irrelevant that those statutes are further violated by conduct that is extraterritorial in nature. As for the second, it is not appropriate to determine the truth of Plaintiffs' allegations at the motion to dismiss stage. "Should the pattern of conduct of certain Defendants or certain schemes prove to be extraterritorial" following discovery, the court may "narrow the scope of this action accordingly, through either motions for (partial) summary judgment or through carefully tailored jury instructions." *Id.* Accordingly, extraterritoriality concerns do not bar the alleged RICO claim at this stage.

### C.      Pleading the RICO Claim

In order to adequately plead a RICO claim under § 1962(c), Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that has caused injury to plaintiff's business or property." *Drexel Burnham Lambert Inc. v. Saxony Heights Realty Associates*, 777 F. Supp. 228, 238 (S.D.N.Y. 1991); *see Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  Defendants argue that Plaintiffs' claim must fail as it lacks both sufficient injury and a pattern connecting the alleged predicate acts.

### 1.      Breadth of Injury Required

Although Plaintiffs allege predicate acts for violations of both the Travel Act and the wire fraud statute, they allege injury only as a result of the wire fraud.  (Dkt. No. 29 at ¶¶ 150, 162, 273.)  The Travel Act violations arise out of the alleged bribery of Venezuelan officials, from which Reich and ORA are unable to plausibly show any resulting proximate injury.  Nevertheless, Plaintiffs do not need to suffer injury from each of the predicate acts underlying their RICO claim; direct injury from one is enough.  *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990) ("[T]he injury must be caused by a pattern of racketeering activity violating section 1962 *or by individual RICO predicate acts*.") (emphasis added); *see also Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 810 (7th Cir. 1987); *Town of Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1268 (3d Cir. 1987) (citing *Sedima*, 473 U.S. at 497) ("[T]he injury which confers standing on a RICO plaintiff is injury flowing from the commission of the predicate act, not injury flowing from the pattern of such acts."); *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1347 (2d Cir. 1994) (the holdings of the Third and Seventh Circuits "appear[] to be a correct reading of § 1964(c)"); *Chevron Corp.*, 871 F. Supp. 2d at 253 ("[A] RICO damages plaintiff need allege only that it has suffered an injury

directly resulting from some or all of the activities comprising the violation[.]") (internal quotation marks omitted).  Therefore, as long as Plaintiffs can sufficiently plead proximate injury resulting from the wire fraud conduct, they will have met the injury requirement of RICO standing.

### 2.    Standing and Injury

RICO grants standing to "[a]ny person injured in his business or property by reason of a violation of § 1962."  18 U.S.C. § 1964(c).  The wire fraud statute defines the crime as the use of the wires "for the purpose of executing" a "scheme or artifice to defraud."  18 U.S.C. § 1343.  In applying this statute, courts have required plaintiffs to allege: "(1) the existence of a scheme to defraud, (2) defendants' knowing participation in such a scheme, and (3) the use of wire or mail communications in interstate commerce in furtherance of that scheme."  *Am. Fed'n of State, Cnty. & Mun. Employees Dist. Council 37 Health & Sec. Plan v. Bristol-Myers Squibb Co.*, 948 F. Supp. 2d 338, 345 (S.D.N.Y. 2013); *see also MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 142 (S.D.N.Y. 2010); *Boritzer v. Calloway*, 10 Civ. 6264 (JPO), 2013 WL 311013, at *6 (S.D.N.Y. Jan. 24, 2013).  The relevant portion of the Complaint states that Defendants knowingly agreed among themselves to provide false information to both Banco Venezolano and Cedeño.  (Dkt. No. 29 at ¶¶ 147, 149, 157.)  This false information included the assertion that Reich was working in conjunction with Derwick Associates.  (*Id*. at ¶¶ 148, 159-161.)  The alleged purpose of the scheme underlying the proliferation of this false information was to harm the business of ORA and injure Reich's ongoing professional relationship with the recipients.  (*Id*. at ¶¶ 145, 147, 157-158.)  Finally, the false information was communicated in November and December of 2012 via interstate telephone wires.  (*Id*. at ¶¶ 148, 159.) Defendants contend that Plaintiffs lack standing because: (1) any alleged injury is merely

reputational, and (2) Defendants did not intend to obtain Plaintiffs' property, a necessary component of a scheme to defraud.

As an initial matter, the alleged injury suffered by the Plaintiffs is more than reputational. Defendants contend that the requisite harm for wire fraud must amount to more than injury to one's reputation, or else "any ordinary defamation action could be brought under the mail fraud statute." *United States v. Ferrara*, 701 F. Supp. 39, 43 (E.D.N.Y. 1988), *aff'd*, 868 F.2d 1268 (2d Cir. 1988); *see also Kimm*, 2005 WL 89386, at *4; *Tsipouras v. W&M Properties, Inc.*, 9 F. Supp. 2d 365, 368 (S.D.N.Y. 1998). The distinction between wire fraud and defamation recognizes that "while one can be compensated under the law for injury to one's reputation, that compensation is not based on an injury to what has commonly been known as 'property.'" *Kimm*, 2005 WL 89386, at *5 (quoting *Ferrara*, 701 F.Supp. at 43). In both *Kimm* and *Ferrara*, however, the injury to each plaintiff's reputation was general, forward looking, and speculative, pertaining to theoretical loss of potential future business or profits by unspecified potential clients or associates. Emphasizing this point, the Second Circuit held on appeal in *Kimm* that "the *generalized reputational* harms alleged, including *the risk of future lost business* commissions, are too speculative to constitute an injury to business or property." *Kimm v. Chang Hoon Lee & Champ, Inc.*, 196 F. App'x 14, 16 (2d Cir. 2006) (emphasis added).

In contrast, Plaintiffs' allegations of wire fraud regard two specific phone calls, both containing intentionally false information, made to two specific clients of ORA, in order to induce those clients to cease all business with Plaintiffs, thereby ending the combined $40,000 per month paid to Plaintiffs. (Dkt. No. 29 at ¶¶ 147-149, 157, 159-161.) That $40,000 per month loss is the relevant and sufficient injury suffered by Plaintiffs due to the alleged wire fraud. (*Id*. at ¶ 273.) Courts commonly differentiate in this fashion between insufficient claims

13

of general reputational injury and sufficient claims of actual economic losses stemming from a harmed reputation.  *See Cement-Lock v. Gas Tech. Inst.*, 2007 WL 4246888, at *26 (N.D. Ill. Nov. 29, 2007) ("[I]njury to business reputation is compensable under RICO, if it results in concrete economic, contractual, or business losses . . . .  Plaintiffs point to a specific lost business opportunity . . . .  This is sufficiently concrete to confer RICO standing.") (internal quotation marks omitted); *Hy Cite Corp. v. badbusinessbureau.com, L.L.C.*, 418 F. Supp. 2d 1142, 1151 (D. Ariz. 2005) (recognizing that the injury requirement is met when "[p]laintiff alleges that it has lost [specific] customers, that customers have rescinded [specific] sales contracts, and that Plaintiff's reputation has been injured as a result of the contents of Defendants' website"); *Philatelic Found. v. Kaplan*, 85 Civ. 8571 (RWS), 1986 WL 5629, at *11 (S.D.N.Y. May 9, 1986) (although "[p]ecuniary damage to business reputation [appears] to raise difficult problems of proof, [this] type of damage has been included within the 'injury to his business' requirement of § 1964(c)"), *abrogated on other grounds by Aramony v. United Way of Am.*, 969 F. Supp. 226 (S.D.N.Y. 1997); *see generally Nat'l Beverage Sys., Inc. v. Leonard Fountain Specialities, Inc.*, 2012 WL 2389870 (E.D. Mich. June 25, 2012); *Texas Air Corp. v. Air Line Pilots Ass'n Int'l*, 1989 WL 146414 (S.D. Fla. July 14, 1989); *Galerie Furstenberg  v. Coffaro*, 697 F. Supp. 1282, 1287 (S.D.N.Y. 1988).  Accordingly, Plaintiffs have sufficiently alleged injury to themselves resulting from the acts of wire fraud.

