UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THE HONORABLE OTTO J. REICH and, OTTO REICH ASSOCIATES, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> LEOPOLDO ALEJANDRO BETANCOURT LOPEZ, PEDRO JOSE TREBBAU LOPEZ, and FRANCISCO D'AGOSTINO CASADO, <br><br> Defendants. | No. 13 CV 5307 (JPO) <br> ECF Case <br><br> ~~FILED UNDER SEAL~~ <br><br> **Defendants' Public Filing** |

STATEMENT OF FACTS SUPPORTING A *PRIMA FACIE* CASE OF
PERSONAL JURISDICTION OVER DEFENDANT BETANCOURT AND IN
OPPOSITION TO HIS RENEWED MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(2)[1]

COME NOW Plaintiffs the Honorable Otto J. Reich and Otto Reich Associates, LLC, through the undersigned attorneys and hereby submit this Statement of Facts Supporting a *Prima Facie* Case of Personal Jurisdiction Over Defendant Betancourt And In Opposition To His Renewed Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2).

1. At all relevant times, Betancourt purposely availed himself of the benefits and the protections of New York by procuring and having a residence in New York. (*See* ¶¶ 26-39, *infra*.)

---

[1] Plaintiffs may submit facts and materials outside the pleadings, and the Court can and should consider such materials in determining whether a *prima facie* case of personal jurisdiction exists. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 2014 U.S. Dist. 62748, 2014 U.S. Dist. LEXIS 34590 (S.D.N.Y. May 5, 2014 ); *see also Dorchester Financial Securities, Inc. v. Banco BRJ, S.A.*, 722 F. 3d 81, 86 (2d Cir. 2013). In submitting this Statement of *Prima Facie* facts, Plaintiffs are taking guidance from Judge Scheindlin's decision in *Methyl* where Judge Scheindlin noted that in addressing a Rule 12(b)(2) motion concerning personal jurisdiction, the Court may consider a submitted statement of facts analogous to a Local Rule 56.1 Statement. For the sole purposes of opposing Defendants' renewed Rule 12(b)(2) motions, Plaintiffs set forth herein those facts and materials currently available to Plaintiffs to show the existence of a *prima facie* case of personal jurisdiction, including certain admissions by Defendants. Given the limited nature of the jurisdictional discovery afforded Plaintiffs to date and limited opportunities afforded Plaintiffs to verify certain statements by Defendants, Plaintiffs reserve in all respects their right to amend or alter their positions as to the accuracy of the facts set forth herein as this case progresses.

2. Betancourt regularly receives personal and business-related mail, including mail addressed to his companies, at the Penthouse Apartment. (*See* ¶ 52, *infra*.)

3. At all relevant times, Betancourt intended to remain or return to New York with the intent to permanently reside in New York. (*See* ¶¶ 26-222, *infra*.)

4. At all relevant times, Betancourt was domiciled for the purposes of personal jurisdiction in New York. (*See* ¶¶ 26-222, *infra*.)

5. At all relevant times, the market value of Betancourt's home in New York was orders of magnitude higher than the values of any homes or residences allegedly owned by or lived in by Betancourt in Venezuela. (*See* ¶¶ 26-62, *infra*.)

6. At all relevant times, Betancourt had approximately ▓▓▓▓ in New York banks, which he held there for both personal and business purposes. (*See* ¶¶ 70-79, *infra*.) There is no documentary evidence that this money was ever removed and a reasonable inference supported by the facts is that Trebbau continues to have approximately ▓▓▓ ▓▓▓ in New York banks and/or in banks with New York offices. (Exhibit 57 to Smith Decl.)

7. At all relevant times, virtually all of Betancourt's assets in the world were located in New York. (*See* ¶¶ 26-79, 102-115, 137, 206-221, *infra*.)

8. At all relevant times, virtually all of Betancourt's financial assets were held in United States Dollars and not in the currency of Venezuela, i.e., bolivars. (*See* ¶ 217, *infra*.)

9. At all relevant times, Betancourt retained at least four separate New York law firms to represent his personal and business interests. They are: Kasowitz, Benson, Torres & Freidman LLP, located at 1633 Broadway, New York, N.Y. 10019; Platte, Klarsfeld, Levine & Lachtman LLP, located at 10 East 40th Street, 46th Floor, New York, N.Y.; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ New York, N.Y. ▓▓▓▓; and Lewis Baach PLLC, 405 Lexington Avenue, 62nd Floor, New York, N.Y. 10174. (*See* ¶¶ 92-97, *infra*.)

10. At all relevant times, Betancourt spent far more money on lawyers and professionals in New York or who had New York offices than he did anywhere else. *See* ¶¶ 92-101, *infra*.)

11. For the past 4 years at least, Betancourt has paid New York City and State property taxes and has accounts with ConEdison and Verizon in New York. *See* ¶¶ 38-39, *infra*.

12. Betancourt also employs a cleaning staff to maintain the Penthouse Apartment and, during the year-long renovation project, employed an individual named ▓▓▓▓ to supervise the contractors and act as Betancourt's "man on the ground." (*See* ¶¶ 141-142, *infra*.)

13. At all relevant times, Betancourt has spent far more money on renovating and maintaining his New York home than he has on any home or residence in which he allegedly lives in Venezuela. (*See* ¶¶ 40-62, *infra*.)

14. At all relevant times, Betancourt has spent far more money on acquiring pieces of art for him New York home than he has for any home or residence in which he allegedly lives in Venezuela. (*See* ¶¶ 47-48, *infra*.)

