120. D'Agostino lives in New York and, since 2009, has had an office in New York at 375 Park Avenue, New York, N.Y. (D'Agostino Tr. at 7:15-25; 8;2-4; 9:19-25; 10:2-7, 9; 13:4-10; 12-23; 16:3-7, Exhibit 3 to Smith Decl.)

121. In 2012 and 2013, Betancourt and D'Agostino discussed several business opportunities. (Betancourt Tr. at 103:18-22, Exhibit 1 to Smith Decl.; D'Agostino Tr. at 24:17-19, 22-25; 25:2-4, Exhibit 3 to Smith Decl.)

122. One of the potential business deals that D'Agostino brought to Betancourt concerned ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (D'Agostino Tr. at 24:22-25; 25:2-4, Exhibit 3 to Smith Decl.)

123. D'Agostino met with Betancourt at least a couple of times in New York concerning ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (D'Agostino Tr. at 25:22-25, 26:2-11; 26:15-17, Exhibit 3 to Smith Decl.) Betancourt and D'Agostino ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (D'Agostino Tr. at 71:10-25; 72:2-5, Exhibit 3 to Smith Decl.)

124. In 2012, D'Agostino met with Betancourt and Betancourt's cousin and business partner, Francis Convit, in New York. (D'Agostino Tr. at 29:15-17; 30:3-11, Exhibit 3 to Smith Decl.)

125. D'Agostino and Betancourt have met with hedge funds in New York concerning ▇▇▇▇▇▇▇▇ (D'Agostino Tr. at 26:15-17, Exhibit 3 to Smith Decl.)

126. In addition to setting up meetings with hedge funds for Betancourt, D'Agostino has met with potential investors in New York on behalf of Betancourt concerning potential business opportunities. (D'Agostino Tr. at 37:8-25; 38:2-6, Exhibit 3 to Smith Decl.)

127. On behalf of Betancourt, D'Agostino met with ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (D'Agostino Tr. at 39:14-25; 40:2-12, Exhibit 3 to Smith Decl.) ▇▇▇▇▇▇ resides in New York and has an office in New York. (D'Agostino Tr. at 38:25; 39:2-9, Exhibit 3 to Smith Decl.)

128. D'Agostino also met with ▇▇▇▇▇▇▇▇ in New York to discuss the ▇▇▇▇ ▇▇ he was working on with Betancourt. (D'Agostino Tr. at 41:23-25; 42:2, 4, 11-19; 44:13-22, Exhibit 3 to Smith Decl.)

129. D'Agostino arranged for a meeting in New York in February 2013 between ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Betancourt, D'Agostino and Orlando Alvarado, Derwick Associates' CFO. (Betancourt Tr. at 108:20-25; 109:1-16, Exhibit 1 to Smith Decl.; BET1088-1099, Exhibit 50 to Smith Decl.)

130. Betancourt and D'Agostino also negotiated the potential purchase ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ which was located in New Jersey. (D'Agostino Tr. at 27:15-20, 24-25; 28:6, Exhibit 3 to Smith Decl.)

16

131. D'Agostino has ████████████████████████████████████████ ████████████████████████████████████████ (Betancourt Tr. at 112:5-11, Exhibit 1 to Smith Decl.)

132. In 2012 -2013, D'Agostino visited with Betancourt at the Penthouse Apartment at least three or four times. (D'Agostino Tr. at 52:15-20, Exhibit 3 to Smith Decl.) On at least one occasion, Betancourt's wife was present. (D'Agostino Tr. at 52:21-23, Exhibit 3 to Smith Decl.)

133. Betancourt has met D'Agostino's wife some time in 2012 or 2013 at D'Agostino's home in New York. (D'Agostino Tr. at 112:2-11, Exhibit 3 to Smith Decl.)

134. D'Agostino works for ████████████████████, (Betancourt Tr. at 110:5-9, Exhibit 1 to Smith Decl.) ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████. (Betancourt Tr. at 114:15-21, Exhibit 1 to Smith Decl.)

135. During the period January 1, 2011 through at least July 31, 2013, Betancourt engaged in business or commercial transactions with *no fewer than two dozen* individuals and/or entities in New York ████████████ n any year period. (Betancourt Response to Interrog. No. 1, Exhibit 8 to Smith Decl.; Betancourt Supplemental Response to Interrog. No. 1, Exhibit 9 to Smith Decl.)

