UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

THE HONORABLE OTTO J. REICH and,
OTTO REICH ASSOCIATES, LLC,

    Plaintiffs,

v.

LEOPOLDO ALEJANDRO BETANCOURT
LOPEZ, PEDRO JOSE TREBBAU LOPEZ,
and FRANCISCO D'AGOSTINO CASADO,

    Defendants.

No. 13 CV 5307 (JPO)
ECF Case

~~FILED UNDER SEAL~~

**Defendants' Public Filing**

---

## STATEMENT OF FACTS SUPPORTING A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION OVER DEFENDANT TREBBAU AND IN OPPOSITION TO HIS RENEWED MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(2)[1]

COME NOW Plaintiffs the Honorable Otto J. Reich and Otto Reich Associates, LLC, through the undersigned attorneys and hereby submit this Statement of Facts Supporting a *Prima Facie Case* of Personal Jurisdiction Over Defendant Trebbau And In Opposition To His Renewed Motion to Dismiss Under Fed. R. Civ. P. 12(b)(2).

---

[1] Plaintiffs may submit facts and materials outside the pleadings, and the Court can and should consider such materials in determining whether a *prima facie* case of personal jurisdiction exists. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 2014 U.S. Dist. 62748, 2014 U.S. Dist. LEXIS 34590 (S.D.N.Y., May 5, 2014); *see also Dorchester Financial Securities, Inc. v. Banco BRJ, S.A.*, 722 F. 3d 81, 86 (2d Cir. 2013). In submitting this Statement of *Prima Facie* facts, Plaintiffs are taking guidance from Judge Scheindlin's decision in *Methyl* where Judge Scheindlin noted that in addressing a Rule 12(b)(2) motion concerning personal jurisdiction, the Court may consider a submitted statement of facts analogous to a Local Rule 56.1 Statement. For the sole purposes of opposing Defendants' renewed Rule 12(b)(2) motions, Plaintiffs set forth herein those facts and materials currently available to Plaintiffs to show the existence of a *prima facie* case of personal jurisdiction, including certain admissions by Defendants. Given the limited nature of the jurisdictional discovery afforded Plaintiffs to date and limited opportunities afforded Plaintiffs to verify certain statements by Defendants, Plaintiffs reserve in all respects their right to amend or alter their positions as to the accuracy of the facts set forth herein as this case progresses.

1. At all relevant times, Trebbau purposely availed himself of the benefits and the protections of New York by procuring and having a residence in New York. (*See* ¶¶ 27-40, *infra*.)

2. Trebbau listed the residence at 155 East 55th Street as well as the Penthouse Apartment belonging to his business partner and friend Betancourt as his address on personal and business-related mail. (*See* ¶¶ 27-40, *infra*.)

3. At all relevant times, Trebbau intended to remain or return to New York with the intent to permanently reside in New York. (*See* ¶¶ 41-119, *infra*.)

4. At all relevant times, Trebbau was domiciled for the purposes of personal jurisdiction in New York. (*See* ¶¶ 27-40; 41-119, *infra*.)

5. At all relevant times, Trebbau had approximately ▆▆▆▆ in New York banks. (See ¶¶ 45-48; *see also* Betancourt's Statement of Facts Supporting a *Prima Facie* Case, submitted herewith and incorporated herein by reference, *infra*.) There is no documentary evidence that this money was ever removed and a reasonable inference supported by the facts is that Trebbau continues to have approximately ▆▆▆▆ in New York banks and/or in banks with New York offices. (Exhibit 57 to Smith Decl.)

6. At all relevant times, virtually all of Trebbau's assets in the world were located in New York. (*See* ¶¶ 41-61, *infra*.)

7. At all relevant times, virtually all of Trebbau's financial assets were held in United States Dollars and not in the currency of Venezuela, *i.e.*, bolivars. (*See* ¶ 114, *infra*.)

8. At all relevant times, Trebbau retained at least three separate New York law firms to represent his personal and business interests including Kasowitz, Benson, Torres & Freidman LLP, located at 1633 Broadway, New York, N.Y. 10019, and ▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, New York, N.Y. ▆▆▆ (*See* ¶¶ 65-72, *infra*.)

9. At all relevant times, Trebbau spent far more money on lawyers and professionals in New York or who had New York offices than he did anywhere else. (*See* ¶¶ 62-72; 77-89, *infra*.)

10. At all relevant times, Trebbau owned, together with Betancourt or alone, or had a beneficial economic interest in many companies based in or operating from New York including, but not limited to, Derwick Associates, 641 BL Fifth LLC, and ▆▆▆▆ ▆▆▆▆▆▆▆▆ (*See* ¶¶ 47, 54, 57, 73, 108, *infra*.)

11. At all relevant times, Trebbau deployed his agent, employee and partner Eduardo Travieso to conduct his personal and business affairs in New York on an ongoing, continuous and systematic basis in New York. (*See* ¶¶ 15-26, *infra*.)

12. At all relevant times, Trebbau and his co-defendant, family member and business partner Betancourt, acted both legally and in fact as one another's agent, partner and co-

2

conspirator in their business interests including, but not limited to, co-owning Derwick Associates. By virtue of this alter ego relationship, Betancourt's activities in New York benefitted Trebbau, and Trebbau's activities in New York benefitted Betancourt. (*See* ¶¶ 47, 54, 57, 73, 106, 108, *infra*.)

13. At all relevant times, Trebbau purposely availed himself of the benefits and the protections of New York by retaining New York attorneys and commencing a lawsuit in New York. See ¶¶ 69-71, *infra*. Trebbau has never commenced a lawsuit in Venezuela. Trebbau commenced his lawsuit in New York Supreme Court, which was pending during 2012-2013, because he believed that his personal and professional interests required protections from an alleged defamation campaign which he attributed to a Venezuelan bank and a group of Venezuelan citizens, and which required vindication in the United States, including New York. *(Id.)*

Trebbau's Relationship with Travieso

14. Eduardo Travieso ("Travieso") is one of Trebbau's best friends. Trebbau has known Travieso since kindergarten. (Trebbau Tr. at 29:16-17, Exhibit 2 to Smith Decl.) Trebbau speaks to Travieso "every day." (Trebbau Tr. at 126:5-6, Exhibit 2 to Smith Decl.)

