# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THE HONORABLE OTTO J. REICH and
OTTO REICH ASSOCIATES, LLC,

                      Plaintiffs,

              v.

LEOPOLDO ALEJANDRO BETANCOURT LOPEZ,
PEDRO JOSE TREBBAU LOPEZ, and FRANCISCO
D'AGOSTINO CASADO,

                    Defendants.

Civ. No. 13 CV 5307 (JPO)
ECF Case

**Defendants' Public Filing**
~~FILED UNDER SEAL~~

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO BETANCOURT'S AND TREBBAU'S RENEWED MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO RULE 12(b)(2)

SMITH VALLIERE PLLC
1221 Avenue of the Americas, 42nd Floor
New York, New York 10020
(212) 755-5200

*Attorneys for Plaintiffs*
*The Honorable Otto J. Reich and*
*Otto Reich Associates, LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 3

ARGUMENT .................................................................................................................... 4

I.     LEGAL STANDARD ............................................................................................. 4

     A.     On A Rule 12(b)(2) Motion, Plaintiffs' Only Burden Is
            To Proffer Facts Supporting A *Prima Facie* Case Of Jurisdiction ......................... 4

     B.     Relevant Time-Frame Considered On A Rule 12(b)(2) Motion ............................ 6

II.    PLAINTIFFS HAVE PROFFERED A
     *PRIMA FACIE* CASE OF PERSONAL JURISDICTION .............................................. 6

     A.     Plaintiffs Have Proffered Facts Sufficient To Support A
            *Prima Facie* Case Of Jurisdiction Based On Defendants' Domicile ...................... 7

           1.     Plaintiffs Have Proffered Facts Sufficient
                  To Support A *Prima Facie* Case That
                  Defendants Have Residences In New York ....................................... 8

           2.     Plaintiffs Have Proffered Facts Sufficient To
                  Support A *Prima Facie* Case That Defendants
                  Intend To Remain In Or Return To New York ................................... 9

     B.     Plaintiffs Have Proffered Facts Sufficient To Support
            A *Prima Facie* Case Of Personal Jurisdiction
            Because Defendants Are Doing Business In New York ...................................... 10

     C.     Due Process Considerations Do Not Preclude The
            Exercise Of Personal Jurisdiction Over Defendants In New York ...................... 16

           1.     Defendants Have Sufficient Contacts With
                  New York To Satisfy Due Process Considerations ................................. 16

           2.     The *Daimler* Gloss On General Jurisdiction Is
                  Not Applicable Here Because Plaintiffs' Claims
                  Arise From Conduct By Defendants In New York ................................. 18

3.     Even If *Daimler's* Gloss On General Jurisdiction
Applied, Plaintiffs Have Satisfied The Standard
Because Defendants' Extensive Contacts With
New York Render Them "Essentially At Home" In New York ............... 19

4.     Denying Plaintiffs Access To A New York Court Would
Deprive Plaintiffs Of Their Day In Court Because Venezuela
Is Not A Viable Forum For Plaintiffs To Pursue Their Claims ................ 20

III.    THE LIMITATIONS PLACED ON JURISDICTIONAL
DISCOVERY AND DEFENDANTS' OBSTRUCTIONIST TACTICS
PREJUDICED PLAINTIFFS IN OPPOSING DEFENDANTS' MOTIONS .................. 23

CONCLUSION ......................................................................................................................... 24

# TABLE OF AUTHORITIES

Page

## Cases

*ABKD Indus., Inc. v. Lennon,*
  52 A.D.2d 435 (1st Dep't 1976) ........................................................................ 11

*Bhatti v. Pettigrew,*
  No. 11 Civ. 1044 (JPO), 2012 U.S. Dist. LEXIS 47132 (S.D.N.Y. Apr. 2, 2012)............ 7, 9, 10

*Biro v. Conde Nast,*
  11 Civ. 4402 (JPO), 2012 U.S. Dist. LEXIS 113188 (S.D.N.Y. August 10, 2012) ................ 11

*Blanchard v. Peerless Ins. Co.,*
  958 F.2d 483 (1st Cir. 1992) .......................................................................... 8

*Daniel v. Am. Bd. Of Emergency Med.,*
  988 F. Supp. 127 (W.D.N.Y. 1997) ................................................................... 11

*De Pena v. De Pena,*
  31 A.D.2d 415 (1st Dep't 1969) ...................................................................... 7

*Dorchester Financial Securities, Inc. v. Banco BRJ, S.A.,*
  722 F. 3d 81 (2nd Cir. 2013) .......................................................................... 5

*Eternal Asia Supply Management (USA) Corp. v. Chen,*
  No. 12 Civ. 6390 (JPO), 2013 U.S. Dist. LEXIS 59538 (S.D.N.Y. Apr. 25, 2013)............. 6, 10

*Farrell v. Ashton,*
  No. 89 Civ. 6706 (WCC), 1991 U.S. Dist. LEXIS 2331 (S.D.N.Y. Feb. 28, 1991) ................ 5

*Financial Securities, Inc. v. Banco BRJ, S.A.,*
  722 F. 3d 81 (2d Cir. 2013) ....................................................................... 1, 5

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.,*
  218 F. Supp. 369 (S.D.N.Y. 2002) ................................................................... 11

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
  131 S. Ct. 2846 (2011) ............................................................................... 19

*Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC,*
  No. 11 Civ. 420 (RJH), 2012 U.S. Dist. LEXIS 8231 (S.D.N.Y. Jan. 24, 2012) .................... 11

*HMB Interests, L.L.C. v. Chesapeake Louisiana, L.P.,*
  CIVIL ACTION NO. 08-1542, 2010 U.S. Dist. LEXIS 92910 (W.D. La. Sept. 7, 2010) ........ 8

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,*
  Master File No. 1:00-1898, MDL 1358 (SAS), M21-88,
  2014 U.S. Dist. LEXIS 62748 (S.D.N.Y., May 5, 2014 ) ........................................... 1

*International Shoe Co. v. Washington,*
  326 U.S. 310 (1945) .................................................................................. 18

*Kitson v. Bank of Edwardsville,*
  CIVIL NO. 06-528-GPM, 2006 U.S. Dist. LEXIS 85285 (S.D. Ill. Nov. 22, 2006) ................ 9

*Laufer v. Ostrow,*
    55 N.Y.2d 305 (1982) ........................................................................................... 11

*Metropolitan Life Insurance Co. v. Robertson-Ceco,*
    84 F.3d 560 (2d Cir. 1996) ..................................................................... 4, 6, 10, 21

*National Artists Management Co., Inc. v. Weaving,*
    769 F. Supp. 1224 (S.D.N.Y. 1991) ..................................................................... 9

*Optimum Worldwide Ltd. v. Klebener,*
    95 Civ. 1359 (HB), 1996 U.S. Dist. LEXIS 1740 (S.D.N.Y. Feb. 16, 1996).......................... 11

*Perkins v. Benguet Consol. Mining Co.,*
    342 U.S. 437 (1952)............................................................................................ 20

*Postlewaite v. McGraw-Hill, Inc.,*
    411 F.3d 63 (2d Cir. 2005) ................................................................................. 9

*Press v. Chem. Inv. Servs. Corp.,*
    166 F.3d 529 (2d Cir. 1999) ............................................................................... 9

*Sabaratnam v. Holder,*
    428 Fed. Appx. 110 (2d Cir. 2011)..................................................................... 22