While Plaintiffs have sufficiently alleged actual injury, a wire fraud scheme to defraud also requires that Defendants intend to obtain property, a claim which is lacking in Plaintiffs' allegations.  Although it is well established in this Circuit that wire fraud does not require proof of actual profit from the scheme to defraud, intent to profit is still necessary.  *See Porcelli v. United States*, 404 F.3d 157, 162 (2d Cir. 2005) (quoting *McNally v. United States*, 483 U.S.

14

350, 358-359 (1987)) ("The second clause, 'or for obtaining money or property,' was intended to be read in connection with 'any scheme or artifice to defraud.'  The statute has thus been interpreted to criminalize any scheme or artifice for obtaining money or property" but "the defendant does not need to literally 'obtain' money or property to violate the statute"); *Boritzer*, 2013 WL 311013, at *6 (quoting *Drexel Burnham Lambert Inc.*, 777 F. Supp. at 238) ("[I]n order for the deceit implicit in fraud to rise to the level of wire fraud in particular, 'defendants must have used the . . . wires as a means to obtain money or property.").  In this case, while Plaintiffs allege that Defendants intended to deprive them of money or property, they have not alleged that Defendants intended to *obtain* money or property as a result of their scheme.  Nor could they plausibly do so: Defendants are not a market competitor of Plaintiffs such that they would expect to gain from Plaintiffs' loss of clients.  Consequently, while there may be intent to harm, there is no intent to obtain property from Plaintiffs, and there is no scheme to defraud within the wire fraud statute.

### 3.    Pattern of Racketeering Activity

Alternatively, even if wire fraud were properly pleaded, there is a final pleading requirement that the alleged predicate acts together form "a pattern of racketeering activity." 18 U.S.C. § 1962(c).  A "pattern" requires at least two acts of "racketeering activity" occurring within ten years of each other.  *See* 18 U.S.C. § 1961(5).  The Supreme Court has held that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  In other words, the predicate acts must possess both relatedness and continuity for a pattern to exist.  In the present case, the requirement of relatedness is challenged.

15

The determination of relatedness is heavily dependent on the specific circumstances of each case. The Supreme Court has provided some guidance as to what factors contribute to relatedness among predicates:

> Predicate acts are "related" for RICO purposes when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."

*Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997) (quoting *H.J. Inc.*, 492 U.S. at 240). The Second Circuit has gone further in developing the "requirement of relatedness, holding that predicate acts must be related to each other ('horizontal' relatedness), and they must be related to the enterprise ('vertical' relatedness)." *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006); *see also United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992); *Rosenson v. Mordowitz*, 11 Civ. 6145 (JPO), 2012 WL 3631308 (S.D.N.Y. Aug. 23, 2012). However, while there are technically two distinct relatedness requirements in this Circuit, "[i]n practice, these tests may be satisfied with a single showing of relatedness: vertical relatedness may be demonstrated by establishing that the predicate acts are 'related to the activities of [the RICO] enterprise,' and horizontal relatedness may be established by showing that each individual predicate act is related to the RICO enterprise." *Li Jun An v. Hui Zhang*, 13 Civ. 5064 (PKC), 2013 WL 6503513, at *7 (S.D.N.Y. Dec. 6, 2013) (quoting *Daidone*, 471 F.3d at 375). Therefore, the alleged predicate acts are judged in respect to their joint relationship to the enterprise.

There is a distinction in the application of relatedness as between criminal and civil RICO cases. As a general rule, "the question of whether acts form a pattern rarely is a problem with a criminal enterprise, as distinct from a lawful enterprise that commits occasional criminal acts." *Minicone*, 960 F.2d at 1108 (internal quotation marks omitted). Due to this distinction, it is not

16

enough for Plaintiffs to plead that the alleged predicate acts were in furtherance of one of the potential enterprises, as each "possess[es] multiple legitimate purposes[,] and the predicate acts are not [all] related to the enterprise[s] in the same way." *Vild v. Visconsi*, 956 F.2d 560, 568-69 (6th Cir. 1992); *see also Li Jun An*, 2013 WL 6503513, at *8 ("[W]hen the enterprise primarily conducts a legitimate business, no such presumption arises."); *Envtl. Servs., Inc. v. Recycle Green Servs., Inc.*, 13 Civ. 4568 (ADS), 2014 WL 1259959, at *9 (E.D.N.Y. Mar. 25, 2014).  As this is a civil case, Plaintiffs must plead more.

Beyond the fact that Defendants are the alleged perpetrators of both the bribery and the wire fraud, very little links the two predicates together.  For example, the victims of the predicates are dissimilar.  Whereas the bribery would theoretically harm the Defendants' business competitors, the Plaintiffs are only the victims of the wire fraud.  While a RICO plaintiff does not need to suffer injury from every alleged predicate act to have standing, a claim based upon predicate acts with dissimilar victims still undermines a finding of relatedness.  *See H.J. Inc.*, 492 U.S. at 240.

Additionally, the establishment of a uniform purpose underlying both the bribery and the wire fraud is highly tenuous.  Plaintiffs proffer that the alleged predicates "share common goals (increasing and protecting the financial position of the enterprise) . . . ." *Daidone*, 471 F.3d at 376; (*see* Dkt. No. 44 at p. 13.)  The argument follows that both the bribery and the fraud facilitate Defendants' underlying goal of securing profitable energy contracts without getting caught for their impropriety.  Such a broad characterization of purpose is untenable.  *See Ray Larsen Associates, Inc. v. Nikko Am., Inc.*, 89 Civ. 2809 (BSJ), 1996 WL 442799, at *7 (S.D.N.Y. Aug. 6, 1996) ("Although these two types of conduct may be interrelated in the sense that both have the effect of generally increasing defendants' funds, the relationship between the

two types of conduct is simply too remote to support a claim under RICO."); *see also Heller Fin., Inc. v. Grammco Computer Sales, Inc.*, 71 F.3d 518, 525 (5th Cir. 1996).  If such an all-encompassing purpose were sufficient, the relationship requirement would do little to limit the scope of potential RICO claims.