15. At all relevant times, Betancourt has spent far more money on art for his New York home than he has spent on any entire home or residence in which he allegedly lives in Venezuela. (*See* ¶¶ 47-48, *infra*.)

16. At all relevant times, Betancourt employed literally dozens of New York-based real estate brokers, lawyers, contractors, architects, art historians and art experts, law firms, suppliers, laborers, subcontractors, and attorneys. (*See* ¶¶ 116-140, *infra*.)

17. At all relevant times, Betancourt owned or had a beneficial economic interest in many companies based in or operating from New York including, but not limited to, Derwick Associates and 641 BL Fifth LLC. (*See* ¶¶ 102-112, 205, *infra*.)

18. At all relevant times, Betancourt deployed his agent, employee and partner Eduardo Travieso to conduct his personal and business affairs in New York on an ongoing, continuous and systematic basis in New York. (*See* ¶¶ 174-194, *infra*.)

19. At all relevant times, Betancourt and his co-defendant, family member and business partner Pedro Trebbau, acted both legally and in fact as one another's agent, partner and co-conspirator in their business interests including, but not limited to, co-owning Derwick Associates. By virtue of this alter ego relationship, Betancourt's activities in New York benefitted Trebbau, and Trebbau's activities in New York benefitted Betancourt. (*See* ¶¶ 78, 79, 204, 205, *infra*.)

20. When Betancourt acquired his home in New York, he used New York-based family, New York-based friends, and New York-based business associates to help him procure it. (*See* ¶¶ 26-39, *infra*.)

21. At all relevant times, Betancourt intended to live in his New York home indefinitely. (*See* ¶ 34, *infra*.)

22. At all relevant times, Betancourt has consented repeatedly and in numerous contexts to being sued in New York and has likewise consented repeatedly and in numerous contexts to the application of New York law. (*See* ¶¶ 36, 73, 76, *infra*.)

23. At all relevant times, Betancourt has paid more in taxes in New York than he has in any other jurisdiction. (*See* ¶ 37, *infra*.)

24. At all relevant times, Betancourt purposely availed himself of the benefits and the protections of New York by retaining New York attorneys and commencing a lawsuit in New York. (*See* ¶¶ 92-101, *infra*.) Betancourt has never commenced a lawsuit in

Venezuela. Betancourt commenced his lawsuit in New York Supreme Court, which was pending during 2012-2013, because he believed that his personal and professional interests required protections from an alleged defamation campaign which he attributed to a Venezuelan bank and a group of Venezuelan citizens, and which required vindication in the United States, including New York. (*See* ¶¶ 98, 99, *infra*.)

25. Betancourt has admitted under oath during his deposition that his Certificate of Residency card in Venezuela is factually and materially false and that notwithstanding the falsity of the information on that document, Betancourt submitted the same to this Court. (*See* ¶ 25, *infra*.)

Betancourt Owns A Luxury Penthouse in New York

26. In or about 2010, Betancourt retained Alina Pedrosa of Brown Harris Stevens realtors in New York City to identify potential luxury residential properties for sale in New York. (Betancourt Tr. at 24:2-7, 13-18, Exhibit 1 to Smith Decl.) Brown Harris Stevens describes itself on its website as "the quintessential luxury residential real estate firm." Betancourt was referred to Ms. Pedrosa by his mother and aunt. (Betancourt Tr. at 25:9-11, Exhibit 1 to Smith Decl.)

27. Pursuant to a Contract of Sale dated September 8, 2010, Betancourt acquired Penthouse 6 at the Olympic Tower, 641 Fifth Avenue, New York, N.Y. 10022 ▮▮▮▮▮▮▮ (the "Penthouse Apartment") through his New York limited liability company, BL 641 Fifth LLC. (Betancourt Tr. at 12:11-13; 17:8-10, Exhibit 1 to Smith Decl.; Closing Statement dated November 23, 2010, Exhibit 14 to Smith Decl.) The Olympic Tower is considered one of the top full-service white glove luxury buildings in New York City.

28. In connection with the acquisition of the Penthouse Apartment, Betancourt paid New York City and State taxes in the following amounts: ▮▮▮▮▮▮▮ New York City Real Property Transfer Tax) and ▮▮▮▮▮▮▮ (New York State Real Estate Transfer Tax). (BET144-146, Exhibit 50 to Smith Decl.)

29. Douglas Elliman Property Management, which represents the Olympic Tower, listed Betancourt's "NET WORTH" in October 2010 as ▮▮▮▮▮▮▮, which represents funds held by him and/or one of his companies at J.P. Morgan New York. (October 15, 2010 letter from Douglas Elliman, Exhibit 32 to Smith Decl.)

30. As part of his application to purchase the Penthouse Apartment, Betancourt submitted an October 12, 2010 letter from J.P. Morgan New York to the Members of the Board of the Olympic Tower, which identified him as the "beneficial owner of a company" that maintains an ▮▮▮▮▮▮▮ account with J.P. Morgan New York with a balance of ▮▮▮▮▮▮▮ as of October 2010, and a ▮▮▮▮▮▮▮ account with a balance of ▮▮▮▮▮▮▮ (October 12, 2010 letter from J.P. Morgan, Exhibit 16 to Smith Decl.)

31. In connection with his purchase application, Betancourt also submitted a personal financial statement, which he signed on September 27, 2010. Betancourt's personal financial statement states that he has in excess of ▮▮▮▮▮▮▮ in cash. That figures was

4

obtained from the "records of the undersigned [Betancourt]." (Personal Financial Statement, Exhibit 17 to Smith Decl.)