Audio Video Design
63-04 Woodhaven Boulevard
Rego Park, NY 11374

D. Cohen
37 Canal Street
New York, NY 10002

Davis & Warshow
96 Spring Street
New York, NY 10012

De La Garza Architecture
153 Main Street
Dobbs Ferry, NY 10522

DFB
21-07 Borden Avenue
Long Island City, NY 11101

D.H.E. Company
37 Canal Street
New York, NY 10002

H.P. Elevator & Electrical Services
780 Gulf Avenue
Staten Island, NY 10314

J.P. Morgan Private Bank
4 New York Plaza, 20th Floor
New York, NY 10004

Kasowitz Benson Torres & Friedman LLP
1633 Broadway
New York, NY 10019

LV Wood
24 West 20th Street
New York, NY 10011

Moleteni & Co. Dada
60 Greene Street
New York, NY 10012

New York City Department of Finance
1 Centre Street, 22nd Floor
New York, NY 10007

Platte, Klarsfeld, Levine & Lachtman LLP
10 East 40th Street, 46th Floor
New York, NY 10016

Simon's Hardware
421 3rd Avenue
New York, NY 10016

Sotheby's
1334 York Avenue
New York, NY 10021

Van Gogh
39-08 24th Street
L.L.C., NY 11101

Walter P. Sauer
276 Greenpoint Avenue
Brooklyn, NY 11222

The Dulanski Group
2975 Westchester Avenue, Suite 110
Purchase, NY 10577

Infinity Elevator Cabs
9029 Krier Place
Brooklyn, NY 11236

Kraft Hardware
315 East 62nd Street
New York, NY 10065

Olympic Tower Condominium
641 Fifth Avenue
New York, NY 10022

Perimiter HVAC
146-37 26th Avenue, 1st Floor
Flushing, NY 11354



New York, NY

New York, NY

136. In September 2012, Betancourt actively solicited insurance coverage for the Penthouse Apartment through the New York office of HUB International Personal Insurance. (BET689-699, Exhibit 50 to Smith Decl.)

137. In November 2012, Betancourt paid nearly ▆▆▆ to Sotheby's in New York for a sculpture by artist Anish Kapoor (the "Kapoor Disc"). Betancourt paid ▆▆▆ for the Kapoor Disc, including ▆▆▆ in New York sales tax. (SOTHEBYS1-2, Exhibit 23 to Smith Decl.)

138. In January 2013, Betancourt actively solicited and procured an appraisal of the Kapoor Disc from Sotheby's in New York. (BET639, Exhibit 50 to Smith Decl.)

139. Betancourt actively solicited and procured appraisals for his other two Kapoor pieces from the Winston Art Group, which is located at 41 East 57th Street, New York, N.Y. 10022. (BET2310-2311, Exhibit 50 to Smith Decl.)

140. Betancourt actively solicited and procured the services of D.H.E. Company, Inc., a New York company, to install artwork at the Penthouse Apartment. As of March 2013,

18

Betancourt paid this New York company over ▮▮▮▮. (BET1212, Exhibit 50 to Smith Decl.)

Betancourt Has Employees In New York

141. From at least as early as January 2011, Betancourt employed ▮▮▮▮ to be on site in New York to manage the extensive renovation of the Penthouse Apartment, including interacting on a daily basis with the general contractor, project managers and architect, among others. (Betancourt Tr. at 19:5-12, 18-19; 72:10-21; 122:1-2, 7-9, Exhibit 1 to Smith Decl.) ▮▮▮▮ has a Derwick email address. (Betancourt Tr. at 122:3-6, Exhibit 1 to Smith Decl.)

142. From at least as early as December 2012 and continuing today, Betancourt has employed a New York-based cleaning lady at the Penthouse Apartment. (Betancourt Tr. at 72:22-25; 73:1-13; 154:2-3, Exhibit 1 to Smith Decl.; BET803, Exhibit 50 to Smith Decl.; BET1222-1227, Exhibit 50 to Smith Decl.)

143. In April 2013, Betancourt executed a document appointing Javier de la Garza, a New York resident, to act as his agent in New York "for the improvement of *my residence* at Olympic Tower Penthouse #6, 641 Fifth Avenue, New York, N.Y." (April 4, 2013 letter from Betancourt appointing Javier de la Garza as his agent in New York, Exhibit 35 to Smith Decl.)

Betancourt Engages A "Spin Doctor"
To Perform Services In New York

144. In or about September 2013, an agent for Betancourt, Trebbau and Derwick Associates solicited Hilary Kramer, a New York-based Forbes contributor, to write a very favorable piece about Trebbau, Betancourt and Derwick Associates and to publish the same on *Forbes* magazine's website (www.forbes.com). *See* Hilary Kramer, "Changing Balance of Power May Unlock Venezuela's Markets," September 26, 2013, Forbes.com, *formerly available at* http://www.forbes.com/sites/hilarykramer/2013/09/26/changing-balance-of-power-may-unlock-venezuelas-markets/, Exhibit 41 to Smith Decl.

145. The piece authored by the New York-based Ms. Kramer on Forbes.com was highly solicitous of Derwick Associates, claiming without attribution that:

- "Derwick Associates has the reputation in both the U.S. and Venezuela to make all the entities involved in building a power plant move together."