15. Travieso was a Vice President in J.P. Morgan New York's Private Banking Division who was located in New York, New York. Travieso was Trebbau's personal banker at J.P. Morgan New York from at least as early as January 2010. (TREBBAU443-446, Exhibit 51 to Smith Decl.)

16. Travieso managed Trebbau's personal and business accounts with J.P. Morgan, including Derwick Associates' accounts. (Trebbau Tr. 67:5-25; 68:1-6, Exhibit 2 to Smith Decl.)

17. Travieso also managed Trebbau's business accounts with other New York banks, including Credit Suisse. (Trebbau Tr. at 150:4-24, Exhibit 2 to Smith Decl.; CSSU 46-51, Exhibit 49 to Smith Decl.)

18. In November 2010, Trebbau executed a power of attorney giving Travieso trading authority over ███████████████████████ brokerage account with Credit Suisse. (CSSU46-51, Exhibit 49 to Smith Decl.; Trebbau Tr. at 123:24-25; 124:1-2, Exhibit 2 to Smith Decl.)

19. As least as early as October 2012, FINRA commenced an investigation concerning Travieso. (October 1, 2012 letter from FINRA to Credit Suisse Securities USA, LLC.) Travieso was separated from J.P. Morgan New York in March 2013. (FINRA BrokerCheck for Travieso, Exhibit 27 to Smith Decl.)

20. On March 21, 2013, according to a required U.S. regulatory filing with FINRA, Travieso separated from J.P. Morgan New York following allegations that Travieso had potentially committed violations of investment-related statutes, fraud, or failure to supervise in connection with investment-related statutes, arising from certain undisclosed customer interactions by Travieso. In the filing, J.P. Morgan has stated publicly that "Mr. Travieso

3

acted in a manner that is inconsistent with the Firm's policies and procedures and may have violated applicable regulatory requirements, including *using his residential address as the mailing address for certain customer communications.*" J.P. Morgan concluded that Mr. Travieso's conduct had "fallen short of the standards" of financial industry employees. (FINRA BrokerCheck for Travieso (emphasis added), Exhibit 27 to Smith Decl.)

21. In February 2014, FINRA recommended that disciplinary action be brought against Travieso for potential violations of FINRA Rule 2010 and NASD Rule 3050. (FINRA BrokerCheck for Travieso, Exhibit 27 to Smith Decl.)

22. FINRA's investigation of Travieso is currently ongoing. (FINRA's November 3, 2014 letter, Exhibit 39 to Smith Decl.) According to Trebbau, Travieso has been accused of being a "money launderer." (Trebbau Tr. at 125:24-25; 125:1-4, Exhibit 2 to Smith Decl.)

23. The U.S. Securities & Exchange Commission is also investigating Travieso. (SEC December 31, 2014 Response to FOIL Request re Travieso, Exhibit 40 to Smith Decl.)

24. Following Travieso's termination from J.P. Morgan New York in 2013, he fled New York to Caracas, Venezuela. (Trebbau Tr. at 126:7-10, Exhibit 2 to Smith Decl.) Travieso has refused to provide his complete current address to counsel for Plaintiffs. (Trebbau Tr. at 157:25; 158:1-6, Exhibit 2 to Smith Decl.) Trebbau claims he does not know where his best friend currently resides.

25. In 2012 and 2013, prior to his departure from New York, Travieso acted as Trebbau's agent in a number of non-banking transactions, including the purchase of a ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ located on East 57th Street, New York, N.Y., and the potential acquisition of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ artwork from Sotheby's. (TREBBAU 374-380, 384-386, 395-397, Exhibit 51 to Smith Decl.)

Trebbau Has A Residence in New York

26. From at least November 2010 until March 2012, Trebbau identified the following New York address on banking, federal tax forms and other documents: 155 East 55th Street, Apt. 9A, New York, N.Y. 10022 (the "55th Street Residence"). (Trebbau Tr. at 42:5-20; 43: 1-5, Exhibit 2 to Smith Decl.) This was also Eduardo Travieso's residence in New York during the same period. (CSSU48, Exhibit 49 to Smith Decl.)

27. Trebbau has spent time at the 55th Street Residence. (Trebbau Tr. at 124:16-17, Exhibit 2 to Smith Decl.)

28. Trebbau received mail at the 55th Street Residence. (Trebbau Tr. at 124:20-25, Exhibit 2 to Smith Decl.; Betancourt Tr. at 156:24-25; 157:1-4 Exhibit 1 to Smith Decl.)

29. Trebbau listed the 55th Street Residence as an address for his personal company Derwick Associates Corporation on account opening documents he prepared, signed and submitted

to Credit Suisse in New York in November 2010. (CSSU 1-5, 12, Exhibit 49 to Smith Decl.; Trebbau Tr. at 161:5-18; 163:9-22, Exhibit 2 to Smith Decl.)

30. Pursuant to the New Account Agreement that Trebbau executed on behalf of his personal company Derwick Associates Corporation with Credit Suisse in November 2010, Trebbau agreed that his relationship with Credit Suisse would be governed by New York law. (CSSU6-7, Exhibit 49 to Smith Decl.)

31. Trebbau listed the 55th Street Residence on Form W-8BEN for Derwick Associates Corporation, which he signed on November 20, 2010. (CSSU10, Exhibit 49 to Smith Decl.; Trebbau Tr. at 162:8-19, Exhibit 2 to Smith Decl.)