*Sikhs for Justice v. Nath,*
    850 F. Supp. 2d 435 (S.D.N.Y. 2012) ............................................................... 11

*Sonera Holding B.V. v. Cukurova Holding A.S.,*
    750 F.3d 221 (2d Cir. 2014) ............................................................................. 12

*St. Michael Ent. v. Serbia Ministry of Privatization,*
    09-CV-05147 (SLT) (MDG), 2014 U.S. Dist. LEXIS 46151 (S.D.N.Y. Feb. 18, 2014).......... 9

*United Mizrahi Bank Limited v. Sullivan,*
    No. 97 Civ. 9282 (LMM), 1998 U.S. Dist. LEXIS 13996 (S.D.N.Y. Sept. 8, 1998).............. 11

*Wilson v. Samson Contour Energy E&P, L.L.C.,*
    CIVIL ACTION NO. 14-0109, 2014 U.S. Dist. LEXIS 170335 (E.D. La. Dec. 9, 2014)......... 8

## Statutes

    Fed. R. Civ. P. 12(b)(2) ...................................................................................... 1

## Other Authorities

Alexander, Vincent C.; Practice Commentaries to CPLR 301 [2010] ........................... 7

von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis,
    79 *Harv. L. Rev.* 1121, 1144-1163 (1966) ...................................................... 20

## Rules

CPLR 301 ....................................................................................... 5, 7, 10, 12

CPLR 302 ................................................................................... 11, 16, 17, 18

Plaintiffs the Honorable Otto J. Reich ("Ambassador Reich") and Otto Reich Associates,

LLC ("ORA"), respectfully submit this Memorandum of Law, along with the accompanying

Statement of Facts Supporting a *Prima Facie* Case of Personal Jurisdiction Over Defendant

Betancourt and In Opposition To His Renewed Motion To Dismiss Under Fed. R. Civ. P.

12(b)(2)[1] (the "BS"), Statement of Facts Supporting a *Prima Facie* Case of Personal Jurisdiction

Over Defendant Trebbau and In Opposition To His Renewed To Dismiss Under Fed. R. Civ. P.

12(b)(2) (the "TS"), Declaration of Mark W. Smith dated January 15, 2015 (the "Smith

Declaration") and the exhibits attached thereto, Declaration of Otto J. Reich dated January 15,

2015 (the "Reich Declaration"), and the First Amended Complaint filed in this action (the

"Amended Complaint") (annexed to the Smith Declaration as Exhibit 36), in opposition to the

Renewed Motions to Dismiss Pursuant To FRCP 12(b)(2) (the "Motions") filed by defendants

Leopoldo Alejandro Betancourt Lopez ("Betancourt") and Pedro Jose Trebbau Lopez

("Trebbau") (together, "Defendants").

## PRELIMINARY STATEMENT

Defendants' renewed motions to dismiss under Rule 12(b)(2) are an exercise in

misdirection and gamesmanship.  Defendants submit self-serving statements that ignore the

fundamental questions before the Court, and attempt to leverage their herculean efforts to avoid

meaningful jurisdictional discovery to mislead the Court into finding that no evidence exists to

support a *prima facie* case of jurisdiction.  Nothing could be further from the truth.  Plaintiffs

attempted to obtain discovery from Defendants and third parties concerning Defendants'

residence, their banking and financial transactions in New York, the total value of assets and the

---

[1]     On a Rule 12(b)(2) motion, Plaintiffs may submit facts and materials outside the pleadings, and the Court
can and should consider such materials.  *See Dorchester Financial Securities, Inc. v. Banco BRJ, S.A.*, 722 F. 3d 81,
86 (2d Cir. 2013); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, Master File No. 1:00-1898, MDL
1358 (SAS), M21-88, 2014 U.S. Dist. LEXIS 62748 (S.D.N.Y., May 5, 2014 ).

portion of Defendants' assets that they held in New York, the quantity and quality of the time Defendants spent in New York, and Defendants' contacts with New York and with other jurisdictions, all of which are factors the courts universally recognize are relevant to any jurisdictional analysis. Defendants largely prevented Plaintiffs from taking meaningful discovery on these issues, and now ask this Court to dismiss them from this lawsuit because Plaintiffs purportedly cannot proffer evidence supporting personal jurisdiction here. However, despite Defendants' efforts to "hide the ball" on relevant discovery, Plaintiffs have marshalled significant evidence supporting personal jurisdiction over Defendants.

Plaintiffs have more than fulfilled their burden of proffering a *prima facie* case of jurisdiction over Defendants, both based on their domicile and their extensive and unique contacts with New York. Even the limited scope of jurisdictional evidence available to Plaintiffs at this time provides ample evidence to support a *prima facie* case that Defendants have residences in New York, and there is ample objective evidence that they hold the vast majority of their assets, conduct significant business, and have other significant connections with New York that belie their self-serving and untested claims that the *de facto* third-world and violent country of Venezuela is their domicile. This evidence, and the inferences to be drawn from it (which must be drawn in Plaintiffs' favor on a 12(b)(2) motion) present a *prima facie* case of jurisdiction over Defendants.

Furthermore, Plaintiffs' submissions herewith demonstrate that Defendants have extensive and unique contacts with New York, as well as other factors, which render this case one in which Defendants are subject to general jurisdiction in New York even if Venezuela is their domicile. This same evidence more than satisfies the constitutional due process

considerations applicable to Defendants, even in light of the Supreme Court's recent *Daimler* decision.

Here, Plaintiffs have proffered sufficient facts that, if credited as true by a finder of fact, would establish a *prima facie* case that each Defendant is domiciled in New York. But Plaintiffs have also shown that Defendants' contacts with New York more than suffice to allow the Court, both statutorily and constitutionally, to exercise personal jurisdiction over each of Betancourt and Trebbau. The only evidence that is inconsistent with the objective facts about Defendants' residences, their intent to remain in or return to New York, and their extensive contacts with New York, is self-serving affidavit and deposition testimony by Defendants. However, evidence that (if credited) might contradict Plaintiffs' *prima facie* case may not be considered on a 12(b)(2) motion, and the Court cannot credit such testimony under any circumstances unless and until it conducts a full-blown evidentiary hearing and makes factual findings (which are not permitted in the absence of such a hearing). A Court may not consider any factual assertions by Defendants without permitting Plaintiffs the additional discovery they have repeatedly requested on the jurisdictional issues and then conducting an evidentiary hearing. Given the substantial facts supporting jurisdiction, and the time that has already been consumed by Defendants' gamesmanship, the better course would be to permit this case to proceed to merits-based discovery against all Defendants and resolve factual issues relating to jurisdiction on summary judgment following discovery or at trial.[2]

## STATEMENT OF FACTS

The Court is respectfully referred to the Smith Declaration, with exhibits, the Reich Declaration, the BS, the TS, and the Amended Complaint, all of which are expressly

---

[2]    Plaintiffs set out this position in the parties' Joint Submission on Jurisdictional Discovery dated September 12, 2014, by noting the great overlap in personal jurisdiction and merits. Yet the Court denied this request.

incorporated herein by reference, for a full recitation of the facts relevant to this opposition. Specific facts relevant to the arguments set forth herein are set forth in the Argument section below.