  Without relatedness between the bribery and the wire fraud, each must be judged independently.  Neither is sufficient to plead a RICO claim on its own.  As previously noted, the bribery charges have not caused Plaintiffs proximate injury and therefore Plaintiffs lack standing.  The wire fraud claims alone are insufficient because they lack continuity.  Without the larger, multi-year bribery scheme, the wire fraud allegations consist of only two alleged instances occurring within a two-month period.  Since *H.J., Inc.*, the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time,'" as is necessary under RICO.  *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999).  "While this two-year guidepost is not necessarily a bright-line rule, it is rare" that less time will rise to the level of continuous activity.  *Boritzer*, 2013 WL 311013, at *11 (internal quotation marks omitted).  That is because "Congress [is] concerned in RICO with long-term criminal conduct."  *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995) (quoting *H.J. Inc.*, 492 U.S. at 241-42); *see also Ray Larsen Associates, Inc.*, 1996 WL 442799, at *8 ("A scheme that spans seventeen months does not generally reflect the kind of long-term criminal conduct over a "substantial period of time" contemplated by the RICO statute."); *Cont'l Realty Corp. v. J.C. Penney Co., Inc.*, 729 F. Supp. 1452, 1455 (S.D.N.Y. 1990).  Ultimately, Plaintiffs have attempted to combine the distinct violations under the Travel Act and the wire fraud statute into one claim so that each may compensate for the deficits of the other.  *See, e.g., Ray Larsen Associates, Inc.*, 1996 WL 442799, at *7 ("A review of the record suggests that plaintiff has

alleged these predicate acts as an afterthought, in order to buttress its weak argument with respect to 'continuity,' that is, to extend the duration of the scheme.").  Because the predicates cannot be considered together, the RICO claim must fail.

### D.     RICO Conspiracy Claim

18 U.S.C. § 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  As Plaintiffs have not adequately pleaded a substantive RICO violation, their conspiracy claim under 18 U.S.C. § 1962(d) is also dismissed.  *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) ("[B]ecause Plaintiffs did not adequately allege a substantive violation . . . the District Court properly dismissed Count Six, which alleged a RICO conspiracy."); *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996) ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations."), *vacated on other grounds*, 525 U.S. 128 (1998).

### E.     Subject Matter Jurisdiction

Because the only federal claim in this case—the RICO claim—has been dismissed, the question arises whether this Court has subject matter jurisdiction over the remaining claims, all of which arise under state law.  Plaintiffs alternatively assert subject matter jurisdiction on the basis of diversity of citizenship.  *See* 28 U.S.C. § 1332.  Plaintiffs' Complaint alleges that ORA is a Virginia limited liability company, with Reich as its sole member, and that Reich is a citizen of Virginia.  (Dkt. No. 29 at ¶¶ 21-22.)  The Complaint also alleges that all three defendants are citizens of Venezuela or Spain, and that the amount in controversy is over $2,000,000.  (*Id.* at

¶¶ 24, 26, 28, 324.)  Accordingly, this Court has subject matter jurisdiction over the remaining claims.

### F.      Personal Jurisdiction

Since the Court has dismissed Plaintiffs' RICO claims, Plaintiffs cannot rely upon 18 U.S.C. § 1965(b) to establish personal jurisdiction over each of the defendants.  Absent this statutory grant of authority, Betancourt and Trebbau challenge the exercise of personal jurisdiction over them.[3]

#### 1.      Legal Standard for Personal Jurisdiction

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Gr. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citation omitted).  "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006).  "A prima facie case for personal jurisdiction must satisfy three elements: (1) proper service of process upon the defendant; (2) a statutory basis for personal jurisdiction; and (3) accordance with constitutional due process principles." *Eternal Asia Supply Chain Mgmt. (USA) Corp. v. Chen*, 12 Civ. 6390 (JPO), 2013 WL 1775440 (S.D.N.Y. Apr. 25, 2013) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012)).  Defendants contend that the second and third requirements are not met.

---

[3] D'Agostino was personally served in the State of New York.  (*See* Dkt. No. 42-11 at 2.)  "Fed. R. Civ. P. 4(e)(2) specifically authorizes personal service of a summons and complaint upon an individual physically present within a judicial district of the United States, and such personal service comports with the requirements of due process for the assertion of personal jurisdiction." *Kadic v. Karadzic*, 70 F.3d 232, 247 (2d Cir. 1995) (citing *Burnham v. Superior Court of California*, 495 U.S. 604 (1990)).  D'Agostino does not contest the exercise of personal jurisdiction over him.

In reference to the requisite statutory basis, "[t]he breadth of a federal court's personal jurisdiction is determined by the law of the state in which the district court is located." *Thomas*, 470 F.3d at 495; *see also Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997). Here, the relevant state is New York. For a plaintiff to demonstrate personal jurisdiction over a defendant under New York state law, the plaintiff must show "either that the defendant was 'present' and 'doing business' in New York within the meaning of [CPLR] § 301, [general jurisdiction], or that the defendant committed acts within the scope of New York's long-arm statute, [CPLR] § 302, [specific jurisdiction]." *Schultz v. Safra Nat. Bank of New York*, 377 Fed. App'x. 101, 102 (2d Cir. 2010).

### 2.    General Jurisdiction

Under § 301, a defendant "is subject to general personal jurisdiction in New York if it is 'doing business' in the state." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000). "Although the 'doing business' test is most often used to find jurisdiction over a corporate defendant, this test can be applied to a nonresident individual." *Patel v. Patel*, 497 F. Supp. 2d 419, 425 (E.D.N.Y. 2007); *see also Moneygram Payment Sys., Inc. v. Consorcio Oriental, S.A.*, 05 Civ. 10773 (RMB), 2007 WL 1489806, at *3 (S.D.N.Y. May 21, 2007). A defendant "is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York not occasionally or casually, but with a fair measure of permanence and continuity." *Wiwa*, 226 F.3d at 95 (internal quotation marks and bracketing omitted). "In order to establish that this standard is met, a plaintiff must show that a defendant engaged in continuous, permanent, and substantial activity in New York." *Id.*; *see also Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996) ("Because general

21

jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent

minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and

systematic general business contacts.").

   The Supreme Court's recent decision in *Daimler AG v. Bauman* has brought uncertainty

to application of New York's "doing business" rule.  As a result, it is unclear whether existing

New York general jurisdiction jurisprudence remains viable.  *See Sonera Holding B.V. v.*

*Cukurova Holding A.S.*, 750 F.3d 221, 225 n.2 (2d Cir. 2014) ("[W]e note some tension between

*Daimler*'s 'at home' requirement and New York's 'doing business' test."); *Meyer v. Bd. of*

*Regents of Univ. of Oklahoma*, 13 Civ. 3128 (CM), 2014 WL 2039654, at *4 (S.D.N.Y. May 14,

2014) ("Indeed, the 'at home in' formulation of *Daimler* calls into the question the notion that

'doing business in' New York—the traditional formulation of the CPLR 301 test—is

constitutionally compliant."); *Robinson v. Nat'l R.R. Passenger Corp.*, 14 Civ. 922 (BMC), 2014

WL 1599462, at *1 (E.D.N.Y. Apr. 23, 2014) ("[P]resumably, whatever basis she had for

asserting personal jurisdiction . . . it is not entirely clear that there is such a basis in light of

*Daimler*.").  In any event, this Court need not determine at this time whether Defendants are

subject to general jurisdiction under New York law.[4]  "Whatever the purported scope of N.Y.

C.P.L.R. 301 . . . *Daimler* confirmed that subjecting [Defendants] to general jurisdiction in New

York would be incompatible with due process."  *Sonera Holding B.V.*, 750 F.3d at 224-25.  For

general jurisdiction over an individual to comport with due process, Defendants must be

domiciled in New York, served in New York, or have otherwise consented to the court's

---

[4] Since *Daimler*, the Second Circuit has avoided reinterpreting CPLR § 301, a state statute.  *See*
*Sonera Holding B.V.*, 750 F.3d at 225 n.2; *Meyer v. Bd. of Regents of Univ. of Oklahoma*, 13
Civ. 3128 (CM), 2014 WL 2039654, at *2 (S.D.N.Y. May 14, 2014); *Robinson*, 2014 WL
1599462, at *1.

jurisdiction.  Only on truly "exceptional" occasions may general jurisdiction extend over individuals who are "at home" in a state that is not otherwise their domicile.  *Meyer*, 2014 WL 2039654, at *4 (citing *Daimler*, 134 S. Ct. at 761).