32. Betancourt lists two New York residents as personal references on the Seller Information sheet that he submitted in connection with his application to purchase the Penthouse Apartment: ▓▓▓▓▓▓▓▓▓▓ with an address at ▓▓▓▓▓▓▓▓▓▓, New York, N.Y. 10022, and ▓▓▓▓▓▓▓▓▓▓ with an address at ▓▓▓▓▓▓▓▓▓▓ New York, N.Y. 10021. Both of these individuals submitted letters of recommendation to the Olympic Tower Board of Managers. (Seller Information Sheet, Exhibit 18 to Smith Decl.)

33. Betancourt lists Maira Brito of J.P. Morgan New York as his financial reference on the Seller Information sheet that he submitted in connection with his application to purchase the Penthouse Apartment. Ms. Brito also submitted a letter of recommendation to the Olympic Tower Board of Managers (Seller Information Sheet, Exhibit 18 to Smith Decl.; Letter of Recommendation, Exhibit 19 to Smith Decl.)

34. In 2010, Betancourt represented to the Olympic Tower Board of Managers that he intended to occupy the Penthouse Apartment "indefinite[ly]." (Seller Information Sheet, Exhibit 18 to Smith Decl.)

35. Betancourt's New York counsel, Platte, Klarsfeld, Levine & Lachtman, LLP, represented to the Olympic Tower Board that "Mr. Betancourt will be the occupant of the Apartment." (September 24, 2010 letter from D. Levine to Board of Managers, Exhibit 20 to Smith Decl.)

36. Betancourt consented to the jurisdiction of the courts in New York County when he executed the First Rider to the Contract of Sale for the Penthouse Apartment. He also agreed that any disputes shall be governed by the laws of the state of New York. (Board Package, Exhibit 15 to Smith Decl.)

37. For the past 4 years, Betancourt has been paying New York City and New York State property taxes on the Penthouse Apartment. (Betancourt Tr. at 18:21-25; 19:1-3; 122:12-24, Exhibit 1 to Smith Decl.; BET2032-2033, Exhibit 50 to Smith Decl.) In August 2013, one month after this lawsuit was commenced, Betancourt paid nearly ▓▓▓▓▓▓ in property taxes to New York City. (BET1523-24, Exhibit 50 to Smith Decl.)

38. For the past 4 years, Betancourt has been paying a monthly fee to ConEdison in New York for electricity provided to the Penthouse Apartment. (Betancourt Tr. at 163:1-3, Exhibit 1 to Smith Decl.; BET40-44, Exhibit 50 to Smith Decl.)

39. Betancourt also pays a monthly fee to Verizon in New York for phone and internet services provided to the Penthouse Apartment. (Betancourt Tr. at 163:4-9, Exhibit 1 to Smith Decl.; 2013 Verizon phone bill dated June 21, 2012 for 641 Fifth Avenue, Penthouse 6, New York, N.Y., Exhibit 45 to Smith Decl.) Betancourt has four land lines at the Penthouse Apartment, all of which have an area code of 212. (Betancourt's Supplemental Responses to First Set of Interrogatories, Interrog. No. 9, Exhibit A,

Exhibit 9 to Smith Decl.; Betancourt Tr. at 154:17-25; 155:1-18, Exhibit 1 to Smith Decl.)

Betancourt Spends ▇
Renovating And Decorating The Penthouse Apartment

40. Since at least January, 2011, Betancourt hired over two dozen New York-based contractors, laborers, architects, and suppliers to undertake a gut or complete renovation of the Penthouse Apartment. (Betancourt Tr. at 21:24-25; 22:1-7; Exhibit 1 to Smith Decl.; BET1402-1408, Exhibit 50 to Smith Decl.; Project Team List, Exhibit 21 to Smith Decl.; List of Subcontractors dated June 21, 2011, Exhibit 22 to Smith Decl.; List of Contractors dated July 2013, Exhibit 13 to Smith Decl.; List of Contractors dated October 2011 (BET1382-1386), Exhibit 50 to Smith Decl.)

41. Betancourt paid in excess of ▇ to his New York team of contractors, laborers, architects and suppliers to renovate the Penthouse Apartment. (Betancourt Tr. at 22:8-12, 19-20, Exhibit 1 to Smith Decl.; BET646-647, Exhibit 50 to Smith Decl.)

42. In June 2011, Betancourt (via his New York agent, ▇) entered into an agreement to renovate the Penthouse Apartment with D.H.E. Company, Inc. pursuant to the plans and specifications of De La Garza Architecture LLC, which is the New York architect that Betancourt hired. In June 2011, D.H.E. Company, Inc. estimated a cost of ▇ to complete the renovations. (Agreement to Renovate between Betancourt and D.H.E. Company, Inc., dated June 15, 2011, Exhibit 52 to Smith Decl.)

43. In March 2012, Betancourt owed over ▇ to Walter P. Sauer LLC, a manufacturer of fine furniture and interior cabinetry located in Brooklyn, New York. (Walter P. Sauer LLC Contract Summary dated March 12, 2012, Exhibit 46 to Smith Decl.)

44. The extensive renovations to the Penthouse Apartment were generally completed on or about February 2012, in time for Betancourt's 32nd birthday celebration at Catch in New York. (Betancourt Tr. at 21:20-23, Exhibit 1 to Smith Decl.; Betancourt Response to Interrog. No. 5, Exhibit 8 to Smith Decl.)