- "Derwick Associates' know-how, experience and, yes, political connections, makes it possible for the company to secure the permits, put together competitive bids and then keep all the contractors moving until the plant is done and the lights come on."

- "So far they've done it 11 times in 3 and a half years and added enough power to the Venezuelan grid to take care of well over 800,000 households, or about 10% of the population. The twelfth plant should be on line shortly."

- "The bureaucracy in Caracas is famously corrupt. It does, however, require that all companies that contract with the government-owned companies must receive approval from the Registro Nacional de Contratista (the National Contractor Registry). That requires an audit from a major accounting firm. That requirement, coupled with the American-educated principals at Derwick Associates understanding the value of running a clean company, led the company to hire RSM International."

- "I was relieved to find that RSM International, determined that the company won its contracts legitimately and did not pad its costs with money that ultimately belongs to the Venezuelan people."

Betancourt Engages His New York Agent, D'Agostino, And
<u>New York Counsel To Quash Potential "Bad Press" In New York</u>

146. In late 2012, Thor Halvorssen, the President of the Human Rights Foundation, which is based in New York City, and respected journalist, was preparing to publish a story about Derwick Associates in *Forbes* magazine. (Amended Complaint at ¶ 167, Exhibit 36 to Smith Decl.; D'Agostino Tr. at 78:12-17, Exhibit 3 to Smith Decl.)

147. In connection with his research, Mr. Halvorssen sent a November 15, 2012 email to ProEnergy Services inquiring about "the role of Derwick and the cost of the [energy] project" and commenting that "[t]here are numerous published allegations in Venezuela regarding overbilling by Derwick as well as more sensational allegations of money laundering." (Amended Complaint at ¶ 168, Exhibit 36 to Smith Decl.)

148. In 2012, and at Betancourt's request, Francisco D'Agostino Casado ("D'Agostino"), who, among other things, is Betancourt's New York-based business partner and family friend, agreed to call Mr. Halvorssen from New York in an attempt to dissuade him from publishing the piece about Derwick Associates. (D'Agostino Tr. at 75:4-6, 8; 76:5-7, 13-23; 77:4-25; 78:2-11, 24-25; 79:2, 4-17; 87:2-6, Exhibit 3 to Smith Decl.; Betancourt Tr. at 102:8-15, 20-23; 103:7-10, Exhibit 1 to Smith Decl.)

149. D'Agostino knew Mr. Halvorssen from childhood, but had not spoken with him in nearly a decade. (D'Agostino Tr. at 75:17-18; 83:24-25; 84:2-3, Exhibit 3 to Smith Decl.)

150. D'Agostino called Mr. Halvorssen at Betancourt's request so that Mr. Halvorssen could "get the full picture of [Betancourt's] business dealings," which obviously would include Derwick Associates' ▬▬▬ at J.P. Morgan New York. (D'Agostino Tr. at 79:22-25; 80:2-11, Exhibit 3 to Smith Decl.) At that time, D'Agostino knew that Betancourt and Trebbau worked together. (D'Agostino Tr. at 83:4-7, Exhibit 3 to Smith Decl.)

151. D'Agostino relayed his communications with Mr. Halvorssen to Betancourt. (D'Agostino Tr. at 87:2-6, Exhibit 3 to Smith Decl.)

152. D'Agostino invited Mr. Halvorssen to a meeting with Betancourt and agreed to bring with him the Derwick Associates' contracts with the Venezuelan government and ProEnergy Services as well as Derwick Associates audited financials. (Amended

20

Complaint at ¶¶ 170-72, Exhibit 36 to Smith Decl.; D'Agostino Tr. at 82:5-6, Exhibit 3 to Smith Decl.)

153. D'Agostino called Mr. Halvorssen because "Mr. Betancourt wanted [D'Agostino] to help him with Mr. Halvorssen." (D'Agostino Tr. at 88:11-21, Exhibit 3 to Smith Decl.)

154. Before that meeting took place, Betancourt instructed and/or approved his New York counsel sending a November 20, 2012 letter to *Forbes* magazine in New York warning *Forbes* not to publish Mr. Halvorssen's article. Fearing legal action, *Forbes* magazine declined to go forward with the article. (Betancourt Tr. at 107: 10-23; Exhibit 1 to Smith Decl.; Trebbau Tr. at 32:9-10; 33:4-8, Exhibit 2 to Smith Decl.; Amended Complaint at ¶¶ 169-74, Exhibit 36 to Smith Decl.)

155. A similar letter was sent by Kasowitz, Benson, Torres & Friedman LLP to *The Huffington Post* in New York, with whom Mr. Halvorssen had previously published articles. (Amended Complaint at ¶¶ 175, Exhibit 36 to Smith Decl.)