32. Trebbau listed the 55th Street Residence as an address for his personal company ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on account opening documents he prepared, signed and submitted to Credit Suisse in New York in November 2010. (CSSU 31-35, Exhibit 49 to Smith Decl.; Trebbau Tr. at 151:8-19, Exhibit 2 to Smith Decl.)

33. Pursuant to the New Account Agreement that Trebbau executed on behalf of his personal company ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with Credit Suisse in November 2010, he agreed that his relationship with Credit Suisse would be governed by New York law. (CSSU36-37; Exhibit 49 to Smith Decl.)

34. Trebbau listed the 55th Street Residence on official form for his personal company ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which he signed on November 20, 2010. (CSSU40, Exhibit 49 to Smith Decl.; Trebbau Tr. at 149:6-19, Exhibit 2 to Smith Decl.)

35. Trebbau listed the 55th Street Residence on documents provided to J.P. Morgan New York. (Trebbau Tr. at 155:4-17, Exhibit 2 to Smith Decl.; TREBBAU309-310, Exhibit 51 to Smith Decl.)

36. From at least January 1, 2011 through at least March 31, 2012, J.P. Morgan New York sent its monthly account statements for Trebbau's personal DDA account to the 55th Street Residence. (TREBBAU141-230, Exhibit 51 to Smith Decl.) From April 1, 2012 through at least January 31, 2013, the statements for Trebbau's personal DDA account at J.P. Morgan New York were being held at J.P. Morgan in New York. (TREBBAU231-288, Exhibit 51 to Smith Decl.)

37. In November 2010, Betancourt purchased Penthouse 6 at the Olympic Tower, 641 Fifth Avenue, New York, N.Y. 10022 (the "Olympic Tower Penthouse"). The Olympic Tower is considered one of the top full-service white glove luxury buildings in New York City.

38. Trebbau has spent time at and lived at the Olympic Tower Penthouse, including on the following dates in 2012: July 4-6, 2012; December 18-19, 2012; and December 28, 2012 – January 2, 2013. (Trebbau Response to Interrog. No. 5, Exhibit 4 to Smith Decl.)

39. Trebbau has provided the Olympic Tower Penthouse address as his address. (TREBBAU421-422, Exhibit 51 to Smith Decl.)

### Trebbau Has Bank Accounts and Banking Relationships in New York

40. In 2006, Trebbau opened a personal bank account with ▌▌▌, which has an office at ▌▌▌, New York, N.Y. ▌▌▌ (Trebbau Interrog. Responses No. 1, Exhibit 4 to Smith Decl.; Trebbau Tr. at 61:10-13.) Trebbau was a customer of ▌▌▌ at the time that Plaintiffs commenced this lawsuit, and he continues to be a customer of ▌▌▌ today. (Trebbau Response to Interrog. No. 1, Exhibit 4 to Smith Decl.; Trebbau Tr. at 63:3-8, Exhibit 2 to Smith Decl.)

41. In 2012 and 2013, Trebbau had a MasterCard from ▌▌▌ that functioned as a debit and credit card. He still has that MasterCard today. (Trebbau Tr. at 108:15-25; 109:1, Exhibit 2 to Smith Decl.)

42. From at least as early as 2009, Trebbau commenced a banking relationship with J.P. Morgan in New York. Trebbau was a customer of J.P. Morgan New York when Plaintiffs commenced this lawsuit. (Trebbau Response to Interrog. No. 1, Exhibit 4 to Smith Decl.; Trebbau Tr. at 55:15-22; 59:14-20, 23, Exhibit 2 to Smith Decl.)

43. At all relevant times, Trebbau had debit cards and credit cards from J.P. Morgan New York. (Trebbau Tr. at 108:15-21, Exhibit 2 to Smith Decl.)

44. In 2012 and 2013, Trebbau was responsible for managing the day-to-day relationships with Derwick's international banks. The bank with which Trebbau had "day-to-day relationships" was J.P. Morgan in New York, which has its headquarters on Park Avenue in New York, New York. (Trebbau Tr. at 110:12-15, Exhibit 2 to Smith Decl.; Florida Defamation Complaint at ¶ 35, Exhibit 31 to Smith Decl.)

45. A July 5, 2012 letter from J.P. Morgan New York to Trebbau identifies no fewer than 40 separate banking accounts connected personally to Trebbau, which collectively held over ▌▌▌ in assets (the "July 5, 2012 letter"). (BET155-156, Exhibit 50 to Smith Decl.; October 12, 2010 letter from J.P. Morgan, Exhibit 16 to Smith Decl.)

46. The 40 accounts on the July 5 letter, which include Trebbau's personal accounts with J.P. Morgan, were part of "the Derwick Group" of accounts meaning that, from the perspective of the bank, these accounts "belong[ed] to the same clients." (Trebbau Tr. at 72:3-7, 9-10, 12-13, 18-22, Exhibit 2 to Smith Decl.) To illustrate, Trebbau and Betancourt each own 50% of Derwick Associates Corporation, Derwick Associates de Venezuela, ▌▌▌ ▌▌▌ (Trebbau Tr. at 72:24-25; 73:2-25; 74:3-4, Exhibit 2 to Smith Decl.; Betancourt Tr. at 55:8-13, Exhibit 1 to Smith Decl.)

47. By its July 5 letter, J.P. Morgan told Trebbau it had decided to close his personal accounts and all accounts held by Derwick Associates Corporation and related accounts. (BET155-156, Exhibit 50 to Smith Decl.) Defendants produced no documentary evidence that this actually occurred and, thus, it is a reasonable inference that these accounts remain open today and fully funded.

48. In July 2012, Trebbau traveled to New York with Orlando Alvarado, the Chief Financial Officer of Derwick Associates, to meet with Eduardo Travieso and Sonia Garcia Romero who were Trebbau's and Derwick Associates' private bankers at J.P. Morgan New York. (Trebbau Response to Interrogatory No. 5, Exhibit 4 to Smith Decl.)