**ARGUMENT**

I.    **LEGAL STANDARD**

    A.    **On A Rule 12(b)(2) Motion, Plaintiffs' Only Burden Is**
           **To Proffer Facts Supporting A *Prima Facie* Case Of Jurisdiction**

      While the plaintiff bears the burden of establishing jurisdiction, "[t]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester*, 722 F. 3d 81 at 84. To defeat a Rule 12(b)(2) motion, a plaintiff must merely proffer "factual allegations constitute[ing] a *prima facie* showing of jurisdiction." *Id.* at 85. As the Second Circuit has recognized, where the defendant moves, as Defendants have here, by Rule 12(b)(2) motion after discovery, a plaintiff's sole burden is to present a *prima facie* showing supported by an averment of facts that, *if credited by the trier*, would suffice to establish jurisdiction over the defendant." *Id.* at 84-85 (emphasis added). "When ... a court permits the parties to engage in jurisdictional discovery, the party seeking to establish jurisdiction bears 'the burden of proving by a preponderance of the evidence that personal jurisdiction exists.' ... 'pleadings and affidavits are construed in the light most favorable to the plaintiff, and all doubts are resolved in its favor.'" *C.A., Inc.*, 2014 U.S. Dist. LEXIS 160951 at *6-7. This standard applies even after jurisdictional discovery if no evidentiary hearing has occurred. *Metropolitan Life Insurance Co. v. Robertson-Ceco*, 84 F.3d 560, 567 (2d Cir. 1996). "[U]ntil an evidentiary hearing is held, 'a *prima facie* showing suffices,

4

*notwithstanding any controverting presentation by the moving party*, to defeat the motion."[3] *Dorchester*, 722 F. 3d at 86 (emphasis in original).

Alternatively, the Court may defer determination of the personal jurisdiction issue until summary judgment or a trial on the merits. *See generally Dorchester*, 722 F. 3d 81. "If the overlap in the evidence is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the [District] Court must leave the jurisdictional issue for trial." *Dorchester Financial Securities, Inc. v. Banco BRJ, S.A.*, 722 F. 3d at 87. Even in the context of a Rule 56 motion, which asserts that there are undisputed facts demonstrating the absence of jurisdiction, "the court proceeds, as with any summary judgment motion, to determine if *undisputed* facts exist that warrant the relief sought." *Dorchester*, 722 F. 3d at 85 (emphasis added).

"Although intent is crucial to domicile, mere subjective statements of affiliation with a particular state or of intent to make it one's home cannot suffice for a finding of state citizenship if such statements are belied by objective indicia of actual residence and intent." *Farrell v. Ashton*, No. 89 Civ. 6706 (WCC), 1991 U.S. Dist. LEXIS 2331 at *3 (S.D.N.Y. Feb. 28, 1991). In any event, the Court may not resolve factual disputes without first conducting a full-blown evidentiary hearing. *See Dorchester*, 722 F.3d at 84, 85. Accordingly, because Plaintiffs have proffered facts which, if credited by the trier, support a *prima facie* case of intent by Betancourt

---

[3] The need for a full-blown evidentiary hearing before evidence can be weighed or credibility determinations made is underscored by the fact that Betancourt has already admitted under oath that he provided false information to a governmental office in Venezuela for the purpose of having a false document purportedly evidencing his "residence" issued by that office. Remarkably, the document that Betancourt admitted was false at his deposition was submitted as Exhibit 2 to his Declaration in support of the Motions. This admission and conduct not only calls into question Betancourt's credibility but also demonstrates that, at a minimum, (i) governmental records from Venezuela are easily manipulated, (ii) Betancourt has already done so on at least one occasion, and (iii) Betancourt is willing to submit false documents to this Court. (*See* BS 56-62.)

and Trebbau to remain in or return to New York, Plaintiffs have satisfied the burden necessary to defeat Defendants' motions.

**B.     Relevant Time-Frame Considered On A Rule 12(b)(2) Motion**

When considering Defendants' contacts with New York for jurisdictional purposes, both in the context of the statutory "doing business" analysis under CPLR 301 and in the context of the due process analysis, the Court must consider Defendants' contacts over a period of years. As the Second Circuit has recognized, "[b]ecause the phrase 'continuous and systematic' necessarily requires that courts evaluate the defendant's contact with the forum state over time," restricting the Court's analysis to a narrow time frame, such as the year in which this action was filed, would constitute reversible error. *Metropolitan Life*, 84 F.3d 560 (citing with approval general jurisdiction cases considering contacts with forum state over periods ranging from three to seven years).

**II.     PLAINTIFFS HAVE PROFFERED A**
***PRIMA FACIE* CASE OF PERSONAL JURISDICTION**

"[T]he breadth of a federal court's personal jurisdiction is determined by the law of the state in which the district court is located." *Eternal Asia Supply Management (USA) Corp. v. Chen*, No. 12 Civ. 6390 (JPO), 2013 U.S. Dist. LEXIS 59538 (S.D.N.Y. Apr. 25, 2013) (Oetken, J.). "The amenability of a foreign [defendant] to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guaranty." *Metropolitan Life*, 84 F3d at 567. "[I]n resolving questions of personal jurisdiction in a diversity action, a district court must conduct a two-part inquiry. First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's

assertion of jurisdiction under these laws comports with the requirements of due process."[4]  *Id.*;

*see also C.A., Inc.*, 2014 U.S. Dist. LEXIS 160951 at *6.

To show personal jurisdiction in a federal diversity case,[5] a district court sitting in the Southern District of New York applies the law of New York, which here is CPLR 301.  A plaintiff may establish general jurisdiction in New York pursuant to CPLR 301 by showing that a defendant is (i) "domiciled" in New York within the meaning of the jurisdictional statutes,[6] or (ii) engaged in a continuous and systematic course of doing business in New York.[7]

### A.    Plaintiffs Have Proffered Facts Sufficient To Support A *Prima Facie* Case Of Jurisdiction Based On Defendants' Domicile[8]

There are two elements comprising an individual's domicile.  First, the individual must have a "residence" in the state.  Second, the individual must have an "intent to remain or return" to the state.  *Bhatti v. Pettigrew*, No. 11 Civ. 1044 (JPO), 2012 U.S. Dist. LEXIS 47132 at *8 (S.D.N.Y. Apr. 2, 2012).  Plaintiffs proffer facts which, if credited by the trier of fact along with

---

[4]      The question whether continuous and systematic contacts with New York can satisfy CPLR 301's statutory requirement is entirely separate and distinct from the question whether such contacts, standing alone, can satisfy due process requirements.  Once the Court determines that CPLR 301 has been satisfied as a matter of New York law, the second, constitutional, prong of the analysis – whether exerting personal jurisdiction over these Defendants comports with due process in this case – fully protects Defendants from an unconstitutional application of CPLR 301 to them in this case.  Indeed, the Supreme Court has routinely acknowledged that state jurisdictional statutes may exert jurisdiction up to the bounds of constitutional due process.  *See, e.g., Daimler, AG, v. Bauman*, 134 S. Ct. 746, 754 (2014); *Dorchester*, 722 F.3d 81.

[5]      This Court's dismissal of Plaintiffs' RICO causes of action is the subject of a pending motion for reconsideration.  If the RICO claims are sustained on reconsideration, the RICO statutes will provide a separate, statutory basis for personal jurisdiction.

[6]      *See* Vincent C. Alexander, Practice Commentaries to CPLR 301 [2010].

[7]      *See Laufer v. Ostrow*, 55 N.Y.2d 305 (1982).