Plaintiffs proffer numerous purported indicia of general jurisdiction, including: Betancourt's ownership of New York residential property (Dkt. No. 29 at ¶ 25), Defendants' New York office space (*id*. at ¶ 27), the use of New York banks in Defendants' business operations (*id*. at ¶¶ 50, 74), Defendants' retention of New York-based legal counsel (*id*. at ¶ 36), Defendants' previous use of New York courts (*id*. at ¶ 34), Defendants' retention of the services of a New York-headquartered public relations firm (*id*. at ¶ 197), and Defendants' frequent travel to New York (*id*. at ¶¶ 207-208).  While these factors are relevant, they still fall short of establishing a *prima facie* case of jurisdiction.

### a.     Domicile

It is well established in this Circuit that "for an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile."  *In re Roman Catholic Diocese of Albany, New York, Inc.*, 745 F.3d 30, 38 (2d Cir. 2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2852 (2011)); *see also Daimler AG*, 134 S. Ct. at 760; *Sonera Holding B.V.*, 750 F.3d at 225.  Most recently, the Supreme Court made clear in *Daimler* that, "as a rule, it is not constitutionally permissible to sue an individual or corporation in a state where that individual is not "at home' . . . [and that] [a]n individual is 'at home' in the state of his domicile."  *Meyer*, 2014 WL 2039654, at *2.  Based on the Plaintiffs' Complaint, New York domicile is not established for either Betancourt or Trebbau.

Plaintiffs admit in their supporting memorandum that "it is unclear whether Betancourt or Trebbau—or both—are domiciliaries of New York for jurisdictional purposes."  (Dkt. No. 44 at

p. 29.)  Further, Defendants have not voluntarily offered information identifying of which state they believe themselves to be domiciliaries.  (*See* Dkt. No. 33 at p. 24.)  In order to establish that Defendants' domicile is New York, Plaintiffs should allege key indicia, such as that each Defendant "holds a New York State driver's license," "maintain[s] personal and business checking and credit card accounts at New York banks," "file[s] New York State tax returns," and lists on tax returns New York as his "home address."  *Moneygram Payment Sys., Inc.*, 2007 WL 1489806, at *3.

In reviewing the allegations in the Complaint relating to Betancourt's and Trebbau's potential domicile, there is insufficient information for this Court to conclude that either or both are domiciliaries of New York.  Plaintiffs do not allege where Betancourt or Trebbau file taxes, in which state they hold a driver's license, or in which states the banks holding their personal banking accounts are located.  Additionally, there is no allegation that Trebbau owns any residential property in New York, nor are there allegations indicating that Betancourt's residential property is his "home."  *See Antone v. Gen. Motors Corp., Buick Motor Div.*, 64 N.Y.2d 20, 28, (1984) ("'[R]esidence' and 'domicile' are not interchangeable[;] . . . while a person can have but one domicile he can have more than one residence.")  To clarify whether Betancourt's New York property is his "home," Plaintiffs do not offer any information regarding the portion of the year in which he lives at that property or any indication as to how many other residences outside of New York Betancourt may also own.[5]  If anything, Plaintiffs' allegation that Betancourt and Trebbau are on record as flying to "New York nearly 200 times during a 3-

---

[5] Plaintiffs allege upon information and belief that Betancourt owns additional real property in Florida.  Details regarding this property are absent and no allegation is made that the New York property and the Florida property represent the full extent of Betancourt's property portfolio. (*See* Dkt. No. 29 at ¶ 25.)

year period" (Dkt. No. 44 at p. 23) may suggest that there is some other location at which they are more aptly "at home" (or else they presumably would not need to travel to New York for business with such frequency).  Based on the Complaint, it is impossible to establish the domicile of either Betancourt or Trebbau, in New York or elsewhere.

### b.        Exception to Domicile Requirement

Without establishing the domiciles of Betancourt or Trebbau, it is challenging, but not impossible, to assert general jurisdiction.  While domicile is necessary as a general rule, "the phrase 'as a rule' obviously admits of exceptions, and in *Daimler* the Supreme Court was careful to note that domicile (for individuals) . . . would not always be the only fora in which general jurisdiction could appropriately be asserted."  *Meyer*, 2014 WL 2039654, at *2.

However, Plaintiffs conflate this very limited exception with the "doing business" requirements of CPLR § 301.  Plaintiffs draw attention to allegations of Defendants' use of New York office space for Derwick Associates (Dkt. No. 29 at ¶ 27), Defendants' and Derwick Associates' retention of New York legal counsel (*id*. at ¶ 36), Defendants' and Derwick Associates' previous use of New York courts (*id*. at ¶ 34), and Defendants' and Derwick Associates' retention of the services of a New York-headquartered PR firm (*id*. at ¶ 197).  Even assuming, arguendo, that all the alleged activities of Derwick Associates are attributable to the Defendants to the extent that Plaintiffs contend, general jurisdiction comporting with due process still may not exist.  The mere fact that an individual or a corporation operates in many places does not imply that they are

> deemed at home in all of them.  Otherwise, 'at home' would be
> synonymous with 'doing business' tests framed before specific
> jurisdiction evolved in the United States.  Nothing in *International
> Shoe* and its progeny suggests that 'a particular quantum of local
> activity' should give a State authority over a 'far larger quantum of
> . . . activity' having no connection to any in-state activity.

*Daimler AG*, 134 S. Ct. at 762 n.20 (internal citation omitted); *see also In re Roman Catholic Diocese of Albany, New York, Inc.*, 745 F.3d at 41; *Sonera Holding B.V.*, 750 F.3d at 225.  Even when considered together, the supposed contacts Defendants have with the state of New York do not establish general jurisdiction where it is otherwise absent.  A corporation's or an individual's "engage[ment] in a substantial, continuous, and systematic course of business is alone insufficient to render it at home in a forum."  *Sonera Holding B.V.*, 750 F.3d at 226 (quoting *Daimler AG*, 134 S. Ct. at 761).  That is because a state which properly claims general jurisdiction over an individual is typically singular; "[t]hose affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." *Daimler AG*, 134 S. Ct. at 760; *see also In re Roman Catholic Diocese of Albany, New York, Inc.*, 745 F.3d at 38; *Sonera Holding B.V.*, 750 F.3d at 225.  While "exceptional" cases may exist where an individual is subjected to a state's general jurisdiction irrespective of where they are domiciled, this case is not one of those rare instances.

### 3.    Specific Jurisdiction

Alternatively, § 302(a), New York's long-arm statute, confers "specific jurisdiction over a non-domiciliary defendant arising out of particular acts."  *Accurate Grading Quality Assur., Inc. v. Thorpe*, 12 Civ. 1343 (ALC), 2013 WL 1234836, at *2 (S.D.N.Y. Mar. 26, 2013) (internal quotation marks omitted).  The relevant provisions of the long-arm statute for this case include the grants of jurisdiction over a person who "transacts any business within the state," CPLR § 302(a)(1), or who "commits a tortious act within the state, except as to a cause of action for defamation," CPLR § 302(a)(2).  Plaintiffs contend that both provisions confer jurisdiction over Betancourt and Trebbau for purposes of this action.