45. Betancourt spent has spent ▇ on furniture and accessories to furnish the Penthouse Apartment. By way of illustration, Betancourt spent nearly ▇ at one furniture store alone. (BET640-645, Exhibit 50 to Smith Decl.)

46. Since 2012, Betancourt has purchased at least three pieces of art by the celebrated Indian sculptor, Anish Kapoor. (SOTHEBYS1-2, Exhibit 23 to Smith Decl.; BET816, Exhibit 50 to Smith Decl.; January 5, 2013 email from A. Blanco, Exhibit 47 to Smith Decl.) Mr. Kapoor's work is collected worldwide, including by the Museum of Art in New York City and the Tate Modern in London. All three of Betancourt's Kapoors were installed at the Penthouse Apartment, including an autographed steel disc by Kapoor (the "Kapoor Disc") that Betancourt purchased for ▇ from Sotheby's in November 2012. (SOTHEBYS1-2, Exhibit 23 to Smith Decl.)

47. Betancourt's home insurance company assigned the following values to Betancourt's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

48. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

49. In March 2011, Betancourt entered into an alteration agreement with the Olympic Tower concerning the alteration and replacement of all HVAC in the Penthouse Apartment. The Olympic Tower Alteration Project Log lists the project value as ▇▇▇▇▇. (Alteration Project Log, Exhibit 24 to Smith Decl.)

50. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and lists a New York telephone number with a (212) area code as a contact number for Betancourt. (Alteration Project Log, Exhibit 25.)

51. Betancourt has procured title insurance for the Penthouse Apartment with the Madison Agency, LLC, which is located at 292 Madison Avenue, New York, N.Y.

52. Betancourt receives personal and business-related mail and deliveries at the Penthouse Apartment, including mail addressed to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Betancourt Tr. at 181:6-7, Exhibit 1 to Smith Decl.; Penthouse Six Event Log, Exhibit 26 to Smith Decl.)

53. In February 2012, Betancourt's mother-in-law shipped his birthday gift (a tranquil sounds oxygen bar) to the Penthouse Apartment address. (BET2613-2614, Exhibit 50 to Smith Decl.)

54. In June 2013, Betancourt was not interested in entertaining any potential offers to sell the Penthouse Apartment. (BET866-867, Exhibit 50 to Smith Decl.)

55. In October 2013, Betancourt turned down an offer ▇▇▇▇▇▇▇▇ for the Penthouse Apartment. (BET2623-2624, Exhibit 50 to Smith Decl.)

56. The address of Betancourt's boyhood home is ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ the "Pica Pica Residence"). (Betancourt Response to Second Set of Interrog. No. 1, Exhibit 10 to Smith Decl.) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

57. The Certificate of Residency dated July 10, 2014, which was procured by Betancourt at the request of his counsel from the Bolivarian Republic of Venezuela, National Electoral Counsel, Commission on Civil and Electoral Registration, contains false information. It states that Betancourt has resided permanently at his boyhood home, the Pica Pica Residence, since February 1992, even though Betancourt moved out of the Pica Pica

7

Residence some two years earlier at the end of 2012. (BET2528, Exhibit 50 to Smith Decl.; Betancourt Tr. at 166:16-23, Exhibit 1 to Smith Decl.)

58. At the time that Betancourt procured the Certificate of Residency he was aware that he had not resided at the Pica Pica Address for nearly two years. (Betancourt Tr. at 168:10-25; 169:1-19, Exhibit 1 to Smith Decl.)

59. The Certificate of Residency issued by the Venezuelan government in July 2014 is based on a representation by Betancourt that he knew was false at the time that he made it.

60. Although Betancourt no longer resides at the Pica Pica Residence, he continues to vote in the voting district that includes Pica Pica. (Betancourt Tr. at 171:14-22, Exhibit 1 to Smith Decl.)

61. The Voter Registration Record procured by Betancourt at the request of his counsel from the Venezuelan government also contains false information. It states that Betancourt is registered to vote in the municipality of El Hatillo, state of Miranda, Republic of Venezuela, but Betancourt no longer lives in that voting district. (Betancourt Decl., Exhibit A attached as Exhibit 11 to Smith Decl.)

62. The Tax Registration Record dated July 2014, which was procured by Betancourt at the request of his counsel from the Venezuelan taxing authority also contains false information. It lists Betancourt's address as the Pica Pica Residence. (Betancourt Decl., Exhibit B attached as Exhibit 11 to Smith Decl.; Betancourt Tr. at 175:23-25; 176:1-21, Exhibit 1 to Smith Decl.)

Prior to Acquiring his Penthouse Apartment, Betancourt
Listed Travieso's Address As His New York Residence

63. Betancourt listed the following as his New York address on banking, federal tax forms and other documents: 155 East 55th Street, Apt. 9A, New York, N.Y. 10022 (the "55th Street Residence"). This was also Eduardo Travieso's residence in New York during the same period. (CSSU48, Exhibit 49 to Smith Decl.)

64. Betancourt listed the 55th Street Residence as a mailing address for Derwick Associates Corporation on account opening documents he prepared, signed and submitted to Credit Suisse in New York in November 2010. (CSSU 1-5, Exhibit 49 to Smith Decl.; Trebbau Tr. at 161:5-18; 163:9-22, Exhibit 2 to Smith Decl.)

65. Pursuant to the New Account Agreement that Betancourt executed on behalf of Derwick Associates Corporation with Credit Suisse in November 2010, Betancourt agreed that his relationship with Credit Suisse would be governed by New York law. (CSSU6-7, Exhibit 49 to Smith Decl.)