156. In 2012 or 2013, Betancourt (through Derwick Associates) retained FTI Consulting, Inc., a business advisory firm that provides public relations, economic consulting and other services, which has six offices in New York. (Betancourt Tr. at 127:17-25; 128:1-9; 130:1-4; 131:6-13, Exhibit 1 to Smith Decl.; Trebbau Tr. at 117:20-25, Exhibit 2 to Smith Decl.)

157. FTI was retained for a dual purpose. To provide litigation support in connection with the New York Action and the related Florida defamation action and to prepare a self-due diligence report for Derwick Associates. (Betancourt Tr. at 128:16-21, Exhibit 1 to Smith Decl.; Trebbau Tr. at 115:5-9, Exhibit 2 to Smith Decl.) In connection with the preparation of the due diligence report, FTI reviewed the banking documents at J.P. Morgan New York. (Betancourt Tr. at 128:22-25; 129:2, Exhibit 1 to Smith Decl.; Trebbau Tr. at 118:9-19, Exhibit 2 to Smith Decl.)

158. In 2013, Betancourt and Trebbau, through their company Derwick Associates, hired AfterHim Media LLC, a public relations and reputation management firm to create "good press" about him, Trebbau and Derwick Associates.

159. AfterHim Media LLC entered into an agreement with PRNewswire Association, which is located in New York to distribute positive press pieces about Betancourt, Trebbau and Derwick Associates. Press releases issued on behalf of PR Newswire are sent to journalists in New York City.

160. The contract entered into between AfterHim Media LLC, on behalf of Betancourt and Trebbau, on the one hand, and PR Newswire Association, on the other hand, provides that it shall be governed by New York law and that exclusive jurisdiction and venue shall lie in the State of New York, County of New York, including the U.S. federal courts. (PRNewswire Production, Exhibit 37 to Smith Decl.)

Betancourt Has Traveled To and From New York on Derwick Associates' Private Plane

161. In 2010 through 2013, Derwick Associates operated a private plane with tail number N229DA that frequently traveled to and from the United States. (Trebbau Tr. at 129:2-11, Exhibit 2 to Smith Decl.) When Derwick plane N229DA flew to and from the Unites States, either Trebbau and/or Betancourt were onboard. (Trebbau Tr. at 129:15-19, Exhibit 2 to Smith Decl.)

162. Between December 2010 and December 2012, Derwick plane N229DA traveled to and/or from New Jersey's Teterboro airport at least 16 times. (TREBBAU70-74, Exhibit 51 to Smith Decl.)

163. From December 2011 through December 2012, Betancourt traveled to and/or from New York via Derwick plane N229DA at least nine times. (Betancourt Response to Interrog. No. 7, Exhibit 8 to Smith Decl.) Trebbau accompanied him on at least five of those trips. (Trebbau Response to Interrog. No. 7, Exhibit 4 to Smith Decl.)

164. In at least 2013, the plane with tail number N229DA was insured by XL Insurance America, Inc., which has an office in New York at One World Financial Center, 200 Liberty Street, 3rd Floor, New York, N.Y. 10281. (TREBBAU423-425, Exhibit 51 to Smith Decl.)

165. Betancourt paid fees to the Port Authority of New York and New Jersey, Teterboro Airport arising from his travel to and from New York. (TREBBAU414-416, Exhibit 51 to Smith Decl.)

Betancourt's Business and Travel In New York

166. From August 2010 through December 2010, Betancourt was in New York at least between: August 12-22, 2010; December 15-20, 2010; and December 25-27, 2010. (Betancourt Supplemental Response to Interrog. No. 5, Exhibit 9 to Smith Decl.)

167. From August 2011 through December 2012, Betancourt was in New York on at least between: August 26-30, 2011; October 27-30, 2011; November 22-24, 2011; December 22-29, 2011; February 19-25, 2012; September 5-8, 2012; October 25-November 4, 2012; November 17-21, 2012; and December 18-21, 2012. (Betancourt Response to Interrog. No. 5, Exhibit 8 to Smith Decl.; Betancourt Supplemental Response to Interrog. No. 5, Exhibit 9 to Smith Decl.)

168. Since February 2012, Betancourt spent no fewer than 30 nights at the Penthouse in New York. (Declaration of Alejandro Betancourt, sworn to December 23, 2014, at ¶4, which is attached as Exhibit 3 to F. Wohl's December 23, 2014 Attorney Declaration.)

169. In February 2012, Betancourt hosted 20 members of his family and friends at Catch in New York City to celebrate his 32nd birthday party. (BET6-8, Exhibit 50 to Smith Decl.) Most of Betancourt's family attended his birthday party, including Betancourt's wife, mother, two brothers and cousin. (Trebbau Tr. at 28:7-14, 19-22; 30:8-9; 100:7-20, Exhibit 2 to Smith Decl.)