49. The 40 accounts referenced in the July 2012 letter from J.P. Morgan actually and effectively constitute the personal bank accounts of Trebbau. (Trebbau Tr. at 72:3-7, 9-10, 12-13, 18-22, Exhibit 2 to Smith Decl.)

50. Trebbau had at least three meetings at J.P. Morgan's New York offices with representatives of J.P. Morgan New York during the period 2011 through 2013. (Trebbau Tr. at 53:8-16, Exhibit 2 to Smith Decl.)

51. Trebbau continues to be a customer of J.P. Morgan in New York today where he maintains investment accounts worth no less than ▇▇▇▇▇. (Trebbau Response to Interrog. No. 1, Exhibit 4 to Smith Decl.; Trebbau Tr. at 55:15-22; 59:14-20, 23, Exhibit 2 to Smith Decl.) The investment accounts that Trebbau maintains at J.P. Morgan today are in the name of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Trebbau is the sole owner of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Trebbau Tr. at 60:3-9, Exhibit 2 to Smith Decl.)

52. Plaintiffs believe that Trebbau may hold considerably more accounts than have been disclosed at J.P. Morgan and other financial institutions based in or with New York offices than were disclosed in discovery.

53. Trebbau is the President of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and Betancourt is the Vice President. (Trebbau Tr. at 166:15-19; 167:7-9, Exhibit 2 to Smith Decl.) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ is an investment vehicle or special purpose vehicle designed to manage and invest the funds of Betancourt and/or Trebbau. (Betancourt Tr. at 46:24-25; 47:6-16, Exhibit 1 to Smith Decl.) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ is dominated and controlled by Trebbau for his personal benefit.

54. Betancourt is the President of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and Trebbau is the Vice President. (CSSU28-30, Exhibit 49 to Smith Decl.; Trebbau. Tr. at 166:11-14; 166:25; 167:1-6, Exhibit 2 to Smith Decl.) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ is an investment vehicle or special purpose vehicle designed to manage and invest the funds of Betancourt and/or Trebbau. (Betancourt Tr. at 46:14-15; 47:6-16, Exhibit 1 to Smith Decl.)

55. In December 2010, Trebbau opened multiple banking and securities accounts with Credit Suisse Securities USA, LLC, located at Eleven Madison Avenue, New York, New York 10010. The accounts were in the name of Derwick Associates Corporation and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (CSSU1-13, 31-51, Exhibit 49 to Smith Decl.; Trebbau Tr. at 160:20-25; 161:1-18, Exhibit 2 to Smith Decl.)

56. In November 2010, Trebbau entered into a margin agreement with Pershing LLC on behalf of his personal company, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Trebbau agreed that any disputes arising under that agreement would be governed by New York law. (CSSU42-45, Exhibit 49 to Smith Decl.; Trebbau Tr. at 123:8-18, Exhibit 2 to Smith Decl.)

57. In July 2012, Trebbau met with representatives of Deutsche Bank's New York office for purposes of setting up a trust with the bank. Trebbau opened one or more trust accounts with Deutsche Bank. (Trebbau Supp. Response to Interrog. No. 5, Exhibit 5 to Smith Decl.; Trebbau Tr. at 60:17-25, Exhibit 2 to Smith Decl.)

58. During the relevant period, Trebbau paid Pro Energy Services LLC ("ProEnergy"), which is licensed to do business in New York and is the company believed to do all the actual construction and operation of Derwick Associates' facilities, from New York bank accounts. (Betancourt Tr. at 150:10-23, Exhibit 1 to Smith Decl.)

59. Trebbau testified that he transferred his accounts from J.P. Morgan New York to RBC, which has offices in New York. (Trebbau Tr., at 84:5-15, Exhibit 2 to Smith Decl.; Exhibit 57 to Smith Decl.) Trebbau refused to produce to Plaintiffs documents addressing whether he did and, if so, when, to where, and how much he transferred from one financial institution to another the course of the last few years including any transfers of money or assets from J.P. Morgan.

60. At all relevant times, RBC Wealth Management has offices in New York. (Exhibit 57, to Smith Decl.)

Trebbau Solicits Business In New York

61. In September 2010, Trebbau traveled to New York to solicit business and personal opportunities by attending the annual Clinton Global Initiative, which brings together hundreds of leading CEOs, heads of foundations, philanthropists, and members of the media. (Trebbau Supplemental Response to Interrog. No. 5, Exhibit 5 to Smith Decl.) The 2010 meeting was held at the Sheraton New York Hotel & Towers, 811 7th Avenue, New York, N.Y. 10019.

62. In September 2010, with an intent toward conducting business, Trebbau met with Hans Hertell in New York. Mr. Hertell is a lawyer and the former U.S. Ambassador to the Dominican Republic. In 2012 or 2013, Trebbau on behalf of Derwick Associates retained Hertell as legal counsel. (Trebbau Supplemental Response to Interrog. No. 5, Exhibit 5 to Smith Decl.; Trebbau Tr. at 142:19-25; 143:1-3; 12-25; 144:1-4, Exhibit 2 to Smith Decl.)

63. In December 2012, Trebbau, Betancourt and Trebbau's father-in-law, Eloy Montenegro, Sr., met with representatives of ▓▓▓▓▓▓▓▓▓▓▓▓ which has an office in New York located at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, New York, N.Y. ▓▓▓ concerning a potential investment. (Trebbau Response to Interrog. No. 5, Exhibit 4 to Smith Decl.; Trebbau Tr. at 103:3-15, 22-25, Exhibit 2 to Smith Decl.)