[8]      Virtually all of the cases cited by Defendants concerning domicile were decided in the context of disputes about the existence of diversity-based subject matter jurisdiction.  This is significant because, as this Court has recognized, "[t]he policy behind § 1332 requires that it be strictly construed against finding jurisdiction." *See Bhatti*, 2012 U.S. Dist. LEXIS 47132 at *7.  There is no corresponding requirement that courts construe domicile strictly against a finding of personal jurisdiction.  Accordingly, all of the cases Defendants cite in support of their domicile arguments are inapposite here.

all inferences in Plaintiffs' favor, establish a *prima facie* case that Defendants are both domiciled in New York.[9]

> **1.  Plaintiffs Have Proffered Facts Sufficient To Support A *Prima Facie* Case That Defendants Have Residences In New York**

There is no dispute that in 2010, Betancourt acquired a ███████████ penthouse at the Olympic Tower in New York City (the "Penthouse Apartment").  (BS 27.)  The Olympic Tower is one of the most luxurious full service white-glove buildings in Manhattan.  Over the last several years, Betancourt has spent at least another ████████ to renovate the Penthouse Apartment to suit his very particular high-end tastes. (BS 40-51.)  Since he acquired the Penthouse Apartment, Betancourt has declined at least two offers to sell it, including an offer of ███████████. (BS 54-55.)  Tellingly, Betancourt was present at the Penthouse Apartment when Plaintiffs attempted to serve him in July 2013.  (Smith Declaration, Exhibit 48.)

From at least November 2010 until March 2012, Trebbau listed 155 East 55th Street, Apt. 9A, New York, N.Y. 10022 (the "East 55th Street Residence") as his New York address on banking, federal tax forms and other documents.  (TS 26-36.)  Trebbau admits he spent time at the East 55th Street Residence and received mail at that address.  (TS 27.)  Trebbau is the long-time best friend of Eduardo Travieso, who also resided at the East 55th Street Residence.  (TS 27.)  Following the completion of extensive renovations to Betancourt's New York Penthouse Apartment in early 2012, Trebbau has occupied that residence.  (TS 38.)  Trebbau has also received mail at the Penthouse Apartment.  (TS 39.)  Trebbau's admitted long-time friend Travieso resided at the East 55th Street Residence at all relevant times.  (TS 26.)  Travieso, along with Defendants, is subject to SEC and FINRA investigations arising from their New York

---

[9]  Although Defendants are citizens of Venezuela and/or Italy, that is irrelevant to the question of domicile. A foreign citizen can be a domiciliary of the United States and New York.  *See, e.g., De Pena v. De Pena*, 31 A.D.2d 415 1st Dep't 1969).

8

activities. (TS103-104.)  When Plaintiffs sought to procure documents and information about Defendants' relationship with Travieso, the Court initially granted it.  However, after Defendants essentially ignored the Court's order, the Court subsequently ordered no discovery of Betancourt and Trebbau's relationship with Travieso.

Courts have repeatedly held that listing an in-state mailing address on important documents is *prima facie* evidence that a defendant maintains a residence in the state. *See, e.g.*, *Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 494 (1st Cir. 1992) (denying summary judgment on issue of domicile because use of in-state mailing address on bank accounts constitutes evidence of residence in state); *Wilson v. Samson Contour Energy E&P, L.L.C.*, CIVIL ACTION NO. 14-0109, 2014 U.S. Dist. LEXIS 170335 at *10 (E.D. La. Dec. 9, 2014) (same); *HMB Interests, L.L.C. v. Chesapeake Louisiana, L.P.*, CIVIL ACTION NO. 08-1542, 2010 U.S. Dist. LEXIS 92910 at *7 (W.D. La. Sept. 7, 2010) (same); *Kitson v. Bank of Edwardsville*, CIVIL NO. 06-528-GPM, 2006 U.S. Dist. LEXIS 85285 (S.D. Ill. Nov. 22, 2006) at *21 (listing in-state address creates presumption of domicile in state).  Further, there is no requirement that a defendant own or even lease real property in New York to satisfy the "residence" prong of the domicile inquiry.  Residing in a friend's apartment when in New York can satisfy the residence requirement. *See, e.g.*, *Bhatti*, 2012 U.S. Dist. LEXIS 47132.

2.  **Plaintiffs Have Proffered Facts Sufficient To Support A *Prima Facie* Case That Defendants Intend To Remain In Or Return To New York**

Ample facts exist supporting a finding that Defendants intend to remain in or return to New York, rather than in the violent and dangerous nation of Venezuela. (*See, e.g.*, BS and TS.) In determining a defendant's intent for domicile purposes, "a 'totality of the evidence' approach is followed, and no single factor is conclusive." *Id.*  Courts look to a virtually limitless number of factors when considering the issue of intent concerning domicile.  "None of these factors can

9

establish domicile conclusively; rather, a court must examine the range of a person's conduct to draw the necessary inferences as to the relevant intent to establish a domicile." *Id.*

"Although intent is crucial to domicile, mere subjective statements of affiliation with a particular state or of an intent to make it one's home, of course cannot suffice for a finding of state citizenship if such statements are belied by objective indicia of actual residence and intent." *National Artists Management Co., Inc. v. Weaving*, 769 F. Supp. 1224 (S.D.N.Y. 1991).[10] "[A] party's own statements concerning his intentions are relevant, but they are of slight weight when they come into conflict with other facts that tend to disclose a contrary intent." *Bhatti*, 2012 U.S. Dist. LEXIS 47132 at *10.

Defendants' contention that they are domiciled in Caracas, Venezuela and not New York is belied by their numerous contacts with New York, which establish that they intend to remain in (or at least return) to New York. (*See* Part II.B., *infra*.) Moreover, given Defendants' wealth and stature, it is simply implausible that they could maintain their extravagant lifestyles in Venezuela – a violent, third-world country beset by rampant blackouts, food shortages and gross poverty. Indeed, as the record in this case illustrates, the only reason Defendants maintain a toehold in Venezuela at all is to avoid U.S. worldwide taxes and because they are in criminal cahoots with the corrupt Venezuelan government.

---

[10] It is basic black letter law that "intent" is a quintessential question of fact. Courts routinely deny summary judgment on the issue of intent because a hearing is required. *See, e.g., Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005); *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). Indeed, to survive a motion for summary judgment after discovery and in the absence of an evidentiary hearing, the plaintiff need only make "a prima facie showing that 'include[s] an averment of facts, that *if credited by the trier*, would suffice to establish jurisdiction over the defendant.'" *St. Michael Ent. v. Serbia Ministry of Privatization*, 09-CV-05147 (SLT) (MDG), 2014 U.S. Dist. LEXIS 46151 (S.D.N.Y. Feb. 18, 2014) (emphasis added).

**B.**    **Plaintiffs Have Proffered Facts Sufficient To Support**
        **A *Prima Facie* Case Of Personal Jurisdiction**
        <u>**Because Defendants Are Doing Business In New York**</u>

A defendant is "'doing business' and is therefore 'present' in New York and subject to

personal jurisdiction under to CPLR 301 concerning any cause of action, related or unrelated to

the New York contacts, if he does business in New York with a "fair measure of permanence and

continuity." *Eternal Asia*, 2013 U.S. Dist. LEXIS 59538 at *13. To establish personal

jurisdiction over a defendant under New York law, a plaintiff must "demonstrate … that the

defendant was 'present' and 'doing business' in New York within the meaning of CPLR 301. *Id.*

The personal jurisdiction analysis requires a court to review Defendants' activities over a period

of several years. *Metropolitan Life Insurance Company*, 84 F.3d 560.