          **a.**       **CPLR § 302(a)(1)**

"[I]n determining whether personal jurisdiction may be exercised under section 302(a)(1), a court must decide (1) whether the defendant transacts any business in New York and, if so, (2) whether this cause of action aris[es] from such a business transaction." *Eternal Asia Supply Chain Mgmt*, 2013 WL 1775440, at *4 (quoting *Licci*, 673 F.3d at 60).  A defendant transacts business if he has "purposely availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006); *see also Licci*, 673 F.3d at 61.  "A suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Licci*, 673 F.3d at 66; *see also Eternal Asia Supply Chain Mgmt*, 2013 WL 1775440, at *4; *HSH Nordbank AG N.Y. Branch v. Street*, 11 Civ. 9405 (DLC), 2012 WL 2921875, at *4 (S.D.N.Y. July 18, 2012).  Plaintiffs have not shown that Defendants meet this standard.

      The only transacted business that Plaintiffs cite is Defendants' hiring of and consulting with New York legal counsel.  While the retention of New York lawyers tasked with the advancement of Defendants' interests qualifies as transacting business pursuant to § 302(a)(1), *see Chevron Corp.*, 974 F. Supp. 2d at 623 ("[A]n out of state entity's retention and use of the services of a New York lawyer constitutes transaction of business.); *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir. 1997); *Barclays Am./Bus. Credit, Inc. v. Boulware*, 542 N.Y.S.2d 587, 587-88 (1989), the current cause of action does not arise out of such business. The hired legal counsel in question was retained in association with the defamation lawsuits against Banco Venezolano, to which Plaintiffs were not parties.  Further, there is no allegation that the New York counsel ever actually discussed Plaintiffs (*see* Dkt. No. 29 at ¶ 37 ("New

York-based discussions certainly *would have* included mention of Ambassador Reich")
(emphasis added)), let alone participated in or provided advice regarding the two alleged phone
calls giving rise to the current claims.

The "arising out of" requirement for personal jurisdiction under § 302(a)(1) is not the
same as merely being indirectly "related to" the transacted business.  Plaintiffs acknowledge that
"an articulable nexus" or a "substantial relationship" between the asserted claim and the
transacted business is required, *see Licci*, 673 F.3d at 66 (2d Cir. 2012); *PDK Labs, Inc.*, 103
F.3d at 1109; *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir.
1996), but they contend that the New York counsel's mere involvement in Betancourt's and
Trebbau's "multi-pronged strategy" is sufficient to satisfy this nexus.  (Dkt. No. 44 at p. 27.)
Such a connection is "too attenuated" from the transaction to give rise to specific jurisdiction.
*Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 340 (2012).  For a claim to arise out of the
services of hired counsel, the lawyers must have some interaction with Plaintiffs.  "For example,
in *PDK Labs*, the defendant's attorney—acting as his agent—'initiated from New York
persistent, vexing communications' with the plaintiff for approximately three months.  These
communications apparently included threats of a lawsuit alleging patent violations and false
advertising and attempts to compel the plaintiff into investing in defendant's product."  *Chevron
Corp.*, 974 F. Supp. 2d at 624 (citing *PDK Labs, Inc.*, 103 F.3d at 1109).  In this case, the New
York counsel was retained by Defendants, who separately and independently caused harm to
Plaintiffs.  Plaintiffs cannot plausibly allege that the harm stemmed from the retention of the
New York counsel.  The hiring of a New York lawyer does not automatically grant personal
jurisdiction in New York over every subsequent action of the client.

### b.    CPLR § 302(a)(2)

Alternatively, Plaintiffs assert that Defendants have "[committed] a tortious act within the state," and are thereby subject to New York's jurisdiction pursuant to CPLR § 302(a)(2).  This argument is also unavailing.  Section 302(a)(2) includes an exception for "cause[s] of action for defamation."  Although Plaintiffs' claims include, in addition to defamation, tortious interference with prospective economic advantage, trade libel, and injurious falsehood, all of these causes of action sound in defamation.  *See Symmetra Pty Ltd. v. Human Facets*, LLC, 12 Civ. 8857 (SAS), 2013 WL 2896876, at *6 n.74 (S.D.N.Y. June 13, 2013) (citing *Cantor Fitzgerald, L.P. v. Peaslee*, 88 F.3d 152, 157 (2d Cir. 1996)) ("[C]laims of injurious falsehood and tortious interference with prospective economic advantage were subject to defamation exception of sections 302(a) (2) . . . because the entire complaint sounded in defamation."); *Jolivet v. Crocker*, 859 F. Supp. 62, 65 (E.D.N.Y. 1994) ("In an attempt to circumvent this statute, [Plaintiff] has labelled his claims for relief as 'libel' and 'tortious interference with a contractual relationship.' However, both of these claims are based on the alleged defamatory letter, and thus § 302(a)(3) cannot serve to supply a basis for personal jurisdiction."); *Findlay v. Duthuit*, 86 A.D.2d 789, 790 (N.Y. App. Div. 1st Dep't 1982) ("In looking for the reality and the essence of the action and not its mere name, we conclude from a fair reading of the complaint that plaintiff's claims do indeed sound in defamation of character.").  Although Plaintiffs attempt to distinguish between "the falsity of the statement" and "its defamatory nature" (Dkt. No. 44 at p. 28), they provide no support for such a distinction, nor is it logical to draw one.

### 4.    Jurisdictional Discovery

Since Plaintiffs have not made a *prima facie* showing of personal jurisdiction over Betancourt and Trebbau, they request permission for jurisdictional discovery.  At the

jurisdictional stage, "district courts enjoy broad discretion in deciding whether to order discovery." *Eternal Asia Supply Chain Mgmt. (USA) Corp.*, 2013 WL 1775440, at *10 (quoting *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 811 (S.D.N.Y. 2005)). In deciding when to grant such discovery, reliance on "conclusory" allegations is generally not enough, *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998), as it may lead to an unwarranted "fishing expedition" for jurisdiction, *NovelAire Technologies, L.L.C. v. Munters AB*, 13 Civ. 472 (CM), 2013 WL 6182938, at *13 (S.D.N.Y. Nov. 21, 2013). Similarly, Plaintiffs' preliminary showings should reveal more than mere "speculations or hopes" that jurisdiction exists. *Rosenberg v. PK Graphics*, 03 Civ. 6655 (NRB), 2004 WL 1057621, at *1 (S.D.N.Y. May 10, 2004).

In this case, jurisdictional discovery is appropriate. Plaintiffs plausibly contend that limited discovery will reveal much of the currently lacking information, including whether Trebbau owns New York residential property as well as information regarding the portion of the year in which Betancourt and Trebbau reside in New York. It seems likely that such discovery is necessary for Plaintiffs to establish where Defendants are domiciled. "Accordingly, the Court cannot hold as a matter of law that [Plaintiffs have] failed to make a sufficient start toward establishing" jurisdiction. *Biro*, 2012 WL 3262770, at *8.

G.    **D'Agostino**

Unlike the other two Defendants in this case, D'Agostino was served in the state of New York and is therefore subject to this Court's jurisdiction. *See Kadic*, 70 F.3d at 247. However, D'Agostino contends that Plaintiffs have insufficiently pleaded both the RICO claim and the state law causes of action in relation to his involvement. As Plaintiffs have failed to properly

plead the RICO claim generally, only D'Agostino's arguments regarding the state law claims remain. Those claims are addressed below.