66. Betancourt listed the 55th Street Residence on Form W-8BEN for Derwick Associates Corporation, which he signed on November 20, 2010. (CSSU10, Exhibit 49 to Smith Decl.)

67. Betancourt listed the 55th Street Residence as a mailing address for ▮▮▮▮▮ on account opening documents he prepared, signed and submitted to Credit Suisse in New York in November 2010. (CSSU14-18, Exhibit 49 to Smith Decl.)

68. Pursuant to the New Account Agreement that Betancourt executed on behalf of ▮▮▮▮▮ with Credit Suisse in November 2010, Betancourt agreed that his relationship with Credit Suisse would be governed by New York law. (CSSU19-20, Exhibit 49 to Smith Decl.)

69. Betancourt listed the 55th Street Residence on Form W-8BEN for ▮▮▮▮▮ which he signed on December 2, 2010. (CSU23, Exhibit 49 to Smith Decl.; Trebbau Tr. at 165:18-21, Exhibit 2 to Smith Decl.)

Betancourt Has Bank Accounts and Banking Relationships in New York

70. From at least as early as 2009, Betancourt commenced a banking relationship with J.P. Morgan in New York. (Betancourt Tr. at 49:5-7; 83:2-3, 9-12, Exhibit 1 to Smith Decl.) Betancourt was a customer of J.P. Morgan New York when Plaintiffs commenced this lawsuit. (Betancourt Response to Interrog. No. 2, Exhibit 8 to Smith Decl.)

71. At all relevant times, Betancourt's accounts were managed by a team of J.P. Morgan New York employees located at its Worldwide Headquarters in New York.

72. In April 2011, Betancourt, through his New York limited liability company, BL 641 Fifth LLC, procured a ▮▮▮▮▮ mortgage from J.P. Morgan New York in connection with the acquisition of the Penthouse Apartment. (Betancourt Tr. at 28:1-10, Exhibit 1 to Smith Decl.; Closing Statement dated April 25, 2011, Exhibit 29 to Smith Decl.)

73. In April 2011, Betancourt executed a Guaranty with J.P. Morgan New York, which personally guaranteed the amount owed on the mortgage. Betancourt appointed Corporation Service Company, which maintains a New York City office at 1177 Avenue of the Americas, New York, N.Y., as his agent for services of process. Betancourt further agreed that any disputes concerning the Guaranty would be governed by New York law and consented to the jurisdiction and venue of the state and federal courts of New York City. (Guaranty dated April 2011, Exhibit 42 to Smith Decl.)

74. Betancourt entered into an Appointment of Agent Agreement with J.P. Morgan New York pursuant to which he appointed his New York counsel, David Levine, of the law firm Platter, Klarsfeld, Levine & Lachtman, LLP as his agent for the service of process in connection with any legal action under the agreement. Betancourt further agreed that any legal action arising under the agreement would be brought exclusively in the courts of the State of New York and be governed by New York law. (BET626-629, Exhibit 50 to Smith Decl.)

75. In May 2012, Betancourt, through his New York limited liability company, BL 641 Fifth LLC, refinanced his mortgage with J.P. Morgan New York. (May 22, 2012 Closing Statement, Exhibit 30 to Smith Decl.)

76. In March 2012, Betancourt executed a Guaranty with J.P. Morgan New York, which personally guaranteed the amount owed on the mortgage. Betancourt appointed his New York counsel, Platte, Klarsfeld, Levine & Lachtman LLP, as his agent for services of process. Betancourt further agreed that any disputes concerning the Guaranty would be governed by New York law and consented to the jurisdiction and venue of the state and federal courts of New York City. (BET630-634, Exhibit 50 to Smith Decl.)

77. In 2012 and 2013, Trebbau, on behalf of Betancourt and Derwick Associates was responsible for managing the day-to-day relationships with Derwick's international banks. The bank with which Trebbau had "day-to-day relationships" was J.P. Morgan New York, which has its headquarters on Park Avenue in New York, New York. (Trebbau Tr. at 110:12-15, Exhibit 2 to Smith Decl.; Florida Defamation Complaint at ¶35, Exhibit 31 to Smith Decl.)

78. A July 5, 2012 letter from J.P. Morgan New York to Betancourt identifies no fewer than 40 separate banking accounts connected to Betancourt, which collectively held over ███████████ (the "July 5, 2012 letter"). (BET155-156, Exhibit 50 to Smith Decl.; October 15, 2010 letter from Douglas Elliman to Board of Managers at Olympic Tower, Exhibit 32 to Smith Decl.; October 12, 2010 letter from J.P. Morgan, Exhibit 16 to Smith Decl.)

79. The accounts on the July 5 letter, which include Betancourt's personal accounts with J.P. Morgan New York, were part of "the Derwick Group" of accounts meaning that, from the perspective of the bank, these accounts "belong[ed] to the same clients." (Trebbau Tr. at 72:3-7, 9-10, 12-13, 18-22, Exhibit 2 to Smith Decl.) To illustrate, Trebbau and Betancourt each own 50% of Derwick Associates Corporation, Derwick Associates de Venezuela, ████████████████████████████████████████ ████████████████████████████ Trebbau Tr. at 72:24-25; 73:2-25; 74:3-4, Exhibit 2 to Smith Decl.; Betancourt Tr. at 55:8-13, Exhibit 1 to Smith Decl.)