170. Also in attendance at the birthday party was Betancourt's business partner and cousin, Pedro Trebbau, and Joaquin Mavares, who, at that time, was the Vice President of International Business Development of Pro Energy Services LLC ("ProEnergy"), which is licensed to do business in New York and is the company believed to do all the actual construction and operation of Derwick Associates' facilities. (Betancourt Tr. at 151:25, Exhibit 1 to Smith Decl.; 152:1-2, 8-20; Trebbau Tr. at 28:23-25; 29:1-2, Exhibit 2 to Smith Decl.) D'Agostino was invited but unable to attend. (D'Agostino Tr. at 53:14-19, Exhibit 3 to Smith Decl.)

171. In 2014, Betancourt traveled to New York via New Jersey's Teterboro Airport at least once. (Betancourt Tr. at 136:9-14, Exhibit 1 to Smith Decl.)

172. In 2014, Betancourt met with his lawyer, Adam Kaufman, in New York. (Betancourt Tr. at 141:17-18, Exhibit 1 to Smith Decl.; Trebbau Tr. at 105:9-23, Exhibit 2 to Smith Decl.)

173. In 2014, Betancourt traveled to New York with Trebbau and Francisco Convit, who are co-owners with Trebbau of Derwick Oil & Gas. (Trebbau Tr. at 141:4-5, 8-12; 142:5-14, Exhibit 2 to Smith Decl.)

Betancourt's Relationship with Travieso

174. Eduardo Travieso ("Travieso") is one of Betancourt's friends. (Betancourt Tr. at 32:12-16, Exhibit 1 to Smith Decl.)

175. Travieso is a "very close friend" to Trebbau whom he has known since childhood. (Betancourt Tr. at 79:15-16, 25; 80:1-5, Exhibit 1 to Smith Decl.)

176. D'Agostino has met Travieso on several occasions, including at Betancourt's wedding, and in New York at least once. (D'Agostino Tr. at 55:3-14, Exhibit 3 to Smith Decl.)

177. D'Agostino flew Travieso to Venezuela on D'Agostino's plane. (D'Agostino Tr. at 55:15-23, Exhibit 3 to Smith Decl.) When he is flying out of the tri-state area (New York, Connecticut, New Jersey), D'Agostino flies out of ███████ which is in New York. (D'Agostino Tr. at 60:11-23, Exhibit 3 to Smith Decl.) When D'Agostino flew with Travieso, the plane took off from ███████ (D'Agostino Tr. at 98:14-17, Exhibit 3 to Smith Decl.)

178. Travieso was a Vice President in J.P. Morgan's Private Banking Division who was located in New York, New York. (Betancourt Tr. at 32:17-18, Exhibit 1 to Smith Decl.)

179. Travieso was Betancourt's personal banker at J.P. Morgan New York from at least as early as January 2010. (Betancourt Tr. at 38:14-17, 18-19, 21-25; 39:1-2, Exhibit 1 to Smith Decl.)

180. Travieso managed Betancourt's personal and business accounts with J.P. Morgan, including Derwick Associates' accounts. (Betancourt Tr. at 38:14-17, 18-19, 21-25;

39:1-2; 56:17-25; 84:12-17, Exhibit 1 to Smith Decl.; Trebbau Tr. 67:5-25; 68:1-6, Exhibit 2 to Smith Decl.)

181. In November 2010, Travieso was given trading authority over ▮▮▮▮▮ ▮▮▮▮▮ brokerage account with Credit Suisse. Betancourt is the Vice President of ▮▮▮▮▮▮▮▮▮▮. (CSSU46-51, Exhibit 49 to Smith Decl.; Trebbau Tr. at 123:24-25; 124:1-2, Exhibit 2 to Smith Decl.)

182. In May 2011, Betancourt executed a Certificate for the Purchase of IPOs of Equity Securities and identified Travieso as the registered representative for an account held at J.P. Morgan New York in the name of ▮▮▮▮▮▮▮▮, which is one of Betancourt's investment vehicles. (BET557-558, Exhibit 50 to Smith Decl.) The Options Agreement accompanying that registration provides that controversies concerning said account shall be resolved solely and exclusively by arbitration conducted only at the New York Stock Exchange. (BET559-561, Exhibit 50 to Smith Decl.)

183. In November 2010, Betancourt appointed Travieso as Manager of BL 641 Fifth LLC for purposes of acquiring the Penthouse Apartment and empowered him with authority to execute, deliver, file, acknowledge and record all necessary documents and to take any and all such actions necessary to effectuate the acquisition of the Penthouse Apartment. (Betancourt Tr. at 34:4-10; 35:14-24, Exhibit 1 to Smith Decl.; BET109-110, Exhibit 50 to Smith Decl.)

184. Travieso was also identified by Betancourt as his "[c]ommunications designee" in connection with the closing of the Penthouse Apartment. (Notification Letter, Exhibit 44 to Smith Decl.)