Trebbau Retains At Least Three
New York Law Firms During The Relevant Period

64. During the period August 2012 through at least January 2014, Trebbau (and/or one of his companies) retained three separate New York law firms to represent his personal and business interests. They are: Kasowitz, Benson, Torres & Freidman LLP, located at

1633 Broadway, New York, N.Y. 10019; █████████████████████████
located at █████████████, New York, N.Y. ████, and Lewis Baach PLLC, 405
Lexington Avenue, 62nd Floor, New York, N.Y. 10174. (Trebbau Response to Interrog.
No. 1, Exhibit 4 to Smith Decl.; Trebbau Tr. at 9:7-13; 10:18-25; 11:1-3, 15-16; 12:1-
6,18-22; 22:21-23; 23:1-17; 24:20-21, 24; 25:1, 4, Exhibit 2 to Smith Decl.)

65. In or about August 2012, Trebbau retained the New York law firm, Kasowitz, Benson, Torres & Freidman LLP, located at 1633 Broadway, New York, N.Y. 10019. (Trebbau Response to Interrog. No. 1, Exhibit 4 to Smith Decl.; Trebbau Tr. at 9:7-13, Exhibit 2 to Smith Decl.; BET772-773, Exhibit 50 to Smith Decl.)

66. In or about May 2013, Trebbau, as owner of Derwick Associates Corp., retained the New York law firm, █████████████████████████ located at █████████ ████, New York, N.Y. ████. During a less than three week period, Trebbau and/or Betancourt exchanged least 60 e-mail communications with counsel at █████████. (Trebbau Supp. Response to Interrog. No. 1, Exhibit 5 to Smith Decl.) The New York office of █████████████████████████ was paid approximately ████ for its legal services. (Trebbau Tr. at 24:4-11, Exhibit 2 to Smith Decl.)

67. In 2014, Trebbau (through Derwick Associates) retained Adam Kaufman of the New York office of Lewis Baach PLLC, which is located at 405 Lexington Avenue, 62nd Floor, New York, N.Y. 10174. (Trebbau Tr. at 24:20-21, 24; 25:1, 4, Exhibit 2 to Smith Decl.; Betancourt Tr. at 141:1-2; 10-18, Exhibit 1 to Smith Decl.)

Trebbau Commences A Related Lawsuit In New York

68. In or about September 2012, Trebbau commenced a lawsuit filed by Kasowitz, Benson, Torres & Freidman LLP on Trebbau's behalf in the Supreme Court, New York County captioned *Derwick Associates Corp., et al. v. John Does 1-10* (Supreme Court of the State of New York, County of New York), Index No. 653345/12 ( the "New York Action") (Exhibit 12 to Smith Decl.). (Trebbau Response to Interrog. No. 1, Exhibit 4 to Smith Decl.; Trebbau Tr. at 9:14-16, 24-25, Exhibit 2 to Smith Decl.)

69. The New York Action sought damages for alleged "egregiously false and defamatory statements" allegedly posted by those defendants and that were "intended to ... destroy [Betancourt's, Trebbau's and Derwick Associates'] current and prospective business and banking relationships, which are indispensable to the operation, expansion and success of Derwick." (Exhibit 12 to Smith Decl. at ¶ 1.)

70. The instant lawsuit commenced by Ambassador Reich against Trebbau arose in part from the Defendants' conduct and activities associated with the New York Action that Trebbau commenced in New York. (*See* Amended Complaint, Exhibit 36 to Smith Decl.)

71. Kasowitz, Benson, Torres & Freidman LLP's initial retainer was ████ (BET772-773, Exhibit 50 to Smith Decl.) The firm was paid ████████ total for legal services performed over a seven month period in connection with the New York Action and a related Florida defamation action. (Trebbau Tr. at 44:17-18, Exhibit 2 to Smith Decl.) Kasowitz, Benson, Torres & Freidman LLP's legal fees were paid for by Derwick

Associates from a bank account that Derwick Associates had in New York. (Trebbau Tr. at 19:17-25; 20:4-5, 12-25; 21:1-4; 44:17-18, 24-25; 45:1-4, Exhibit 2 to Smith Decl.)

Trebbau Retained New York-based Financial Advisors

72. During the period 2011 through 2013, Trebbau retained at least three New York-based financial advisors: J.P. Morgan New York, ▮▮▮▮ and the Compass Group. (Trebbau Tr. at 64:2-5, Exhibit 2 to Smith Decl.)

73. From at least as early as October 2009 through at least October 2012, Trebbau had an account with the Compass Group in the name of his personal company, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Compass Group production to FINRA, Exhibit 34 to Smith Decl.) The Compass Group is an investment adviser/brokerage company with an office at 135 East 57th Street, 30th Floor, New York, N.Y. (Trebbau Response to Interrog. No. 1, Exhibit 4 to Smith Decl.; Trebbau Tr. at 61:14-23, Exhibit 2 to Smith Decl.) According to its website, the Compass Group services high net worth individuals and institutional clients.

Trebbau Engages A "Spin Doctor"
To Perform Services In New York

74. In or about September 2013, an agent for Trebbau, Betancourt and Derwick Associates solicited Hilary Kramer, a New York-based Forbes contributor, to write a very favorable piece about Trebbau, Betancourt and Derwick Associates and to publish the same on *Forbes* magazine's website (www.forbes.com). *See* Hilary Kramer, "Changing Balance of Power May Unlock Venezuela's Markets," September 26, 2013, Forbes.com, *formerly available at* http://www.forbes.com/sites/hilarykramer/2013/09/26/changing-balance-of-power-may-unlock-venezuelas-markets/, Exhibit 41 to Smith Decl.

75. The piece authored by the New York-based Ms. Kramer on Forbes.com was highly solicitous of Derwick Associates, claiming without attribution that:

- "Derwick Associates has the reputation in both the U.S. and Venezuela to make all the entities involved in building a power plant move together."

- "Derwick Associates' know-how, experience and, yes, political connections, makes it possible for the company to secure the permits, put together competitive bids and then keep all the contractors moving until the plant is done and the lights come on."