New York courts have interpreted CPLR 301 to allow the exercise of personal

jurisdiction over a defendant if it does business in New York 'not occasionally or casually, but

with a "fair measure of permanence and continuity." *Id.* at *7. Courts in this Circuit have

repeatedly confirmed that CPLR 301's "doing business" standard for personal jurisdiction is

applicable to individual as well as corporate defendants. *See, e.g.*, *Sikhs for Justice v. Nath*, 850

F. Supp. 2d 435 (S.D.N.Y. 2012) (applying CPLR 302 "doing business" standard to individual

defendant); *United Mizrahi Bank Limited v. Sullivan*, No. 97 Civ. 9282 (LMM), 1998 U.S. Dist.

LEXIS 13996 (S.D.N.Y. Sept. 8, 1998) (same).

"New York courts have generally focused on the following indicia of jurisdiction: the

existence of an office in New York; the solicitation of business in New York; the presence of

bank accounts or other property in New York; and the presence of employees or agents in New

York." *Laufer*, 55 N.Y.2d at 310. Courts within the Second Circuit also consider, among other

things: (1) defendant's "residence" (*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F.

Supp. 369, 393 (S.D.N.Y. 2002)); (2) whether defendant has previously sued in New York

(*Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC*, No. 11 Civ. 420 (RJH),

2012 U.S. Dist. LEXIS 8231, at \*11 (S.D.N.Y. Jan. 24, 2012)); (3) whether defendant retained

New York lawyers (*ABKD Indus., Inc. v. Lennon*, 52 A.D.2d 435, 439 (1st Dep't 1976));

(4) whether defendant engaged in business, operational or financial activities in New York

(*Daniel v. Am. Bd. Of Emergency Med.*, 988 F. Supp. 127 (W.D.N.Y. 1997)); (5) travel to New

York (*Optimum Worldwide Ltd. v. Klebener*, 95 Civ. 1359 (HB), 1996 U.S. Dist. LEXIS 1740, at

\*13-14 (S.D.N.Y. Feb. 16, 1996)), and (6) the engagement of public relations firms to perform

services in New York (*Biro v. Conde Nast*, 11 Civ. 4402 (JPO), 2012 U.S. Dist. LEXIS 113188,

at \*12 (S.D.N.Y. August 10, 2012)).

    Where a defendant dominates and controls the conduct of a corporate entity, the New

York contacts of that corporate entity are imputed to the defendant for general jurisdictional

purposes. *See, e.g., Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225-26 (2d

Cir. 2014) (recognizing that *Daimler* reaffirmed that jurisdictional contacts may be imputed

under an alter-ego theory).

    Here, Defendants engaged in exactly the types of conduct that the New York state and

federal courts have repeatedly recognize comprise "doing business" in New York for purposes of

CPLR 301. In addition to their own actions, Defendants dominated and controlled a significant

number of companies, including so-called "special purpose vehicles" whose sole purposes were

to effect personal investments for defendants and/or purchase and hold real and/or personal

property for them and Derwick, whose extensive New York contacts also must be imputed to

Defendants. (*See Sonera Holding*, 750 F.3d at 225-26.) Indeed, Trebbau testified that J.P.

Morgan viewed Betancourt, Trebbau and their corporate entities, including Derwick Associates,

with holdings of at least ███████████, as one big "family." (*See* Exhibit 2 to Smith Decl. at 47:24-25; 48:1-5.)

With respect to Betancourt and Trebbau, the following contacts with New York are significant and sufficient to establish general jurisdiction and to demonstrate their intent to remain in or return to New York as their domicile:

- **Betancourt Resides in New York.** Betancourt resides in the Penthouse Apartment in New York. Betancourt has employed more than two dozen New York-based contractors, suppliers and architects to renovate the Penthouse Apartment to suit his needs. For the past 4 years at least, Betancourt has paid New York City and State property taxes and has accounts with ConEdison and Verizon in New York. Betancourt regularly receives personal and business-related mail, including mail addressed to his companies, at the Penthouse Apartment. (BS 26-53, 135.)

- **Trebbau Resides in New York.** Trebbau has resided at either the 55th Street Residence or the Penthouse Apartment during the relevant period. He has received mail and/or deliveries at both addresses. (TS 27-40.)

- **Betancourt Has Several Banking Relationships in New York During The Relevant Period.** In July 2012, Betancourt was linked to *no fewer than 40 separate banking accounts* at J.P. Morgan in New York, which collectively held *over* █████ in assets. Betancourt was a customer of J.P. Morgan in New York at the time that Plaintiffs commenced this lawsuit and is a customer of J.P. Morgan in New York today. Betancourt also had a relationship with Credit Suisse USA, LLC and the Compass Group in New York. Betancourt also claims to have a relationship with RBC, which has offices in New York. (BS 70-91.)

- **Trebbau Has Several Banking Relationships in New York.** Trebbau was a customer of █████ at the time that Plaintiffs commenced this lawsuit, and he continues to be a customer of █████ today. From at least as early as 2009, Trebbau has had a banking relationship with J.P. Morgan in New York. In July 2012, Trebbau was linked to *no fewer than 40* separate banking accounts at J.P. Morgan in New York, which collectively held *over* █████ in his assets. Trebbau was a customer of J.P. Morgan New York at the time that Plaintiffs commenced this lawsuit and continues to be a customer of J.P. Morgan New York today where he maintains investment accounts worth approximately █████. During the relevant period, Trebbau had accounts with Credit Suisse Securities USA, LLC, Pershing LLC, the Compass Group and Deutsche Bank in New York. (TS 41-61.)

- **Betancourt's and Trebbau's Personal Banker – Who Is Currently Under Investigation – Resided in New York During the Relevant Period.** Eduardo Travieso ("Travieso") was a Vice President in J.P. Morgan's Private Banking Division in New York during the relevant period. Travieso was Defendants' personal banker at J.P.

Morgan in New York and managed their personal and business accounts. In October 2012, FINRA commenced an investigation concerning Travieso and, in February 2014, recommended that disciplinary action be brought against him. According to Trebbau, Travieso has been accused of being a "money launderer." FINRA's investigation is ongoing and the U.S. Securities & Exchange Commission is also investigating Travieso. (TS 15-26; BS 18.)

- **The Vast Majority of Betancourt's Net Worth Was In New York During The Relevant Period.** In July 2012, Betancourt had at least ███████ in assets at J.P. Morgan New York, which consisted of cash and securities. Betancourt testified that, *in his opinion*, only 35% percent of his net worth was located at J.P. Morgan New York in 2012, and that his global net worth in 2012 was somewhere around ███████. Betancourt has produced no documentation corroborating that testimony and conceded that the vast majority of the assets that comprise his alleged ███████ net worth are in the form of an ownership interest in privately held companies. He also conceded that his determination of his ████ net worth was entirely subjective and not based on the opinion of any third-party experts or appraisers or any audited financials. Defendants and the Court prevented Plaintiffs from taking discovery from third parties that could corroborate or refute this subjective evaluation. (BS 6-8, 206-220.)