### 1.    The Defamatory Statements

Plaintiffs' state law claims, which include defamation, trade libel/injurious falsehood/defamation, tortious interference with prospective economic advantage, and civil conspiracy, are all based upon the allegedly defamatory statements made in the two phone calls to Cedeño and Banco Venezolano. As a general matter, Plaintiffs have properly pleaded the requirements of defamation; except for the question of D'Agostino's involvement, the claims are actionable. "To state a claim for defamation under New York Law, the plaintiff must allege (1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010); *see also Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 169 (2d Cir. 2003); *Caruso v. City of New York*, 973 F. Supp. 2d 430, 459 (S.D.N.Y. 2013); *Dillon v. City of New York*, 261 A.D.2d 34, 38 (1999). Plaintiffs allege that third parties Cedeño and Banco Venezolano were intentionally told false statements regarding Plaintiffs' business dealings with Derwick Associates, without prior authorization, resulting in both actual monetary damage ("the loss of something having economic or pecuniary value") and an injury that "impugns the basic integrity or creditworthiness of a business." *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 179-180 (2d Cir. 2000); *see* Dkt. No. 29 at ¶¶ 147-150, 157-162.

### 2.    Pleading through Conspiracy

It is uncontested that D'Agostino did not personally place either of the phone calls or directly utter any of the alleged defamatory statements.  (*See* Dkt. No. 29 at ¶¶ 147, 159; Dkt. No. 43 at p. 4.)   However, Plaintiffs still "may plead the existence of a conspiracy in order to connect the actions of [an] individual defendant[] [to] an actionable, underlying tort." *Briarpatch Ltd., L.P. v. Pate*, 81 F. Supp. 2d 509, 516 (S.D.N.Y. 2000); *see also Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986).  Therefore, Plaintiffs may charge D'Agostino "with the tortious activity alleged in the Amended Complaint, insofar as he is alleged to be part of a civil conspiracy to commit those acts." (Dkt. No. 43 at p. 4.)  Plaintiffs' success in pleading claims III through VII is dependent on whether Plaintiffs have sufficiently pleaded a civil conspiracy among the three defendants.

At the outset, Plaintiffs' seventh claim is civil conspiracy.  But New York does not recognize civil conspiracy as an independent cause of action.  *See Powell v. Kopman*, 511 F. Supp. 700, 704 (S.D.N.Y. 1981) ("in New York there is no substantive tort of civil conspiracy"); *see also Legion Lighting Co., Inc. v. Switzer Grp., Inc.*, 567 N.Y.S.2d 52 (1991); *Plymouth Drug Wholesalers, Inc. v. Kirschner*, 658 N.Y.S.2d 64 (1997); *Lau v. Berman*, 792 N.Y.S.2d 292, 294 (Civ. Ct. 2004) ("New York law does not recognize a cause of action for civil conspiracy"). Rather, "the damage for which recovery may be had in a civil action is not the conspiracy itself but the injury to the plaintiff produced by specific overt acts."  *Rutkin v. Reinfeld*, 229 F.2d 248, 252 (2d Cir. 1956).  In other words, "the charge of conspiracy in a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts."  *Id.*; *see also Brownstone Inv. Grp., LLC. v. Levey*, 468 F. Supp. 2d 654, 661 (S.D.N.Y. 2007); *Powell*, 511 F. Supp. at 704; *Alexander & Alexander of New York, Inc.*, 68 N.Y.2d at 969.   Therefore, the claim for civil conspiracy will be

dismissed, but Plaintiffs may plead the existence of a civil conspiracy to attach responsibility to

D'Agostino for the other state law causes of action.

To establish a civil conspiracy, Plaintiffs "must demonstrate the underlying tort, plus the

following four elements: (1) an agreement between two or more parties; (2) an overt act in

furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan

or purpose; and, (4) resulting damage or injury." *Treppel v. Biovail Corp.*, 03 Civ. 3002 (PKL),

2005 WL 2086339 (S.D.N.Y. Aug. 30, 2005); *see also Meisel v. Grunberg*, 651 F. Supp. 2d 98,

119 (S.D.N.Y. 2009); *Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc.*, 515 F. Supp.

2d 298, 318 (N.D.N.Y. 2007).  In this case, the civil conspiracy allegation turns on whether

Plaintiffs have pleaded with particularity that D'Agostino actually agreed to a conspiracy to

defame.

### a.    Conclusory Allegations

D'Agostino first contends that Plaintiffs' allegations are too conclusory to plausibly

allege that he was involved in a conspiracy with the other defendants.  He compares this case to

*Schwartz v. Soc'y of New York Hosp.*, in which the First Department explained:

> [M]ore than a conclusory allegation of conspiracy or common
> purpose is required to state a cause of action against [a] nonactor.
> In this case, the bare allegation that these two defendants were
> acting in concert with defendant Savarese without any allegation of
> independent culpable behavior on their part was clearly insufficient
> to link them to the allegedly defamatory remarks.  Nor is the
> unsupported statement that he was acting on their behalf sufficient
> to allege an agency relationship encompassing the authority to
> make the remarks.[6]

---

[6] Although *Schwartz* involved a request for leave to amend, its holding has been applied in the
context of a motion to dismiss.  *See Meisel*, 651 F. Supp. 2d at 119; *Am. Bldg. Maint. Co. of New
York*, 515 F. Supp. 2d at 318; *Treppel*, 2005 WL 2086339, at *5.

199 A.D.2d 129, 130, 605 N.Y.S.2d 72, 73 (N.Y. App. Div. 1st Dep't 1993) (internal citations omitted).  D'Agostino argues that even if he is assumed to be an official of Derwick Associates, that fact alone does not imply that he agreed to conspire to defame Plaintiffs.  *See Schwartz*, 605 N.Y.S.2d at 73 (conspiracy was not established among co-officials of a hospital); *Donini Int'l, S.p.A. v. Satec (U.S.A.) LLC*, 03 Civ. 9471 (CSH), 2004 WL 1574645 (S.D.N.Y. July 13, 2004) (conspiracy charge among companies partially held by the same owners and located at same address was dismissed as conclusory); *Brownstone Inv. Grp., LLC.*, 468 F. Supp. 2d at 661 (conspiracy charge among co-principals of a business dismissed as conclusory).  Plaintiffs cannot rely exclusively upon such a business relationship to sufficiently plead a conspiracy.

However, even if D'Agostino's alleged business relationship is set aside, Plaintiffs have pleaded conspiracy with enough specificity.  To do this, they must assert "specific allegations, including the times, facts, and circumstances of the alleged conspiracy."  *Am. Bldg. Maint. Co. of New York*, 515 F. Supp. 2d at 318; *see also Brownstone Inv. Grp., LLC.*, 468 F. Supp. 2d at 661. Frequently, conspiracy allegations are deemed conclusory when the totality of the allegations starts and ends with a generic statement that the defendants conspired against the plaintiff.  *See Treppel*, 2005 WL 2086339, at *12 ("[h]is conclusory allegations . . . do not even identify Treppel's alleged co-conspirators"); *Donini Int'l, S.p.A.*, 2004 WL 1574645, at *4 ("the Complaint does not [even] provide a factual basis from which it can be inferred that [Defendant] did anything"); *Brownstone Inv. Grp., LLC.*, 468 F. Supp. 2d at 661 (nothing in complaint that the alleged co-conspirators were aware of the underlying tort, let alone formed an agreement to advance it); *Am. Bldg. Maint. Co. of New York*, 515 F. Supp. 2d at 318 (no allegations that any overt act ever occurred); *Goldstein v. Siegel*, 19 A.D.2d 489, 492, 244 N.Y.S.2d 378, 381 (1963) ("no facts are alleged to identify each of the defendants [in] the alleged conspiracy").