80. By its July 5 letter, J.P. Morgan told Betancourt it had decided to close his personal accounts and all accounts held by Derwick Associates Corporation and related accounts. (BET155-156, Exhibit 50 to Smith Decl.)

81. In July 2012, Trebbau, acting on behalf of himself, Betancourt and their businesses, traveled to New York with Orlando Alvarado, the Chief Financial Officer of Derwick Associates, to meet with Eduardo Travieso and Sonia Garcia Romero who were Trebbau's and Derwick Associates' private bankers at J.P. Morgan New York. (Trebbau Response to Interrogatory No. 5, Exhibit 4 to Smith Decl.)

82. Trebbau, acting on behalf of himself, Betancourt and their businesses, had at least three meetings at J.P. Morgan's New York offices with representatives of J.P. Morgan New York during the period 2011 through 2013. (Trebbau Tr. at 53:8-16, Exhibit 2 to Smith Decl.)

83. Betancourt could not state with any specificity when the accounts identified on the July 5 letter from J.P. Morgan were closed and/or transferred to another bank. (Betancourt Tr.

10

at 43:21-25; 44:1-25; 45:1-15; 46:3-8; 54:2-11; 57:16-18, 24-25; 58:1-6, 14-18; 84:18-25; 85:1-3, Exhibit 1 to Smith Decl.)

84. In 2012-2013, Betancourt also had a Visa card from J.P. Morgan New York. (Betancourt Tr. at 144:7-9, Exhibit 1 to Smith Decl.)

85. Betancourt continues to be a customer of J.P. Morgan New York today. (Betancourt Tr. at 45:16-25, Exhibit 1 to Smith Decl.)

86. Trebbau is the President of ███████████████ and Betancourt is the Vice President. (Trebbau Tr. at 166:15-19; 167:7-9, Exhibit 2 to Smith Decl.) ███████████████ s an investment vehicle or special purpose vehicle designed to manage and invest the funds of Betancourt and/or Trebbau. (Betancourt Tr. at 46:24-25; 47:6-16, Exhibit 1 to Smith Decl.)

87. Betancourt is the President of ███████████████ and Trebbau is the Vice President. (CSSU28-30, Exhibit 49 to Smith Decl.; Trebbau Tr. at 166:11-14; 166:25; 167:1-6, Exhibit 2 to Smith Decl.) ███████████████ is an investment vehicle or special purpose vehicle designed to manage and invest the funds of Betancourt and/or Trebbau. (Betancourt Tr. at 46:14-15; 47:6-16, Exhibit 1 to Smith Decl.)

88. In December 2010, Betancourt opened at least two accounts with Credit Suisse Securities USA, LLC, located at Eleven Madison Avenue, New York, New York 10010. The accounts were in the name of Derwick Associates Corporation and ███████████████ (CSSU1-30, Exhibit 49 to Smith Decl.)

89. During the relevant period, Betancourt paid Pro Energy Services LLC ("ProEnergy"), which is licensed to do business in New York and is the company believed to do all the actual construction and operation of Derwick Associates' facilities, from New York bank accounts. (Betancourt Tr. at 150:10-23, Exhibit 1 to Smith Decl.)

90. In May 2011, Betancourt signed and submitted an Account Application Package to J.P. Morgan New York that lists the Penthouse Apartment address as his address and the address for ███████████████, one of his investment vehicles. He also states that, at that time, he had brokerage accounts with the following firms: J.P. Morgan, Ameritrade and Julius Baer – all of which have offices in New York City. (BET613-625, Exhibit 50 to Smith Decl.)

91. Betancourt testified that he transferred his accounts from J.P. Morgan New York to RBC, which has offices in New York. (Betancourt Tr., at 54:2-4, Exhibit 1 to Smith Decl.) Betancourt has actively withheld from Plaintiffs documents corroborating his deposition testimony.

Betancourt Retains At Least Four
New York Law Firms During The Relevant Period

92. During the period August 2012 through at least January 2014, Betancourt (and/or one of his companies) retained four separate New York law firms to represent his personal and

11

business interests. They are: Kasowitz, Benson, Torres & Freidman LLP, located at 1633 Broadway, New York, N.Y. 10019; Platte, Klarsfeld, Levine & Lachtman LLP, located at 10 East 40th Street, 46th Floor, New York, N.Y.; ███████████████████████ ███████████████████████, and Lewis Baach PLLC, 405 Lexington Avenue, 62nd Floor, New York, N.Y. 10174. (Betancourt Response to Interrog. No. 1, Exhibit 8 to Smith Decl.; Betancourt Supplemental Response to Interrog. No.1, Exhibit 9 to Smith Decl.; Trebbau Response to Interrog. No. 1, Exhibit 4 to Smith Decl.)

93. In August 2012, Betancourt retained the New York law firm, Kasowitz, Benson, Torres & Freidman LLP, located at 1633 Broadway, New York, N.Y. 10019. (Betancourt Response to Interrog. No. 1, Exhibit 8 to Smith Decl.; BET772-773, Exhibit 50 to Smith Decl.)

94. In or about May 2013, Betancourt, as owner of Derwick Associates Corp., retained the New York law firm, ███████████████████████ ███████████████████████ (Betancourt Supp. Response to Interrog. No. 1, Exhibit 9 to Smith Decl.) During a less than three week period, Betancourt and/or Trebbau exchanged least 60 e-mail communications with counsel at ███████████. (Trebbau Supp. Response to Interrog. No. 1, Exhibit 5 to Smith Decl.) The New York office of ███████████████████████ was paid approximately ███████ for its legal services. (Trebbau Tr. at 24:4-11, Exhibit 2 to Smith Decl.)