185. Numerous documents executed in connection with the purchase of the Penthouse Apartment are signed by Travieso, including the Deposit Agreement, Title Affidavit, Affidavit of Compliance with Smoke Detector Requirement, the Real Property Transfer Tax Return, the Real Property Transfer Report, the Combined Real Estate Transfer Tax Return and an irrevocable Power of Attorney. (Closing Statement from D. Levine dated November 23, 2010, Exhibit 14 to Smith Decl.)

186. When he signed that document, Travieso was working for J.P. Morgan in New York. (Betancourt Tr. at 32:12-25, Exhibit 1 to Smith Decl.) In other words, Travieso (for the benefit of Betancourt) appears to have been on both sides of the mortgage finance transaction, *i.e.*, as the buyer of the real property *and* as the financier of the acquisition.

187. Betancourt listed Travieso as his accountant on documents submitted to the Olympic Tower in connection with his application to purchase the Penthouse Apartment and the Olympic Tower Resident Lookup. (cite; Olympic Tower Resident Lookup, Exhibit 38 to Smith Decl.)

188. As least as early as October 2012, FINRA commenced an investigation concerning Travieso. (October 1, 2012 letter from FINRA to Credit Suisse Securities USA, LLC, Exhibit 28 to Smith Decl.) Travieso was separated from J.P. Morgan New York in March 2013. (FINRA BrokerCheck for Travieso, Exhibit 27 to Smith Decl.)

189. On March 21, 2013, according to a required U.S. regulatory filing with FINRA, Travieso separated from J.P. Morgan following allegations that Travieso had potentially committed violations of investment-related statutes, fraud, or failure to supervise in connection with investment-related statutes, arising from certain undisclosed customer interactions by Travieso. In the filing, J.P. Morgan has stated publicly that "Mr. Travieso acted in a manner that is inconsistent with the Firm's policies and procedures and may have violated applicable regulatory requirements, including *using his residential address as the mailing address for certain customer communications.*" J.P. Morgan concluded that Mr. Travieso's conduct had "fallen short of the standards" of financial industry employees. (FINRA BrokerCheck for Travieso (emphasis added), Exhibit 27 to Smith Decl.)

190. In February 2014, FINRA recommended that disciplinary action be brought against Travieso for potential violations of FINRA Rule 2010 and NASD Rule 3050. (FINRA BrokerCheck for Travieso, Exhibit 27 to Smith Decl.)

191. FINRA's investigation of Travieso is currently ongoing. (FINRA's November 3, 2014 letter, Exhibit 39 to Smith Decl.) According to Trebbau, Travieso has been accused of being a "money launderer." (Trebbau Tr. at 125:24-25; 125:1-4, Exhibit 2 to Smith Decl.)

192. The U.S. Securities & Exchange Commission is also investigating Travieso. (SEC December 31, 2014 Response to FOIL Request re Travieso, Exhibit 40 to Smith Decl.)

193. Following Travieso's termination from J.P. Morgan New York in 2013, he fled New York for Caracas, Venezuela. (Trebbau Tr. at 126:7-10, Exhibit 2 to Smith Decl.) Travieso refused to provide his complete current address to counsel for Plaintiffs and the address that Betancourt provided in his interrogatory responses was Travieso's business address at J.P. Morgan, which is obviously, not current. (Betancourt Response to Interrog. No. 4, Exhibit 8 to Smith Decl.; Trebbau Tr. at 157:25; 158:1-6, Exhibit 2 to Smith Decl.)

194. Betancourt has seen Travieso socially on a number of occasions since Travieso's departure from J.P. Morgan New York, including in Caracas with Trebbau. (Betancourt Tr. at 79:10-24, Exhibit 1 to Smith Decl.) Yet, he claims not to know Travieso's current address.

Betancourt has Family, Friends and Business Partners in New York

195. Betancourt's cousin and business partner, Pedro Trebbau, has had a residence in New York from at least 2010 to the present.

196. Betancourt's aunt, ███████████████████, has a home in New York at ███████ New York, N.Y. Betancourt has stayed with his aunt on at least two occasions in 2011: August 26-30, 2011 and December 22-29, 2011. (Betancourt Tr. at 30:5-14; 80:12-20, Exhibit 1 to Smith Decl.; Betancourt's Responses to Interrog. No. 5, Exhibit 8 to Smith Decl.)

25

197. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ was one of Betancourt's personal references on the sales application he submitted to the Olympic Tower in connection with his acquisition of the Penthouse Apartment. (Betancourt Tr. at 30:15-17, Exhibit 1 to Smith Decl.; (cite).)

198. Betancourt's cousin, ▬▬▬▬▬▬▬, resides or resided in New York. (Trebbau Tr. at 136:20-24; 137:3-7, Exhibit 2 to Smith Decl.)

199. Betancourt's cousin, ▬▬▬▬▬▬▬▬ has an apartment in New York. (Betancourt Tr. at 92:22-25; 93:1-5, Exhibit 1 to Smith Decl.)