- "So far they've done it 11 times in 3 and a half years and added enough power to the Venezuelan grid to take care of well over 800,000 households, or about 10% of the population. The twelfth plant should be on line shortly."

- "The bureaucracy in Caracas is famously corrupt. It does, however, require that all companies that contract with the government-owned companies must receive approval from the Registro Nacional de Contratista (the National Contractor Registry). That requires an audit from a major accounting firm. That

requirement, coupled with the American-educated principals at Derwick Associates understanding the value of running a clean company, led the company to hire RSM International."

- "I was relieved to find that RSM International, determined that the company won its contracts legitimately and did not pad its costs with money that ultimately belongs to the Venezuelan people."

See Hilary Kramer, "Changing Balance of Power May Unlock Venezuela's Markets," September 26, 2013, Forbes.com, *formerly available at* http://www.forbes.com/sites/hilarykramer/2013/09/26/changing-balance-of-power-may-unlock-venezuelas-markets/, Exhibit 41 to Smith Decl.

Trebbau Engages His New York Agent, D'Agostino, And
New York Counsel To Quash Potential "Bad Press" In New York

76. In late 2012, Thor Halvorssen, the President of the Human Rights Foundation, which is based in New York City, and a respected journalist, was preparing to publish a story about Derwick Associates in *Forbes* magazine. (Amended Complaint at ¶ 167, Exhibit 36 to Smith Decl.)

77. In connection with his research, Mr. Halvorssen had sent a November 15, 2012 email to ProEnergy Services inquiring about "the role of Derwick and the cost of the [energy] project" and commenting that "[t]here are numerous published allegations in Venezuela regarding overbilling by Derwick as well as more sensational allegations of money laundering." (Amended Complaint at ¶ 168, Exhibit 36 to Smith Decl.)

78. At Betancourt's request, Francisco D'Agostino Casado ("D'Agostino"), who, among other things, is Betancourt's business partner and family friend, agreed to reach out to Mr. Halvorssen in an attempt to dissuade him from publishing the piece about Derwick Associates. (Betancourt Tr. at 102:8-15, 20-23; 103:7-10, Exhibit 1 to Smith Decl.) D'Agostino knew Mr. Halvorssen from childhood, but had not spoken with him in nearly a decade. (Amended Complaint at ¶ 170, Exhibit 36 to Smith Decl.)

79. D'Agostino lives in New York and, since 2009, has had an office in New York at 375 Park Avenue, New York, N.Y. (D'Agostino Tr. at 7:15-25; 8:2-4; 9:19-25; 10:2-7, 9; 13:4-10; 12-23; 16:3-7, Exhibit 3 to Smith Decl.)

80. D'Agostino is friends with Betancourt and knows Trebbau having met him in 2011 and interacted with him on multiple occasions. (D'Agostino Tr. at 18:18-19; 19:8-19, Exhibit 3 to Smith Decl.)

81. D'Agostino invited Mr. Halvorssen to a meeting with Betancourt and agreed to bring with him the Derwick Associates' contracts with the Venezuelan government and ProEnergy Services as well as Derwick Associates audited financials. (Amended Complaint at ¶¶ 170-72, Exhibit 36 to Smith Decl.)

11

82. Before that meeting took place, Trebbau instructed his New York counsel, Kasowitz, Benson, Torres & Friedman LLP, to send a November 20, 2012 letter to *Forbes* magazine in New York warning *Forbes* not to publish Mr. Halvorssen's article. Fearing legal action, *Forbes* magazine declined to go forward with the article. (Trebbau Tr. at 32:9-10; 33:4-8, Exhibit 2 to Smith Decl.; Amended Complaint at ¶¶ 169-74, Exhibit 36 to Smith Decl.)

83. A similar letter was sent by Kasowitz, Benson, Torres & Friedman LLP to *The Huffington Post* in New York, with whom Mr. Halvorssen had previously published articles. (Amended Complaint at ¶¶ 175, Exhibit 36 to Smith Decl.)

84. In 2012 or 2013, Trebbau (through Derwick Associates) retained FTI Consulting, Inc., a business advisory firm that provides public relations, economic consulting and other services, which has six offices in New York. (Trebbau Tr. at 117:20-25, Exhibit 2 to Smith Decl.; Betancourt Tr. at 127:17-25; 128:1-9; 130:1-4; 131:6-13, Exhibit 1 to Smith Decl.)

85. FTI was retained for a dual purpose. To provide litigation support in connection with the New York Action and the related Florida defamation action and to prepare a self-due diligence report for Derwick Associates. (Trebbau Tr. at 115:5-9, Exhibit 2 to Smith Decl.; Betancourt Tr. at 128:16-21, Exhibit 1 to Smith Decl.) In connection with the preparation of the due diligence report, FTI reviewed the banking documents at J.P. Morgan New York and the New York law firm Kasowitz, Benson worked with FTI to prepare the report. (Trebbau Tr. at 118:10-19, Exhibit 2 to Smith Decl.; Betancourt Tr. at 128:22-25, Exhibit 1 to Smith Decl.)

86. In 2013, Trebbau and Betancourt, through their company Derwick Associates, hired AfterHim Media LLC, a public relations and reputation management firm to create "good press" about him, Trebbau and Derwick Associates. (PRNewswire Production, Exhibit 37 to Smith Decl.)

87. AfterHim Media LLC entered into an agreement with PRNewswire Association, which is located in New York to distribute positive press pieces about Trebbau, Betancourt, and Derwick Associates. Press releases issued on behalf of PR Newswire are sent to journalists in New York City. (PRNewswire Production, Exhibit 37 to Smith Decl.)

88. The contract entered into between AfterHim Media LLC on behalf of Trebbau and Betancourt, on the one hand, and PR Newswire Association, on the other hand, provides that it shall be governed by New York law and that exclusive jurisdiction and venue shall lie in the State of New York, County of New York, including the U.S. federal courts. (PRNewswire Production, Exhibit 37 to Smith Decl.)