- **The Majority of Trebbau's Net Worth Was In New York.** In July 2012, the value of the Trebbau's assets at J.P. Morgan New York was in the magnitude of ███████. At his deposition, Trebbau speculated that, *in his unsubstantiated opinion*, 50% of his assets were located in Venezuela in 2012, and 60% of his assets were located in Venezuela in 2013. Trebbau conceded, however, that 100% of his assets in Venezuela in 2012 and 2013 were in private companies. Defendants and the Court prevented Plaintiffs from taking discovery from third parties that could corroborate or refute this subjective evaluation. (TS 107-116.)

- **Betancourt Retains Four New York Law Firms.** During the relevant period, Betancourt retained at least four separate New York law firms to represent his personal and business interests. (BS 9.)

- **Trebbau Retains Three New York Law Firms.** During the relevant period, Trebbau retained three separate New York law firms to represent his personal and business interests. (TB 8.)

- **Betancourt and Trebbau Commenced A Related Litigation In New York During The Relevant Period.** In September 2012, Betancourt's and Trebbau's New York lawyers commenced a related action on their behalf in the Supreme Court, New York County captioned *Derwick Associates Corp., et al. v. John Does 1-10* (Supreme Court of the State of New York, County of New York), Index No. 653345/12 ( the "New York Action"). The New York Action was purportedly brought to protect Betancourt's and Trebbau's personal reputations globally, including in New York. Defendants paid the law firm ███████ ███████ for legal services performed over a seven month period from a bank account that Derwick Associates had in New York. (BS 98-101; TS 69-72.)

14

- **Betancourt is the Sole Member of a New York LLC.** In or about August 2010, Betancourt retained another New York law firm to form BL 641 Fifth LLC, a New York limited liability company. BL 641 Fifth LLC was formed to acquire the Penthouse Apartment and avoid the payment of New York and federal taxes. Betancourt is the sole managing member of BL 641 Fifth LLC whose principal office is located at the Penthouse Apartment. BL 641 Fifth LLC's Operating Agreement provides for the application of New York law. (BS 102-112.)

- **Betancourt Solicits Business In New York.** Betancourt and Trebbau have solicited business in New York on a regular basis since at least September 2010 when Trebbau, on behalf of himself, Betancourt and Derwick Associates, attended the annual Clinton Global Initiative in New York. To further illustrate, in December 2012, Defendants met in New York with representatives of ███████████████ concerning a potential investment ██████████████. Since 2010, Betancourt has met with his co-defendant, business partner and good friend, Francisco D'Agostino ("D'Agostino"), in New York on numerous occasions. D'Agostino lives in New York and has an office in New York. In 2012 and 2013, D'Agostino brought several potential business deals to Betancourt and met with potential investors on Betancourt's behalf in New York. (BS 40-62, 70-97, 113-165; TS 62-68.)

- **Betancourt Engages in Significant Commercial Activity In New York.** From 2011 through at least July 31, 2013, Betancourt engaged in commercial transactions with *no fewer than two dozen* New York-based contractors, suppliers, vendors, architects and other professionals paying each ██████████████ in any one year period. Tellingly, Betancourt objected to producing documents reflecting his commercial transactions in New York in exceeding $600 per year on the grounds that said production would be unduly burdensome. (BS 113-143.)

- **Betancourt Has Employees and Agents In New York.** Betancourt has had numerous employees and agents in New York during the relevant period including a New York project manager. Betancourt has also employed and continues to employ a New York cleaning staff to maintain the Penthouse Apartment. During the relevant period, Betancourt appointed several individuals to acts as his agent in New York, including his architect, project manager, New York counsel and Travieso. (BS 113-143.)

- **Betancourt and Trebbau Have Engaged Various Reputation Managers and PR Firms to Protect Their Reputations in New York (and Elsewhere) During The Relevant Period.** In 2012, Betancourt, on behalf of himself, Trebbau and Derwick Associates, asked D'Agostino in New York to contact Thor Halvorssen, a Forbes writer, in an attempt to persuade Mr. Halvorssen not to publishing an unflattering piece about Defendants. Defendants' New York counsel also sent threatening letters to *Forbes* magazine in New York and *The Huffington Post* in New York. At or about the same time, Defendants retained FTI Consulting, Inc., a business advisory firm, which has six offices in New York. In September 2013, Defendants' agent solicited Hilary Kramer, a New York-based Forbes contributor, to write a very favorable piece about Betancourt, Trebbau and Derwick Associates. In 2013, Betancourt and Trebbau hired AfterHim

Media LLC, a reputation management firm to create and circulate "good press" about them in New York (and elsewhere). (BS 144-160; TS 84-88.)

- **Betancourt Spends Time In New York During The Relevant Period.** Betancourt has spent time in New York in 2010. From August 2011 through December 2012, Betancourt was in New York on *at least* nine separate occasions. Since February 2012, Betancourt has spent *at least* 30 nights at the Penthouse Apartment in New York. Betancourt deliberately curtailed his travel to New York following the filing of this lawsuit in July 2013. Indeed, his interrogatory responses do not identify any trips to New York post July 31, 2013 although third-party documents indicate otherwise. (BS 161-173.)

- **Trebbau Spends Time In New York During The Relevant Period.** In 2012, Trebbau was in New York *at least* between February 18-24, 2012; July 4-6, 2012; December 18-19, 2012 and December 28, 2012 – January 3, 2013. Trebbau deliberately curtailed his travel to New York following the filing of this lawsuit in July 2013. Indeed, his interrogatory responses do not identify any trips to New York post July 31, 2013 although he has been in New York since the commencement of this litigation. (TS 94-97.)

- **Betancourt Has Family, Friends and Business Partners in New York.** During the relevant period, Betancourt had (and continues to have) family and friends in New York, including at least one individual who provided a personal reference for him to the Olympic Tower. He also had (and continues to have) business partners and associates in New York, including Trebbau, D'Agostino and Travieso. (BS 174-198.)

- **Trebbau Has Family, Friends and Business Partners in New York.** During the relevant period, Trebbau had (and continues to have) family and friends in New York, including Eloy Montenegro, Jr., Trebbau's brother-in-law, and █████████████, both of whom work at J.P. Morgan; and several cousins. He also had (and continues to have) business partners and associates in New York, including Betancourt, D'Agostino and Travieso. (TS 98-102.)

C.    **Due Process Considerations Do Not Preclude The Exercise Of Personal Jurisdiction Over Defendants In New York**

   1.    **Defendants Have Sufficient Contacts With New York To Satisfy Due Process Considerations**

As set forth in Section II.B., Defendants have extensive contacts with New York. These contacts more than satisfy the constitutional requirement that they have sufficient contacts with New York to render them subject to jurisdiction here. As set forth in Point II.B., *supra*, Defendants and the businesses they dominate and control have extensive contacts with New

York. Imputation of the New York contacts of Defendants' businesses to Defendants is appropriate here because Defendants here admitted that they dominate and control those businesses. *Daimler* is not to the contrary. Unlike here, the Supreme Court in *Daimler* specifically noted that "at no point have [the plaintiffs] maintained that [the defendant's purported agent] is an alter ego of [the defendant]." *Daimler*, 134 S. Ct. at 758. Here, Plaintiffs have proffered facts demonstrating that Defendants dominate and control these companies.