The allegations in this case are not as cursory.  The Complaint alleges when the agreement constituting the conspiracy was initiated (late 2012), the identities of the co-conspirators (Betancourt, Trebbau, and D'Agostino), the content of the alleged agreement (to contact Cedeño and Banco Venezolano to convey false information), and the motivation underlying the conspiracy (to disseminate false information "throughout the U.S.-based marketplace").  (Dkt. No. 29 at ¶¶ 157-161, 321-323.)  It also includes a fairly detailed account of how the alleged conspiracy was executed, including dates, some locations, and the specific acts taken by each conspirator.  (*See id*.)  Based on Plaintiffs' allegations, it is plausible to infer that D'Agostino agreed to the defamatory acts which Betancourt and Trebbau executed.

### b.      Group Pleading

D'Agostino also raises the concern that Plaintiffs engage in impermissible group pleading.  "The essential purpose of Rule 8(a)'s pleading requirements is to 'give the defendant[s] fair notice of what the claim is and the grounds upon which it rests.'"  *Watkins v. Smith*, 12 Civ. 4635 (DLC), 2013 WL 655085, at *9 (S.D.N.Y. Feb. 22, 2013) (quoting *Twombly*, 550 U.S. at 555).  D'Agostino contends that Plaintiffs' Complaint frequently uses the collective term "Defendants" when referring to events in which only Betancourt and Trebbau engaged, which prevents each Defendant from knowing the particular allegations made against him.

While Plaintiffs should generally plead allegations in relation to each defendant, the instances of "group pleading" identified by D'Agostino do not raise notice concerns.  The underlying premise of Plaintiffs' allegations is that D'Agostino is a de facto principal or agent of Derwick Associates who is heavily involved in its operations, regardless of whether he has an official title.  As such, Plaintiffs' use of the collective term "defendants" when discussing the

state lawsuit is not a mistake or attempt to obfuscate, but an accurate indication of their claim that D'Agostino was directly involved in the matter even though he was not a named party. "[S]ince there are only three defendants named, which [Plaintiffs allege] were acting either together or interchangeably," Plaintiffs' "imprecise use of the term 'defendants'" does not merit dismissal. *Umoh v. Marks*, 2010 WL 2651939, at *3 n.2 (N.D.N.Y. June 25, 2010).

The cases cited by D'Agostino in support of his argument reveal the kinds of scenarios where group pleading leads to a lack of notice and therefore warrants dismissal. In each of those cases, the plaintiff alleges fraud, thus invoking Rule 9(b)'s heightened pleading standard requiring even greater specificity. In contrast, in this case, fraud is not raised outside of the improperly pleaded RICO claim. Additionally, Plaintiffs' allegations are comparatively specific. For example, in *Targum v. Citrin Cooperman & Co., LLP*, 12 Civ. 6909 (SAS), 2013 WL 6087400, at *6 (S.D.N.Y. Nov. 19, 2013), group pleading was an issue because the complaint referred to the multiple defendants in an inconsistent manner. *See id*. ("[Plaintiff] confusingly treats Weber and Citrin as a unit—referring at various times to 'Citrin and Weber,' 'Citrin and/or Weber,' and 'Citrin/Weber'"). Here, the Complaint frequently distinguishes among the acts committed by the various defendants. In reference to the phone calls at the center of the state law claims, the Complaint clearly states that only Betancourt made the first call to Cedeño; that Trebbau's father-in-law, acting as his agent, made the second call to Cedeño; and that Betancourt and Trebbau, through Betancourt's cousin, contacted Banco Venezolano. (Dkt. No. 29 at ¶¶ 147, 159-162.) D'Agostino's ability to draw attention to the fact that the Complaint never alleges that he personally uttered any of the defamatory remarks demonstrates that there is sufficient notice as to what allegations are levied against which defendants, when it is necessary to distinguish among them.

36

c.        **Intracorporate Conspiracy Doctrine**

While Plaintiffs sufficiently allege the requisite elements of a civil conspiracy,

D'Agostino argues that the charge is nonetheless barred under the intracorporate conspiracy

doctrine.[7]   "Under the intracorporate conspiracy doctrine, the officers, agents, and employees of

a single corporate entity, each acting within the scope of [his] employment, are legally incapable

of conspiring together."  *Little v. City of New York*, 487 F. Supp. 2d 426, 441-42 (S.D.N.Y.

2007) (internal quotation marks omitted); *see also Herrmann v. Moore*, 576 F.2d 453, 459 (2d

Cir.1978); *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 210 (S.D.N.Y.

2013); *Dunlop v. City of New York*, 06 Civ. 0433 (RJS), 2008 WL 1970002, at *10 (S.D.N.Y.

May 6, 2008); *Ericson v. Syracuse Univ.*, 35 F. Supp. 2d 326, 329 (S.D.N.Y. 1999).  The

exception to this doctrine "applies where a plaintiff adequately alleges that each defendant

possessed an independent, personal conspiratorial purpose, wholly separate and apart from the

entity."  *Broich v. Inc. Vill. of Southampton*, 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009) (internal

quotation marks omitted); *see also Little*, 487 F. Supp. 2d at 442; *Quinn v. Nassau Cnty. Police

Dep't*, 53 F. Supp. 2d 347, 360 (E.D.N.Y. 1999).  Therefore, when the alleged conspirators are

members of the same corporation, Plaintiffs can avoid the application of the intracorporate

conspiracy doctrine only by alleging that "'the individual defendants were motivated by an []

independent personal stake in achieving the corporation's objective' rather than 'merely carrying

out the corporation's managerial policy.'"  *Dunlop*, 2008 WL 1970002, at *10 (quoting *Girard v.

94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71 (2d Cir. 1976)).

Plaintiffs contend that the intracorporate conspiracy doctrine is applicable only in the

narrow contexts of federal antitrust law, 42 U.S.C. § 1985, and 42 U.S.C. § 1983, and does not

---

[7] D'Agostino motion to file a sur-reply is granted.  (Dkt. No. 57.)

extend to New York state common law conspiracy claims.  While it is true that the Second

Circuit has applied the doctrine thus far only in antitrust and § 1985 cases, it has never explicitly

limited its application to those narrow confines, *see United States v. Weintraub*, 27 Fed. App'x

54, 57 (2d Cir. 2001); *see also Herrmann*, 576 F.2d at 459; *Girard*, 530 F.2d at 74, and district

courts in this Circuit have expanded the doctrine to cover § 1983 conspiracy claims, *see Dunlop*,

2008 WL 1970002, at *10; *K.D. ex rel. Duncan*, 921 F. Supp. 2d at 210; *Little*, 487 F. Supp. 2d

at 442.  More importantly, Plaintiffs' position is contradicted by the case law: district courts in

this Circuit have already applied the intracorporate conspiracy doctrine to state law conspiracy

claims on numerous occasions.  *See N. Shipping Funds I, L.L.C. v. Icon Capital Corp.*, 12 Civ.