95. In 2010, Betancourt retained Platte, Klarsfeld, Levine & Lachtman LLP, located at 10 East 40th Street, 46th Floor, New York, N.Y. (Betancourt Response to Interrog. No. 1, Exhibit 8 to Smith Decl.) Platte, Klarsfeld, Levine & Lachtman LLP acted as Betancourt's real estate counsel in connection with the acquisition of the Penthouse Apartment in November 2010. (Betancourt Tr. at 27:13-14, Exhibit 1 to Smith Decl.) Platte, Klarsfeld, Levine & Lachtman LLP was also responsible for preparing the documentation necessary to form BL 641 Fifth LLC, the New York limited liability company that Betancourt formed to acquire the Penthouse Apartment. Platte, Klarsfeld, Levine & Lachtman LLP was paid in U.S. dollars by Betancourt for their legal services rendered in New York.

96. In 2014, Betancourt (through Derwick Associates) retained Adam Kaufman of the New York office of Lewis Baach PLLC, which located at 405 Lexington Avenue, 62nd Floor, New York, N.Y. 10174. (Betancourt Tr. at 141:1-2; 10-18, Exhibit 1 to Smith Decl.; Trebbau Tr. at 24:20-21, 24; 25:1, 4, Exhibit 2 to Smith Decl.)

97. Although Kaufman does not "officially" represent Betancourt in this lawsuit, he prepared a written statement that he sent to the Wall Street Journal in New York, which defames Otto Reich and comments on Plaintiffs' claims here. Jose de Cordoba, *Venezuelan Firm Is Probed In U.S.*, Wall Street Journal, August 9, 2014., Exhibit 33 to Smith Decl.)

Betancourt Commences A Related Lawsuit In New York

98. In or about September 2012, Kasowitz, Benson, Torres & Freidman LLP commenced a lawsuit on Betancourt's behalf in the Supreme Court, New York County captioned *Derwick Associates Corp., et al. v. John Does 1-10* (Supreme Court of the State of New York, County of New York), Index No. 653345/12 ( the "New York Action") (Exhibit 12 to Smith Decl.). (Betancourt Response to Interrog. No. 1, Exhibit 8 to Smith Decl.; Betancourt Tr. at 9:22-25; 10:1-6, Exhibit 1 to Smith Decl.)

99. The New York Action sought damages for alleged "egregiously false and defamatory statements" allegedly posted by those defendants and that were "intended to ... destroy [Betancourt's, Trebbau's and Derwick Associates'] current and prospective business and banking relationships, which are indispensable to the operation, expansion and success of Derwick." (Exhibit 12 to Smith Decl.) The New York Action was brought as part of Kasowitz, Benson, Torres & Freidman LLP's legal strategy, which was to protect Betancourt's (as well as Trebbau's and Derwick Associates') reputation globally, including New York. (Betancourt Tr. at 10:16-19; 11:2-3, 13-17, Exhibit 1 to Smith Decl.)

100. In October/November 2012, Betancourt met face-to-face with his counsel from Kasowitz, Benson, Torres & Friedman LLP in New York. (Betancourt Response to Interrog. No. 5, Exhibit 8 to Smith Decl.; Betancourt Tr. at 93:19-25, Exhibit 1 to Smith Decl.)

101. Kasowitz, Benson, Torres & Freidman LLP's initial retainer was ▓▓▓▓. (BET772-773, Exhibit 50 to Smith Decl.) The firm was paid ▓▓▓▓ total for legal services performed over a seven month period in connection with the New York Action and a related Florida defamation action. (Trebbau Tr. at 44:17-18, Exhibit 2 to Smith Decl.) Kasowitz, Benson, Torres & Freidman LLP's legal fees were paid for by Derwick Associates from a bank account that Derwick Associates had in New York. (Trebbau Tr. at 19:17-25; 20:4-5, 12-25; 21: 1-4; 44:17-18, 24-25; 45:1-4, Exhibit 2 to Smith Decl.)

Betancourt Is The Sole Member
Of A New York Limited Liability Company

102. In August 2010, Betancourt formed BL 641 Fifth LLC, a New York limited liability company. (Betancourt Tr. at 36:7-11, Exhibit 1 to Smith Decl.; BET109-139, Exhibit 50 to Smith Decl.)

103. Betancourt retained the law firm Platte, Klarsfeld, Levine & Lachtman LLP to prepare the formation documents for his New York limited liability company.

104. BL 641 Fifth LLC was formed to acquire the Penthouse Apartment. One of the other purposes of forming BL 641 Fifth LLC was to avoid the payment of New York taxes. (September 24, 2010 letter from D. Levine to Board of Managers, Exhibit 20 to Smith Decl.)

105. Betancourt is the sole managing member of BL 641 Fifth LLC. (BET139, Exhibit 50 to Smith Decl.)

106. Article II of the Operating Agreement entitled "FORMATION" provides that the principal office of BL 641 Fifth LLC is 641 Fifth Avenue, Penthouse 6, New York, N.Y. 10022. (BET124, Exhibit 50 to Smith Decl.)