200. Betancourt's relation, ▬▬▬▬▬▬▬, had (and may still have) a home in New York. (Betancourt Tr. at 93:1-13, Exhibit 1 to Smith Decl.)

201. The Chief Financial Officer of Derwick Associates, Orlando Alvarado, formerly resided in New York. (Trebbau Tr. at 136:7-12, Exhibit 2 to Smith Decl.) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Betancourt Tr. at 18:9-13, Exhibit 1 to Smith Decl.)

202. Betancourt's former boss, ▬▬▬▬▬▬▬, resides in New Jersey. (Trebbau Tr. at 167:15-23, Exhibit 2 to Smith Decl.)

Betancourt Is Under Investigation by
the New York District Attorney's Office (And Others)

203. In August 2014, the Wall Street Journal reported that the Manhattan District Attorneys' Office and the U.S. Department of Justice are investigating Derwick Associates. (Jose de Cordoba, *Venezuelan Firm Is Probed In U.S.*, Wall Street Journal, August 9, 2014, Exhibit 33 to Smith Decl.)

Betancourt's Relationship With Trebbau

204. Trebbau is Betancourt's first cousin, business partner and one of his best friends. (Betancourt Tr. at 113:12-13, Exhibit 1 to Smith Decl.) Betancourt and Trebbau operate many businesses together. (Betancourt Tr. at 119:8-10, Exhibit 1 to Smith Decl.)

205. In 2012-2013, Betancourt was the President of Derwick Associates and Trebbau was the Vice President. Betancourt and Trebbau were equal owners of Derwick Associates at that time. (Trebbau Tr. at 22:7-17, Exhibit 2 to Smith Decl.)

The Majority Of Betancourt's Net Worth
Was Located In New York During The Relevant Period

206. In July 2012, the value of the various assets held by the "Derwick Group" at J.P. Morgan New York was in the magnitude of ▬▬▬▬▬▬. (BET155-156, Exhibit 50 to Smith Decl.; October 12, 2010 letter from J.P. Morgan, Exhibit 16 to Smith Decl.; Betancourt Tr. at 49:24-25; 50:4-9, Exhibit 1 to Smith Decl.)

207. At his deposition, Betancourt offered incredible and unsubstantiated testimony concerning his net worth, which Plaintiffs reject. Betancourt speculated that, *in his opinion*, 35% percent of his net worth was located at J.P. Morgan New York in 2012. (Betancourt Tr. at 51:15-22; 61:7-10, Exhibit 1 to Smith Decl.) He further speculated that his global net worth in 2012 was somewhere around ▅▅▅▅▅. (Betancourt Tr. at 61:11-21; 62:1-14, Exhibit 1 to Smith Decl.) Not surprisingly, Betancourt has produced no corroborating documentation.

208. Betancourt claimed that he derived this percentage by determining the market valuation of different assets he held at that time outside New York in Europe, Venezuela, and Africa. (Betancourt Tr. at 59:16-25; 60:1-15, Exhibit 1 to Smith Decl.)

209. Betancourt identified the following as his purported global assets during the relevant period: assets he holds in Europe, in Spain in particular; accounts he has in Europe and in Canada; and BL 641 Fifth LLC, which holds the Penthouse Apartment in New York. (Betancourt Tr. at 62:16-21; 65:12-24, Exhibit 1 to Smith Decl.; BET155-156, Exhibit 50 to Smith Decl.) Betancourt has produced no corroborating documentation.

210. Betancourt admitted that the vast majority of the assets that comprise Betancourt's purported ▅▅▅▅▅ net worth are in the form of an ownership interest in privately held companies, *i.e.*, companies that are not publicly traded on the stock market. (Betancourt Tr. at 69:6-10, 13-19, Exhibit 1 to Smith Decl.) Betancourt's assessment of his ▅▅▅▅▅ net worth includes the assets and infrastructure of Derwick Associates. (Betancourt Tr. at 69: 23-25; 70:3, Exhibit 1 to Smith Decl.)

211. At his deposition, Betancourt claimed that the assets of Derwick Associates include a facility in Latin America for servicing power generation turbines, Derwick Associates' offices in Caracas, Derwick Associates' accounts receivable and Derwick Associates' equipment and inventory in Venezuela. (Betancourt Tr. at 122:25; 123:1-12, Exhibit 1 to Smith Decl.) Betancourt has produced no corroborating documentation.

212. He testified that Derwick Associates has an undisclosed amount of debt on its books. (Betancourt Tr. at 124:17-19, Exhibit 1 to Smith Decl.) Thus, the value of Derwick Associates' assets would be offset by the debt on Derwick Associates' books. (Betancourt Tr. at 124:20-25; 125:1-2, Exhibit 1 to Smith Decl.)