Trebbau Travels To And From New York on Derwick Associates' Private Plane

89. In 2010 through 2013, Derwick Associates operated a private plane with tail number N229DA that frequently traveled to and from the United States. (Trebbau Tr. at 129:2-11, Exhibit 2 to Smith Decl.) When Derwick plane N229DA flew to the United States,

either Trebbau and/or Betancourt were onboard. (Trebbau Tr. at 129:15-19, Exhibit 2 to Smith Decl.)

90. Between December 2010 and December 2012, Derwick plane N229DA traveled to and/or from New Jersey's Teterboro airport at least 16 times. (TREBBAU70-74, Exhibit 51 to Smith Decl.) Teterboro airport, despite being in New Jersey, is a major hub for private airplane travel to New York.

91. From February 2012 through December 2012, Trebbau traveled to and/or from New York via Derwick plane N229DA at least five times. (Trebbau Response to Interrog. No. 7, Exhibit 4 to Smith Decl.) Betancourt accompanied him on all of those trips. (Betancourt Response to Interrog. No. 7, Exhibit 8 to Smith Decl.)

92. In at least 2013, the plane with tail number N229DA was insured by XL Insurance America, Inc., which has an office in New York at One World Financial Center, 200 Liberty Street, 3rd Floor, New York, N.Y. 10281. (TREBBAU423-425, Exhibit 51 to Smith Decl.)

93. Trebbau paid fees to the Port Authority of New York and New Jersey, Teterboro Airport arising from their travel to and from New York. (TREBBAU414-416, Exhibit 51 to Smith Decl.)

Trebbau's Non-Business Travel To And From New York

94. In 2012, Trebbau was in New York at least during four separate periods: February 18-24, 2012; July 4-6, 2012; December 18-19, 2012 and December 28, 2012 – January 3, 2013. (Trebbau Response to Interrog. No. 1, Exhibit 4 to Smith Decl.)

95. In February 2012, Trebbau attended Betancourt's birthday party at Catch in New York City. (Trebbau Tr. at 28:7-14, Exhibit 2 to Smith Decl.) Most of Betancourt's family attended Betancourt's birthday party, including Betancourt's wife, mother, two brothers and cousin. (Trebbau Tr. at 28:19-22; 30 at 8-9; 100:7-20, Exhibit 2 to Smith Decl.) Also in attendance was Joaquin Mavares, who, then, was the Vice President of International Business Development of Pro Energy Services LLC ("ProEnergy"), which is licensed to do business in New York and is the company believed to do all the actual construction and operation of Derwick Associates' facilities. (Trebbau Tr. at 28:23-25; 29:1-2, Exhibit 2 to Smith Decl.; Betancourt Tr. at 151:25; 152:1-2, 8-20, Exhibit 1 to Smith Decl.)

96. Trebbau celebrated the holidays in New York from December 2012 through January 2013. Trebbau stayed at the Olympic Tower Penthouse (Trebbau Tr. at 105:24-25; 106:1-10, Exhibit 2 to Smith Decl.)

97. Trebbau was in New York and attended business meetings in New York including to meet with his lawyer Adam Kaufman, and he stayed at the Olympic Tower Penthouse. (Trebbau Tr. at 105:9-23, Exhibit 2 to Smith Decl.) On that occasion, Trebbau flew to New York on Derwick Associates' private plane landing at the Teterboro Airport in New Jersey. (Trebbau Tr. at 131:7-15, Exhibit 2 to Smith Decl.) The second time, Trebbau

took a chartered jet to New York with Betancourt and Francisco Convit, who are co-owners with Trebbau of Derwick Oil & Gas. (Trebbau Tr. at 141:4-5, 8-12; 142:5-14, Exhibit 2 to Smith Decl.)

Trebbau has Family, Friends and Business Partners in New York

98. Trebbau's brother-in-law, Eloy Montenegro, Jr., resides in New York. (Trebbau Tr. at 107:17-23; 108:2-4, Exhibit 2 to Smith Decl.) He has been employed by J.P. Morgan New York since at least 2012 and continues to work there today. (Trebbau Tr. at 106:11-18, 25; 107:1-3, Exhibit 2 to Smith Decl.)

99. Trebbau's cousin and business partner, Alejandro Betancourt, is domiciled in New York and was domiciled in New York in 2013. (See Statement of Prima Facie Facts submitted to Court on January 15, 2015 accompanying this statement and incorporated by reference herein).

100. Trebbau's cousin, ███████████, resides or resided in New York. (Trebbau Tr. at 134:21-22; 135:3-5, Exhibit 2 to Smith Decl.; Betancourt Tr. at 30:5-14, Exhibit 1 to Smith Decl.)

101. Trebbau's cousin, ███████████, resided in New York. (Trebbau Tr. at 136:20-24; 137:3-7, Exhibit 2 to Smith Decl.)

102. Trebbau's friend, ███████████, who works at J.P. Morgan New York, resides in New York. (Trebbau Tr. at 138:23-25; 139: 1-17, Exhibit 2 to Smith Decl.)

Trebbau Is Under Investigation by
the New York District Attorney's Office (And Others)

103. In August 2014, the Wall Street Journal reported that the Manhattan District Attorneys' Office and the U.S. Department of Justice are investigating Derwick Associates. (Jose de Cordoba, *Venezuelan Firm Is Probed In U.S.*, Wall Street Journal, August 9, 2014, Exhibit 33 to Smith Decl.)

104. That the Manhattan District Attorneys' Office is investigating the activities of Trebbau proves that Trebbau's business and personal connections to New York is substantial.

Trebbau's Relationship With Betancourt

105. Betancourt is Trebbau's first cousin, business partner and friend.

106. In 2012-2013, Betancourt was the President of Derwick Associates and Trebbau was the Vice President. Trebbau and Betancourt were equal owners of Derwick Associates at that time. (Trebbau Tr. at 22:7-17, Exhibit 2 to Smith Decl.)