Moreover, Defendants' conduct *in New York* giving rise to this action also precludes any argument that subjecting them to personal jurisdiction would contravene traditional notions of fair play and justice. The Amended Complaint alleges that Betancourt and Trebbau placed a call from New York to Convit-Guruceaga and instructed him to call Urbano, one of Banco Venezolano's largest shareholders, and to falsely tell Urbano that "Otto Reich is working for us." (AC ¶ 147.) This tortious act by Betancourt and Trebbau constituted, among other things, wire fraud and tortious interference with Plaintiffs' contract and business relationships. Plaintiffs' claims also allege other significant acts in New York by Defendants and their agent, including meeting in and correspondence from New York. (AC ¶¶ 34, 36-38, 174-75.) Although the Court found that this conduct by Defendants (which must be assumed true on a Rule 12(b)(2) motion) did not satisfy CPLR 302's statutory specific jurisdiction requirements, it does specifically link Defendants' conduct and New York in a way that overcomes any argument that it would be unfair from a constitutional perspective, to subject Defendants to jurisdiction here in this case. *See* Point II.C.3, *infra*.

While the Court held that these contacts with New York did not rise to the level of the "transaction of business in New York" giving rise to statutory specific jurisdiction under CPLR 302(a)(1), they are nonetheless direct contacts with New York giving rise to Plaintiffs' claims

and more than satisfy the constitutional requirement that Defendants have contacts with New York sufficient to justify this Court's exercise of jurisdiction over them.

### 2. The *Daimler* Gloss On General Jurisdiction Is Not Applicable Here Because Plaintiffs' Claims Arise From Conduct By Defendants In New York

The recent Supreme Court decision in *Daimler* has clarified that, where a plaintiff seeks to hale a *corporate defendant* into court in a state other than the defendant's state of domicile to litigate claims that are *entirely unrelated* to the defendant's in-state conduct (neither of which factors are present here), a plaintiff must show a sufficient quality and quantity of contacts by the defendant with the forum state, which render the defendant "essentially at home" in the jurisdiction. However, the *Daimler* gloss on general jurisdiction for *corporate* defendants who are sued on claims *unrelated* to New York (neither of which are true here) does not apply here.

As Justice Ginsberg noted at the very outset of the *Daimler* decision, that "case concern[ed] the authority of a court in the United States to entertain a claim brought *by foreign plaintiffs* against a foreign defendant *based on events occurring entirely outside the United States.*" *Daimler*, 134 S.Ct. at 750 (emphasis added). "The question presented in *Daimler* was whether the Due Process Clause of the Fourteenth Amendment precludes the [California] District Court from exercising jurisdiction over Daimler ... *given the absence of any California connection to the atrocities* [*i.e*, the misconduct alleged], *perpetrators* [*i.e.*, defendants] or victims described in the complaint.[11] *Id.* (emphasis added). None of the factors deemed essential to the Supreme Court's decision and holding in *Daimler* exist here. The events of

---

[11] "We granted certiorari to decide whether consistent with the Due Process Clause of the Fourteenth Amendment, Daimler is amenable to suit in California courts for claims involving *only foreign plaintiffs* and conduct *occurring entirely abroad. Id.* at 753.

which Plaintiffs complain in their state law claims[12] consist of defamatory telephone calls made by *Defendants* and their agents *from New York*.[13]

Indeed, in its Opinion and Order dated August 18, 2014 (the "Opinion & Order"), the Court rejected Defendants' argument that Plaintiffs' alleged RICO claims would require the Court to apply RICO extraterritorially based in part on the Court's finding that Plaintiff's wire fraud claims alleged significant conduct in the United States (defamatory telephone calls and related calls and meetings), which conduct was all alleged to occur in New York. *See* Opinion & Order at 7-10; Amended Complaint ¶¶ 147-150, 154-163. Thus, the Supreme Court's holding that "Daimler is not 'at home' in California, and cannot be sued there *for injuries plaintiffs attribute to MB Argentina's* [Daimler's purported agent's] *conduct in Argentina*" is also inapplicable here. *Id.* at 751. In fact, in a terse footnote addressing the concurring opinion of Justice Sotomayor, the *Daimler* opinion specifically noted and reaffirmed the admonition in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), that where a lawsuit involves claims that "*arise out of or are connected with the activities within the state*, a procedure which requires the [defendant] to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." *Daimler*, 134 S. Ct. at 758 (emphasis in original).

3. **Even If *Daimler's* Gloss On General Jurisdiction Applied, Plaintiffs Have Satisfied The Standard Because Defendants' Extensive Contacts With New York Render Them "Essentially At Home" In New York**

In *Daimler*, the Supreme Court indicated that for a defendant to be subject to general jurisdiction in a state, the defendant should be "essentially at home" in that state, such that

---

[12]    The Court's dismissal of Plaintiffs' RICO claims is the subject of a pending motion to reconsider.

[13]    The sole consideration in *Daimler* was whether the exercise of personal jurisdiction over *Daimler* would violate the federal constitution. The question whether the connections between Defendants' conduct at issue and New York are sufficient to invoke specific jurisdiction under CPLR 302 is entirely separate from the question whether those same contacts satisfy due process concerns.

19

defendant could reasonably expect to be required to litigate there. *Daimler*, 134 S. Ct. at 751. Although the Supreme Court noted that an individual's domicile and a corporation's state of incorporation and principle place of business are the "paradigmatic" jurisdictions in which they are subject to general jurisdiction, the *Daimler* decision specifically noted that neither the *Daimler* decision, nor the Court's prior decision in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011), held that a defendant "may be subject to general jurisdiction *only* in" those fora, rather, "it simply typed those places as paradigm all-purpose forums." *Daimler*, 134 S. Ct. at 760 (emphasis in original). The *Daimler* decision did "not foreclose the possibility that in an exceptional case" a defendant's contacts with a forum could be "so substantial and of such a nature as to render the [defendant] at home in that State." *Daimler*, 134 S. Ct. at 761. It did not provide any guidance on what might constitute such exceptional circumstances. *Id.*

Here, Plaintiffs have proffered sufficient evidence to show Defendants are essentially at home in New York.

> **4.    Denying Plaintiffs Access To A New York Court Would Deprive Plaintiffs Of Their Day In Court Because Venezuela Is Not A Viable Forum For Plaintiffs To Pursue Their Claims**

*Daimler* recognizes the importance of a plaintiff having "at least one clear and certain forum in which a [] defendant may be sued on any and all claims." *Daimler*, 134 S. Ct. at 760. In fact, the Supreme Court acknowledged that "[g]eneral jurisdiction exists as an imperfect safety valve that sometimes allows plaintiffs access to a reasonable forum in cases when specific jurisdiction would deny it." *Daimler*, 134 S. Ct. at 758. While the Supreme Court did state that "it would be hard to conjure up an example of the 'deep injustice'" that its narrowing of general jurisdiction could create, a situation like the one here where Plaintiffs are completely denied access to a working judicial system to redress their injury certainly falls into that category. *Daimler*, 134 S. Ct. at 758.

*The Harvard Law Review* article[14] that Justice Ginsberg cites extensively in her opinion in *Daimler*[15] (and on which she repeatedly relies in other jurisdictional opinions) specifically recognizes that the *Perkins v. Benguet Consol. Mining Co.*[16] decision, which subjected a corporate defendant to jurisdiction in a forum other than its state of incorporation and principal place of business (the Philippines), and which was reaffirmed in *Daimler*, turned on the fact that the plaintiff could not sue the defendant in the Philippines because of the absence of a functioning judicial system there (during World War II). *See* von Mehren & Trautman at 1144. This is consistent with the authors' admonition that "[b]y opening up to inquiry both the question of the relative fairness to plaintiff and defendant and the question of litigational convenience, we find it difficult to escape the conclusion that cases will arise … in which defendant's activity in the forum is minimal or non-existent but in which the traditional bias in favor of the defendant should be overturned." *Id.* at 1172. The authors also recognized that "[a]nother form of jurisdiction by necessity may also eventually emerge: the assertion of jurisdiction in the interest of justice in those rare cases in which no forum that is appropriate under conventional standards is prepared to act. *Id.* 1173-74.