3584 (JCF), 2013 WL 1500333, at *6 (S.D.N.Y. Apr. 12, 2013); *Atl. Int'l Movers, LLC v. Ocean

World Lines, Inc.*, 914 F. Supp. 2d 267, 280 (E.D.N.Y. 2012); *LaPorte v. Greenwich House*, 09

Civ. 6645 (NRB), 2010 WL 1779342, at *8 n.15 (S.D.N.Y. Apr. 26, 2010); *Santos v. Praxair

Surface Technologies, Inc.*, 2005 WL 756528 (D. Conn. Mar. 31, 2005).  Furthermore, there is

no reason not to apply the doctrine to New York state conspiracy claims as it is rooted in the

New York state common law.  *See Bereswill v. Yablon*, 6 N.Y.2d 301, 305 (1959) (citing *Nelson

Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911 (5th Cir. 1952)) ("While it is entirely

possible for an individual and a corporation to conspire, it is basic that the persons and entities

must be separate.").[8]  Finally, it would be logically inconsistent to hold that agents of a

corporation, acting in their official capacity, together constitute only a single actor for the sake of

some conspiracies but not for others.  There is no distinction among the types of conspiracies

---

[8] Notably, in *Bereswill* the New York Court of Appeals cited *Nelson Radio & Supply Co.*, 200
F.2d 911, to support its adoption of the intracorporate conspiracy doctrine.  This is the same case
cited by the Second Circuit in *Girard* when it first extended the same doctrine to § 1985
conspiracy claims.  *See Girard*, 530 F.2d at 70.

covered by the aforementioned federal statutes as compared to New York state common law that

would explain disparate application of the intracorporate conspiracy doctrine.  This is evidenced

by Plaintiffs' inability to raise any legal arguments opposing the application of the doctrine to

state law civil conspiracy claims beyond stating that such application "should be viewed with

caution." (Dkt. No. 50. at p. 6.)  As Judge Mukasey held when he applied the intracorporate

conspiracy doctrine to § 1983 conspiracy claims, "in the absence of controlling contrary

authority, this court will continue to apply the intracorporate conspiracy doctrine . . . because the

doctrine's logic is sound." *Anemone v. Metro. Transp. Auth.*, 419 F. Supp. 2d 602, 604

(S.D.N.Y. 2006).

      In the present case, Plaintiffs repeatedly attempt to establish that D'Agostino is the likely

founder and co-owner of Derwick Associates.  (*See* Dkt. No. 29 at ¶¶ 47, 69-70, 78, 84, 89, 98,

112, 132, 165-166, 171-172.)  In their memorandum, they state that "Plaintiffs' defamation

allegations cannot be viewed in a vacuum separate and apart from their allegations concerning

D'Agostino's . . . involvement with Derwick." (Dkt. No. 43 at p. 8.)  By basing their allegations

on such a theory, they have subjected their claims to the scope of the intracorporate conspiracy

doctrine.  If Plaintiffs' allegations are accepted as true at this stage in the proceedings,

D'Agostino, Betancourt, and Trebbau are all officers or agents of Derwick Associates.

      Plaintiffs alternatively argue that even if the doctrine applies to state law conspiracies, it

is inapplicable in the present case because a single corporate entity is not involved, Derwick

Associates is not a named defendant, and Defendants' actions qualify under the personal interest

exception.  First, although the name Derwick Associates is used in reference to the combination

of Derwick Associates USA LLC and Derwick Associates Corporation, the Complaint alleges

that "at all relevant times, Defendants Betancourt, Trebbau, and D'Agostino worked together as

each other's agents and partners, and were the owners and/or officers, directors, or operators of

Derwick Associates USA LLC *and* Derwick Associates Corporation." (Dkt. No. 29 at ¶¶ 57-48,

53-54) (emphasis added).  As such, the Complaint states with sufficient specificity that the

alleged conspirators were all members of at least one single corporate entity.  Even if the

Complaint lacked this allegation, the intracorporate conspiracy doctrine has previously been

expanded to include the "activity of a parent and its wholly owned subsidiary" as one relevant

entity.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, (1984).  Although the

exact relationship between Derwick Associates USA and Derwick Associates Corporation is not

entirely clear at this stage, the allegations suggest that "they have a complete unity of interest.

Their objectives are common, not disparate; their general corporate actions are guided or

determined not by two separate corporate consciousnesses, but one," and thus should be judged

as one entity for the purposes of this doctrine.  *Id.*

  Second, it is not a requirement of the intracorporate conspiracy doctrine that the corporate

entity in question be a named defendant in the alleged conspiracy.  *See, e.g.*, *Lopez v. Bushey*,

2013 WL 1294477 (N.D.N.Y. Mar. 4, 2013); *Randle v. Alexander*, 960 F. Supp. 2d 457, 475

(S.D.N.Y. 2013).

  Finally, Plaintiffs contend that if the doctrine is otherwise applicable, it still does not

apply to this case as the alleged conspirators are pursuing personal interests separate and apart

from their shared involvement in the corporate entity.  Many of the allegations in the Complaint

appear to contradict this assertion.  For example, the defamatory statements on which all the state

law claims arise regard Derwick Associates ("Ambassador Reich is working for Derwick") (Dkt.

No. 29 at ¶ 157), and those statements were allegedly uttered with the intent to cover up the

continued operations of Derwick Associates' bribery scheme.  Nevertheless, there is also reason

to believe based on the Complaint that D'Agostino may have been acting outside of his official capacity. In particular, Plaintiffs draw attention to the fact that D'Agostino "profited wildly" from the ongoing illegal bribery scheme. (*Id*. at ¶ 3.) This implies a "personal stake in achieving the corporation's objective" that goes beyond "merely carrying out the corporation's managerial policy." *Girard*, 530 F.2d at 71; *see also Little*, 487 F. Supp. 2d at 442; *Dunlop*, 2008 WL 1970002, at *10. While an employee ensuring the profitability of his company is not exceptional, if Plaintiffs are capable of showing that D'Agostino's alleged conspiratorial activities provided him disproportionately great profit as compared to Derwick Associate's derived benefit (or at the expense of Derwick), such a showing may constitute a personal stake. *See Walters v. McMahen*, 795 F. Supp. 2d 350, 359 n.16 (D. Md. 2011), *aff'd*, 684 F.3d 435 (4th Cir. 2012). Additionally, the alleged conspiracy relates to D'Agostino's attempt to harm Plaintiffs in order to, in part, protect himself from the surfacing of the bribery activity. Self-protection is separate and apart from the concerns of the company. *See Hill v. City of New York*, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005) ("conspiring with others to cover-up" illegal activity deemed a personal interest). For these reasons, Plaintiffs have sufficiently alleged at this stage that D'Agostino's involvement in the alleged conspiracy was plausibly based on personal interests rather than his supposed role in Derwick Associates. Accordingly, Plaintiffs' allegations are not barred by the intracorporate conspiracy doctrine at the dismissal stage.

**IV.    Conclusion**

For the foregoing reasons, Defendants' motion to dismiss (Docket No. 31) is GRANTED in part and DENIED in part. Claims I and II (RICO) and VII (civil conspiracy) are dismissed.

Defendant D'Agostino's motion for leave to file a sur-reply (Docket No. 57) is granted.

The parties shall confer on the appropriate scope and schedule for jurisdictional discovery and submit a joint letter to the Court with a proposed schedule on or before September 12, 2014.

The Clerk of Court is directed to close the motions at Docket Nos. 31 and 57.

SO ORDERED.

Dated:  August 18, 2014
        New York, New York

_____
            J. PAUL OETKEN
        United States District Judge