107. Article IV of the Operating Agreement entitled "ACCOUNTING AND RECORDS" provides that the following records are to be maintained at 641 Fifth Avenue, Penthouse 6, New York, N.Y. 10022: (i) a current list of the full name and last known address of each Member; (ii) a copy of the Articles and all amendments thereto, together with the executed copies of any powers of attorney pursuant to which any Articles have been executed; (iii) copies of the Company's federal, foreign, state and local income tax returns and reports, if any, for the three most recent years; (iv) copies of the Operating Agreement; (v) any financial statements of the Company for the three most recent years; (vi) a writing or other data compilation from which information can be obtained through retrieval devices into reasonably usable form setting forth the following: (a) the amount of cash and a description and statement of the agreed value of the other property or services contributed by each member and which each Member has agreed to contribute; (b) the times at which or event on the happening of which any additional Commitments agreed to be made by each member are to be made, and (c) any right of a Member to receive, or of the Company to make, Distributions to a Member which include a return of all or any part of the Member's Capital Contribution. (BET125, Exhibit 50 to Smith Decl.)

108. Article X of the Operating Agreement entitled "TAXES" requires Betancourt to make timely income tax payments to any taxing jurisdiction, here, in New York, and to accept personal jurisdiction of the taxing jurisdiction with respect to the collection of income taxes attributable to his membership income and interest and penalties assessed on such income. (BET132, Exhibit 50 to Smith Decl.)

109. Article XVI of the Operating Agreement entitled "ARBITRATION" provides that any disputes or claims between members concerning their relationship to each other or to BL 641 Fifth LLC shall be resolved by arbitration before a single arbitrator in New York.

110. Article XVII of the Operating Agreement entitled "MISCELLANEOUS PROVISIONS" provides that "[t]his agreement shall be governed by and construed in accordance with the laws of the State of New York, applicable to agreements made and to be performed entirely within New York." (BET119-139, Exhibit 50 to Smith Decl.)

111. The address for service of process for BL 641 Fifth LLC is the law office of Platte, Klarsfeld, Levine & Lachtman LLP, 10 E. 40th Street, 46th Floor, New York, N.Y. 10016. (BET112, Exhibit 50 to Smith Decl.)

112. In March 2011, Betancourt, as the sole managing member of BL 641 Fifth, LLC, appointed David Levine, counsel with the New York law firm, Platte, Klarsfeld, Levine & Lachtman, LLP, as Manager of BL 641 Fifth LLC in connection with refinancing of the mortgage on the Penthouse Apartment. (Written Consent of Sole Managing Member dated March 2011, Exhibit 43 to Smith Decl.)

Betancourt Retained New York-based Financial Advisors

113. During the period 2011 through 2013, Betancourt retained at least two New York-based financial advisors: J.P. Morgan New York and the Compass Group. (Trebbau Tr. at 64:2-5, Exhibit 2 to Smith Decl.)

114. In or about February 2011, Betancourt opened an account with the Compass Group in the name of his company, ▒▒▒▒▒▒▒▒▒▒▒▒▒▒ (Compass Group production to FINRA, Exhibit 34 to Smith Decl.; Betancourt Tr. at 81:10-25; 82:1-6, Exhibit 1 to Smith Decl.) The Compass Group is an investment adviser/brokerage company with an office at 135 East 57th Street, 30th Floor, New York, N.Y. According to its website, the Compass Group services high net worth individuals and institutional clients.

115. In February 2014, Betancourt considered retaining the financial advisory services of Arden Asset Management LLC, which is located at 375 Park Avenue, New York, N.Y. concerning a potential investment. (BET2067-2070, Exhibit 50 to Smith Decl.)

Betancourt Solicits And/Or Conducts Business In New York

116. In September 2010, Trebbau, on behalf of himself, Betancourt and Derwick Associates, attended the annual Clinton Global Initiative, which brings together hundreds of leading CEOs, heads of foundations, philanthropists, and members of the media. The 2010 meeting was held at the Sheraton New York Hotel & Towers, 811 7th Avenue, New York, N.Y. 10019.

117. In September 2010, Trebbau, on behalf of himself, Betancourt and Derwick Associates, met with Hans Hertell in New York. Mr. Hertell is a lawyer and the former U.S. Ambassador to the Dominican Republic. In 2012 or 2013, Betancourt on behalf of Derwick Associates retained Hertell as legal counsel. (Trebbau Supplemental Response to Interrog. No. 5, Exhibit 5 to Smith Decl.; Trebbau Tr. at 142:19-25; 143:1-3; 12-25; 144:1-4, Exhibit 2 to Smith Decl.)

118. In December 2012, Betancourt, Trebbau, and Trebbau's father-in-law, Eloy Montenegro, Sr., met with representatives of ▒▒▒▒▒▒▒▒▒▒▒▒ which has an office in New York located at ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ concerning a potential investment ▒▒▒▒▒▒▒▒▒▒▒▒. (Betancourt Response to Interrog. No. 5, Exhibit 8 to Smith Decl.; Betancourt Tr. at 106:5-21, Exhibit 1 to Smith Decl.; Trebbau Tr. at 103:3-15, 22-25, Exhibit 2 to Smith Decl.)

119. Since 2010 and including in 2013, Betancourt has met with his business partner and good friend, D'Agostino, in New York on numerous occasions – too many for him to recall with any specificity. (Betancourt Tr. at 103:13-25; 104:1-9, 14-18, 21-25; 105:1-3; 113:13-14, Exhibit 1 to Smith Decl.; D'Agostino Tr. at 18:18-19, Exhibit 3 to Smith Decl.) Those meetings occurred at various public places and also at D'Agostino's home in New York. (Betancourt Tr. at 105:9-11, Exhibit 1 to Smith Decl.)