213. Betancourt claimed that his assets in Europe (Spain) consist of a company that owns land and properties. He speculated that, in a good market, the value could be as high as ▅▅▅▅▅. (Betancourt Tr. at 125:7-20, Exhibit 1 to Smith Decl.) Betancourt has produced no corroborating documentation. Betancourt could not recall what value he placed on those properties when he determined his purported ▅▅▅▅▅ net worth. (Betancourt Tr. at 125:21-24, Exhibit 1 to Smith Decl.)

214. In 2012, the assets Betancourt held at J.P. Morgan New York were cash and securities. (Betancourt Tr. at 60:16-23, Exhibit 1 to Smith Decl.)

215. Betancourt identified four financial institutions with which he has a banking relationship in Venezuela. They are: ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

(Betancourt Response to Second Set of Interrogs., Interrog. No. 2, Exhibit 10 to Smith Decl.)

216. Betancourt produced no documents indicating the amount of money or assets he held in each of these banks in 2012-2013 and was not able to provide that information at his deposition. (Betancourt Tr. at 142:21-25; 143: 1-13, Exhibit 1 to Smith Decl.)

217. Betancourt did not hold any significant amount of bolivars (the Venezuelan currency) in any Venezuelan bank due to the high rate of inflation in Venezuela. (Trebbau Tr. at 145:18-20; 146:2-6, 8-24; 147:25; 148:1-4, Exhibit 2 to Smith Decl.)

218. In 2012-2013, Betancourt borrowed ▮▮▮ U.S. Dollars in bolivars from ▮▮▮▮▮▮▮▮▮▮, who resides at ▮▮▮▮▮▮▮▮▮ New York, N.Y. ▮▮▮ (Betancourt's Supplemental Responses to Interrog. No. 1, Exhibit 9 to Smith Decl.; Betancourt Tr. at 149:7-17, Exhibit 1 to Smith Decl.; BET801-802, Exhibit 50 to Smith Decl.; D'Agostino Tr. at 121:7-25; 122:2-11, Exhibit 3 to Smith Decl.)

219. Betancourt admitted that his determination of his ▮▮▮ net worth was entirely subjective and not based on the opinion of any third-party experts or appraisers or any audited financials. (Betancourt Tr. at 126:10-17, Exhibit 1 to Smith Decl.)

220. Betancourt produced no documents concerning the amount of real estate and income taxes he paid in Venezuela in 2012-2013 and was not able to provide that information at his deposition. (Betancourt Tr. at 149:21-25; 150:1-9, Exhibit 1 to Smith Decl.)

221. In 2012 or 2013, Betancourt made an appointment with a doctor in New York. (Betancourt Tr. at 77:19-21, Exhibit 1 to Smith Decl.)

Plaintiffs Cannot Sue In Venezuela

222. Plaintiffs cannot sue either Betancourt or Trebbau in Venezuela and receive their day in court. The Venezuelan government views Ambassador Reich as effectively an enemy of the state of Venezuela. For the reasons set forth in his Declaration submitted herewith, Reich would not be allowed to prosecute his claims against defendants Betancourt or Trebbau in a Venezuela court. (Declaration of Otto J. Reich filed separately.)

Incorporation by Reference

223. Plaintiffs incorporate by reference each of the jurisdictional facts set forth in the Statement of Facts Supporting A *Prima Facie* Case of Personal Jurisdiction Over Defendant Trebbau And In Opposition To His Renewed Motion To Dismiss Under Fed. R. Civ. P. 12(b)(2), as if set forth herein.

Dated: New York, New York
January 15, 2015

                          SMITH VALLIERE PLLC

                          By: _____
                              Mark W. Smith, Esq.
                              Noelle Kowalczyk, Esq.

                          1221 Avenue of the Americas, 42nd Floor
                          New York, New York 10020
                          (212) 755-5200
                          msmith@svlaw.com
                          nkowalczyk@svlaw.com

                          *Attorneys for Plaintiffs*
                          *The Honorable Otto J. Reich and*
                          *Otto Reich Associates, LLC*

## CERTIFICATE OF SERVICE

I hereby certify this 15th day of January, 2015, that I caused a true and correct copy of the foregoing document to be served via electronic mail on the following attorneys of record.

Frank H. Wohl, Esq.
Julia C. Green, Esq.
Lankler Siffert & Wohl
500 Fifth Avenue, 34th Floor
New York, NY 10110
*Attorneys for Defendant Leopoldo Alejandro Betancourt Lopez*

Joseph A. DeMaria, Esq.
Fox Rothschild LLP
200 South Biscayne Blvd.
Suite 3590
Miami, FL 33131
*Attorneys for Defendant Pedro Jose Trebbau Lopez*

Shawn Rabin, Esq.
Susman Godfrey, L.L.P.
560 Lexington Avenue, 15th Floor
New York, NY 10022
*Attorneys for Defendant Francisco D'Agostino Casado*

_____
Mark W. Smith