### The Majority Of Trebbau's Net Worth Is Or Was Located In New York During The Relevant Period

107. Trebbau testified that the majority of his assets and wealth are located outside of New York. Trebbau's testimony concerning his net worth is not credible and entirely unsubstantiated and rejected by Plaintiffs.

108. In July 2012, the value of the various assets held by the "Derwick Group" at J.P. Morgan New York was in the magnitude of ▓▓▓▓▓▓▓▓ (October 12, 2010 letter from J.P. Morgan, Exhibit 16 to Smith Decl.)

109. Trebbau speculated that, *in his opinion*, 50% of his assets were located in Venezuela in 2012, and 60% of his assets were located in Venezuela in 2013. (Trebbau Tr. at 81:6-8; 83:6-15, Exhibit 2 to Smith Decl.) However, Trebbau never produced any documents corroborating this assertion.

110. Trebbau testified that one hundred percent of Trebbau's assets in Venezuela in 2012 and 2013 were in private companies, *i.e.*, companies that are not publicly traded on the stock market. (Trebbau Tr. at 83:16-25; 84:1-4; 97:25; 98:1-4, Exhibit 2 to Smith Decl.) This means their economic value is not readily accessible.

111. When asked to explain the methodology that Trebbau used to put a financial or economic value on his ownership interest in private companies outside New York, he testified: "[It] depend[s] on whatever assets they hold." (Trebbau Tr. at 94:4-7, Exhibit 2 to Smith Decl.) He continued: "If it's a bank account, it holds a certain amount of dollars at a given day. If it's private property, it has a market value at any given day." (Trebbau Tr. at 94:10-12, Exhibit 2 to Smith Decl.) This means that their economic value is not readily ascertainable.

112. Trebbau identified three financial institutions with which he has a banking relationship in Venezuela. They are: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Trebbau Response to Second Set of Interrogs., Interrog. No. 2, Exhibit 6 to Smith Decl.; Trebbau Tr. at 145:6-10, Exhibit 2 to Smith Decl.)

113. In 2012-2013, Trebbau held no U.S. dollars in any Venezuelan banks and less than one percent (1%) of his net worth in bolivars (the Venezuelan currency) in any Venezuelan bank. (Trebbau Tr. at 145:18-20; 146:2-6, 8-24; 147:25; 148:1-4, Exhibit 2 to Smith Decl.)

114. When asked to explain how Trebbau determined the market value on private property located outside New York, he testified: "Just basically how much the market is or how much they cost. Not even how much they cost, but how much the market it. Like I said, this is not done by an appraiser, this is just me thinking about the market, the current market value during that time." (Trebbau Tr. at 94:13-23, Exhibit 2 to Smith Decl.)

115. Trebbau admitted that his assessment of the percentage of his net worth that was located in New York and Venezuela in 2012 and 2013 was entirely subjective and not based on

the opinion of any third-party experts or appraisers. (Trebbau Tr. at 83:11-15; 94:4-25; 95:1-3; 98:6-10, Exhibit 2 to Smith Decl.)

116. In response to questions about the percentage of Trebbau's net worth that he had in New York in 2012 and 2013, he testified with respect to his "financial assets" that "I don't even remember the assets that were held in New York at that time. . . . I don't remember what stocks I held, I don't' remember what bonds I held in that account, I don't remember what financial structure I had at that moment." Likewise, he had no knowledge of the "financial assets" he held outside New York in 2012 and 2013. (Trebbau Tr. at 95:4-21, 96:22-25; 97;1-4, 7-9, 11-24, Exhibit 2 to Smith Decl.)

Plaintiffs Cannot Sue In Venezuela

117. Plaintiffs cannot sue either Betancourt or Trebbau in Venezuela and receive their day in court. The Venezuelan government views Ambassador Reich as effectively an enemy of the state of Venezuela. For the reasons set forth in his Declaration submitted herewith, Reich would not be allowed to prosecute his claims against defendants Betancourt or Trebbau in a Venezuela court. (Declaration of Otto J. Reich filed separately.)

Incorporation by Reference

118. Plaintiffs incorporate by reference each of the jurisdictional facts set forth in the Statement of Facts Supporting A *Prima Facie* Case of Personal Jurisdiction Over Defendant Betancourt And In Opposition To His Renewed Motion To Dismiss Under Fed. R. Civ. P. 12(b)(2), as if set forth herein.

Dated: New York, New York
January 15, 2015

SMITH VALLIERE PLLC

By: _____
Mark W. Smith, Esq.
Noelle Kowalczyk, Esq.

1221 Avenue of the Americas, 42nd Floor
New York, New York 10020
(212) 755-5200
msmith@svlaw.com
nkowalczyk@svlaw.com

*Attorneys for Plaintiffs
The Honorable Otto J. Reich and
Otto Reich Associates, LLC*

# CERTIFICATE OF SERVICE

I hereby certify this 15th day of January, 2015, that I caused a true and correct copy of the foregoing document to be served via electronic mail on the following attorneys of record:

Frank H. Wohl, Esq.
Julia C. Green, Esq.
Lankler Siffert & Wohl
500 Fifth Avenue, 34th Floor
New York, NY 10110
*Attorneys for Defendant Leopoldo Alejandro Betancourt Lopez*

Joseph A. DeMaria, Esq.
Fox Rothschild LLP
200 South Biscayne Blvd.
Suite 3590
Miami, FL 33131
*Attorneys for Defendant Pedro Jose Trebbau Lopez*

Shawn Rabin, Esq.
Susman Godfrey, L.L.P.
560 Lexington Avenue, 15th Floor
New York, NY 10022
*Attorneys for Defendant Francisco D'Agostino Casado*

Mark W. Smith