Here, Defendants argue, in essence, that despite the fact that they hold vast wealth and benefit tremendously from New York (including availing themselves of the New York court system), Plaintiffs must sue them in Venezuela for jurisdictional reasons.[17] Defendants do not argue that New York is an inconvenient forum. In effect, Defendants are asking this Court to

---

[14] von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv. L. Rev. 1121, 1144-1163 (1966) (hereinafter "von Mehren & Trautman").

[15] *See Daimler*, 134 S. Ct. at 754, 755, 756, 758, 762 n.20.

[16] 342 U.S. 437 (1952).

[17] The nature of Defendants' apparent intended relationship with the U.S. is such that it is essentially their home for all important purposes while they work to maintain a Venezuelan citizenship status to avoid the "worldwide income tax" imposed by the U.S. government. *(See, generally,* BS and TS.)

find that Defendants cannot be sued at all on Plaintiff's claims (which arise from Defendants' conduct in New York), which the Court has already held state valid claims for relief.

This is not a case in which Plaintiffs have picked a particular state for a strategic gain, such as benefitting from a longer statute of limitations. *See, e.g., Metropolitan Life*, 84 F.3d at 565. Here, Defendants assert *no* alternative forum in which to sue other than Venezuela. But Venezuela is a lawless and dangerous country for all, especially for U.S. citizens.[18] (*See* Reich Declaration, submitted herewith.) The U.S. Department of State indicates that Venezuela is dangerous for U.S. citizens to travel there. (*See* Exhibits 54-55 to Smith Declaration.)[19] The State Department also confirms that the Venezuelan courts are corrupt. An as Ambassador Reich explains, he has no chance to get a fair hearing for his claims in a Venezuelan court. (Reich Decl. ¶ 6) Thus, if the court dismissed Plaintiffs' case, Plaintiffs will be left with no forum in which to pursue their claims and Defendants will completely evade responsibility for their misconduct and the injury caused Plaintiffs. This flies in the face of the holding and spirit of the *Daimler* decision and the underlying theory of general jurisdiction relied on by Justice Ginsburg, who authored the decision.

---

[18]     It is incredible that individuals possessing such massive wealth would pick Venezuela as their domicile or home.

[19]     The Court may take judicial notice of U.S. Department of State publications. *See, e.g., Sabaratnam v. Holder*, 428 Fed. Appx. 110 (2d Cir. 2011) (taking judicial notice of the U.S. Department of State 2010 Country Report on Human Rights Practices in Sri Lanka and the information contained therein).

## III. THE LIMITATIONS PLACED ON JURISDICTIONAL DISCOVERY AND DEFENDANTS' OBSTRUCTIONIST TACTICS PREJUDICED PLAINTIFFS IN OPPOSING DEFENDANTS' MOTIONS[20]

Plaintiffs have proffered a *prima facie* case of personal jurisdiction over Defendants despite certain unfair limitations placed upon them during jurisdictional discovery, and despite the obstructionist tactics employed by Defendants during discovery, which precluded Plaintiffs from amassing even further facts supporting their *prima facie* case. For example:

- Plaintiffs were denied access to communications between Defendants and Travieso that non-party JP Morgan was willing to provide to Plaintiffs. Defendants vigorously fought Plaintiffs' efforts to obtain these documents, which Plaintiffs believe will contain additional information concerning additional contacts between the Defendants and New York and will demonstrate that Trebbau used Travieso's New York apartment as his residence, consistent with his listing that address on various banking and other documents.

- Plaintiffs were denied access to documents evidencing the totality of Defendants' assets. These documents would have further demonstrated that the vast majority of Defendants' activities and assets are in New York. This would further support Plaintiffs' *prima facie* showing that Defendants intend to remain in or return to New York and the extraordinary and unique nature of Defendants' contacts with New York, *vis a vis* other jurisdictions other than their domicile. Plaintiffs believe Defendants' assertions about the quantity of their non-New York assets her are incredible and should be rejected.

- Plaintiffs were denied access to documents that would corroborate or contradict Defendants' claims about what assets Defendants had in New York during which periods. Although the Court stated that Plaintiffs could obtain information about these topics from Defendants at depositions, Defendants claimed ignorance of many of these facts or made obviously self-interested assertions without any corroborating evidence. And Plaintiffs were prejudiced by the inability to test the accuracy and truthfulness of the limited testimony Defendants did provide on this subject.

- Plaintiffs were denied access to Defendants' credit card and other statements that would evidence purchases in and payments to New York. As a result Plaintiffs were prejudiced by the inability to test the accuracy and truthfulness of statements

---

[20] Should Defendants attempt to proffer facts that have not been fully explored during jurisdictional discovery, or should the Court determine to hold an evidentiary hearing and Defendants attempt to proffer such facts at the hearing, Plaintiff must be permitted additional discovery to fully explore such issues and facts. Any other procedure would severely and unfairly prejudice Plaintiffs.

concerning Defendants contacts with New York and the amount of time
Defendants spent in New York through this important documentary evidence.

Each of these limitations, and the other limitations placed on jurisdictional discovery by

Defendants and the Court, prevented Plaintiffs from proffering additional evidence in support of

their *prima facie* case of jurisdiction.  If the Court deems any of these issues relevant or material

to the pending jurisdictional issues, then the Court must infer that if the requested documents and

information were favorable to Defendants they would not have resisted its production.  Thus, if

the Court finds that Plaintiff has not proffered sufficient facts at this stage, Plaintiffs are entitled

to an adverse inference against Defendants on each of the above subjects or, in the alternative,

then Plaintiffs should be granted additional discovery on these subjects.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Motions in their entirety and grant

Plaintiffs such other and further relief as the court deems appropriate

Dated: New York, New York
       January 15, 2015

                          Respectfully submitted,

                          SMITH VALLIERE PLLC

                          By:
                              Mark W. Smith, Esq.
                              Noelle Kowalczyk, Esq.


                          1221 Avenue of the Americas, 42nd Floor
                          New York, New York  10020
                          (212) 755-5200
                          msmith@svlaw.com
                          nkowalczyk@svlaw.com

                          *Attorneys for Plaintiffs*
                          *The Honorable Otto J. Reich*
                          *and Otto Reich Associates, LLC*

## CERTIFICATE OF SERVICE

I hereby certify this 15th day of January, 2015, that I caused a true and correct copy of the foregoing document to be served via electronic mail on the following attorneys of record.

Frank H. Wohl
Julia C. Green
Lankler Siffert & Wohl
500 Fifth Avenue, 34th Floor
New York, NY 10110
*Attorneys for Defendant Leopoldo Alejandro Betancourt Lopez*

Joseph A. DeMaria
Fox Rothschild LLP
200 South Biscayne Blvd.
Suite 3590
Miami, FL 33131
*Attorneys for Pedro Jose Trebbau Lopez*

Shawn Rabin
Susman Godfrey, L.L.P
560 Lexington Avenue, 15th Floor
New York, NY 10022
*Attorneys for Defendant Francisco D'Agostino Casado*

Mark W. Smith