Exhibit A to Mark W. Smith, Esq.
Declaration In Support of Plaintiffs' Motion
Pursuant To Fed. R. Civ. P. 15(a)(2) For
Leave To File Second Amended Complaint

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                     )

| | | |
|---|---|---|
| THE HONORABLE OTTO J. REICH and OTTO REICH ASSOCIATES, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | Civ. No. 13 CV 5307 (JPO) |
| v. | ) ) | Jury Trial Demanded |
| LEOPOLDO ALEJANDRO BETANCOURT LOPEZ, PEDRO JOSE TREBBAU LOPEZ, and FRANCISCO D'AGOSTINO CASADO, | ) ) ) ) | ECF CASE |
| Defendants. | ) ) | |

_____ )

### SECOND AMENDED COMPLAINT

Plaintiffs, the Honorable Otto J. Reich and Otto Reich Associates, LLC, by and through their attorneys Smith Valliere PLLC, for their Second Amended Complaint against Defendants Leopoldo Alejandro Betancourt Lopez, Pedro Jose Trebbau Lopez, and Francisco D'Agostino Casado, allege as follows:

### NATURE OF THE ACTION

1.     The Honorable Otto J. Reich ("Ambassador Reich") is the former U.S. Ambassador to Venezuela.  Over his long and distinguished career, Ambassador Reich served in prominent positions in the U.S. Department of State, focusing on Latin America and the Caribbean.  For his work as Ambassador, Reich was awarded the highest commendations of the U.S. Department of State.  Over his many decades of public service, Ambassador Reich worked to eliminate the cultures of corruption that plague many governments in Latin America.

Ambassador Reich has repeatedly spoken out against the corruption that became rampant in Venezuela under the regime of Hugo Chavez, and which continues to exist today.

2.      Since his retirement from government service in 2004, Ambassador Reich has continued to publicly condemn corruption in Venezuela and around the world, and to assist those who believe, as he does, in democracy, transparent government, and the rule of law. Ambassador Reich has written numerous articles, delivered speeches throughout the United States, and offered congressional testimony on the problems facing many Latin American countries.  Through his company Otto Reich Associates, LLC ("ORA"), Ambassador Reich has also consulted with a number of pro-democracy and anti-corruption organizations and individuals throughout the United States, assisting them in their public relations and business efforts here and abroad.  Many of those individuals and organizations are based in the United States and are vocal opponents of the current regime in Venezuela.

3.      Defendants are U.S. residents who have amassed enormous fortunes through an illicit scheme to secure energy-industry contracts in Venezuela for their various U.S.-based companies, Derwick Associates USA LLC and Derwick Associates Corporation (together with these companies' predecessors, successors, assigns and affiliates, "Derwick Associates"). Known in the press as the "ChavezKids," "BoliBoys," and "the mafiosi of the Fifth Republic," Defendants Leopoldo Alejandro Betancourt Lopez ("Betancourt"), Pedro Jose Trebbau Lopez ("Trebbau"), and Francisco D'Agostino Casado ("D'Agostino) have profited wildly from their ongoing acts of racketeering designed to exploit for their personal financial gain the corrupt and anti-democratic Chavez regime.

4.      Derwick Associates' "business model" is simple.  From their home base of operations in the United States, Defendants offer multi-million dollar kickbacks to public

officials in Venezuela in exchange for the award of energy-sector construction contracts. Once

the contracts are secured for themselves and Derwick Associates (and the money ultimately

transferred into bank accounts in New York), Defendants skim millions off the top, which they

deposit in U.S. banks. Defendants then subcontract out the actual work to be performed on site

to other U.S.-based companies, including one based in Missouri. Essential to the maintenance

and furtherance of Defendants' unlawful scheme are the strong-arm tactics they employ, which

are designed to ensure that their illicit activities remain concealed and uninterrupted. Thus,

Defendants' primary and ongoing business consists of an illegal scheme whereby Defendants

improperly obtain energy-sector contracts through bribery, farm out any legitimate work to be

performed pursuant to those contracts to their U.S.-based partners, and take all necessary steps to

conceal, protect and further their enterprise and acts of racketeering.

     5.     An indispensable and necessary element of Defendants' business model is

secrecy, which is an essential characteristic of any illegal bribery and corruption scheme. This is

especially true here where virtually any change to the status quo poses a material risk of

disrupting Defendants' ongoing racketeering operation.

     6.     Defendants run their illegal operation from their homes and offices in New York,

through various U.S.-based agents, and through their U.S.-based companies and relationships.

Defendants secured their first contract in 2009 and continue to actively "court" certain

Venezuelan and other government officials responsible for awarding new contracts. Within

approximately the past year, Derwick Associates registered with the United States government to

engage in lobbying activities in the United States. Defendants have also retained U.S.-based

professionals, including attorneys, specializing in reputation management, to intimidate members

of the U.S. media to prevent the dissemination of additional negative publicity about Defendants and Derwick Associates.

7.     Defendants' racketeering business has been a huge financial boon to Defendants Betancourt, Trebbau, and D'Agostino, all of whom have accumulated vast fortunes and enjoy lifestyles of extreme wealth in the United States.

8.     While rampant public corruption is a reality in Venezuela, not everyone stands silent.  In recent years, a number of respected individuals and institutions in the United States have begun to speak out against the "ChavezKids" and their ilk, intent on eliminating corruption in Venezuela.  Plaintiffs fall squarely within this category.  Fearing exposure and/or a disruption of the status quo, Defendants have taken extreme measures to, among other things, conceal their ongoing unlawful activities to ensure that no material adverse change in the status quo detrimentally affects their racketeering business.  Among other actions, Defendants have used the U.S. wires to commit wire fraud, deployed abusive business practices and threats, and have commenced lawsuits in U.S. courts, and used other improper means to silence their opponents. Several of these "opponents," as perceived by Defendants, include well-known journalists and authors who have previously been critical of Defendants (and Derwick Associates).  Defendants' efforts in this regard send an unmistakable message of intimidation to anyone who might threaten to expose their illegal practices or otherwise alter the status quo in a manner that would put at risk the perpetuation of Defendants' ongoing acts of racketeering.

9.     In September 2012, when Defendants became convinced that Banco Venezolano de Credito S.A. ("Banco Venezolano") and others had commenced a nascent campaign designed to shed light on their illegal scheme and expose their criminal enterprise, Derwick Associates and two of its principals, Betancourt and Trebbau, each individually, filed related civil lawsuits

for defamation in Florida and in New York against, among others, Banco Venezolano.  Banco Venezolano is one of the oldest and most respected banks in Venezuela, which does business in the United States.  The leaders of Banco Venezolano are known as vocal critics of the Chavez regime – so much so that Banco Venezolano refuses to do business with the Venezuelan government.

10.     In the Florida lawsuit, *Derwick Associates Corp., et al. v. Venezolano de Credito, S.A., et al.*, No. 12-36297-CA-11 (Cir. Ct. 11th Dist. Miami-Dade Co.) (hereinafter, the "Florida Defamation Suit"), Derwick Associates, Betancourt and Trebbau accused Banco Venezolano, its President and Board Chairman Oscar Garcia Mendoza, and others of defaming Derwick Associates by financing an anti-Chavez, anti-Derwick website, thus allegedly damaging Defendants' reputations.  In sum and substance, the "anti-Derwick" statements posted on the Internet and purportedly repeated in various news outlets accused Defendants of illegally amassing enormous fortunes arising from their obscene and illegal business arrangements with the Venezuelan government.

11.     The Florida and New York defamation suits were commenced to intimidate and stifle Defendants' critics who were accusing Defendants of corruption, bribery, money laundering, theft and unscrupulous business practices, among other things, and who had begun to call into question Defendants' youth, inexperience and connections within the Venezuelan government.  Tellingly, Defendants did not commence suit in Venezuela but, rather, in the United States, reflecting the centrality of the U.S. to their racketeering activities.

12.     In the Florida Defamation Suit, Defendants sought the outrageous sum of *$300 million*, a clear effort to bully the bank into quiescence and prevent others from threatening to expose or otherwise adversely alter their scheme.  The Florida and New York lawsuits were also

intended to provide comfort to Defendants' New York bankers and money managers who had undoubtedly heard the allegations that were the subject of the Florida Defamation Suit and were presumably expressing concerns about whether to continue their relationships with Defendants.

13.     To Defendants' surprise, Banco Venezolano did not immediately bow to the pressure of the lawsuit.  Instead, Banco Venezolano fought the Florida Defamation Suit vigorously by seeking to prove the truth of the allegations being made about Defendants.  Soon after that lawsuit was commenced, the bank sought immediate discovery including the deposition of a representative of Derwick Associates in the United States concerning the alleged defamatory statements, which centered on Defendants' acts of racketeering.  That deposition was scheduled to occur on December 19, 2012, but no representative of Derwick Associates appeared for the deposition.  Instead, Derwick Associates moved for a stay of discovery and protective order.  Needless to say, it is atypical for an earnest plaintiff to seek to stay discovery and thus intentionally delay its opportunity to prove its case.

14.     Defendants anticipated that Banco Venezolano would "roll over" in the face of the $300 million lawsuit.  Upon information and belief, Defendants anticipated a quick and favorable settlement, which Defendants would trumpet to their accusers as an example of what happens to Defendants' critics.  When Banco Venezolano refused to knuckle under, Defendants grew concerned that the Florida Defamation Suit might have the opposite effect of what they intended.  Publicity surrounding the lawsuit had raised considerably Defendants' (and Derwick Associates') profiles in the national and international media and now discovery in that lawsuit threatened to expose, at a minimum, details concerning Defendants' procurement of the energy-sector contracts.  From the Defendants' point of view, their situation was potentially about to become worse.

15.     As the former United States Ambassador to Venezuela and a preeminent expert on Venezuela and corruption in its government, Ambassador Reich has an impressive resume and a wealth of contacts and relationships throughout the United States/Venezuelan community. He has a loyal following in the United States, including within the U.S. Department of State, and his actions are also closely monitored by the corrupt government of Venezuela, as well as many other U.S. public officials, private opinion-makers, and public policy influencers.

16.     Given Ambassador Reich's perceived and actual stature, reputation and influence both in the public and private sectors in the United States and Venezuela, it should not be surprising that, within months of the commencement of the Florida Defamation Suit, Defendants offered to pay Ambassador Reich and his company "a lot of money" if they would agree to work for Derwick Associates.  By their actions, Defendants sought to "buy off" a potential critic and formidable adverse expert witness who would otherwise bring unwanted attention to their coordinated unlawful activities.

17.     A relationship with Ambassador Reich, a well-regarded former United States Ambassador to Venezuela and a preeminent expert on that country, would have been incredibly beneficial to Defendants.  In Defendants' view, retaining Plaintiffs would preclude Ambassador Reich from actively working against them.  Defendants also believed that, if Ambassador Reich were aligned with them, his endorsement might help sway public opinion in their favor.  In the long term, Defendants believed that an alliance with Ambassador Reich would help maintain the very lucrative status quo by eliminating at least one potential threat to their ongoing racketeering activities that was being advanced by Banco Venezolano.  Plaintiffs refused to work for Derwick Associates.

18.     When Defendants learned that Banco Venezolano sought to retain Ambassador Reich and his U.S.-based consultancy, ORA, to, among other things, help defend against Defendants' allegations in the Florida Defamation Suit, Defendants reacted by committing multiple acts of wire fraud in violation of 18 U.S.C. § 1343 in an attempt to prevent the disclosure and termination of their illegal acts of racketeering.

19.     Defendants perceived Ambassador Reich's potential engagement by Banco Venezolano to be a direct threat to Defendants' then-existing, multi-year and ongoing pattern of racketeering, which included their campaign of intimidation against Banco Venezolano (and others).

20.     Rightly or wrongly, Defendants perceived that the union of a respected financial institution, on the one hand, and a highly-regarded and well-connected former U.S. government official, on the other hand, would pose an immediate threat of revealing Defendants' unlawful activities or otherwise altering the status quo in some materially adverse manner.  More specifically, Defendants feared that a business alliance between Banco Venezolano and Ambassador Reich would undercut their claims in the Florida Defamation Suit and reveal the unholy alliance between Defendants and certain Venezuelan government officials.  Ambassador Reich's involvement in the Florida Defamation Suit would also have the unwanted consequence of drawing heightened attention to the subject matter of and allegations underlying that litigation and, by extension, to the activities, relationships, and practices of Defendants and Derwick Associates.  Given these actual and perceived risks, Defendants embarked upon an intentional and unlawful effort to drive a wedge between Banco Venezolano and Ambassador Reich. Defendants Betancourt, Trebbau, and D'Agostino conspired to discredit Ambassador Reich in

the eyes of Banco Venezolano in the most effective way they knew how – tying Ambassador

Reich to Derwick Associates.

21.     In a series of telephone calls placed from or caused to be placed from New York

in late 2012, Defendants and their agents (at Defendants' direction) fraudulently told officials of

Banco Venezolano and others in the small Venezuelan émigré community in the U.S. that

Ambassador Reich was working for Derwick Associates.  That was blatantly false and was

known by Defendants to be false.

22.     Nevertheless, the fraud worked.  Once Banco Venezolano heard that its potential

consultant was working for the people who were suing it (and who had profited from the corrupt

Chavez regime), Banco Venezolano pulled out of its agreement with ORA.  At the same time,

another client of ORA, a well-regarded U.S.-based businessman named Eligio Cedeño

("Cedeño") (who himself has long been an enemy of the corrupt Chavez regime) also terminated

his contractual and financial relationship with ORA.  Cedeño, like the bank, had also been told

(falsely) by Defendants that Ambassador Reich was working for Derwick Associates, including

in connection with a project in Panama.  Taken together, the loss of those agreements and

business relationships deprived Plaintiffs of a substantial amount of money and property.

Additionally, Defendants tarnished the reputation of an American citizen who has spent decades

decrying corrupt business practices of individuals like Betancourt, Trebbau and D'Agostino.

23.     By their wire fraud, Defendants not only sought to deprive Plaintiffs of money

and property, but Defendants simultaneously intended and endeavored to obtain money or

property in various forms including, but not limited to, property in the form of their own contract

with Ambassador Reich and ORA; property in the form of a judgment against Banco Venezolano

(and/or the other defendants in the Florida Defamation Suit) by eliminating Ambassador Reich,

whom Defendants perceived to be a formidable adverse expert witness; and/or property in the form of a settlement agreement with Banco Venezolano and/or one or more of the other defendants in the Florida litigation. Defendants also intended to benefit monetarily by procuring additional money and illicit contracts arising from the perpetuation and furtherance of their racketeering activities once Defendants eliminated any perceived threat of publicity or exposure arising from Ambassador Reich's involvement in the Florida Defamation Suit or his cooperation with Banco Venezolano.

24.     Defendants' racketeering efforts, including their scheme to bribe foreign public officials from their lap of luxury in the United States and cover up their actions here in the United States, violates federal law, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq*. Defendants engaged in a pattern of racketeering activity that violated, among other laws, the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1, and the federal wire fraud statute, 18 U.S.C. § 1343. Defendants' racketeering activity is ongoing.

25.     Defendants' actions also constitute a violation of various state laws. Defendants intentionally targeted ORA and specifically sought to deprive Ambassador Reich and ORA of their business property and cash through a fraudulent scheme designed to perpetrate lies about Ambassador Reich and ORA, thereby interfering with and destroying Plaintiffs' U.S.-based and U.S.-focused business arrangements with Banco Venezolano and Eligio Cedeño. Defendants' willful and fraudulent actions have caused substantial damage to Ambassador Reich's and ORA's business and property.

26.     In the Court's Decision and Order dated August 18, 2014, the Court found that Plaintiffs had alleged adequately predicate acts under RICO for violation of the Travel Act/FCPA.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1332 (diversity jurisdiction); and 18 U.S.C. § 1964 (Racketeer Influenced and Corrupt Organizations Act).  The amount in controversy here exceeds $75,000.

28.     Further, pursuant to 18 U.S.C. § 1965(b), the ends of justice require that the Court exercise personal jurisdiction over any Defendant who claims not to have contacts with this forum.  Defendants engaged in a multi-district conspiracy to defraud and discredit Ambassador Reich.  This Court has personal jurisdiction over most, if not all, of the alleged co-conspirators, and each and every one of the alleged co-conspirators here has previously availed themselves of the courts in New York to vindicate their legal rights.

29.     This Court has supplemental jurisdiction over the state causes of action pursuant to 28 U.S.C. § 1367(a), as those state law causes of action arise out of the same nucleus of operative facts, which support the federal claims.

30.     Venue is proper in the Southern District of New York under 18 U.S.C. § 1965 and 28 U.S.C. § 1391, in that each Defendant owns property, conducted business, and/or has been found in the Southern District of New York during the relevant time periods.  A substantial portion of the communications, transactions, and events underlying Plaintiffs' claims occurred in this judicial district.

## PARTIES

### *Plaintiffs Otto J. Reich and Otto Reich Associates, LLC*

31.      Plaintiff Otto J. Reich is a citizen of the United States.  When this lawsuit was commenced, he was domiciled in the State of Virginia.

32.      Plaintiff ORA is a Virginia limited liability company with its principal place of business located at 1001 Pennsylvania Avenue, 11th Floor, Washington, DC.  ORA regularly conducts business in the United States, including in New York, Florida, Maryland and Virginia.  ORA and Ambassador Reich regularly conduct business in the Southern District of New York, and conducted business in this judicial district during the relevant time periods as described in this Second Amended Complaint.  Ambassador Reich is the founder and principal of ORA.  Ambassador Reich is and always has been the sole owner and member of ORA.

33.      At all relevant times, Plaintiffs were "persons" within the meaning of that term as defined by 18 U.S.C. § 1961(3).

### *Defendants Betancourt, Trebbau, and D'Agostino*

34.      Defendant Leopoldo Alejandro Betancourt Lopez ("Betancourt") is a citizen of Venezuela who resides primarily in the United States.  Betancourt was born in 1980 and is 35 years old.  He is a graduate of Suffolk University in Boston, Massachusetts.  On the date of the first energy contract awarded to Derwick Associates, Betancourt was only 29 years old.

35.      Upon information and belief, during the relevant time period, Betancourt owned a home located at the famous Olympic Tower, 641 Fifth Avenue, Penthouse 6, New York, New York 10022, where he continues to reside today.  Betancourt also, upon information and belief, owns real and other property in Florida.  Upon information and belief, during the relevant time period (and continuing today), Betancourt regularly conducted business from New York, including from his home in New York and offices located in New York.

36.     Defendant Pedro Jose Trebbau Lopez ("Trebbau") is a citizen of Venezuela who resides primarily in the United States.  Trebbau was born in 1983 and is 31 years old.  He is a graduate of Boston College in Massachusetts.  On the date of the first energy contract awarded to Derwick Associates, Trebbau was only 26 years old.

37.     Upon information and belief, during the relevant time period (and continuing today), Trebbau regularly conducted business from New York.  During the relevant time period (and continuing today), Trebbau owned property in Florida.

38.     Defendant Francisco D'Agostino Casado ("D'Agostino") is a dual citizen of Venezuela and Spain who resides primarily in New York, New York.  D'Agostino graduated from Boston College in Massachusetts.  Upon information and belief, during the relevant time period (and continuing today), D'Agostino owned a home located at 82 Elm Street, Southampton, New York 11968.  Upon information and belief, D'Agostino currently resides at 10 East 75th Street, New York, New York 10021 and formerly resided in the Penthouse Apartment at 807 Park Avenue, New York, New York.

39.     During the relevant time period (and continuing today), D'Agostino regularly conducted business from New York.  Upon information and belief, D'Agostino conducted business in New York from his homes in New York and from offices located in New York.  According to a U.S. Securities and Exchange Commission filing, D'Agostino is the owner of a U.S. investment company with offices in New York City.

**_Defendants are Subject to Jurisdiction in New York_**

40.     This Court has personal jurisdiction over Defendant D'Agostino, who resides in New York, and who was served personally with the Summons and Complaint (the "Original Complaint") in this action at his home located at 82 Elm Street, Southampton, New York.  As

long as this Court has personal jurisdiction over any one Defendant, it has jurisdiction over each

other Defendant alleged to be part of the RICO conspiracy.

41.     Defendant Betancourt only evaded personal service in New York as a result of his

quick-thinking doorman.  When the professional process server attempted to serve him at his 641

Fifth Avenue residence on July 31, 2013, the doorman admitted that Defendant Betancourt "was

home."  Only after discovering that the process server was there to serve legal papers, did the

doorman say that Betancourt was "not home."  Betancourt's longtime New York corporate

counsel, who is located in Manhattan, subsequently accepted service on Betancourt's behalf.

42.     Even absent personal service on D'Agostino, Defendants have minimum contacts

with New York sufficient to subject them to general jurisdiction in this forum.  As detailed more

fully below, each Defendant owns property, conducts business, and/or has been found in New

York during the relevant time periods.  New York is also where a substantial portion of the

communications, transactions, and events underlying Plaintiffs' lawsuit occurred.  Each

Defendant has engaged in a continuous and systematic course of doing business in this forum

during the relevant period.

43.     Defendants are also subject to specific jurisdiction in this forum for many reasons,

not the least of which is that each Defendant and/or his agent has purposefully availed himself of

the privilege of transacting business within the state.

44.     Indeed, Defendants should reasonably expect to be haled into court in this forum

having invoked the benefits and protections of the New York courts and New York State laws.[1]

---

[1]     D'Agostino is no stranger to the New York courts.  In *D'Agostino v. 813 Park Avenue Holdings, LLC, et al.* (Supreme Court of the State of New York, County of New York), Index No. 160750/13 (the "Park Avenue Action"), D'Agostino sought over $325,000 plus treble damages and attorneys' fees concerning a lease dispute over his former penthouse residence at 807 Park Avenue, New York, New York.  D'Agostino is being represented by New York lawyer Lawrence E. Fabian ("Fabian"), who has represented and presumably been paid by D'Agostino in

On September 24, 2012, less than two weeks after commencing the Florida Defamation Suit, Defendants Betancourt and Trebbau and Derwick Associates commenced a related litigation in New York State court alleging, among other things, claims for defamation like in the Florida Defamation Suit.  *See Derwick Associates Corp., et al. v. John Does 1-10* (Supreme Court of the State of New York, County of New York), Index No. 653345/12 (hereafter, the "New York Defamation Suit").  That action was brought against "John Does 1-10" who were defined as "unknown defendant co-conspirators [of the bank defendants in the Florida Defamation Suit] who participated in the conspiracy and campaign to disseminate false and defamatory information about" Betancourt, Trebbau and Derwick Associates.  Like the Florida Defamation Suit, the New York Defamation Suit sought damages for "egregiously false and defamatory statements" allegedly posted by those defendants and that were "intended to … destroy [Betancourt, Trebbau and Derwick Associates'] current and prospective business and banking relationships, which are indispensable to the operation, expansion and success of Derwick."

45.     Plaintiffs' claims here put squarely at issue Defendants' allegedly unlawful business practices, which were also at the factual heart of the Florida and New York defamation suits.  The subject matter of the Florida and New York defamation suits are the same as the instant suit, and the operative facts largely overlap.

46.     Betancourt, Trebbau and Derwick Associates hired a New York law firm to represent their interests in the Florida Defamation Suit and the New York Defamation Suit (the

---

the Park Avenue Action and various other suits over the last six years.  It has been reported that, on or about October 2007, Fabian represented D'Agostino in a $100,000 breach of contract action arising from D'Agostino's lease of a waterfront home in Sag Harbor, New York.  D'Agostino also availed himself of the jurisdiction of this Court in *D'Agostino v. American Express Centurion Services Corp.* (United States District Court for the Southern District of New York), Civ. No. 09 CV 4683, where he alleged violations of the federal Truth in Lending Act arising from an alleged improper charge of $65,000 on D'Agostino's American Express Centurion Card (also known as the "AmEx Black Card," which is reportedly one of the most exclusive charge cards in the world).  Fabian represented D'Agostino in that lawsuit.

"New York Counsel").  In fact, simultaneously with the filing of the Florida complaint and the issuance of the summonses, New York Counsel filed motions for *pro hac vice* on behalf of three of their New York lawyers demonstrating that both the Florida and New York defamation suits (and all strategies and decisions concerning the same) would be assessed in and executed from New York.  Upon information and belief, in connection with that representation, Defendants Betancourt and Trebbau executed retainer agreements in at least their personal capacities with New York Counsel; paid legal fees to New York Counsel in New York in U.S. dollars; and regularly communicated with New York Counsel either in person at their attorneys' offices in New York or through phone calls, electronic mail or facsimile communications directed to New York.

47.     Upon information and belief, virtually all legal work undertaken in connection with the Florida and New York Defamation Suits was conducted primarily, if not exclusively, by Betancourt and Trebbau's New York Counsel.  Thus, all decisions concerning the commencement, prosecution and eventual settlement of the claims brought in the Florida and New York defamation suits were made by New York Counsel in New York.  Such strategic decisions would have included, at the most basic level, who to sue, where to sue, when to sue, an evaluation of potential claims and likely defenses, an assessment and determination of damages (*$300 million* in the Florida Defamation Suit), discovery to be sought and how best to respond to discovery demands, and, of course, settlement recommendations and negotiations.  New York Counsel also would have recommended and evaluated potential experts to be retained by Betancourt, Trebbau and Derwick Associates and developed a list of likely candidates.  Upon information and belief, such New York-based discussions certainly would have included mention

of Ambassador Reich who would have been on the "short list" of potential experts to be considered or otherwise addressed.

48.     Prior to October 2013, New York Counsel represented Betancourt in this litigation.  Although Betancourt has since retained yet another New York law firm, New York Counsel continue to monitor this case, including by sending an attorney from the firm to observe this Court's conference on December 17, 2013.

49.     Further, upon information and belief, each Defendant is a principal of Derwick Associates and, thus, Derwick Associates' contacts with New York are attributable to each Defendant where Derwick Associates engaged in purposeful activities in New York; Derwick Associates' activities were performed for the personal benefit of each of the Defendants and with the knowledge and consent of each of the Defendants; and each of the Defendants exercised, operated and managed Derwick Associates.

50.     Plaintiffs incorporate by reference the factual and legal predicates demonstrating the existence of personal jurisdiction over Defendants Betancourt and Trebbau as set forth more fully in Plaintiffs' Statements of Jurisdictional Facts appearing on the Court's ECF docket at numbers 120 (filed under seal), 148, 149, and 150.  Because the Court may take judicial notice of the evidence and materials set forth therein and on the Court's docket, which support the exercise of personal jurisdiction over these Defendants, Plaintiffs shall not repeat those factual statements here.

## DETAILED ALLEGATIONS

***Former Ambassador Otto Reich is a Distinguished***
***Individual Who Has Been Outspoken About Corruption in Venezuela***

51.     United States Ambassador Reich was born in Cuba.  In 1960, shortly after Fidel Castro came to power, he moved to the United States with his family.  After college, he joined

the U.S. Army, serving as a lieutenant in the U.S. Army's 3rd Civil Affairs Group (Airborne), Panama Canal Zone.

52.     From 1981 to 1983, Ambassador Reich was Assistant Administrator of the U.S. Agency for International Development (USAID) in charge of U.S. economic assistance to Latin America and the Caribbean.  From 1983 to 1986, he served as Special Advisor to the Secretary of State, where he directed the Office of Public Diplomacy for Latin America and the Caribbean.

53.     From 1986 to 1989, Ambassador Reich served as U.S. Ambassador to Venezuela. For his work as Ambassador, Reich was awarded the highest commendations of the U.S. Department of State.  In 1991 and 1992, as a private citizen and at the request of President George H. W. Bush, Ambassador Reich served as Alternate U.S. Representative to the United Nations' Human Rights Commission in Geneva.  During his long career, Ambassador Reich has also served as Washington Director of the Council of the Americas, Community Development Coordinator for the City of Miami, and International Representative of the State of Florida Department of Commerce.

54.     In 2001, Ambassador Reich was appointed by President George W. Bush to be the Assistant Secretary of State for Western Hemisphere Affairs.  In 2003, he became the President's Special Envoy for Western Hemisphere Initiatives, and a Senior Staff member of the National Security Council.  Ambassador Reich retired from government service in June 2004.

55.     Following his exit from government service, Ambassador Reich focused full-time on ORA, which is a Washington, D.C.-based consulting firm providing government relations, trade, investment, and anti-corruption advice, primarily to U.S.-based clients.  ORA's services are sought mainly by U.S.-based businesses and organizations with operations in Latin America, who believe similarly to Ambassador Reich that foreign corruption is a threat to their honest

business efforts, and who seek to protect themselves against undue influence by foreign public

officials, and need assistance navigating industries in which competitors may be benefiting from

corruption.  Indeed, Ambassador Reich markets himself as a fighter of corruption in Latin

America.  On ORA's website, it states that "ORA also protects corporations from the constant

threat of corruption throughout [Latin America].  We use our experience and knowledge of U.S.

policy to defend clients' interests against improper business practices and undue influence by

public and private officials."[2]

56.     Ambassador Reich appears regularly in the U.S. media, and has spoken

extensively about the political situation in Venezuela, including about public corruption in the

Venezuelan energy sector.  Ambassador Reich has described himself as "very critical of the

organized crime enterprise misruling Venezuela."[3]

### *Derwick Associates is a U.S.-based Enterprise that is Managed and Directed From the United States by Defendants Betancourt, Trebbau, and D'Agostino*

57.     At all relevant times, Defendants Betancourt, Trebbau, and D'Agostino worked

together as each other's agents and partners, and were the owners and/or officers, directors, or

operators of Derwick Associates USA LLC and Derwick Associates Corporation, and these

entities' predecessors, successors, assigns and affiliates ("Derwick Associates").

58.     As part of their pattern of racketeering activity, Defendants direct, control and

coordinate virtually all aspects of global strategy, as well as the day-to-day activities of Derwick

---

[2]      *See* ORA's website, *available at*
http://www.ottoreich.com/www.ottoreichassociates.com/Capabilities_%26_Services.html (last accessed January 12, 2014).

[3]      *See* Otto J. Reich, "Rebutting Maduro's Malicious Allegations," Americas Forum, March 19, 2013, *available at* http://www.americas-forum.com/otto-reich-rebutting-maduros-malicious-allegations/ (last accessed January 9, 2014).

Associates, from their offices and homes in New York and Florida.  It is from these locations

that decisions are made concerning Derwick Associates, all the while using the U.S. wires.

59.     In a court filing in the Florida Defamation Suit, Defendant Betancourt stated that

he is "co-founder and President of Derwick … [and] is responsible for the origination,

structuring and execution of all Derwick projects, and has primary responsibility for the

management of Derwick Associates' relationships with its clients, suppliers, and regulators."

60.     Also in the Florida Defamation Suit, Defendant Trebbau stated that he is "co-

founder and Vice President of Derwick … [and] has primary responsibility for the supervision of

operations of all projects, and is directly responsible for the execution of large EPC contracts in

Venezuela … [and] managing *the day-to-day relationships with Derwick's international banks*"

(emphasis added).  Upon information and belief, the banks with which Trebbau has "day-to-day

relationships" are the New York-based J.P. Morgan, which has its headquarters on Park Avenue

in New York, New York, and the Davos Financial Group, which is located on Park Avenue in

New York, New York.

61.     Derwick Associates holds itself out as being in the business of providing

engineering, procurement and construction services involving power plants to the government of

Venezuela.  Yet, Derwick Associates itself lacks the technology and engineering wherewithal to

engage in or evaluate such large-scale, heavy duty industrial projects.  By Defendants' own

admissions, Derwick Associates relies heavily on several U.S.-based companies, including

General Electric, Pratt & Whitney, and ProEnergy Services, LLC ("ProEnergy Services") to

provide the materials and services needed to construct the power plants.

62.     ProEnergy Services, the company believed to do all the actual construction and

operation of Derwick Associates' facilities, has long been headquartered in Missouri and has

since 2008 been licensed to do business in New York.  General Electric is a New York Stock Exchange-traded company headquartered in Connecticut.  Pratt & Whitney is based in Connecticut and is owned by United Technologies, another New York Stock Exchange-traded company.

63.     During the relevant time period, Derwick Associates USA LLC ("Derwick Associates USA") was registered as a Florida Limited Liability Company, FEI/EIN No. 274195456.  Derwick Associates USA has a place of business located at 1050 Lee Wagner Boulevard, Suite 200-201, Fort Lauderdale, Florida 33315.

64.     During the relevant time period, Defendant Betancourt was on file with the State of Florida as Derwick Associates USA's registered agent, and Defendants Betancourt and Trebbau were on file with the State of Florida as Manager/Members of Derwick Associates USA.

### *Corruption in Venezuela's Government Contracting and Energy Sector*

65.     Bribing public officials is illegal in Venezuela.  Nevertheless, the country has become a breeding ground for public corruption, especially when it comes to the awarding of public contracts.

66.     To illustrate, on March 9, 2015, the President of the United States issued an Executive Order sanctioning certain Venezuelan government officials for, among other things, significant public corruption.

67.     As further noted by the U.S. Department of State and others:

- The U.S. Department of State recognizes Venezuela as being corrupt and of risk to companies seeking to do business there.  As stated in its *2013 Investment Climate Statement* on the country, the State Department warns U.S. businesses that "Venezuela's regulatory system lacks transparency and suffers from corruption," and notes that "Venezuela has not adopted the

OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions."[4]

- Venezuela is ranked number 165 out of 176 nations in the world in Transparency International's 2012 "*Corruption Index*"; in other words, Venezuela is one of the eleven worst countries in the world in terms of public corruption. Transparency International also described Venezuela's public budget transparency as "minimal."[5]

- As noted by the U.S. Department of State, "[i]n 2012, Venezuela ranked 174 out of 177 in the Heritage Foundation's Index of Economic Freedom."[6]

- In 2012, *The New York Times* noted that "[t]he story of how power failures can plague Venezuela even though it boasts some of the world's greatest natural gas reserves and massive hydroelectric dams is the Chávez years in miniature — a heady cocktail of ideological rigidity, corruption and mismanagement."[7]

68.     The U.S. government has identified and acted on many U.S.-based kickback schemes designed to exploit the Venezuelan market. Indeed, unwilling to tolerate bribery and kickbacks by U.S.-connected persons operating in Venezuela, the U.S. government has acted to hold such people accountable. For instance, in 2008, the SEC brought a civil enforcement action against a foreign unit of Siemens in the Southern District of New York, alleging violations of the Foreign Corrupt Practices Act for paying bribes to government officials who "had influence over" the public contracting process in Venezuela to build metro transit lines.

---

[4]     *See* United States Department of State, *2013 Investment Climate Statement – Venezuela, available at* http://www.state.gov/e/eb/rls/othr/ics/2013/204759.htm (last accessed April 24, 2015).

[5]     *See* Transparency International *2012 Corruption Index*, *available at* http://www.transparency.org/country#VEN_DataResearch_SurveysIndices (last accessed April 24, 2015).

[6]     *See* United States Department of State, *2013 Investment Climate Statement – Venezuela*, *available at* http://www.state.gov/e/eb/rls/othr/ics/2013/204759.htm (last accessed April 24, 2015).

[7]     *See, e.g.,* "Full of Gas," *The New York Times/International Herald Tribune*, Sept. 21, 2012, *available at* http://latitude.blogs.nytimes.com/2012/09/21/chavezs-electric-power-problem/ (last accessed April 24, 2015) (emphasis added). Besides corruption in the public contracting sector, the Venezuelan government suffers from corruption in its justice and police systems. For instance, the U.S. Department of State warns travelers that "the criminal threat level for Caracas [is] CRITICAL," due in part to "poorly paid and often corrupt police [and] an inefficient politicized judiciary." U.S. Department of State, *Venezuela 2012 Crime and Safety Report*, *available at* https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=13038 (last accessed April 24, 2015).

69.     In May 2013, the U.S. Department of Justice filed criminal charges in the Southern District of New York against two U.S.-based broker-dealers, Alberto Clarke Bethancourt and Jose Alejandro Hurtado, for conspiring to pay bribes to a Venezuelan public official in exchange for financial trading business.  According to the U.S. government, "defendants in this case allegedly paid huge bribes so that foreign business would flow to their firm … defendants' arrests lay bare a web of bribery and corruption in which employees of a U.S. broker-dealer allegedly generated tens of millions of dollars through transactions in order to fund kickbacks to a Venezuelan government official in exchange for her directing the Venezuelan economic development bank's financial trading business to their employer."[8]  In August 2013, Alberto Clarke Bethancourt and Jose Alejandro Hurtado pleaded guilty in New York federal court (Southern District of New York) for their roles in the bribery schemes.

70.     On October 14, 2013, it was reported that two Spanish officials were charged with approving $30 million in kickbacks to two former Venezuelan military officers, in exchange for their assistance in securing Venezuela's purchase of eight military vessels.  According to the report, the contract prices for the vessels were massively inflated to supply the money needed to fund the kickbacks.[9]

71.     Things are no different today in Venezuela's energy sector, which is rife with opportunity for parties willing to "pay to play."

---

[8]     *See* U.S. Department of Justice Press Release, May 7, 2013, *available at* http://www.justice.gov/opa/pr/2013/May/13-crm-515.html (last accessed April 24, 2015).

[9]     *See* El Universal, Former Spanish officials charged with payment of kickbacks in Venezuela," October 14, 2013, *available at* http://english.eluniversal.com/economia/131014/former-spanish-officials-charged-with-payment-of-kickbacks-in-venezuel (last accessed April 24, 2015).

***Defendants, From the United States and Through***
***Derwick Associates, Exploit the Opportunity for Corruption in Venezuela***

72.     Defendants use Derwick Associates to secure inflated public contracts in Venezuela, paying public officials large payments in exchange for awarding them contracts, and unjustly enriching themselves in the process.

73.     In the Florida Defamation Suit discussed above, Defendants Betancourt and Trebbau admit that "[b]etween 2009 and 2010, Derwick [Associates] submitted more than 25 bids on EPC projects and received EPC contracts on twelve of those projects."

74.     The truth, of course, is far more complicated (and much less flattering to Defendants).  As discussed in more detail below, from 2009 to 2010, Derwick Associates obtained at least a dozen energy-sector contracts valued at approximately *$1 billion* from agencies of the Venezuelan government, secured via illegal bribes, kickbacks and other unlawful activities, all in violation of United States law.

75.     Because the factual particulars concerning Defendants' illicit schemes are peculiarly within the knowledge, possession and control of Defendants (and their co-conspirators), and because Defendants have every incentive to keep their transactions secret so as to prevent criminal prosecution and enable them to continue their profiteering, it is impossible to plead the granular details of Defendants' scheme.  Indeed, commentators have noted that an essential characteristic of a bribery and corruption scheme is maintaining the secrecy of the scheme:  "[corruption] is obviously a dangerous and seductive form of immorality:  it is difficult to detect, for it is in the interest alike of the giver and the receiver of the corrupt gift to keep the thing secret." [10]

---

[10]     *See, e.g.*, LISSACK AND HORLICK ON BRIBERY, § 1.18, at 6 (2011) (citation omitted).

76.     However, Plaintiffs have been able to uncover enough information to allege the following facts concerning Defendants' U.S.-conceived and executed pattern of racketeering activity.

**A.      Petroleos de Venezuela, S.A.**

77.     Petroleos de Venezuela, S.A. ("PDVSA") is the Venezuelan state-owned corporation responsible for the nation's energy production.

78.     PDVSA has come under heavy scrutiny for years regarding its disorganization, inefficiency, and corruption, and has been the subject of multiple U.S. securities enforcement and civil litigation proceedings concerning bribes and kickbacks given to or solicited by PDVSA officials:

- In March 2015, the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a report (the "FinCEN Report"), which found that (i) a high-level manager at Andorra-based Banca Privada d'Andorra (BPA) had accepted exorbitant commissions to process transactions related to Venezuelan third-party money launderers; (ii) this activity involved the development of shell companies and complex financial products to siphon off funds from Venezuela's public oil company PDVSA; and (iii) BPA processed approximately $2 billion in transactions related to this money laundering scheme.[11]

- In 2012, a court-appointed receiver in Connecticut filed suit in U.S. District Court for the District of Connecticut, alleging that the head of a U.S. asset management company paid millions of dollars in kickbacks to a senior PDVSA official in exchange for approval of certain financial transactions with the PDVSA. *Carney v. Illarramendi, et al.,* No. 12-cv-00165 (D. Conn. 2012).

- In 2010, the Securities and Exchange Commission filed suit against Joe Summers, a U.S.-based operations manager for a BVI-based oil drilling company, alleging that he authorized payments to PDVSA officials in exchange for drilling contracts, in violation of the Foreign Corrupt Practices Act. *SEC v. Summers*, No. 10-cv-02786 (S.D. Tex. Aug. 5, 2010).

---

[11]     *See* FinCen March 10, 2015 Press Release, available at http://www.fincen.gov/news_room/nr/pdf/20150310.pdf (last accessed April 23, 2015).

- In 2009, the Securities and Exchange Commission filed suit against Bobby Benton, a U.S.-based operations manager for an oil drilling company, for authorizing payments to PDVSA officials in exchange for drilling contracts, in violation of the Foreign Corrupt Practices Act. *SEC v. Benton*, No. 09-cv-03963 (S.D. Tex. Dec. 10, 2009).

- In 2008, PDVSA was sued by a Miami-based food company, which alleged that PDVSA cancelled contracts with it after the company refused to pay $2 million in bribes.

79.     In 2010, PDVSA's penchant for corruption again asserted itself in connection with its solicitation of construction contracts.  In mid-2010, PDVSA awarded contracts to Derwick Associates for the construction of four power plants in Venezuela.  The plants in question were to be located in the cities of Las Morochas, Barinas, El Furrial, and El Morichal.

80.     These contracts were not the subject of a public bidding process – a tell-tale mark of impropriety.  Indeed, in its resource manual for combatting foreign bribery by U.S.-based businesses, the Criminal Division of the U.S. Department of Justice and the Enforcement Division of the U.S. Securities and Exchange Commission specifically highlight non-public bids as a common red-flag for bribery of foreign officials.[12]

81.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino agreed amongst themselves to attempt to entice and influence Venezuelan officials to award the contracts to Derwick Associates by way of offering kickbacks to those officials.  Upon securing the inflated contracts, Derwick Associates would subcontract out the work to various U.S.-based companies, including Missouri-based and New York-licensed ProEnergy Services, who would do substantially all of the actual construction.  Derwick Associates, having done nothing beyond illegally procuring the contracts, would keep a substantial percentage of the contract proceeds for itself and its principals.

---

[12]     *See* U.S. Department of Justice, *FCPA:  A Resource Guide to the Foreign Corrupt Practices Act*, *available at* http://www.justice.gov/criminal/fraud/fcpa/guide.pdf (last accessed January 9, 2014).

82.     Although the exact details of the PDVSA kickback scheme (including the amount of the kickback and the dates it was offered and paid) remain shrouded in secrecy given the nature of the crimes, it is believed that through an individual named Francisco Convit-Guruceaga ("Convit-Guruceaga") (who is Defendant Betancourt's first cousin and also a part owner of Derwick Associates), Defendants Betancourt, Trebbau, and D'Agostino contacted Nervis Villalobos ("Villalobos"), a former Vice Minister of Energy, about obtaining the contracts to build the plants.

83.     Upon information and belief, Convit-Guruceaga, pursuant to Defendants' instructions, told Villalobos to extend an offer of a substantial payment on their behalf to Rafael Ramirez ("Ramirez"), President of PDVSA, in order to award the construction contracts to Derwick Associates.  Upon information and belief, Villalobos did so, and Ramirez accepted the offer.  Upon information and belief, according to flight manifest records, Nervis Villalobos has flown on Derwick Associates' private jet to and from Venezuela.[13]

84.     As a result, PDVSA awarded the following four contracts to Derwick Associates:

- On April 30, 2010, PDVSA awarded to Derwick Associates the contract for the Las Morochas facility;

- On November 21, 2010, PDVSA awarded to Derwick Associates the contract for the El Furrial facility;

- On November 21, 2010, PDVSA awarded to Derwick Associates the contract for the El Morichal facility; and

- On November 23, 2010, PDVSA awarded to Derwick Associates the contract for the Barinas I facility.

---

[13]     *See* Cesar Batiz, *La Historia intima de Derwick,* October 12, 2012, Últimas Noticias, *available at* http://settysoutham.files.wordpress.com/2012/12/yahoo-cache-on-la-historia-c3adntima-de-de-idad-c3baltimas-noticias.pdf (last accessed April 24, 2015).

85.     The final contract prices were never publicly released by the Venezuelan government.  However, it has been reported that the final contract price for the Barinas I facility was $242.3 million.

86.     Upon receipt of the contracts, Defendants subcontracted with a U.S. company to perform the work, the Missouri-based and New York-licensed ProEnergy Services.  Upon information and belief, the monies that Derwick Associates received from the contracts were wired to accounts at J.P. Morgan and Davos Financial Group in New York, and were used, in turn, to pay millions of dollars in kickbacks to Ramirez.

**B.     CORPOELEC**

87.     CORPOELEC stands for Corporación Eléctrica de Venezuela.  CORPOELEC is the successor entity to Electricidad de Caracas.  It is the state-owned entity responsible for supplying power to the Venezuelan capital of Caracas.  It was created in 2007 via the merger of a number of Venezuelan state-owned power companies.

88.     Like PDVSA, CORPOELEC has been widely recognized as a target for exploitation by corrupt public officials.  For instance, *The Economist* observed that "[t]entative efforts to tame corruption [in Venezuela's energy sector] have [] been undermined … On [Hugo Chávez's] watch, [Chávez's brother] had led the electricity ministry as well as Corpoelec, the graft-riddled state-run electricity giant."[14]  CORPOELEC's "graft-riddled" nature asserted itself in 2009 with its solicitation of construction contracts.[15]

89.     In mid-to-late 2009, CORPOELEC awarded contracts to Derwick Associates for the construction of energy generating plants known as Raisa I and II, Guarenas I and II, Picure,

---

[14]     *See* The Economist, *A Circus Without a Ringmaster*, June 6, 2013, *available at* http://www.economist.com/news/americas/21580477-radicals-former-soldiers-and-cuban-spies-jostle-control-venezuelan-ring-circus (last accessed April 24, 2015).

[15]     *Id*.

and Margarita, each located in and around Caracas.  Those contracts were not the subject of a public bidding process, which is a tell-tale mark of impropriety.[16]

90.    Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino set out to offer millions of dollars in kickbacks to CORPOELEC officials in exchange for awarding the contracts to Derwick Associates.  Upon securing the inflated contracts, Derwick Associates would then subcontract out the work to another U.S. company, Missouri-based and New York-licensed ProEnergy Services, which would do substantially all of the actual work.  Derwick Associates, having done almost nothing, would keep a substantial percentage of the contract proceeds for itself.

91.    Although the exact details of the kickback scheme (including the amount of the kickback and the dates it was offered and paid) remain necessarily shrouded in secrecy given the nature of the crimes, it is believed that Defendant Trebbau approached Javier Andres Alvarado Pardi ("Alvarado"), the son of Javier Alvarado Ochoa ("Alvarado Ochoa"), former Venezuelan Minister of Electrical Development, and a childhood friend of the Defendants, about awarding the contracts to Derwick Associates.  Trebbau offered Alvarado a substantial kickback in exchange for his assistance in securing the contracts for Derwick Associates.

92.    Upon information and belief, that offer was accepted, and as a result, CORPOELEC awarded Derwick Associates the following five contracts:

- On October 2, 2009, CORPOELEC awarded to Derwick Associates the contract for the Picure facility;

- On November 23, 2009, CORPOELEC awarded to Derwick Associates the contract for the La Raisa I facility;

---

[16]    *See* U.S. Department of Justice, *FCPA:  A Resource Guide to the Foreign Corrupt Practices Act*, *available at* http://www.justice.gov/criminal/fraud/fcpa/guide.pdf (last accessed January 9, 2014).

- On November 30, 2009, CORPOELEC awarded to Derwick Associates the contract for the La Raisa II;

- On March 11, 2010, CORPOELEC awarded to Derwick Associates the contract for the Guarenas I facility; and

- On October 4, 2010, CORPOELEC awarded to Derwick Associates the contract for the Guarenas II facility.

93.     During this time period, Derwick Associates was also awarded a portion of the contract for the facility in Margarita, Venezuela, although no public information exists regarding when that contract was awarded.

94.     The final contract prices have not been publicly disclosed by the Venezuelan government.  However, media reports have noted that CORPOELEC accepted a $240 million bid from Derwick Associates for construction of the Picure facility; a $242.3 million bid from Derwick Associates for construction of the La Raisa I facility, a $142.2 million bid from Derwick Associates for construction of the La Raisa II facility, and a $253.6 million bid from Derwick Associates for construction of the Guarenas I and II facilities.

95.     Upon information and belief, the monies that Derwick Associates received from the contracts were wired to accounts at J.P. Morgan and Davos Financial Group in New York, and were used, in turn, to pay millions of dollars in kickbacks to Alvarado.

96.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino plan to continue their "courting" of CORPOELEC officials.  On April 23, 2013, the Venezuelan government authorized CORPOELEC to award new contracts to construct power plants and to buy various energy-related goods and services.

97.     Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino are at present attempting to obtain such contracts for Derwick Associates, and intend to offer substantial illegal payments to government officials in exchange for contract awards.

98.     Upon information and belief, as an apparent personal favor to Alvarado, the son of the former Venezuelan Minister of Electrical Development, on or about May 21, 2010, Defendants allowed Alvarado to list Derwick Associates' U.S. office address and telephone number as the shipping address and contact number in connection with his importation into the United States of an exotic luxury sports car from the Dominican Republic.  The nature of this nepotistic conduct providing such "value" to the son of a foreign government official appears similar to the type of conduct that the United States Securities and Exchange Commission is investigating in connection with J.P. Morgan's "Sons and Daughters" hiring program, as reported in *The New York Times* and the *Wall Street Journal*.[17]

99.     Since the First Amended Complaint in this action was filed, it has been reported that Spain's Anti-Money Laundering unit (SEPBLAC) is investigating Villalobos and Alvarado Ochoa, Alvarado's father, in connection with allegations of money laundering.  Derwick Associates procured the majority of its contracts either directly from CORPOELEC (through Alvarado Ochoa) or from its partner PDVSA (through Villalobos).  Upon information and belief, the U.S. government, including the U.S. Department of Treasury's Financial Crimes Enforcement Network, is cooperating with the Spanish government in this matter.

### C.     Corporacion Venezolana de Guayana

100.     Corporacion Venezolana de Guayana ("CVG") is a state-owned entity controlling energy production in the Guayana region in southeast Venezuela.

---

[17]     "JPMorgan Hiring Put China's Elite on an Easy Track," August 29, 2013, *The New York Times*, *available at* http://dealbook.nytimes.com/2013/08/29/jpmorgan-hiring-put-chinas-elite-on-an-easy-track/ (last accessed April 24, 2015); "J.P. Morgan Emails Note Hire's Family Ties," December 8, 2013, *The Wall Street Journal*, *available at* http://online.wsj.com/news/articles/SB10001424052702303560204579246674206332380 (last accessed April 24, 2015).

101.    In late 2009, CVG awarded two contracts to Derwick Associates for the construction of energy plants in Puerto Ordaz, Venezuela, named Sidor Planta A and Sidor Planta B.  The contracts were not the subject of a public bidding process.

102.    Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino set out to offer millions of dollars in kickbacks to CVG officials in exchange for awarding the contracts to Derwick Associates.  Upon securing the inflated contracts, Derwick Associates would then subcontract out the work to another U.S. company, Missouri-based and New York-licensed ProEnergy Services, who would do substantially all of the actual work.  Derwick Associates, having done almost nothing, would keep a substantial percentage of the contract proceeds for itself.

103.    Although the exact details of the kickback scheme (including the amount of the kickback and the dates it was offered and paid) remain necessarily shrouded in secrecy, it is believed that through the above-mentioned intermediary Convit-Guruceaga, Defendants Betancourt, Trebbau, and D'Agostino contacted Rodolfo Sanz ("Sanz"), the Venezuelan Minister of Basic Industries and Mining.

104.    Upon information and belief, Defendants Betancourt, Trebbau, and D'Agostino together authorized Convit-Guruceaga to offer Sanz a substantial payment in order to obtain the contracts.  Convit-Guruceaga did so.  Betancourt later personally negotiated with Sanz over the terms of the payment.  Upon information and belief, Sanz accepted the offer, and as a result, CVG awarded Derwick Associates the contracts.

105.    On November 30, 2010, CVG awarded to Derwick Associates the contract for the Sidor Planta A facility.

106. Further, upon information and belief, during this time period, Derwick Associates was also awarded the contract for the Sidor Planta B facility, although no public information exists regarding when that contract was awarded.

107. The final contract prices have not been publicly disclosed by the Venezuelan government. However, media reports have revealed that CVG accepted a $920 million bid from Derwick Associates for the Sidor Planta B facility.

108. Upon information and belief, the monies that Derwick Associates received from the contracts were wired to accounts at J.P. Morgan and Davos Financial Group in New York, and were used, in turn, to pay millions of dollars in kickbacks to Sanz.

**D'Agostino Has Admitted that Defendants Pay**
**Illegal Bribes To Secure the Energy Contracts**

109. Defendants have bragged to their friends and acquaintances in the United States that Derwick Associates secured the Venezuelan energy-sector contracts by giving kickbacks to the right people.

110. For instance, in November, 2012, while in the United States, D'Agostino told a friend that "of course" Derwick Associates paid kickbacks to secure its energy contracts; he noted that in Venezuela, "you always have to pay" what D'Agostino called "consulting fees," in order to secure the contracts. Of note, the U.S. Department of Justice has declared that payments to foreign officials to influence their decisions violate the Foreign Corrupt Practices Act even if they are accounted for as "consulting fees." U.S. Department of Justice, *FCPA:  A Resource Guide to the Foreign Corrupt Practices Act*, *available at* http://www.justice.gov/criminal/fraud/fcpa/guide.pdf (last accessed January 9, 2014) ("[b]ribes

are often concealed under the guise of legitimate payments, such as commissions or consulting fees").[18]

111.    After the Original Complaint in this matter was filed, agents of Defendant D'Agostino approached Ambassador Reich and made statements that, at a minimum, confirmed not only that D'Agostino had access to information only available to those at the highest levels of management of Derwick Associates and accessible only on a "need to know" basis, but that such information would be damning to Defendants Betancourt and Trebbau in this litigation.

112.    In August 2013, Ambassador Reich had lunch in Washington, D.C. with a former Venezuelan government official (the "Emissary") who claimed to be an agent of Defendant D'Agostino.  The Emissary had flown to the United States on the private jet of D'Agostino's father-in-law.  At their meeting, the Emissary told Ambassador Reich that if he would dismiss D'Agostino from the lawsuit, D'Agostino would provide Ambassador Reich with information about Defendants Betancourt and Trebbau that would substantiate the allegations set forth in Plaintiffs' case.

***The Projects Undertaken by Derwick Associates***
***Were Grossly Overbilled and are of Poor Quality***

113.    A hallmark feature of corruption in government contracting or procurement is the supplying of low-quality goods or underperforming services at inflated prices.  That is exactly what has happened with the projects undertaken by Derwick Associates.

---

[18]    At the 22nd National Forum on the Foreign Corrupt Practices Act (November 17, 2009), Lanny A. Breuer, former U.S. Assistant Attorney General, Criminal Division, Department of Justice stated:  "We are all here today to consider a law enforcement challenge of truly global dimensions.  The word 'bribe' is, of course, known throughout the world.  In the United States, it has been called a pay-off, a kickback, hush money, payola, and a sweetener.  It is sometimes concealed behind what is called a commission, a reward, a finder's fee, a gratuity, or a 'thank you'."  Lanny A. Breuer, Address at the 22nd National Forum on the Foreign Corrupt Practices Act (November 17, 2009), a*vailable at* http://online.wsj.com/public/resources/documents/111709breuerremarks.pdf (last accessed April 24, 2015).

114.    In September 2013, the preliminary results of a major study undertaken by a respected energy expert, Jose Aguilar (the "Energy Expert"), were made public, showing gross overbilling in the construction and operation of energy-sector projects in Venezuela, including on projects by Derwick Associates.

115.    The Energy Expert is a mechanical engineer specializing in industrial oil, gas, and electricity projects who has worked for years in the Venezuelan energy sector.  Upon information and belief, in the 1980s, the Energy Expert immigrated to the United States, where he worked for energy utilities, and today he consults on risk-management projects for public utilities concerning maintenance, operations, and safety issues.

116.    The Energy Expert reviewed previously undisclosed information regarding the costs of certain Derwick Associates' energy projects, and compared those costs to what the projects *should have* cost, had the projects been awarded based on a competitive, transparent bidding processes.

117.    The Energy Expert developed estimates for what the projects would have cost had the contracts not been grossly inflated by Defendants as a result of their pattern of racketeering activity.

118.    The Energy Expert estimated that the contract prices for the projects awarded to Derwick Associates exceeded, by approximately *$2.9 billion,* the amount that the projects should have cost.

119.    In September 2013, the Energy Expert released updated results confirming the gross overbilling and underperformance by Derwick Associates.  Based upon his updated results, he estimated that Derwick Associates grossly overcharged for every project they were awarded, some projects by over 300%.

120.    The Energy Expert found that the average overbill by Derwick Associates on the projects analyzed was over 200%.  In other words, the average Derwick Associates energy contract was approximately *three times* more expensive than it should have been.

121.    It has been reported that Derwick Associates' projects have also been plagued by delays and underperformance.  According to the Energy Expert, the majority of the projects undertaken by Derwick Associates are either years late in completion, only partially completed, or entirely non-functional:

- For the CORPOELEC project in Guarenas, the Energy Expert estimates that, at market rates, the project should have cost approximately $90 million. According to government records, Derwick Associates was awarded a contract for $253.6 million.  Only 80 of the promised 156 megawatts are currently functional.

- For the CORPOELEC project La Raisa I, the Energy Expert estimates that, at market rates, the project should have cost approximately $110 million. According to government records, Derwick Associates was awarded a contract for $242.3 million.  Originally set for completion in December 2010, only 95 of the promised 180 megawatts are currently functional.

- For the CORPOELEC project La Raisa II, the Energy Expert estimates that, at market rates, the project should have cost approximately $62 million. According to government records, Derwick Associates was awarded a contract for $142 million.   Only 40 of the promised 90 megawatts are currently functional.

- For the CORPOELEC project Picure, the Energy Expert estimates that, at market rates, the project should have cost approximately $95 million. According to government records, Derwick Associates was awarded a contract for $240 million.  Originally set for completion in August 2010, only 100 of the promised 132 megawatts are currently functional.

- For the CORPOELEC project Margarita, the Energy Expert estimates that, at market rates, the project should have cost approximately $102.9 million. According to government records, Derwick Associates was awarded a contract for $337.7 million.  Originally set for completion in November 2011, only 120 of the promised 170 megawatts are currently functional.

- For the CVG project Sidor, the Energy Expert estimates that, at market rates, the project should have cost approximately $528 million.  According to government records, Derwick Associates was awarded a contract for $920

million.   None of the promised 880 megawatts are currently (or have ever been) functional.

122.    The Energy Expert also reviewed and analyzed projects that Derwick Associates was awarded by PDVSA under the PDVSA's umbrella "Autosuficiencia" program, which is a program to make the PDVSA itself completely self-supplying when it comes to power generation.  The Energy Expert estimated that the various projects – in which Derwick Associates took part – should have cost approximately $789.9 million at market rates.  However, the Energy Expert's research revealed that PDVSA awarded contracts worth $2.1 billion.

123.    According to the Energy Expert, only 287.5 of the promised 1354 megawatts needed for PDVSA's "Autosuficiencia" program are currently functional (despite being scheduled for completion in October 2010).

124.    Charging a premium for substandard goods is a classic way to build enough "padding" into a contract to pay kickbacks (and make an illicit profit).  Inflated government contract prices and underperformance on government contracts are tell-tale signs of public corruption.  The Washington, D.C.-based International Anti-Corruption Resource Center, whose mission it is to attack and thwart public corruption, has noted that inflated contract prices and underperformance on contract specifications are two "red flags" indicative of the existence of bribery and kickback schemes with respect to government contracts.[19]

125.    Based on the contract prices awarded to Derwick Associates, the Venezuelan government appears to have paid substantially above market value for purportedly "new" equipment.  Upon information and belief, the overbilling by Derwick Associates for its energy-

---

[19]    *See Summary of Fraud and Corruption Cases in International Development Projects*, February 6, 2012, *available at* http://iacrc.org/fraud-and-corruption/summary-of-fraud-and-corruption-cases-in-international-development-projects/ (last accessed April 24, 2015).

sector contracts went not only to line the pockets of Defendants Betancourt, Trebbau, and

D'Agostino, but to pay the kickbacks to government officials necessary to secure the contracts.

126.    The Energy Expert is not the only industry expert to question the projects

undertaken by Derwick Associates.  For instance, Gustavo Coronel ("Coronel"), an oil-industry

veteran who claims over 35 years of experience in the industry, has written extensively regarding

Derwick Associates' lack of manpower, expertise, and capital needed to engage in the type of

projects Derwick Associates claims it engages in.  Coronel has noted that Derwick Associates'

small size (15 employees at the time the First Amended Complaint was filed), lack of

experience, and lack of capital is not "compatible with the magnitude, complexity and

sophistication of the projects Derwick has been doing."[20]

***Defendants' Business Operations Have Drawn Interest***
***From Many Reputable Parties, Including the***
***<u>Manhattan D.A.'s Office And The United States Government</u>***

127.    Reflecting the essential nexus between the United States and Defendants'

unlawful acts of racketeering, several major U.S.-based agencies are investigating Defendants

and its principals.  The incredible manner in which Derwick Associates (being operated by such

young and inexperienced owners, operators and managers) secured more than *a billion dollars* in

complex energy construction contracts in such a short time has drawn interest from the

Manhattan District Attorneys' Office, the United States government, and numerous media

sources.

128.    Derwick Associates is currently under investigation by the U.S. Department of

Justice and the Manhattan District Attorney's office.  In August 2014, *The Wall Street Journal*

reported that "[t]he U.S. Department of Justice and the Manhattan district attorney's office are

---

[20]      *See* Coronel's website; for instance http://lasarmasdecoronel.blogspot.com/2013/09/about-transparency-derwick-and-pdvsa.html (last accessed April 24, 2015).

probing Derwick Associates, a Venezuelan company awarded hundreds of millions of dollars in

contracts in little more than a year to build power plants in Venezuela, shortly after the country's

power grid began to sputter in 2009....."[21]

129.    Information has also emerged from publicly-available sources that individuals

associated with the Federal Bureau of Investigation have conducted inquiries into Derwick

Associates' activities.[22]  Upon information and belief, the Department of Homeland Security and

the Treasury Department have also made inquiries into Derwick Associates' activities.  Further,

upon information and belief, the United States Securities and Exchange Commission's New

York Regional Office is interested in the activities of Derwick Associates.

130.    A number of mainstream English and Spanish-language publications have also

published articles detailing the suspicious manner in which the energy-sector contracts were

awarded to Derwick Associates, and recount allegations that Derwick Associates secured these

contracts via improper payments to Venezuelan officials.  For instance:

- Cesar Batiz, an award-winning reporter at the Spanish-language publication *Últimas Noticias*, reported that Derwick Associates had received these immense contracts despite the lack of any sort of track record, and the lack of experience of its managers. Batiz also wrote a piece exploring the questions surrounding suppliers of electricity equipment in Venezuela that were likely overcharging (including Derwick Associates in that group).

- A number of postings written by a *Christian Science Monitor* correspondent at the website *Setty's Notebook* recounted the allegations against Derwick Associates

---

[21]    *See Wall Street Journal*, "Venezuelan Energy Company Investigated in U.S.," August 8, 2014, *available at* http://online.wsj.com/articles/venezuelan-energy-company-derwick-investigated-in-u-s-1407516278 (last accessed April 24, 2015).

[22]    *See* Posting to Infodio, September 12, 2012, *available at* http://infodio.com/content/fbi-looking-derwick-associates (last accessed April 24, 2015) (Derwick Associates' "claims of proven track record, experience, business methods and so on have been grossly exaggerated and just don't stack up," and noting that FBI has on multiple occasions visited the website after having searched for the term "Derwick.").

regarding the contracts; the website editor later received a letter from Derwick Associates' attorneys threatening legal action.[23]

131.    For his work exposing Derwick Associates, Batiz was awarded an honorable mention at the Latin American Conference on Investigative Journalism in March, 2012, and was awarded an honorable mention for the Peruvian Latin American Award for Investigative Journalism.

132.    Batiz's work was highlighted in a book published in July 2013 entitled, *Estado Delincuente: Como actúa la delincuencia organizada en Venezuela* ("*Rogue State: How Organized Crime Operates in Venezuela*," in English), by authors Carlos Tablante ("Tablante") and Marcos Tarre ("Tarre").  Tablante is a former governor, senator and cabinet minister of Venezuela.  *Rogue State* chronicles how the Venezuelan state has been thoroughly corrupted by individuals like Defendants.

133.    *Rogue State* discusses Derwick Associates.  Tablante and Tarre discuss multiple transactions benefitting Derwick Associates, including:  (a) the sale by Derwick of Rolls Royce Trent 60 machines for $34.6 million each, where a Rolls Royce press release in 2010 ascribes a cost of only $18.3 million per machine (p. 186), and (b) the purchase of four thermoelectric power plants *from the United States* to be installed in Sidor, Venezuela, to begin operating in 2010 (p. 204).  According to the authors, "not one kilowatt" has been produced by the four Sidor power plants (p. 205).  One has been installed, but is not in use; a second is inactive and abandoned at Sidor; and the fate of the other two is unknown (*id*.)  The book also discusses how the Davos Financial Group's affiliate (discussed herein) receives transfers of funds arising from

---

[23]    *See* Posting to Setty's Notebook, October 12, 2012, *available at* http://settysoutham.wordpress.com/2012/10/12/derwick-associates-censorship/ (last accessed April 24, 2015) (Derwick Associates "has had incredible success in the three years since it was founded, gaining hundreds of millions of dollars in contracts to procure generating turbines and other materials and to then build electricity plants. Press reports have raised questions about exactly how Derwick got so big, so fast.")

bribery transactions.  And it also shows how Defendants conduct their acts of racketeering in U.S. dollars rather Venezuelan Bolivars.

134.    In March 2015, Batiz published another piece on Derwick Associates, which relied, in part, on his review of 18 gigabytes of digital documents obtained from ProEnergy Services.  Batiz reported that Derwick Associates conducted business in *U.S. dollars*, and not in Venezuela's currency of Bolivars.  Batiz also reported that (a) Derwick Associates charged an unduly large premium for construction and sold used equipment that was offered at higher prices than if it were new; (b) despite searching between 2008 and 2009 for the national or international invitation to tender bids for electrical power works, no calls for bids on contracts for the construction of 12 electric power plants, adaptation of equipment or provision of turbines awarded to Derwick Associates were found; (c) Derwick Associates billed the Venezuelan State $2.25 billion – about $809 million more than it paid ProEnergy Services; and (d) according to the latest official National Electrical System report, which was accessed in March 2015, only three out of ten turbines sold and installed by Derwick are serviceable, and the rest are idle due to maintenance or flaws, or never entered operation.

135.    Alek Boyd, columnist for Colombia's *Semana* magazine and editor of the Infodio website (www.infodio.com), has written a number of articles on his news website detailing allegations of improper payments by Defendants and Derwick Associates in the securing of the aforementioned energy contracts.  As described by Boyd, "Derwick Associates is a fine example of a cast of criminal enterprises that have flourished under Hugo Chavez's galloping and irresponsible waste."[24]

---

[24]    *See* Posting to Infodio, March 10, 2012, *available at* http://infodio.com/content/derwick-associates-exhibit-x-venezuelas-corrupt-criminals (last accessed April 24, 2015).

136.    *The New York Times* has implicitly questioned the business practices of Defendants in a September 12, 2012 article discussing various financial "scandals," where "ghost companies" landed energy "contracts worth hundreds of millions of dollar … at shamelessly inflated prices."

137.    Newspaper articles, blog entries and the like are often relied upon as a credible source of information by United States government officials for launching criminal investigations.  On this topic, Lanny Breuer, former U.S. Assistant Attorney General for the Criminal Division of the U.S. Department of Justice, has stated:

> Although many of these cases come to us through voluntary disclosures, which we certainly encourage and will appropriately reward, I want to be clear:  the majority of our cases do not come from voluntary disclosures.  They are the result of pro-active investigations, whistleblower tips, newspaper stories, referrals from our law enforcement counterparts in foreign countries, and our Embassy personnel abroad, among other sources.[25]

138.    On or about October 31, 2013, a former mayor and police chief named Freddy Bernal, a central figure in the Venezuelan regime, gave an interview on a pro-regime television station in Venezuela where he called for an investigation into Derwick Associates, citing specifically Defendants' ostentatious New York properties and other expenditures.[26]

***Defendants Use Criminality and Intimidation***
***To Further Their Ongoing Racketeering Scheme***

139.    In order to maintain and further their illegal scheme and avoid criminal prosecution, Defendants must deter, discourage, minimize or discredit any investigation into

---

[25]    Lanny A. Breuer, Address at the 22nd National Forum on the Foreign Corrupt Practices Act (November 17, 2009), a*vailable at* http://online.wsj.com/public/resources/documents/111709breuerremarks.pdf (last accessed April 24, 2015).

[26]    *See* Posting to Setty's Notebook, October 23, 2013, *available at* http://settysoutham.wordpress.com/2013/10/23/chavista-freddy-bernal-calls-for-investigation-of-derwick-associates/ (last accessed April 24, 2015).

and/or negative notoriety concerning their racketeering activities.  Defendants' motives and intent in this regard is entirely in keeping with other criminal enterprises whose *sine qua non* is secrecy, concealment, intimidation, and threats.  Over the last several years, Defendants have deployed the U.S. wires to unlawfully target journalists, media outlets, private citizens, subject matter experts, and former government officials in the United States to accomplish this goal. Defendants engage in criminal acts, disinformation campaigns, wire fraud, frivolous lawsuits and threats to sue, while applying political and financial pressure, all in order to ensure that critics of the ChavezKids are severely and swiftly punished and others are intimidated into silence.

140.    The *pièce de résistance* in Defendants' campaign of concealment, intimidation, and subterfuge was the very public Florida Defamation Suit filed in September 2012 by Defendants Betancourt, Trebbau, and Derwick Associates in the Circuit Court of Miami, Florida. The suit was mostly designed as a public relations tool to dissuade interested persons from pursuing stories, investigations, or otherwise paying critical attention to Defendants' racketeering activities.  The Florida Defamation Suit sought injunctive relief and damages in excess of *$300 million* from Banco Venezolano, one of the oldest and most respected banks in Venezuela with offices in the United States, and its President, Oscar Garcia Mendoza ("Garcia Mendoza"), a vocal opponent of the Chavez regime and one of the few bankers in Venezuela who refuses to do business with the Venezuelan government, Banco Universal, Rafael Alfonso Hernandez and a large number of John Doe defendants.

141.    In addition to suing Banco Venezolano in Florida, Defendants Betancourt, Trebbau, and Derwick Associates filed the New York Defamation Suit in New York state court, alleging, among other things, claims for defamation tracking those alleged in the Florida Defamation Suit.  *See Derwick Associates Corp., et al. v. John Does 1-10* (Supreme Court of the

State of New York, County of New York), Index No. 653345/12.  The New York Defamation

Suit, like the Florida Defamation Suit, was voluntarily withdrawn by Defendants without them

receiving any consideration for doing so.

142.     The Florida Defamation Suit alleged that Banco Venezolano, its chairman Garcia

Mendoza, and another director created and spread defamatory information concerning Derwick

Associates and its founders on an Internet website named wikianticorrupcion.org.  Defendants

claimed that statements concerning Derwick Associates' unscrupulous business methods on the

website "have been repeated hundreds of times on other Internet sites, Twitter, and various news

outlets," entitling them to hundreds of millions of dollars in damages.

143.     In their initial complaint (the "Defamation Complaint"), Defendants Betancourt

and Trebbau alleged that Garcia Mendoza and Banco Venezolano caused the

wikianticorrupcion.org website to publish allegations that, among other things, Defendants

Betancourt and Trebbau, through Derwick Associates:

- "Launder[ed] the money originating from oil and electricity corruption and join[ed] illegal financial deals."

- "Found[ed] another Venezuelan financial entity through which they continued to launder the money that was the product of their crimes."

- "Were involved in the theft of 500 million dollars from another Venezuelan corporation, Corporacion Venezolana de Guayana (CVG)."

- "Stole the amount of one point three billion dollars ($1.3 BILLION) from CVG."

- "Are part of a 'criminal group' that have amassed a 'pot … [of] up to about two billion dollars (US$ 2.0 billion) … through which [they] launder money by making investments.'"

144.     The subject matter of Defendants' Florida and New York defamation suits was

largely identical to the instant suit.  And, just as Defendants used the U.S. wires to commit acts

of bribery, Defendants also used the U.S. wires to publicize their contrived, public relations-driven lawsuits in Florida and New York.

145.    Defendants commenced the Florida Defamation Suit with the intent to silence their critics and maintain the status quo in both the United States and Venezuela.  If this were a poker game, Defendants were seeking to "bluff" their way to a big public relations victory by, among other things, suppressing critical and/or negative scrutiny of them and their racketeering activities.  Defendants correctly recognized that the success of their bribery and corruption scheme was entirely dependent on Defendants maintaining not only the secrecy of their illegal activities, but also their existing banking and other relationships in the U.S.  Absent these and other necessary conditions, Defendants would be "out of business."

146.    Allegations of money laundering, theft and unscrupulous business activities had cast Defendants and Derwick Associates in a negative light both in the U.S. and internationally. It also shone a spotlight on Defendants' youth, inexperience, and the twelve energy-sector contracts they had illegally obtained.  Defendants viewed this negative publicity as problematic and a possible threat to the survival of their racketeering business.  Speculation about the methods and means by which Defendants had procured the energy-sector contracts threatened – or was perceived by Defendants to threaten – their ability to perpetuate and further their unlawful scheme, *i.e.*, obtaining additional energy-sector contracts from their U.S. base of operations through bribery.  Defendants' "bad press" had heightened their public notoriety, and Defendants worried that their relationships with their U.S. business partners and banks could be or already were in jeopardy.

147.    One of the ways that Defendants build, manage and protect their brand and reputations is to generate "good press" while simultaneously suppressing "bad press."  Publicity

generated by Defendants – where they control the message – is good press; press that is critical of Defendants or ascribed to them unlawful actions is bad press.

148.    Defendants' public relations efforts in the U.S. are integral to the continuation of their unlawful business activities.  Defendants have *admitted* in writing that maintaining their reputations and that of Derwick Associates is essential to their business operations in all respects. In a document prepared by their counsel (the Volkov Law Group) for submission to the U.S. government, Defendants describe the key operations and business of Derwick Associates.  In doing so, Defendants (who refer to themselves as "Derwick's founders and key executives") expressly and repeatedly mention their "reputation", their "reputation for high quality work", their "integrity" and that they are known for being an "ethical" and "efficient" company.  In the same document, Defendants also stress the importance of their reputations (and that of Derwick Associates) to their business partners in the United States.

149.    Defendants intended for the initial filing of the Florida Defamation Suit (and the publicity surrounding it) to provide them with a burst of positive publicity while helping to suppress public criticism of Defendants (and Derwick Associates).  Defendants hoped this dual effect would help assuage the apparent growing concerns of Defendants' banks, vendors, subcontractors and business partners in the U.S., all of whom played essential roles in Defendants' ongoing and highly-profitable acts of racketeering.

150.    Proving that Defendants' reputations in the United States were "mission critical" to Defendants' perceived and actual ability to continue and further their illicit scheme, Defendants commenced the Florida Defamation Suit in the United States and not in Venezuela.

151.    As part of Defendants' public relations strategy, the Florida Defamation Suit was widely reported in the news media and on the Internet given the parties involved and the

enormous amount of damages being sought (*i.e.*, $300 million).  Defendants helped generate

publicity by their use of the U.S. wires to issue press releases and convey other favorable

information to the media about the Florida lawsuit.

152.    Upon information and belief, Defendants expected that the Florida lawsuit would

be resolved quickly by way of a settlement in their favor or some other form of capitulation by

Banco Venezolano (and/or one of the other Florida defendants).  From Defendants' perspective,

the Florida Defamation Suit was akin to a SLAPP (Strategic Lawsuit Against Public

Participation) suit.  That Defendants believed that the lawsuit would serve the purpose of chilling

criticism is consistent with other examples of companies using the courts to intimidate and quiet

their critics.  Indeed, the very existence of anti-SLAPP statutes across the country reflects that

the deployment of lawsuits to silence perceived or actual critics is hardly atypical and further

reflects how Defendants' acts of intimidation relate to the underlying illegal activities

Defendants sought to continue.

153.    News of the Florida Defamation Suit traveled quickly and had the chilling effect

Defendants desired – on everyone but, apparently, the Banco Venezolano defendants.  Certain of

the Banco Venezolano defendants moved forward on the opportunity to engage in discovery in

the Florida Defamation Suit.  During discovery, Betancourt and Trebbau (and Derwick

Associates) would have been required to produce documents (including e-mails and financial

documents) and sit for depositions concerning the substance of the alleged defamatory

statements, *i.e.*, their business practices.

154.    Through discovery and trial, each of Betancourt, Trebbau and D'Agostino

(through Derwick Associates) would have had the opportunity to pursue a legal process that,

ostensibly, could have cleared their sullied reputations.  Rather than pursue the discovery process

and prove their claims, each of Betancourt, Trebbau, and D'Agostino (through Derwick Associates) moved for a stay of discovery.

155.    Defendants desired to procure a quick and easy victory both from a public relations and legal perspective in the Florida Defamation Suit.  However, following an initial round of favorable publicity generated by Defendants using the U.S. wires, Defendants found themselves in a public relations nightmare where (a) they no longer controlled the message or the flow of information about the litigation or themselves; (b) Banco Venezolano seemed intent on retaining Plaintiffs, which Defendants perceived would change the dynamic of the Florida Defamation Suit; and (c) Defendants perceived that they were on the verge of being on the receiving end of some potentially high-profile, yet very negative, publicity about the Florida lawsuit, Defendants, and Defendants' relationships and illicit business practices

156.    In April 2013, mere months after the Florida Defamation Suit was commenced – and before any material discovery could take place – Defendants agreed to voluntarily dismiss the Florida litigation.  It has been reported that Betancourt, Trebbau, and Derwick Associates withdrew their $300 million Florida Defamation Suit without having received payment of even a single dollar from Banco Venezuela or anyone else.

157.    Tellingly, Defendants' public relations strategy of creating a "false front" of innocence by affirmatively and proactively attacking their critics is a longstanding tactic frequently employed by wealthy individuals and businesses to silence their accusers and prevent any type of journalistic inquiry.  In a major story by the *New York Daily News* in 2012,[27] the

---

[27]    http://www.nydailynews.com/sports/more-sports/zone-lance-armstrong-bully-downfall-article-1.1188512 (last accessed April 24, 2015) – *New York Daily News* article:  "Victims of Lance Armstrong's strong-arm tactics feel relief and vindication in the wake of U.S. Anti-Doping Agency report," published Saturday, October 20, 2012; updated Friday, October 26, 2012.

paper described how this scare tactic works, using disgraced cyclist Lance Armstrong as an example:

> [Lance Armstrong] set a precedent for other athletes who would go on to use guerilla tactics to attempt to intimidate the media or silence accusers. … Armstrong unleashed a shotgun blast of litigation at virtually everyone involved with "L.A. Confidential: Les Secrets de Lance Armstrong," [which was a book alleging Armstrong used [illegal] performance enhancing drugs]. Just as the book was hitting shelves in Europe, Armstrong sued the authors, the publisher, the sources [], a magazine that ran an excerpt, and the Sunday Times of London, the British newspaper that ran a preview of the book. Armstrong announced the suit at a splashy Maryland press conference on June 15, 2004, then quietly dropped it in 2005, withdrawing his claims before a trial could begin, a tactic similar to the ones athletes Roger Clemens and Shane Mosley would later use against their own accusers.
>
> …
>
> Armstrong had also filed a bevy of suits in France [but] … Armstrong withdrew all of his French defamation cases shortly before they were to go to trial . …

158.    Just as Lance Armstrong, the now-admitted user of unlawful performance enhancing drugs, used proactive legal and other bullying attacks to silence his critics who were actually speaking the truth, Defendants deployed the same strategy using the U.S. wires.

159.    In or about October 2012, Defendants' New York-based counsel in the Florida and New York defamation suits used the U.S. wires and mails to send letters to (a) Mr. Steven Bodzin, now a correspondent for *Monocle* and the *Christian Science Monitor*, and the editor of the website http://settysoutham.wordpress.com; (b) Mr. Robert Bottome, President of Veneconomia; and (c) Mr. Miguel Octavio, who Defendants wrongfully claimed was the author of the blogspot http://venepiramides.blogspot.com, threatening legal action if those individuals did not remove from their websites articles criticizing Derwick Associates (and Defendants).

***Desperate To Maintain and Further Their Ongoing Bribery Scheme,
Defendants Attempt To Buy Off Ambassador Reich And,
When That Fails, They Intentionally Spread False Information About
<u>Ambassador Reich To Destroy ORA's Business Relationship with Banco Venezolano</u>***

160.    In October and November 2012, shortly *after* the Florida Defamation Suit was commenced, Banco Venezolano entered into negotiations with ORA to assist in defending against the claims made in the Florida Defamation Suit and to provide unrelated business and consulting services to Banco Venezolano in the United States.

161.    Banco Venezolano was very interested in retaining Ambassador Reich given his reputation, contacts and experience and because he has repeatedly spoken out against the types of schemes from which Defendants have profited (and, upon information and belief, which Defendants were trying to cover up by suing Banco Venezolano).

162.    Banco Venezolano sought ORA's assistance in connection with the claims made against it by Betancourt, Trebbau, and Derwick Associates, including with a potential investigation into Derwick Associates' business practices in the United States.  Banco Venezolano sought to uncover proof of Defendants' illegal conduct and to prove the truth of the alleged defamatory statements, which formed the basis for Defendants' $300 million Florida Defamation Suit.  Rightly or wrongly, Banco Venezolano (like Defendants) believed Plaintiffs were well-positioned to contribute to this effort, and that Plaintiffs would add significant value. By directing Plaintiffs' spotlight on Defendants and their business activities, Plaintiffs' vast network of connections and resources would be brought to bear against Defendants and such attention might encourage and embolden other critics and informants (who otherwise would have remain intimidated and silent) to come forward.

163.    From Plaintiffs' perspective, this would have been a significant business, financial and contractual relationship for ORA with an important institutional client.  By late November

2012, negotiations between the bank and ORA had advanced to the stage that the parties understood that ORA would charge $20,000 per month for consulting services, to commence immediately.  The agreed-upon contract was to be project-based, with the initial project estimated to last at least six months.  Additional amounts were to be provided by Banco Venezolano to cover up to $20,000 per month in out-of-pocket expenses such as meals, travel, hotels, and the like.

164.     As the former United States Ambassador to Venezuela, Ambassador Reich is a well-respected and influential individual within the Venezuelan émigré community with an impressive and impeccable reputation.  Equally important, as both Defendants and Banco Venezolano knew, Ambassador Reich has a wealth of contacts and relationships throughout the United States/Venezuelan community and within the U.S. Department of State.

165.     Since his retirement from public service, Ambassador Reich has remained actively involved in monitoring events in Venezuela, including the abuse of civil rights and the rule of law by Venezuelan governments, especially since the 1999 inauguration of Hugo Chavez as President of Venezuela and the subsequent succession of Nicolas Maduro to that office in 2013.

166.     Ambassador Reich is considered and perceived to be a person of influence and high visibility in Venezuela.  Indeed, the United Kingdom's *The Guardian* credited Ambassador Reich with playing a significant role in the *coup d'état* that temporarily removed Venezuelan President Hugo Chavez from power in 2002.  While that assertion has been denied by the U.S. Department of State, that such a reputable news source believes that Ambassador Reich wields such influence explains why it is reasonable that Defendants were concerned about Ambassador Reich's direct, focused and active involvement in the Florida Defamation Suit.

167.    To say that Ambassador Reich is closely watched by the Venezuelan government would be an understatement.  He has repeatedly been declared an enemy of the state by the corrupt Venezuelan government, and wrongfully accused of conspiring to assassinate President Hugo Chavez, President Nicolas Maduro and opposition candidate Henrique Capriles.  He has also been falsely accused by the Venezuelan government of working with the U.S. Government to destabilize Venezuela, recruiting thousands of mercenaries to attack Venezuela, being involved in a plot to purchase more than a dozen advanced jet fighters to "bomb Venezuela," supporting terrorist attacks in Venezuela; and organizing and financing the waves of violence that have rocked Venezuela during the Chavez and Maduro governments, most recently in 2014.  None of these allegations are true, but they demonstrate that the Venezuelan government pays attention to what Ambassador Reich is doing and saying, and the projects with which he is involved.

168.    As a former member of the U.S. Department of State, Ambassador Reich is also on the U.S. government's radar.  For example, less than two years ago, the U.S. Department of State issued a public statement denying an alleged assassination plot purportedly involving Ambassador Reich and the Central Intelligence Agency as against President Maduro.

169.    Having learned of Ambassador Reich's negotiations with Banco Venezolano and the potential relationship springing therefrom, Defendants were determined to prevent Banco Venezolano from engaging Ambassador Reich for a host of reasons, all of which were essential to Defendants' ongoing racketeering activities.  Among other concerns, Defendants perceived Plaintiffs to be a threat not only to their ability to achieve a quick settlement with or judgment against Banco Venezolano (and the other defendants in the Florida Defamation Suit) but, more importantly, to the perpetuation of their ongoing bribery scheme.

170.     Rightly or wrongly, Defendants perceived Ambassador Reich to constitute a

threat because, among other things, they perceived him (a) to be a highly regarded former U.S.

State Department official and former U.S. Ambassador to Venezuela, which he is; (b) to possess

a wealth of contacts both in the United States and abroad, which he does; (c) to be an expert on

Venezuela and corruption in its government, which he is; (d) to wield considerable power and

influence among the anti-corruption forces in Venezuela, which he does; (e) to have the ability to

alter Venezuelan government policy; and (f) to have remained in close contact with high-ranking

U.S. government officials across the various branches on account of his nearly 20 years of

service to the U.S. State Department, which he has.

171.     Defendants were also concerned about the actual or perceived synergies that

might result from the union of Banco Venezolano, a respected financial institution, and

Ambassador Reich, both of whom have spent decades rallying against the corrupt status quo in

Venezuela.  Banco Venezolano and Plaintiffs together posed a greater threat to Defendants'

criminal enterprise than they would have acting alone.  Accepting as true Defendants' allegations

in the Florida Defamation Suit, Banco Venezolano possessed detailed factual information about

Defendants and their business activities specifically.  While Plaintiffs lacked such detailed and

specific information, Plaintiffs would have brought other skills, knowledge and experience to the

relationship.  Plaintiffs possessed significant access to individuals and institutions, including

within the U.S. government, that could prove helpful to Banco Venezolano and to which Banco

Venezolano did not have access.  Plaintiffs were also uniquely situated to draw considerable

attention to Banco Venezolano's plight on account of Ambassador Reich's stature and

reputation, and to bring other resources to bear in favor of the bank, including Ambassador

Reich's expertise on corruption in Venezuela, his experience dealing with high profile matters

that affect the public interest, and his media savvy.  The combination of Banco Venezolano and Plaintiffs would have resulted in a vigorous, robust and proactive investigation of Defendants and their criminal activities that Defendants were not anticipating when they commenced their defamation actions.

172.    Defendants were concerned that, if Ambassador Reich became involved in the Florida Defamation Suit on behalf of Banco Venezolano, his participation would automatically and naturally increase the visibility of the lawsuit in a manner not desired by Defendants and, among other things, embolden Banco Venezolano to prove through documents and Defendants' testimony the truth of the allegations being made about Defendants.  If proven, Defendants' bribery and corruption scheme would be revealed and Defendants held accountable for their actions.

173.    By virtue of his stature and reputation (and regardless of whether Ambassador Reich's participation in the Florida Defamation Suit would have had any substantive impact whatsoever), Ambassador Reich's involvement in the Florida Defamation Suit would also bring added (but negative) attention to the lawsuit for Defendants, heighten Defendants' profiles (negatively) in the national and international media, and subject Defendants to further scrutiny concerning the methods and means by which they procured the energy-sector contracts.  Akin to how the association with a celebrity spokesperson (*i.e.*, George Clooney) or a well-known subject matter expert (*i.e.*, Neil deGrasse Tyson in science) raises awareness of an issue, cause, condition, or situation, so too would Plaintiffs' involvement with Banco Venezolano and the Florida lawsuit increase the risk of heightened public scrutiny in a manner adverse to Defendants.

174.     Defendants feared (rightly or wrongly) that such increased visibility might make them targets of an investigation by a number of U.S. government agencies, including the Department of Justice (which is currently investigating Derwick Associates), and could lead to Defendants' criminal prosecution and imprisonment.  Defendants were also concerned about the impact on their reputations in the U.S.  Further increased attention on Defendants and Derwick Associates would, by mere association, put the spotlight on, among others, Defendants' banks, vendors, middlemen and subcontractors in the United States, like ProEnergy Services (also currently under investigation by the U.S. Department of Justice).  Defendants believed (rightly or wrongly) that those third parties might cease doing business with them on account of negative publicity surrounding Defendants, including that Defendants were accused of engaging in criminal activity.  Defendants were also worried (rightly or wrongly) about whether Ambassador Reich's involvement might encourage the anti-corruption forces in Venezuela (and the citizens of Venezuela who continue today to suffer from severe electricity blackouts) to put a target on Defendants' backs or, worse yet, cause the corrupt Venezuelan officials to look for another partner in crime.

175.     For these reasons, Defendants perceived Ambassador Reich's involvement in the Florida Defamation Suit to be a real and immediate threat to the status quo, *i.e.*, to their ongoing bribery and corruption scheme.  If any aspect of Defendants' racketeering activities were exposed (or even if merely subjected to greater negative scrutiny), Defendants feared that they would no longer be able to perpetuate their illegal scheme, which would cause them to suffer the loss of their illicit revenue stream and the loss of future unlawful contracts, among other things. Whether the union of Ambassador Reich and Banco Venezolano would *actually* have resulted in the exposure of Defendants' racketeering activity is irrelevant.  It is sufficient that Defendants

*perceived* such an alliance to be a threat and thus undertook unlawful efforts to thwart this real or perceived threat.

176.    Given Ambassador Reich's stature, reputation and influence both in the United States and Venezuela, Defendants believed that his blessing or endorsement of them and their racketeering business would help ensure the maintenance of the status quo.  Defendants also thought that if Ambassador Reich was aligned with them, Defendants would be depriving Banco Venezolano (and the other anti-corruption forces) of a powerful and influential ally who could potentially shine a bright spotlight upon and help thwart and expose Defendants' ongoing acts of racketeering.

177.    In an attempt to minimize Defendants' perceived threat of exposure and maintain the status quo, Defendants made at least two attempts to hire (*i.e.*, buy off or effectively bribe) Ambassador Reich prior to the dismissal of the Florida Defamation Suit.  No better evidence exists of Ambassador Reich's perceived value to Defendants than their repeated attempts to buy him off in order to silence him.

178.    In late November 2012, one of Defendants' agents in Washington, D.C. tried to persuade Ambassador Reich not to do business with the Banco Venezolano, and instead to provide ORA's services to Derwick Associates, promising Ambassador Reich "a lot of money." Ambassador Reich would not be bought off by the Defendants and refused to work for Derwick Associates.

179.    Not dissuaded, Defendants persisted in their attempts to woo Ambassador Reich. Defendants wanted Ambassador Reich on their team and not aligned with Banco Venezolano. Several days later, on December 6, 2012, Defendants' agent again tried to "persuade"

Ambassador Reich to work for them.  Again, Ambassador Reich refused Defendants' offer of "a lot of money."

180.    When Defendants concluded that they could not co-opt Ambassador Reich, they conspired to take other measures to neutralize his perceived power and influence and thereby preserve the secrecy of their illegal scheme and maintain the status quo.  Defendants conspired to discredit Ambassador Reich by falsely claiming that he was aligned with them.

181.    On December 7, 2012, Ambassador Reich was scheduled to meet with a representative of Banco Venezolano named Cesar Briceño ("Briceño") at the office of Banco Venezolano's U.S. attorneys in Miami, Florida.

182.    *On the same day as the meeting with Ambassador Reich,* Defendants caused Derwick Associates to file an Amended Complaint in the Florida Defamation Suit and, upon information and belief, to serve Cesar Briceño (a representative of Banco Venezolano) with legal papers when he arrived at the Miami airport.  The Amended Complaint named Briceño as a defendant and alleged that Briceño had met in Miami in "December 2102" with a "former U.S. government official" for the alleged purpose of "provid[ing] false information of criminal wrongdoing by [Defendants]" to that "former U.S. government official."  The meeting referenced in the Amended Complaint as having occurred in "December 2012," was the December 7, 2012 meeting between Ambassador Reich and Briceño.  In other words, the Amended Complaint described a meeting that *had yet to occur* when the Amended Complaint was filed.  A lawyer for Derwick Associates later confirmed to Banco Venezolano's lawyer that the reference in the Amended Complaint to a "former government official" was indeed meant to refer to Ambassador Reich.

183.    The motive and objective of including that piece of information in the Amended Complaint (filed on the same day as the meeting in Miami) was to give Banco Venezolano the false impression that Ambassador Reich was a "double agent" working for Derwick Associates, and that Ambassador Reich had shared the location and timing of his December 7, 2012 meeting with Briceño with Derwick Associates in order to allow legal papers to be served upon Briceño. That was not true.  Ambassador Reich never worked for, or with, Derwick Associates, and never acted on their behalf in any regard.  Moreover, Ambassador Reich does not know how Defendants knew of his December 7, 2012 meeting with Briceño.  He did not provide Defendants with that information.

184.    Defendants continued to try to drive a wedge between ORA and Banco Venezolano, this time successfully.  Shortly after Ambassador Reich's meeting with Briceño in Miami, Betancourt and Trebbau, who are believed to have been in New York then, placed a call to their partner (and Betancourt's cousin) Convit-Guruceaga.  They instructed Convit-Guruceaga to call Joaquin Urbano Berrizbeitia ("Urbano"), one of Banco Venezolano's largest shareholders, who also sits on the Banco Venezolano board of directors.  Defendants directed Convit-Guruceaga to (falsely) tell Urbano that "Otto Reich is working for us."

185.    On or about December 20, 2012, Convit-Guruceaga placed the call, and conveyed that false information to Urbano.  Urbano then relayed that message to Banco Venezolano's leadership.  As a result, the bank (including its board of directors) believed that Ambassador Reich was working for Derwick Associates, *the party that was suing it for $300 million*.  Banco Venezolano also came to believe (falsely) that Ambassador Reich was working for and/or affiliated with an enterprise (Derwick Associates) that had profited wildly from the corruption of Venezuela's energy sector.

186.    That information was intended to convince Banco Venezolano not only that Ambassador Reich was aligned with Defendants, but also that he would ethically be unable to assist Banco Venezolano as an expert or otherwise in the Florida Defamation Suit due to a conflict of interest.  The communication that "Otto Reich is working for us" was false, and each Defendant (and Convit-Guruceaga, who is not a defendant to this action) knew it was false when it was made.

187.    In or about the last week of December 2012, Banco Venezolano ceased all communications with Ambassador Reich as a result of the false information conveyed to it.  A major business and contractual relationship worth at least $20,000 per month was lost.

188.    Defendants' false communications to Banco Venezolano were also meant to punish and discredit Ambassador Reich, who had resisted Defendants' efforts to recruit him, including as their expert in the Florida Defamation Suit, which was commenced specifically with the intent to perpetuate and further advance the Defendants' acts of racketeering.

189.    Defendants' acts to discredit Plaintiffs were specifically intended and designed to maintain the status quo in a manner favorable to Defendants, *i.e.*, prevent the disclosure of Defendants' ongoing acts of racketeering, and enhance and protect the enterprise.  If Defendants' bribery scheme were exposed (or if any material aspect of their scheme was adversely altered), Defendants would be out of business and they would no longer be able to perpetuate and profit from their illegal racketeering activities.  Defendants' false communications to Banco Venezolano that Ambassador Reich was working for them were not only directly related to Defendants' bribery and corruption scheme, but Defendants believed them to be essential to the concealment and continuation of their scheme.

***Defendants Intentionally Spread False Information, Which Destroyed***
***Plaintiffs' Business and Contractual Relationship with Eligio Cedeño***

190.    In October 2010, two years prior to the Florida Defamation Suit, ORA was hired by an individual named Eligio Cedeño ("Cedeño") to provide consulting services.  Cedeño resides full time in the United States.

191.    At one point, Cedeño was a prominent Venezuelan citizen involved in the financial industry.  In 2003, Cedeño served as President for Banco Canarias de Venezuela C.A., a financial institution based in Caracas, Venezuela.  Cedeño was also an outspoken opponent of the Venezuelan government, specifically the regime of Hugo Chavez, and he supported a number of anti-Chavez figures in Venezuela.

192.    In 2007, Cedeño was arrested by the Chavez government and held as a political prisoner for more than two years without trial.  He was freed upon recommendation by the United Nations Working Group on Arbitrary Detention.  Immediately upon his release, Cedeño fled to Miami, Florida, and requested political asylum in the United States.  He was granted asylum in May 18, 2011.[28]

193.    Following his arrival in the United States in 2010, Cedeño retained ORA to consult on government relations affairs, specifically regarding Cedeño's status as a vocal opponent of the Chavez regime, as well as to assist Cedeño's efforts to re-establish his business affairs in his new home, the United Sates.

194.    The agreement between ORA and Cedeño called for the payment of $20,000 per month to ORA.  Cedeño paid this amount monthly beginning in 2010.  Pursuant to the contract between ORA and Cedeño, the business relationship was to continue indefinitely.

---

[28]    *See* "U.S. Grants Asylum to Chavez Opponent," *Wall Street Journal*, May 19, 2011, *available at* http://online.wsj.com/article/SB10001424052748704281504576331681585940852.html (last accessed April 24, 2015).

195.    Given his long experience with the Venezuelan government and finance industry, Cedeño knew that Defendants were accused of engaging in corrupt activities in Venezuela, including bribery of energy-sector officials in exchange for government contracts, as described above.

196.    In late 2012, during their campaign to undermine Ambassador Reich's relationship with Banco Venezolano, Defendants Betancourt, Trebbau, and D'Agostino learned that Cedeño was a client of ORA.  Defendants agreed amongst themselves to (falsely) tell Cedeño that Ambassador Reich was working for Derwick Associates.

197.    Defendants knew that if Cedeño was falsely convinced that ORA was working or otherwise associated with Derwick Associates, Cedeño would terminate his consulting contract with ORA, and word would continue to spread (including to Banco Venezolano) and throughout the U.S.-based marketplace that Ambassador Reich and ORA served, that Otto Reich was aligned with Derwick Associates.

198.    To effectuate the scheme, Defendant Betancourt placed a telephone call in November 2012 from what is believed to be his home in New York, to Cedeño, who was then in Miami.

199.    During that conversation, Defendant Betancourt told Cedeño that ORA had been retained by Derwick Associates to offer consulting services.  Defendant Betancourt further told Cedeño that Derwick Associates had an ongoing arrangement with Ambassador Reich for a proposed business venture in Panama.  Neither of those statements was true.

200.    Upon information and belief, at or about the same time, Eloy Montenegro ("Montenegro"), who is Defendant Trebbau's father-in-law made phone calls to Cedeño and/or his agents in which Montenegro stated, in sum and substance, that "Otto Reich is working for

Derwick." At the time that Montenegro communicated this false information, he was acting as an agent not only of Trebbau, but of the other Defendants.

201. Days after his telephone conversation with Defendant Betancourt, Cedeño terminated his agreement with ORA.

202. At that time, Ambassador Reich was unaware that Betancourt had called Cedeño and relayed false information to him concerning Ambassador Reich's alleged relationship with Derwick Associates. As such, Ambassador Reich could do nothing to counter the false statements made to Cedeño.

203. In a later phone conversation between Ambassador Reich and Cedeño, Ambassador Reich learned what Cedeño had been (falsely) told about the "relationship" between Plaintiffs and Derwick Associates, and about Ambassador Reich's purported "business venture" in Panama with Betancourt. Even though this information was proven to be false, Cedeño continued to question Ambassador Reich's allegiances. In fact, before the Original Complaint was filed, Cedeño made specific reference to Betancourt's project in Panama, asking Ambassador Reich again whether he was sure "you weren't in Panama" at a particular time.

204. Defendants' materially false statements to Cedeño that Ambassador Reich was working for Derwick Associates were in response to and in retaliation for Ambassador Reich's refusal to work with Defendants. Defendants' false communications to Cedeño about Plaintiffs were not only directly related to their bribery and corruption scheme, but Defendants believed them to be essential to the concealment and continuation of their scheme. Defendants' statements caused Cedeño to terminate his relationship with Ambassador Reich, thereby injuring Plaintiffs in their business and property.

**Having Deprived Plaintiffs Of Two Important Clients,**
**Defendants Make One More Attempt To Recruit Plaintiffs**

205.    In March 2013, and before the Florida Defamation Suit had been dismissed,

Ambassador Reich published an article in the Miami Herald, which, in part, set forth his opinion

about the Florida Defamation Suit.  He wrote:

> In Chávez's Venezuela, [] a politically favored group (some with
> no previous experience in complex sectors such as energy and
> finance) were able to accumulate [] fortunes that allow them to
> purchase luxury mansions in the U.S. … most of the culprits live in
> or come regularly to this country … They use U.S. banks to move
> money and to maintain their extravagant properties  … To cover
> their tracks and attempt to enjoy the privilege of living in our
> country, some 'Boligarchs' have launched lawsuits against honest
> Venezuelan businessmen in American courts. The purpose is to
> create a smokescreen to hide behind, and prevent the U.S.
> government from expelling the real offenders … [amassing their
> wealth from the] illegitimate awards of government contracts, from
> kickbacks and other gifts to government officials and from other
> unethical and immoral activities.[29]

206.    Shortly thereafter, Ambassador Reich received a call from the former U.S.

Ambassador to the Dominican Republic (the "Former Ambassador").  The Former Ambassador

described Defendants as very successful businessmen who wanted to expand their current,

ongoing business.  He said that he was currently working with Defendants and purportedly being

paid "lots of money."  On behalf of Defendants, the Former Ambassador extended an offer of

employment to Plaintiffs, promising that Plaintiffs would also be well compensated.  Again,

Plaintiffs refused to be bought off by Defendants.

---

[29]    *See* Otto J. Reich and Ezequiel Vasquez-Ger, "Venezuela's Chavez and his U.S. Business Partners," *Miami Herald, available at* http://www.miamiherald.com/2013/03/02/3262092/venezuelas-hugo-chavez-and-his.html#storylink=cpy (last accessed January 9, 2014).

***Defendant D'Agostino is a Founder, Owner, Operator***
***and Agent of Derwick Associates, and Directs its Activities***

207.   While Betancourt and Trebbau are the public faces of Derwick Associates, Defendant D'Agostino, upon information and belief, is a founder, owner and operator of the company, and directs and manages its daily activities.  Upon information and belief, initial financing for Derwick Associates was procured by D'Agostino through the use of his family's monies.

208.   Prior to the commencement of this lawsuit, D'Agostino had acknowledged and admitted to being a key player and member of Derwick Associates' inner circle.

209.   For instance, in late 2012, a human rights advocate and respected journalist (the "*Forbes* Writer") was preparing to publish a story about Derwick Associates in *Forbes* magazine.

210.   Prior to publication of the piece, the *Forbes* Writer sent a November 15, 2012 e-mail to ProEnergy Services inquiring about "the role of Derwick and the cost of the [energy] project" and commenting that "[t]here are numerous published allegations in Venezuela regarding overbilling by Derwick as well as more sensational allegations of money laundering."

211.   As alleged more thoroughly above, ProEnergy Services is the U.S.-based company that does substantially all of the engineering, construction, and operation of the facilities for which Derwick Associates contracted with the Venezuelan government.  The Derwick Associates-ProEnergy relationship is even mentioned in the 2013 book, *Rogue State: How Organized Crime Operates in Venezuela.*

212.   Within days of sending the e-mail to ProEnergy Services, the *Forbes* Writer received several text messages and telephone calls from Defendant D'Agostino.  The *Forbes*

Writer, who knew D'Agostino from childhood, had not spoken to D'Agostino in *at least a decade*.

213.    In his conversation with the *Forbes* Writer, D'Agostino spoke about the business of Derwick Associates.  He also inquired about the article that the *Forbes* Writer was working on about Derwick Associates, and attempted to dissuade the *Forbes* Writer from publishing the piece; in doing so, D'Agostino used the U.S. wires.

214.    In an attempt to convince the *Forbes* Writer that Derwick Associates is a legitimate and law-abiding company, D'Agostino offered to share with the *Forbes* Writer Derwick Associates' contracts with the Venezuelan government, as well as its contracts with ProEnergy Services.  D'Agostino also agreed to disclose Derwick Associates' audited financial statements.  Defendants Betancourt and Trebbau have publicly maintained for years that Derwick Associates' contracts with the Venezuelan government are "confidential." D'Agostino's offer to share those contracts (and Derwick Associates' audited financial statements) with the *Forbes* Writer proves (at a minimum) that D'Agostino is a key player within Derwick Associates who possesses intimate knowledge of Derwick Associates' business.  If D'Agostino were not a key player or member of Derwick Associates' inner circle, be it as a founder, de facto owner, operator, manager, agent or the equivalent, he would not have had access to documents that Defendants Betancourt and Trebbau have publicly maintained are "confidential" nor would he have access to Derwick Associates' financials.

215.    Shortly before November 20, 2012, D'Agostino invited the *Forbes* Writer to dinner in Los Angeles, California, to meet with him and Betancourt.  D'Agostino agreed to bring with him the Derwick Associates' contracts and financials.

216.    On or about November 20, 2012, *Forbes* magazine in New York received a letter from Betancourt, Trebbau, and Derwick Associates' New York counsel in the Florida and New York Defamation Suits, warning them not to publish the *Forbes* Writer's piece.  Fearing legal action, *Forbes* magazine declined to go forward with the piece.

217.    A similar letter was sent by Betancourt, Trebbau, and Derwick Associates' New York counsel to *The Huffington Post*, with whom the *Forbes* Writer had previously published articles.

218.    The *Forbes* Writer and D'Agostino thereafter exchanged a number of text messages.  Those text messages would later be referenced in an Amended Complaint filed by Derwick Associates, Betancourt, and Trebbau in the Florida Defamation Suit – evidence that D'Agostino was working with Betancourt, Trebbau, and Derwick Associates in their legal efforts, and that D'Agostino had supplied the *Forbes* Writer's text messages to their New York Counsel.

219.    Upon information and belief, at Defendants' request, Montenegro also pressured the *Forbes* Writer in connection with the ultimately scuttled *Forbes* piece.

**Defendants' Conspiracy was Conceived and Orchestrated in the United States and Involves Predominately United States Enterprises**

220.    As discussed herein, as part of their pattern of racketeering activity, Defendants direct, control and coordinate virtually all aspects of global strategy, as well as the day-to-day activities of Derwick Associates, from the United States.

Defendants Admit in Formal Documents Publicly-Filed with the
United States Government that Derwick Associates is a U.S. Business

221.    In December 2013, Derwick Associates hired a U.S.-based lobbying firm, the Volkov Law Group LLC (the "Volkov Group"), to represent and advance its business interests in the United States.  Defendants' retention of the Volkov Group reflects that they are actively

seeking new business with other domestic and foreign governments and entities in a manner consistent with their past business practices.

222.    The Volkov Group formally filed the required LD-1 Disclosure Form on behalf of Derwick Associates with the United States Government.  In response to a question on the LD-1 Disclosure Form concerning "foreign entities," Derwick Associates represented that there are *no foreign entities* that (i) hold at least 20% equitable ownership in Derwick Associates or any affiliated organization; (ii) directly or indirectly, in whole or in major part, plan, supervise, control, direct, finance or subsidize the activities of Derwick Associates or any affiliated organization; and (iii) are affiliated with Derwick Associates or any affiliated organization that has a direct interest in the outcome of the lobbying activity.

223.    The Volkov Law Group is part of a group of companies that includes the Volkov Energy Consulting Group.  According to its website, the Volkov Energy Consulting Group "guides energy clients through the global political, business and organizational landscape to produce bottom-line results."  Upon information and belief, Defendants retained the Washington, D.C.-based Volkov Law Group to guide them "through the global political, business and organizational [energy-contracting] landscape."

224.    In a press release issued on November 9, 2013 in the United States by a U.S.-based press agent (Brandon Hopkins) using a U.S.-based press release service (PRWeb), Derwick Associates announced that Betancourt and Trebbau had met with the government of Spain to potentially supply power plants to that country.  In the U.S.-issued press release, Derwick Associates expressed an interest in continuing their energy business in Spain.[30]

---

[30]    *Available at* http://www.prweb.com/releases/DerwickAndAssociates/PowerPlantSpain/prweb11297806.htm (last accessed April 24, 2015).

Defendants Rely Heavily on
U.S.-based Businesses to Construct the Power Plants

225.     By Defendants' own admissions, Derwick Associates relies heavily on several

U.S.-based companies, including General Electric, Pratt & Whitney, and ProEnergy Services to

provide the materials and services needed to construct the power plants.

Defendants Use New York-based J.P. Morgan and Davos
Financial to Funnel Their Illicit Profits into the United States

226.     Upon information and belief, the profits realized under the contracts by

Defendants were funneled through J.P. Morgan and Davos Financial in New York (along with

other financial institutions) by use of the U.S. wires.

227.     At all relevant times, Defendants' personal banker at J.P. Morgan was an

individual named Eduardo Travieso ("Travieso"), a Vice President in the Private Banking

Division who was located in New York, New York.

228.     It has been reported that while at J.P. Morgan, Travieso was tasked by Derwick

Associates to obscure the source of their ill-gotten gains.[31]  The scheme worked like this:  after

wire transfers from Venezuela placed significant funds in Derwick Associates' accounts,

Travieso would buy – and then almost immediately sell – significant quantities of bonds, and

then wire the money out of Derwick Associates' account (most often to Derwick Associates'

accounts at Davos Financial Group), thus obscuring the true source of the funds.

229.     On March 21, 2013, according to a required U.S. regulatory filing with FINRA,

Travieso separated from J.P. Morgan following allegations that Travieso had potentially

committed violations of investment-related statutes, fraud, or failure to supervise in connection

---

[31]     *See* Posting to Infodio, October 2, 2013, available at
http://infodio.com/021013/eduardo/travieso/derwick/associates/jp/morgan (last accessed January 12, 2014); Posting
to Infodio, July 31, 2013, available at http://infodio.com/310713/eduardo/travieso/jp/morgan/derwick/associates
(last accessed April 24, 2015).

with investment-related statutes, arising from certain undisclosed customer interactions by Travieso. In the filing, J.P. Morgan has stated publicly that "Mr. Travieso acted in a manner that is inconsistent with the Firm's policies and procedures," and had "fallen short of the standards" of financial industry employees.

230.   Travieso was not only Derwick Associates' banker; he was and remains a personal friend of the Defendants. Indeed, Travieso helped at least one of them secure real property in New York and also procure financing from United States banks.

231.   According to public documents, Defendant Betancourt currently resides at the Olympic Tower, 641 Fifth Avenue, Penthouse 6, New York, New York 10022. The Olympic Tower is considered one of the top full-service white glove luxury buildings in New York City, and is a symbol of the financial empire of the late Greek shipping magnate, Aristotle Onassis, and his wife, the former First Lady, Jacqueline Kennedy. Sale documents filed with the New York City Department of Finance, Office of the City Register, indicate that Penthouse 6 was purchased on November 23, 2010 by a company named BL 641 Fifth LLC. Upon information and belief, "BL" in the company name stands for "Betancourt Lopez." Upon information and belief, Defendant Betancourt is the effective owner of Penthouse 6, and he (or one of his corporate entities) has been paying and continues to pay New York real estate taxes on that property.

232.   Penthouse 6 is subject to a $5.85 million mortgage *financed by J.P. Morgan.* David Levine, an attorney with the New York law firm, Platte, Klarsfeld, Levine & Lachtman, is identified on the mortgage documents as the "Manager" of BL 641 Fifth, LLC and, upon information and belief, has been paid in U.S. dollars by Defendant Betancourt for his New York-focused services as manager of BL 641 Fifth, LLC.

233.     The Real Property Transfer Report filed with the State of New York for Penthouse 6 indicates that an individual named Eduardo Travieso signed as *"Buyer"* for BL 641 Fifth LLC.  Upon information and belief, when he signed that document, Travieso *worked for J.P. Morgan Securities LLC* in New York.  In other words, Travieso (for the benefit of Betancourt) appears to have been on both sides of the mortgage finance transaction, *i.e.*, as the buyer of the real property *and* as the financier of the acquisition.

234.     Upon information and belief, Defendants also use Davos Financial Advisors, LLC (d/b/a Davos Financial Group), a financial services firm that maintains offices in New York and Florida, to move their ill-gotten funds.

235.     According to S.E.C. filings, Davos Financial Advisors, LLC is headquartered in the United States at 2665 S. Bayshore Drive, Suite 810, Coconut Grove, Florida 33133.  That location is also registered as the headquarters of two other businesses managed by David Osio – Davos Mortgage Investors, LLC, and Carraven, LLC.  According to its website, Davos Financial Group maintains offices in New York at 405 Park Avenue, 17th Floor, New York, NY 10022.

236.     In publicly-filed documents, Derwick Associates claims that, in order for it to participate in the Venezuelan energy market, it was required to purchase and provide a U.S.-based original equipment manufacturer with a surety bond for approximately U.S. $500,000 in exchange for a one-month exclusivity period.  During that period, Derwick Associates says that it was contractually required either to sell the equipment to a third party or, if unable to obtain a purchaser, forfeit the $500,000 amount of the surety bond.[32]  Upon information and belief, the negotiations, paperwork, financing efforts and the other conduct necessary to agree upon and

---

[32]     Of note, the currency of Venezuela is the Venezuelan Bolivar; yet, Defendants, in their court filings and otherwise, discuss their business practices in U.S. dollars (and not Bolivars) lending further proof to the U.S.-based nature of Defendants' business.

memorialize such transactions here in the United States reflect the U.S.-based focus of

Defendants' business efforts as well as their reliance on U.S.-based businesses; it also reflects

Defendants' ongoing use of the U.S. wires.

> Derwick Associates and the Defendants
> Market Their Business Activities in the U.S.

237.    Derwick Associates promotes its business in the United States to prospective

clients.  Upon information and belief, in a recent project proposal to the dictatorship of

Suriname, Derwick Associates claimed in a PowerPoint presentation to have constructed the

Harry D. Mattison Power Plant in Tontitown, Arkansas.

238.    Derwick Associates and Defendants also employ U.S.-based public relations

firms and other "brand and reputation managers"[33] to create "good press" about Defendants and

the company and its affiliates in the United States where Derwick Associates' business and

banking relationships are located.  These individuals are responsible for managing and protecting

Defendants' (and Derwick Associates') reputation and public image, and they use the U.S. wires

to do so.

239.    Defendants have retained and caused to be paid at least two U.S.-based press

release services to distribute positive press pieces about Defendants and Derwick Associates:  PR

Newswire, which is a U.S.-based business with its headquarters in New York City, and PRWeb,

which is a U.S.-based business with offices in Virginia, Maryland and Washington, D.C.  Press

---

[33]    Brand and reputation management generally refers to the process of maintaining, improving, protecting and upholding a company's or a person's brand and reputation so a name is associated with positive perceptions and images in the minds of others.  Virtually all major companies employ brand and reputation management professionals as part of their typical business operations.  To name only a few, General Electric, Amazon, Starbucks, Nike, Target, Coca-Cola, IBM, General Motors, and Pfizer all employ such managers within their companies.  That such businesses across a wide range of industries deploy brand and reputation managers demonstrates the inextricable and logical connection (*i.e.*, the relatedness) between a company's provision of their products and services, on the one hand, and brand and reputational management and protection, on the other hand.

releases issued on behalf of PRWeb and PR Newswire are sent to journalists in New York City, including at *The New York Times*.

240.    That Defendants continue to self-promote their business interests here in the United States by issuing English language press releases via a U.S.-based public relations company with a California phone number, and availing themselves of the New York media market, reflects that Defendants have substantial business interests that they wish to protect and advance in the United States.

241.    Since the commencement of this lawsuit, Defendants have issued many press releases in the United States including the following concerning Derwick Associates:

- On January 10, 2014, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets about how Defendants work to "meet the needs of the Venezuelan people." The press release referenced Betancourt and Trebbau, and acknowledged that they intend to continue to seek out business in Venezuela as opportunities are presented. *See* January 10, 2014, PR Newswire, Media Contact: Brandon Hopkins, AfterHim Media LLC, (559) 871-1613, brandonchopkins@gmail.com, *available at h*ttp://m.prnewswire.com/news-releases/derwick-associates-continues-to-meet-the-needs-of-the-venezuelan-people-239623871.html (last accessed April 24, 2015).

- On January 9, 2014, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets about an "award" they supposedly received. The press release referenced Betancourt and Trebbau and, then, quotes from an unnamed "representative with Derwick." *See* December 31, 2013, PR Newswire, Media Contact: Brandon Hopkins, AfterHim Media LLC, (559) 871-1613, brandonchopkins@gmail.com, *available at* http://m.prnewswire.com/news-releases/derwick-associates-wins-capital-award-for-best-latin-american-initiative-238240221.html (last accessed April 24, 2015).

- On December 31, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets that they are looking "to bring [their] unique brand of experience" to Spain. Defendants stated that their business "experience" makes them "uniquely qualified for this opportunity to expand." *See* January 9, 2014, PRWeb, Contact: Brandon Hopkins SunsetReputation.com, (559) 871-1613, *available at* http://www.prweb.com/releases/Pedro-Trebbau-Lopez/Derwick-

Associates/prweb11477028.htm (last accessed April 24, 2015) ("Derwick Associates looks to expand").

- On December 26, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets about Betancourt's views of Derwick Associates' business. *See* December 26, 2013, PRWeb, Contact: Brandon Hopkins SunsetReputation.com, (559) 871-1613, *available at* http://www.prweb.com/releases/Leopoldo-Alejandro/Betancourt-Lopez-Derwick/prweb11443299.htm (last accessed April 24, 2015).

- On December 25, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets about how Derwick Associates' business experience has supposedly been well documented. *See* December 25, 2013, PRWeb, Contact: Brandon Hopkins SunsetReputation.com, (559) 871-1613, *available at* http://www.prweb.com/releases/FranciscoConvitGuruceaga/Derwick_Associates/prweb11443290.htm (last accessed April 24, 2015).

- On November 9, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets that "the directors of Derwick Associates have expressed an interest in taking their projects overseas." *See* "Derwick Associates Looking to Build Power Plants in Spain," November 9, 2013, PRWeb, Contact: Brandon Hopkins SunsetReputation.com, (559) 871-1613, *available at* http://www.prweb.com/releases/DerwickAndAssociates/PowerPlantSpain/prweb11297806.htm (last accessed April 24, 2015).

- On November 6, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets about how Defendants intend to continue "power plant construction in 2014." *See* November 6, 2013, PRWeb, Contact: Brandon Hopkins SunsetReputation.com, (559) 871-1613, *available at* http://www.prweb.com/releases/DerwickAssociates/Venezuela-Power-Plant-Job/prweb11297808.htm (last accessed April 24, 2015).

- On November 5, 2013, Defendants caused their public relations company to prepare and issue a press release from the United States (published in English) for the specific purpose of boasting to the United States and New York markets that "Derwick is seeking opportunities abroad." *See* "Derwick Associates to Seek Investment Opportunities in Spain," November 5, 2013, PRWeb, Contact: Brandon Hopkins SunsetReputation.com (559) 871-1613, *available at* http://www.prweb.com/releases/Derwick-Associates/Spain-Expansion/prweb11297809.htm (last accessed April 24, 2015).

242.     Upon information and belief, Derwick Associates employs online "reputation managers" to cultivate a positive online reputation for Derwick Associates (and, by extension, Defendants) in the United States.  Such "reputation managers" create search-result clutter that has the effect of obscuring negative information about Derwick Associates and Defendants should an individual enter search terms like, for example, "Derwick Associates," "Alejandro Betancourt," "Pedro Trebbau," or "D'Agostino" into search engines such as Google.

243.     Generating positive press for Defendants (and Derwick Associates) is only part of the equation.  Defendants' efforts are also focused on what is termed "opposition research" in politics or negative press that will silence their critics.  For example, Defendants have retained (a) a U.S.-based lobbying firm; (b) a former 18-year prosecutor with the Manhattan District Attorney's office; and (c) the former Latin America Bureau Chief and Global News Editor (Energy) for the *Wall Street Journal* to help squash adverse publicity and silence their critics.  Through these individuals, Defendants try to "control the message" and influence public opinion by, among other things, preparing and distributing a set of talking points to the U.S. media about themselves, this lawsuit, Derwick Associates and Defendants' various business activities.  These efforts are a necessary and integral part of Defendants' overall scheme to protect their reputations, image, and ongoing acts of racketeering.

244.     Upon information and belief, Derwick Associates employs the services of an individual named Rafael Eladio Núñez Aponte a/k/a "RaFa" to manage their online reputations and orchestrate smear campaigns against their opponents.  "RaFa" openly admits that he was formerly a U.S.-based hacker convicted of hacking the website of the United States Air Force, for which he was later convicted and imprisoned.  Upon information and belief, "RaFa" now

74

heads the online reputation company called "Clean Perception," which has an office in Florida; "RaFa" is an owner of the website Primicias24.com, which is discussed more fully below.

245.    Notably, Defendants' reputation-protecting efforts focus mostly on the English-language media in the United States – the only place Defendants care about protecting their reputation and projecting an air of legitimacy.

246.    Upon information and belief, Defendants have also retained FTI Consulting, a U.S.-based business advisory firm with an office in New York, to conduct investigative-type services, and a California-based business known as Sunset Reputation, which also appears to be in the business of reputation management.

Unusual Media Events Suggest That Defendants
May Be Trying to Manipulate the U.S. Media

247.    On September 27, 2013, an article about Derwick Associates was published on *Forbes* magazine's website by an individual named Hilary Kramer ("Kramer").[34]  Kramer's piece on Forbes.com was highly solicitous of Derwick Associates, claiming without attribution that Derwick Associates secured its energy-sector contracts cleanly despite their acknowledged "political connections," and purporting that Derwick Associates' contracts were audited by a company named RSM International.

248.    The *very next day*, in a highly unusual move, the piece was pulled from *Forbes'* website without comment.  The piece has not been reposted.  Kramer later issued an apology for the piece via her personal Twitter account, claiming that she was "looking at [Derwick] purely from a stock-picker's perspective," even though Derwick Associates, of course, does not issue public stock.  The fact that the piece was pulled so quickly and without comment suggests that

---

[34]    *See* Hilary Kramer, "Changing Balance of Power May Unlock Venezuela's Markets," September 26, 2013, Forbes.com, *formerly available at* http://www.forbes.com/sites/hilarykramer/2013/09/26/changing-balance-of-power-may-unlock-venezuelas-markets/

Defendants or one of their agents was responsible for its preparation and publication in the U.S. media.

Derwick Associates Uses the U.S. Court System
And U.S. Laws To Protect its Business Interests

249.   Derwick Associates also uses the U.S. court system, including the New York courts, to suppress its (and Defendants) critics and protect its U.S.-based economic and financial interests.  Indeed, within the last two years, and in response to perceived threats to its business, Derwick Associates commenced two related legal actions in the United States in state courts in New York and in Florida.  In New York, Defendants Betancourt and Trebbau and Derwick Associates sued a group of unknown conspirators whom they alleged to be acting in concert with Banco Venezolano and the other defendants in the Florida Defamation Suit.  Derwick Associates retained legal counsel in New York to represent its interests in both of those litigations and, upon information and belief, that same New York law firm continues today to represent Derwick Associates' interests.

Derwick Associates Owns Property in the United
States and Employs Individuals in the United States

250.   Upon information and belief, Derwick Associates owns at least two private jets that are registered in the United States.  According to published reports, Derwick Associates owns a Falcon 2000 business jet with tail number N229DA.  The registrant for the plane in the United States database is CSC Trust Co. of Delaware Trustee, but other registries available online list the registrant as Derwick Associates under "OpName" for the plane.  There is also a Cessna 550 jet with United States tail number N300CS registered to CSC Trust Company of Delaware that lists Derwick Associates under "OpName."  "OpName" refers to "operator name."

251.   Upon information and belief, Defendants employ an individual named Gilbert Deleaud ("Deleaud"), who resides in Florida, to fly their private jets.  According to Federal

Aviation Administration flight records, between December 20, 2010 and June 8, 2013, the aircraft bearing identification number N229DA, arrived in or departed from airports within the United States, including Teterboro Airport in New Jersey, no less than 185 times. According to its website, Teterboro Airport is less than 12 minutes from midtown Manhattan. Teterboro is the main private jet airport serving Manhattan, which has been described as "synecdochical for the New York Dream" and "a landmark of the social geography mapped by 'Page Six,' *Fortune*, and *Gossip Girl*."[35]

252. Deleaud is a registered agent for EOE Management Inc., a company registered in Florida on January 9, 2013. The registered address for EOE Management Inc. is 1100 Lee Wagner Blvd, Suite 349, Ft Lauderdale, FL. That is the building next door to 1050 Lee Wagner Boulevard, Suite 349, Ft Lauderdale, FL, which – as noted above – is where Derwick Associates USA, LLC is located. Upon information and belief, Deleaud also shares a home with an individual named Massiel Hernandez, who is listed on public documents as a registered agent for Derwick Associates USA, LLC.

> Derwick Associates has a United States Contact Number
> And an English Language Website that is Accessible in the United States

253. Derwick Associates' electronic mail signature as used by at least Defendant Trebbau specifically references www.derwick.com (which is a website published in English) and lists a "USA Direct" phone number (1-786-266-7703), which further reflects Defendants' use of the U.S. wires.

---

[35]    *See* "Teterboro Airport, Ground Zero for the Private-Jet Backlash," July 20, 2009, *New York Magazine*, *available at* http://nymag.com/daily/intelligencer/2009/07/teterboro_airport_ground_zero.html (last accessed April 24, 2015).

254.     Derwick Associates' website can also be found at www.derwickassociates.com, which is displayed in English, which further demonstrates that their business is U.S.-based; the native language in Venezuela is not English, but Spanish.

***Within Days of the Original Complaint Being Filed,***
***Ambassador Reich and ORA Suffer Online Attacks***

255.     It cannot be a coincidence that on August 2, 2013, only days after the Original Complaint in this action was filed, various websites associated with Ambassador Reich and ORA (including www.americas-forum.com; www.ottoreich.com and www.ezequielvazquez.com) suffered online attacks and were taken offline.

256.     That same day, the Infodio website, known for writing about the corruption of Derwick Associates, was also taken offline in what appears to have been an intentional denial-of-service (hacking) attack.

257.     Also that day, an ORA employee witnessed attempts to hack his e-mail via "phishing" scams.  "Phishing" scams are attempts to get the target to click on a dangerous website or enter a password (which would then allow the hacker to infiltrate the user's computer).  The attempts to hack Ambassador Reich's and his employees' e-mails continued into the third week of August 2013.

***Following the Commencement of this Lawsuit, Several***
***People Referenced in the Original Complaint Were***
***Targeted and Subjected to Personal Ridicule and Attack***

258.     After the filing of the Original Complaint in this litigation, Ambassador Reich and at least three individuals referenced in the Original Complaint as having been perceived as critical of Defendants and/or Derwick Associates were clumsily smeared in various media outlets in outlandish ways.  These apparent acts of retaliation by Defendants deployed the U.S. wires.

Ambassador Reich is Accused of Being an
Assassin, a "Mercenary" and a "Professional Terrorist"

259.    On or about September 25, 2013, the President of Venezuela, Nicolás Maduro,

stated publicly that the reason he did not attend the General Assembly of the United Nations in

New York City was because of unspecified "provocations" against him by Ambassador Reich.[36]

In response to these unfounded allegations, the United States Department of State issued a

statement categorically rejecting allegations of U.S. persons' involvement in any plots to harm

Venezuelan officials or to destabilize the Venezuelan government.

260.    On or about November 21, 2013, Primicias24.com, a pro-Venezuelan government

website, posted a 47-page "special report" that purports to show that Garcia Mendoza and

Ambassador Reich are in cahoots to destabilize Venezuela.  Referring to Ambassador Reich as a

"mercenary" and "professional terrorist," the Primicias24.com report claims that Ambassador

Reich's lawsuit against Derwick Associates is one part of a larger campaign to overthrow the

government of Venezuela (the "Primicias24 Report").[37]  Upon information and belief, the

Primicias24 Report, which has been translated into English, is housed in a Google drive in the

United States.[38]

261.    Primicias24.com regularly promotes articles that appear to be little more than

press releases about "good works" done by Derwick Associates,[39] and gives prominent

---

[36]     *See* "Venezuelan Leader, Citing Plot, Skips U.N.," *Wall Street Journal*, September 25, 2013, *available at* http://online.wsj.com/news/articles/SB10001424052702304795804579097852798627702 (last accessed April 24, 2015).

[37]     *See* Primicias24.com, *available at* http://www.primicias24.com/nacionales/plan-to-overthrow-Nicolás-maduro-by-destroying-pdvsa/ (last accessed January 9, 2014).

[38]     *Id*.

[39]     For instance, Primicias24.com regularly tweets about "news items" like Derwick Associates' donations to social causes. *See, e.g.*, https://twitter.com/primicias24/status/250265614357233665 (tweet regarding Derwick donation) (last accessed April 24, 2015).

placement to smears and attacks on Derwick Associates' enemies.  Indeed, Primicias24.com

appears to be little more than a mouthpiece for rhetoric by the Defendants.

262.     According to publicly available information, Primicias24.com is a U.S.-hosted

website operated by Dynadot.com, located in San Mateo, California.[40]  But Dynadot.com does

not actually have anything to do with Primicias24.com; rather, Dynadot.com is a company whose

business is to help hide the true identity of a website operator.[41]

> Oscar Garcia Mendoza is Accused of Plotting the
> Attempted Assassination of Several Venezuelan Government Officials

263.     Plaintiffs' Original Complaint makes numerous references to Garcia Mendoza,

who was the President and Board Chairman of Banco Venezolano when the Florida Defamation

Suit was commenced.  *See* Original Complaint, ¶¶ 6, 84-87, 92.

264.     In an article originally published on September 23, 2013 on the U.S.-hosted

online "news" site Primicias24.com, Garcia Mendoza is accused of plotting to kill Miguel

Rodríguez Torres, a Major General in the Venezuelan Army and Director of the National

Bolivarian Intelligence Service (SEBIN), as well as the Minister of the Interior, Justice and

Peace of Venezuela.[42]

> Alek Boyd is Accused of Contracting
> AIDS and Intentionally Spreading the Disease

265.     In the Original Complaint, Plaintiffs reference Alek Boyd as one of several

authors who have published articles detailing allegations of improper payments by Defendants

---

[40]     *See* http://www.whois.com/whois/primicias24.com (last accessed April 24, 2015).

[41]     *See* Dynadot.com website, *available at* http://www.dynadot.com/domain/privacy.html (last accessed April 24, 2015) ("When someone does a Whois lookup for your domain, your personal e-mail address, phone number, and mailing address are all replaced with Dynadot's domain privacy contact information.").

[42]     *See* Primicias24.com, *available at* http://primicias24.com/nacionales/oscar-garcia-mendoza-thor-halvorssen-y-leopoldo-lopez-planean-asesinar-al-ministro-rodriguez-torres/ (last accessed January 9, 2014).

and Derwick Associates in the securing of the energy-sector contracts.  *See* Original Complaint, ¶ 79.

266.    In an article originally published on September 28, 2013 on Primicias24.com, Boyd was accused of contracting AIDS from a transsexual and deliberately spreading the disease to various men and women around the world.[43]  On September 30, 2013, Primicias24.com published another piece accusing Boyd of spreading AIDS and sleeping with "boys," and in the same piece defended the honor of Derwick Associates, characterizing the company as honest and unfairly maligned by Boyd.[44]

267.    Primicias24.com regularly re-publishes those smears, including tweets linking to the articles.  Indeed, Primicias24.com tweeted a link to the articles on Garcia Mendoza and Boyd as late as November 13, 2013.

A Banco Venezolano Shareholder and
Director Suffers a Major Invasion of Privacy

268.    Rafael Alfonzo ("Alfonzo") was a defendant in the Florida Defamation Suit. When that suit was commenced, he was a shareholder and director of Banco Venezolano.

269.    On or about October 10, 2013, a video was posted on the website Vimeo.com (and republished in a Panama-based newspaper) of Alfonzo.[45]  The video, captioned "My Little Camera Sees Everything," shows Mr. Alfonzo's bedroom, and contains footage of Mr. Alfonzo reading and sleeping.  It appears that a spycam was placed in Mr. Alfonzo's bedroom to surreptitiously record him.

---

[43]    *See* Primicias24.com, *available at* http://www.primicias24.com/actualidad/alek-boyd-has-aids/ (last accessed January 9, 2014).

[44]    *See* Primicias24.com, *available at* http://www.primicias24.com/nacionales/carlos-herrera-respuesta-al-sicario-homosexual-y-enfermo-de-alek-boyd/ (last accessed January 9, 2014).

[45]    *See* Posting to Infodio, October 17, 2013, *available at* http://infodio.com/node/556 (last accessed April 24, 2015).

270.     Upon information and belief, the smears and the other actions undertaken by Primicias24.com were directed by Defendants, and part and parcel of their ongoing scheme, for the express purpose of undermining those individuals whom Defendants believe to be critical of Defendants.

## FIRST CLAIM FOR RELIEF

### Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. § 1962(c)

271.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 270, inclusive, as if fully set forth herein.

272.     Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), are brought against each and every Defendant.  Plaintiffs Ambassador Reich and ORA are each "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).  Defendants Betancourt, Trebbau and D'Agostino are each a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1962(c) who each individually conducted, participated in, engaged in, and operated and managed the affairs of various enterprises through a pattern of racketeering activity.

273.     Specifically, Defendants Betancourt, Trebbau and D'Agostino conducted, participated in, and agreed to conspire to conduct the affairs of RICO Enterprises I, II, III, IV, V and VI through a pattern of racketeering activity.

274.     Defendants' enterprises are based in the United States, and the activities of Defendants' enterprises affect interstate and foreign commerce.  As described below, Defendants operate and manage their enterprises through acts of racketeering in violation of the Travel Act, 18 U.S.C. § 1952(a) and (b); the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*; and the federal wire fraud statute, 18 U.S.C. § 1343.

275.     Defendants' enterprises constitute the equivalent of an organized crime family, drug organization or street gang, and are engaged in the business of racketeering.

### *RICO Enterprise I – Derwick Associates*

276.     RICO Enterprise I (also referred to herein as "Derwick Associates") is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) and consists of the following members:  Derwick Associates USA LLC and Derwick Associates Corporation, and these entities' predecessors, successors, assigns and affiliates.  The members of Derwick Associates have the common purpose of advancing and protecting the economic interests of Betancourt, Trebbau, and D'Agostino.  The members of Derwick Associates are all related in that they are all controlled, operated and managed by, or are the alter egos of Betancourt, Trebbau, and D'Agostino.  Derwick Associates possesses sufficient longevity to achieve its purpose(s) in that it has secured more than $1 billion in government contracts, continues to secure additional government contracts, and continues to defend and advance the reputations and business practices of its principals:  Betancourt, Trebbau, and D'Agostino.

277.     As set forth above, Betancourt, Trebbau, and D'Agostino were the founders, officers, and managers of Derwick Associates, and at all relevant times have directed, controlled and coordinated the activities of Derwick Associates from their New York offices and homes.  Upon information and belief, Betancourt, Trebbaum and D'Agostino communicate with each other by phone, text messages and e-mail on a daily basis and have done so for the duration of the racketeering activity alleged, and have met often in New York and Florida.

278.     Betancourt, Trebbau and D'Agostino agreed to and did conduct and participate in the conduct of Derwick Associates' affairs through a pattern of racketeering activity discussed above, to wit, the solicitation and payment from the United States of Venezuelan officials for

purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and

from bank accounts in the United States, and the silencing, via wire fraud and other methods, of

those (like Ambassador Reich) who were critical of or otherwise posed an actual or perceived

threat to Derwick Associates' illicit methods and who could expose their illegal scheme.

279.    Pursuant to and in furtherance of their fraudulent scheme, and as discussed above,

Derwick Associates committed multiple related acts constituting violations of the Travel Act, 18

U.S.C. § 1952(a) and (b); the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*; and the

federal wire fraud statute, 18 U.S.C. § 1343.

### *RICO Enterprise II – Betancourt, Trebbau, and D'Agostino*

280.    RICO Enterprise II, which is alleged in the alternative, is an association-in-fact

enterprise within the meaning of 18 U.S.C. § 1961(4) and consists of the following members:

Betancourt, Trebbau, D'Agostino, and non-party Convit-Guruceaga.  The members of RICO

Enterprise II have the common purpose of advancing and protecting their personal mutual

economic interests and the business of Derwick Associates.  The members of RICO Enterprise II

are all related in that they are all business partners, associates or colleagues seeking to secure

energy-sector contracts, including from the Venezuelan government, through Derwick

Associates.  RICO Enterprise II possesses sufficient longevity to achieve its purpose(s) in that it

has secured more than $1 billion in government contracts, continues to secure additional

government contracts, and continues to defend and advance the reputations and business

practices of Betancourt, Trebbau, D'Agostino, non-party Convit-Guruceaga, and Derwick

Associates.

281.    At all relevant times, Betancourt, Trebbau, D'Agostino, and non-party Convit-

Guruceaga directed, controlled, operated, managed and coordinated the activities of RICO

Enterprise II from their New York offices and homes.  Upon information and belief, the members of RICO Enterprise II communicate with each other by phone, text messages and e-mail on a daily basis and have done so for the duration of the racketeering activity alleged, and have met often in New York and Florida.

282.    Betancourt, Trebbau, D'Agostino, and non-party Convit-Guruceaga agreed to and did conduct and participate in the conduct of the affairs of RICO Enterprise II through a pattern of racketeering activity discussed above, to wit, the solicitation and payment from the United States of Venezuelan officials for purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and from bank accounts in the United States, and actions constituting wire fraud.

283.    Pursuant to and in furtherance of their fraudulent scheme, Defendants Betancourt, Trebbau, D'Agostino, and non-party Convit-Guruceaga committed multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18 U.S.C. § 1343.

### *RICO Enterprise III – Betancourt and Trebbau*

284.    RICO Enterprise III, which is alleged in the alternative, is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) and consists of the following members: Betancourt and Trebbau.  The members of RICO Enterprise III have the common purpose of advancing and protecting their personal mutual economic interests and the business of Derwick Associates.  The members of RICO Enterprise III are all related in that they are all business partners, associates or colleagues seeking to secure energy-sector contracts, including from the Venezuelan government, through Derwick Associates.  RICO Enterprise III possesses sufficient longevity to achieve its purpose(s) in that it has secured more than $1 billion in government

contracts, continues to secure additional government contracts, and continues to defend and advance the reputations and business practices of Betancourt and Trebbau.

285.    At all relevant times, Betancourt and Trebbau directed, controlled, operated, managed and coordinated the activities of RICO Enterprise III from their New York offices and homes.  Upon information and belief, the members of RICO Enterprise III communicate with each other by phone, text messages and e-mail on a daily basis and have done so for the duration of the racketeering activity alleged, and have met often in New York and Florida.

286.    Betancourt and Trebbau agreed to and did conduct and participate in the conduct of the affairs of RICO Enterprise III through a pattern of racketeering activity discussed above, to wit, the solicitation and payment from the United States of Venezuelan officials for purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and from bank accounts in the United States, and actions constituting wire fraud.

287.    Pursuant to and in furtherance of their fraudulent scheme, Defendants Betancourt and Trebbau committed multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18 U.S.C. § 1343.

### *RICO Enterprise IV – Betancourt*

288.    RICO Enterprise IV, which is alleged in the alternative, consists of Betancourt, an individual who constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).  Trebbau and D'Agostino individually conducted, participated in, engaged in, and operated and managed the affairs of Betancourt through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

289.     Trebbau and D'Agostino's said pattern of racketeering activity consisted of multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18 U.S.C. § 1343.  In particular, as set forth above, Trebbau and D'Agostino, through Betancourt, engaged in the solicitation and payment from the United States of Venezuelan officials for purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and from bank accounts in the United States, and actions constituting wire fraud.

### *RICO Enterprise V – Trebbau*

290.     RICO Enterprise V, which is alleged in the alternative, consists of Trebbau, an individual who constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).  Betancourt and D'Agostino individually conducted, participated in, engaged in, and operated and managed the affairs of Trebbau through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

291.     Betancourt and D'Agostino's said pattern of racketeering activity consisted of multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18 U.S.C. § 1343.  In particular, as set forth above, Betancourt and D'Agostino, through Trebbau, engaged in the solicitation and payment from the United States of Venezuelan officials for purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and from bank accounts in the United States, and actions constituting wire fraud.

### *RICO Enterprise VI – D'Agostino*

292.     RICO Enterprise VI, which is alleged in the alternative, consists of D'Agostino, an individual who constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).

Betancourt and Trebbau individually conducted, participated in, engaged in, and operated and managed the affairs of D'Agostino through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

293.    Betancourt and Trebbau's said pattern of racketeering activity consisted of multiple related acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18 U.S.C. § 1343.  In particular, as set forth above, Betancourt and Trebbau, through D'Agostino, engaged in the solicitation and payment from the United States of Venezuelan officials for purposes of securing energy-sector contracts, transmission of the ill-gotten gains via wire to and from bank accounts in the United States, and actions constituting wire fraud.

### *Predicate Acts – Travel Act*

294.    The Travel Act prohibits the use of interstate or foreign commerce to "promote," "manage," or "carry on" unlawful activity.  18 U.S.C. § 1952(a).  Bribery is a form of illegal activity.

295.    As set forth in the preceding paragraphs, Betancourt, Trebbau, and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI intentionally made and conspired to use the mail and other facilities in interstate and foreign commerce; to promote, manage, establish, and carry on, their unlawful activities (to wit, bribery in violation of the laws of the United States); and thereafter performed additional acts in furtherance of the specified unlawful activities.

296.    As set forth in the preceding paragraphs, Betancourt, Trebbau, and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI intended to and did engage in unlawful activities, namely, the bribery of Venezuelan public officials; Betancourt, Trebbau, and D'Agostino used wire communications (including communications via telephone) originating

from the United States and traveled to and from the United States and Venezuela to further their pattern of racketeering activity; and Betancourt, Trebbau, and D'Agostino accepted and transmitted their ill-gotten gains to and from bank accounts in the United States, including accounts at J.P. Morgan Chase Bank and Davos Financial Group.

### *Predicate Acts – FCPA*

297.    The Foreign Corrupt Practices Act ("the FCPA") prohibits a person from using the U.S. mails or wires to bribe foreign officials to effectuate business.  15 U.S.C. §§ 78dd-1, *et seq*.

298.    As set forth in the preceding paragraphs, Betancourt, Trebbau, and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI, knowingly and intentionally made and conspired to make use of the instrumentalities of interstate commerce corruptly in furtherance of offers and payments of money to Venezuelan public officials, knowing that such money was offered and paid, to wrongfully influence such foreign officials in their official capacity in order to secure improper advantages to assist in obtaining business; to wit, the contracts described above.

299.    As set forth in the preceding paragraphs, Betancourt, Trebbau, and D'Agostino through RICO Enterprises I, II, III, IV, V and VI, used wire communications (including communications via telephone, internet and e-mail) originating from the United States on numerous occasions to further these U.S.-based fraudulent activities, and transmitted their ill-gotten gains to and from bank accounts in the United States, including accounts at J.P. Morgan Chase Bank and Davos Financial Group.

### *Predicate Acts – Wire Fraud*

300.    As set forth in the preceding paragraphs, Betancourt, Trebbau, and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI, intentionally and knowingly made and conspired to make materially false statements, known by them to be false, to Cedeño, officials from Banco Venezolano, and others, regarding Ambassador Reich and ORA; to wit, that Ambassador Reich and ORA were personally and professionally associated with Derwick Associates and/or its individual members, with the intent that Banco Venezolano, Cedeño and others would rely on those false statements.

301.    Betancourt, Trebbau and D'Agostino's predicate acts of wire fraud were specifically designed and calculated to deprive Ambassador Reich and ORA of large sums of money and property, and to destroy Ambassador Reich's and ORA's business reputation and relationships with Cedeño and Banco Venezolano.  Defendants' predicate acts of wire fraud deprived Ambassador Reich and ORA of large sums of money and property, and destroyed Ambassador Reich's and ORA's business reputation and relationships with Cedeño and Banco Venezolano.

302.    Betancourt, Trebbau and D'Agostino's predicate acts of wire fraud were also intended to and did (a) prevent the formation of an alliance between Plaintiffs and Banco Venezolano, a longtime critic of Defendants, with all the attendant actual and perceived threats to Defendants' ongoing criminal scheme; (b) prevent Plaintiffs from working against Defendants in the Florida and New York defamation suits, which, among other things, Defendants perceived would increase public awareness, scrutiny, and criticism of Defendants and their illicit business practices; (c) prevent Plaintiffs from directing their focus on and/or becoming directly and actively involved in the subject matter and allegations of the Florida and New York defamation suits, which concerned Defendants, their business relationships and their illicit business

practices, including acts of bribery; (d) prevent Plaintiffs from being retained as a formal and focused influencer, investigator, and critic as against Defendants, their business relationships and illicit business practices, including acts of bribery; and (e) prevent Plaintiffs from having the opportunity to uncover information concerning Defendants' acts of illegal bribery, including through discovery in the Florida Defamation Suit.

303.    Betancourt, Trebbau, and D'Agostino's predicate acts of wire fraud were also intended and designed to prevent the disclosure of Defendants' ongoing acts of racketeering and to ensure that Defendants continue to benefit monetarily (obtain money in the form of additional illicit profits and additional illegal contracts) from the perpetuation of their racketeering activities. Rightly or wrongly, Defendants perceived that the union of Ambassador Reich and Banco Venezolano could be fatal to Defendants' ability to perpetuate their unlawful scheme. By taking steps to prevent that association, Betancourt, Trebbau, and D'Agostino preserved their ability to continue securing energy-sector contracts through improper means for their economic benefit without fear of exposure or criminal punishment and the whole host of personal and professional consequences that would result from such exposure and punishment.

304.    By their predicate acts of wire fraud, Defendants also specifically intended to obtain and secure property and money in the form of a "contract" with Plaintiffs. By intending to (and actually) depriving Plaintiffs of their existing clients and contracts with Banco Venezolano and Cedeño (*i.e.*, their "property") through Defendants' acts of wire fraud, Defendants specifically intended to reduce Plaintiffs' opportunities for business in the marketplace and increase the likelihood that Plaintiffs would agree to work for them.

305.    An agreement with ORA and Ambassador Reich, a highly-regarded former United States Ambassador to Venezuela and a preeminent expert on that country, would have

had innumerable benefits to Defendants, not the least of which would have been to eliminate or at least significantly reduce a potential threat to their ongoing racketeering activities.  Defendants believed that such a relationship also would have had the added advantage of legitimizing Defendants' racketeering business and increasing the likelihood that they would have obtained money or property in the Florida Defamation Suit by way of a judgment or favorable settlement.

306.     Defendants fully expected to and did, in fact, gain from Plaintiffs' loss of clients by enhancing Defendants' economically-competitive bargaining position in connection with future negotiations with Plaintiffs, increasing the likelihood that Defendants would obtain a judgment against or favorable settlement with Banco Venezolano (and/or the other defendants) in the Florida Defamation Suit, and, most importantly, allowing Defendants to continue to conduct "business as usual" (*i.e.*, securing inflated public energy contracts, paying public officials large payments in exchange for awarding them contracts, and unjustly enriching themselves in the process).

307.     By their predicate acts of wire fraud, Defendants further intended to obtain money or property in the form of a judgment against (or settlement agreement with) Banco Venezolano (and/or the other defendants in the Florida Defamation Suit) by eliminating Plaintiffs as an adverse expert or consulting witness.  If Banco Venezolano (with Plaintiffs' assistance) proved the truth of the alleged defamatory statements, *i.e.*, that Defendants were engaged in illegal bribery, then Defendants stood to lose a judgment (or favorable settlement) as well as the ability to perpetuate their unlawful bribery scheme and obtain future profits.

308.     By their predicate acts of wire fraud, Defendants also intended to (and did) obtain property in the form of a settlement "agreement" with Banco Venezolano and the other defendants in the Florida Defamation Suit.

309.    As set forth in the preceding paragraphs, Betancourt, Trebbau, and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI, used wire communications (including communications via telephone) in interstate commerce to further this fraudulent scheme in violation of 18 U.S.C. § 1343, by relaying false information to Cedeño and Banco Venezolano who relied upon said information to Plaintiffs' harm.

### *Pattern of Racketeering Activity*

310.    Betancourt, Trebbau, and D'Agostino engaged in a pattern of racketeering activity as described in this Second Amended Complaint that began in 2009 and continued at least through December 2012.  Moreover, Betancourt, Trebbau, and D'Agostino's pattern of racketeering has become the customary way in which Defendants conduct their ongoing business and poses a threat of indefinite duration.

311.    As set forth in the preceding paragraphs, Betancourt, Trebbau, and D'Agostino have committed at least two acts of racketeering activity in the past ten years; to wit, multiple payments to Venezuelan officials in order to secure energy-sector contracts; multiple transfers of illicitly derived funds to accounts in the United States; and multiple calls placed by telephone from the United States in order to discredit Ambassador Reich and undermine the business of ORA, each as discussed in this Second Amended Complaint, in violation of the federal wire fraud statute.

312.    Upon information and belief, Betancourt, Trebbau, and D'Agostino will continue to make fraudulent statements and commit acts that constitute the basis of violations of the Travel Act, the FCPA, and the federal wire fraud statute.

313.     Betancourt, Trebbau, and D'Agostino, through RICO Enterprises I, II, III, IV, V and VI, which are located in the United States, implemented the racketeering acts described in this Second Amended Complaint to conduct their regular business activities.

## *Pattern – Relatedness*

314.     As set forth in the preceding paragraphs, Betancourt, Trebbau, and D'Agostino's racketeering acts are related by a similar purpose, results, participants, victims, and methods of commission, and are otherwise interrelated by distinguishing characteristics and are not isolated events.

315.     Defendants' predicate acts share a common or similar purpose as well as a common result.  Defendants engaged in illegal bribery from their base of operations in the U.S. to obtain Venezuelan energy contracts and profited excessively from that activity.  Motivated by a fear of prison, a catastrophic loss of personal wealth, irreparable damage to their reputations and the loss of future illicit profits, Defendants sought to further their unlawful conspiracy by attempting to maintain the secrecy of their illegal actions while simultaneously seeking to maintain the status quo in all material respects in both the U.S. and in Venezuela.

316.     If Plaintiffs exposed Defendants' racketeering activities or merely caused there to be increased (and negative) public scrutiny of Defendants' activities, Defendants feared (rightly or wrongly) that they would no longer be able to perpetuate their illegal scheme, which would mean the loss of their illicit revenue stream and, more importantly, potential criminal convictions and prison.  Defendants' false statements that "Otto Reich is working for [Derwick Associates]" were specifically intended and designed by Defendants to eliminate the actual and perceived threat posed by Plaintiffs' involvement in the Florida Defamation Suit, thereby preventing the

disclosure of Defendants' ongoing racketeering activity, and enabling the perpetuation of

Defendants' bribery and kickback scheme and the illicit profits it generated.

317.    The purpose of Defendants' wire fraud was not simply to induce Banco

Venezolano and Cedeño to stop retaining Plaintiffs' consulting service.  To the contrary,

Defendants' acts of wire fraud were designed to further the overall purpose of and advance the

common result of Defendants' illicit enterprise and reduce the risk of interference with the

enterprise's operations.  Defendants intended for their acts of wire fraud to consummate,

maintain, perpetuate and further the purpose of the enterprise:  to conceal and perpetuate their

bribery and corruption scheme, reap extreme profits, and safely enjoy their ill-gotten gains in the

United States without risk of disclosure or a material adverse change to the status quo preventing

future illicit profits.

318.    Defendants' false statements that Ambassador Reich was working for Derwick

Associates were not only directly related to Defendants' bribery and corruption scheme, but

Defendants believed them to be essential to both the concealment of and continuation of their

scheme and critical to its continued success.  An *exposed* and/or an adversely and materially

altered bribery scheme would not yield any additional money/profits for Defendants, while a

scheme that remained concealed without adverse material changes would do so.

319.    Defendants perceived that but for their predicate acts of wire fraud, Defendants'

bribery scheme likely would have been exposed and/or materially altered in any one of a number

of fundamental ways to Defendants' detriment, which would have had far reaching ramifications

on virtually every aspect of Defendants' lives, including their residency, travel, professional and

personal reputations, immigration status in the U.S., job prospects and social status.  Relatedly, if

Defendants faced greater negative scrutiny from the direct and active involvement of Plaintiffs,

and from the spotlight Plaintiffs could bring to bear on Defendants and on their acts of racketeering, then Defendants recognized that they could find themselves in an altered, and far less favorable, environment, and potentially unable to continue their profitable racketeering activities.  By injuring Plaintiffs in their property and money, Defendants punished Plaintiffs for rejecting Defendants' job offers and eliminated a potential disruptor of their criminal enterprise, thereby facilitating the continuation of Defendants' criminal activities.

320.    By their acts of racketeering, Defendants succeeded in achieving their common purpose and, thus, achieved a common result.  Defendants enriched the members of the enterprise by bribing Venezuelan officials so that these U.S.-based Defendants would obtain lucrative energy-sector contracts; and protected and concealed their ongoing scheme so as to avoid criminal prosecution, including through acts of wire fraud against Plaintiffs who threatened to expose Defendants' racketeering activity, thus enabling its perpetuation. Defendants' predicate acts share a common or similar purpose and result to promote and enhance Defendants' criminal enterprise and its members' activities, enrich members of the enterprise, and conceal and otherwise protect the criminal activities of the enterprise.

321.    The common result of Defendants' acts of racketeering was to perpetuate their bribery and related criminal activities, to continue Defendants' corrupt enrichment, and to avoid disclosure while maintaining the status quo in a manner needed to keep the racketeering activities and profits therefrom flowing.  Defendants accomplished those goals in various ways, including when they prevented the alignment of Plaintiffs and Banco Venezolano by relaying false information to Banco Venezolano and Cedeño that Ambassador Reich was working for Derwick Associates.

322.     Defendants' acts of racketeering have or had similar participants, namely, Betancourt, Trebbau, D'Agostino, and Francisco Convit-Guruceaga.  Each of these individuals is alleged to be an operator, manager, or key member of one or more of the six criminal enterprises alleged by Plaintiffs.

323.     Defendants' predicate acts also have common victims.  Defendants' acts of wire fraud drove a wedge between Ambassador Reich, Banco Venezolano and Cedeño, and prevented Plaintiffs from, among other things, becoming actively involved in the Florida Defamation Suit. As one potential consequence, Defendants' acts of bribery were permitted to continue and have continued unchecked.  Defendants' business competitors are victims of Defendants' ongoing acts of bribery because they were denied the opportunity to bid for and procure the energy-sector contracts in an open market.  As commentators have noted about the FCPA and the Travel Act, allowing one market competitor to engage in illegal bribery gives that competitor an unfair competitive advantage in the marketplace over their competitors who choose not to or who are unable to engage in bribery and corruption as business methods.  Defendants' business competitors are also victims of Defendants' wire fraud.  When Defendants successfully discredited and undercut Ambassador Reich with Banco Venezolano and Cedeño, the likelihood that Defendants' acts of bribery would be revealed and eliminated became substantially reduced, if not eliminated.  Because Defendants' scheme was able to continue, Defendants were able to continue to secure additional energy-sector contracts through bribes.  Defendants' business competitors, who might otherwise have won those same energy-sector contracts, have suffered injury on account of the bribes and continued to suffer injury on account of the wire fraud.

324.     Just like Defendants' business competitors are victims of Defendants' wire fraud, Plaintiffs are also victims of Defendants' bribery.  Plaintiffs were targeted by Defendants

specifically because Defendants perceived them to constitute a threat to the perpetuation of

Defendants' acts of bribery and corruption.  Plaintiffs would not have been victims of

Defendants' wire fraud but for Defendants' desire to maintain the secrecy of their illegal bribes

and to ensure the continuation of the status quo, which favored and allowed the ongoing acts of

bribery to continue.  Because Defendants' wire fraud is inextricably linked to the acts of bribery,

*i.e.*, part and parcel of an underlying scheme, Plaintiffs are victims of both predicate acts.

325.    Additional victims of Defendants' predicate acts include those identified by

Defendants to constitute a threat to their continued ability to engage in corrupt business

practices, *i.e.*, those who threaten the enterprise's goals.  Such common victims include

Plaintiffs, Banco Venezolano and the other defendants in the Florida Defamation Suit, the Forbes

Writer, Steven Bodzin, Robert Bottome, Miguel Octavio, Defendants' business competitors and

the U.S. government.

326.    Defendants' predicate acts have or had similar methods of commission – to wit:

offers of money made by Defendants, or their intermediaries from the United States, to

Venezuelan officials in exchange for energy-sector contracts; use of the U.S. wires to convey

false information about the association of Ambassador Reich and ORA with Derwick Associates;

use of the U.S. wires to convey the ill-gotten proceeds of Defendants' acts of corruption, and to

transmit money that was ultimately used to bribe officials in Venezuela; and use of the U.S.

wires or mail to intimidate and silence other "critics" of Derwick Associates (*e.g.*, Banco

Venezolano and the other defendants in the Florida Defamation Suit, the *Forbes* Writer, Steven

Bodzin, Robert Bottome, and Miguel Octavio).

327.    Defendants' predicate acts also share other characteristics of interrelatedness.

Among other things, Defendants' actions were designed to reap benefits from the corrupt Chavez

regime.  But for the corruption in Venezuela, Defendants' bribery scheme would not have existed nor would the perceived threat of exposure posed by Plaintiffs' alliance with Banco Venezolano.  Defendants have also engaged in a campaign of concealment using lawsuits and threats to sue, political and financial pressure and abusive business tactics designed to silence their critics and prevent the disclosure of their acts of racketeering.  Defendants tried to hire Plaintiffs in an attempt to gain from an association with Plaintiffs, which Defendants perceived to be quite valuable, and, when their overtures were rejected, embarked on a campaign to discredit Plaintiffs in the eyes of Plaintiffs' clients (and others).  Also relevant here is the fact that Defendants' illicit proceeds have been funneled via the U.S. wires through J.P. Morgan and Eduardo Travieso, and deposited in U.S. banks.

## *Pattern – Continuity*

328.    As set forth in the preceding paragraphs, Betancourt, Trebbau, and D'Agostino's racketeering acts took place repeatedly over a substantial period of time, and threaten to repeat themselves in the future.

329.    Following Derwick Associates' founding in 2009, Betancourt, Trebbau, and D'Agostino and their agents repeatedly engaged in behavior violating federal law, as described in the preceding paragraphs, from 2009 until 2012.  During that time period, Betancourt, Trebbau, and D'Agostino offered payments on at least twelve contracts in violation of 15 U.S.C. §§ 78dd-1, and transferred the ill-gotten funds to the United States in violation of 18 U.S.C. § 1952(a) and (b).  Further, on no fewer than two occasions in 2012, Betancourt, Trebbau, and D'Agostino and their agents conspired to, and did in fact commit, wire fraud in violation of 18 U.S.C. § 1343 in connection with their intention to harm Ambassador Reich and ORA and prevent any investigation into their illicit scheme.  Betancourt, Trebbau, and D'Agostino's acts

of racketeering were continuous to form a pattern of racketeering activity because they extended

for a substantial period of time.

330.    Betancourt, Trebbau, and D'Agostino's acts of racketeering are also sufficiently

continuous because the acts of racketeering activity evidence Betancourt, Trebbau, and

D'Agostino's ongoing and regular way of conducting their business.  Further, the nature of

Betancourt, Trebbau, and D'Agostino's acts themselves imply a threat of continued criminal

action, as Betancourt, Trebbau, and D'Agostino intend to continue to violate 15 U.S.C. §§ 78dd-

1, 18 U.S.C. § 1952(a) and (b), and 18 U.S.C. § 1343 to effectuate their scheme, particularly in

regards to forthcoming CORPOELEC contracts to construct power plants and buy various

energy-related goods and services, as alleged in the preceding paragraphs, and Betancourt,

Trebbau, and D'Agostino plan to continue taking actions to keep others (including Ambassador

Reich and ORA) from speaking out against them or seeking to thwart their illegal activities in

that regard.

331.    There can be no suggestion that Defendants do not intend to continue to engage in

the illicit pattern of racketeering activity that is the subject of Plaintiffs' claims.  In addition to

retaining a United States-based lobbying firm in or about December 2013, on January 10, 2014,

Defendants issued a press release stating that they are looking to expand their business

operations in Spain and will also continue to do business in Venezuela, should the opportunity

arise.[46]

---

[46]     *Available at* http://m.prnewswire.com/news-releases/derwick-associates-continues-to-meet-the-needs-of-
the-venezuelan-people-239623871.html (last accessed April 24, 2015).

### *Injury*

332.     As a direct and proximate result of, and by reason of, the activities of Betancourt, Trebbau, and D'Agostino, and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, Plaintiffs suffered the loss of existing and future business relationships and contracts with Eligio Cedeño and Banco Venezolano, and the loss of property, contracts and the revenue to be derived therefrom, in an amount to be determined at trial but not less than $2,000,000, plus treble damages, attorneys' fees, and the costs in bringing this action.

## SECOND CLAIM FOR RELIEF

### *Racketeer Influenced and Corrupt Organizations Act*
### *18 U.S.C. § 1962(d)*

333.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 332, inclusive, as if fully set forth herein.

334.     Trebbau and/or D'Agostino conspired with Betancourt to conduct or participate, directly or indirectly, in the conduct of the affairs of RICO Enterprises I, II, III, IV, V and/or VI, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  In particular, Trebbau and/or D'Agostino intended to further an endeavor of Betancourt which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating these criminal endeavors.

335.     In the alternative to Paragraph 334, Betancourt and/or D'Agostino conspired with Trebbau to conduct or participate, directly or indirectly, in the conduct of the affairs of RICO Enterprises I, II, III, IV, V and/or VI, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  In particular, Betancourt and/or D'Agostino intended to further an endeavor of Trebbau which, if completed, would satisfy all of the elements of a substantive RICO criminal

offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating these criminal endeavors.

336.    In the alternative to Paragraphs 334 and 335, Betancourt and/or Trebbau conspired with D'Agostino to conduct or participate, directly or indirectly, in the conduct of the affairs of RICO Enterprises I, II, III, IV, V and/or VI, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  In particular, Betancourt and/or Trebbau intended to further an endeavor of D'Agostino which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating these criminal endeavors.

337.    Plaintiffs were injured by Betancourt's, Trebbau's, and D'Agostino's overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included acts constituting violations of the Travel Act, 18 U.S.C. § 1952(a) and (b), the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, and the federal wire fraud statute, 18 U.S.C. § 1343.

338.    As a direct and proximate result of, and by reason of, the activities of Betancourt, Trebbau, and D'Agostino, and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(d).  Among other things, Plaintiffs suffered the loss of existing and future business relationships, property, and contracts with Eligio Cedeño and Banco Venezolano, and the loss of property, contracts and revenue to be derived therefrom, in an amount to be determined at trial but not less than $2,000,000, plus treble damages, attorneys' fees, and costs in bringing this action.

## THIRD CLAIM FOR RELIEF

### *Tortious Interference with Prospective Economic Advantage*
### *– ORA's Relationship with Cedeño*

339.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 338, inclusive, as if fully set forth herein.

340.     ORA had a long-standing business relationship with Cedeño, which continued through 2012 and during which time he received payment for services provided.

341.     ORA reasonably expected the business relationship to continue indefinitely.

342.     Each Defendant knew of the business relationship between Cedeño and ORA.

343.     Each Defendant took steps to, and did, make or cause others to make false statements to Cedeño concerning ORA and/or Ambassador Reich's alleged association with Derwick Associates and/or Defendants, with the purpose of inducing Cedeño to terminate the business relationship, and to withhold future business from ORA.

344.     Defendants did so through improper means, including, but not limited to, making knowingly false statements to Cedeño with the purpose of inflicting harm upon ORA; specifically, the false statements were made with the purpose of denigrating ORA's reputation and the integrity of the business thereby causing Cedeño to terminate the business relationship, and withhold any future business, from ORA.

345.     Each Defendant is liable to ORA for the actions described herein, which were undertaken in furtherance of an ongoing conspiracy among all Defendants, and each Defendant took steps in furtherance of the conspiracy and each Defendant was aware that his co-conspirators were taking these actions.

346.     As a direct and proximate cause of Defendants' wrongful interference with the business relationship between ORA and Cedeño, Cedeño terminated his ongoing business

relationship with ORA and refused to do future business with ORA.  But for Defendants'
wrongful interference, ORA's relationship with Cedeño would have continued into the future.

347.    ORA has suffered substantial damages as a result of Defendants' unlawful
interference.

348.    By reason of the foregoing, ORA is entitled to compensatory damages in an
amount to be determined at trial, but not less than $1,000,000.

## FOURTH CLAIM FOR RELIEF

### Tortious Interference with Prospective Economic Advantage
### – ORA's Relationship with Banco Venezolano

349.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through
348, inclusive, as if fully set forth herein.

350.    In December 2012, ORA was in final negotiations with Banco Venezolano to
enter into a consulting relationship.  That relationship was to pay ORA no less than $20,000 per
month.

351.    ORA had a reasonable expectation that a written contract would be memorialized
pursuant to its already-negotiated terms.

352.    Each Defendant knew of the relationship between ORA and Banco Venezolano,
and knew that those parties were in final negotiations to memorialize their consulting
relationship.

353.    Defendants Betancourt and Trebbau, with the agreement of Defendant
D'Agostino, took steps to, and did, make false statements to officials of Banco Venezolano, with
the purpose of inducing it to terminate its business agreement, and to withhold future business
from ORA.

354.    Defendants made false statements to Banco Venezolano with the purpose of inflicting harm upon ORA; specifically, the false statements were made with the purpose of causing Banco Venezolano to terminate negotiations with ORA, and withhold future business from ORA, thereby causing ORA substantial economic damage.

355.    Each Defendant is liable to ORA for the actions described herein, which were undertaken in furtherance of an ongoing conspiracy among all Defendants, and each Defendant took steps in furtherance of the conspiracy and each Defendant was aware that his co-conspirators were taking these actions.

356.    Defendants' actions wrongfully interfered with ORA's relationship with Banco Venezolano.

357.    As a direct and proximate cause of Defendants' wrongful interference with the business relationship between ORA and Banco Venezolano, Banco Venezolano terminated its arrangement with ORA and refused to do future business with ORA.  But for Defendants' wrongful interference, ORA's agreement with Banco Venezolano would have been memorialized and continued into the future.

358.    ORA has suffered substantial damages as a result of Defendants' unlawful interference.

359.    By reason of the foregoing, ORA is entitled to compensatory damages in an amount to be determined at trial, but not less than $1,000,000.

## FIFTH CLAIM FOR RELIEF

### *Trade Libel/Injurious Falsehood/Defamation*

360.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 359, inclusive, as if fully set forth herein.

361.    Defendants knowingly published false and derogatory statements about ORA, including that ORA was in business with disreputable individuals and entities, *i.e.*, Defendants Betancourt, Trebbau, D'Agostino, and Derwick Associates.  Defendants knew or should have known that these statements were false and that the false statements would denigrate ORA's reputation and discourage others from dealing with ORA.

362.    The false and defamatory statements concerning ORA constitute defamation and/or defamation *per se*.

363.    Defendants published these false statements of fact to third persons with the purpose of inflicting harm upon ORA; specifically, the false statements were published with the purpose of ruining ORA's business reputation, impugning the integrity of the business, and causing clients to terminate their business agreements with, and potential clients to withhold future business from, ORA.

364.    Individuals and entities, namely Cedeño and Banco Venezolano, did in fact terminate their business relationships with ORA and/or refuse to do business with ORA because of Defendants' false statements.  But for Defendants' actions those relationships would have continued and ORA's business reputation would not have been damaged.

365.    Defendants' false and defamatory statements concerning ORA were made maliciously, knowingly, willfully, and in conscious disregard of ORA's rights, and were specifically intended to – and did – cause damage to ORA's reputation and business.

366.    Each Defendant is liable to ORA for the actions described herein, which were undertaken in furtherance of an ongoing conspiracy among all Defendants, and each Defendant took steps in furtherance of the conspiracy and each Defendant was aware that his co-conspirators were taking these actions.

367.     As a direct and proximate cause of Defendants' wrongful conduct, ORA has

suffered, and continues to suffer, substantial damages as a result of Defendants' defamatory

statements.

368.     By reason of the foregoing, ORA is entitled to compensatory and punitive

damages in an amount to be determined at trial, but not less than $2,000,000.

## SIXTH CLAIM FOR RELIEF

### *Defamation of Ambassador Reich*

369.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through

368, inclusive, as if fully set forth herein.

370.     Defendants knowingly published false and defamatory statements about

Ambassador Reich, including that Ambassador Reich is personally and professionally associated

with, and does business with, disreputable individuals and entities, *i.e.*, Defendants Betancourt,

Trebbau, D'Agostino, and Derwick Associates.

371.     The false and defamatory statements concerning Ambassador Reich constitute

defamation and/or defamation *per se*.

372.     The false and defamatory statements published by Defendants, as reasonably

understood, impugn the integrity, credibility and reputation of Ambassador Reich, and

discourage individuals and entities, including potential clients, from associating with him and/or

seeking his services, thus injuring him and his business, ORA.

373.     Defendants knowingly and willfully published the false statements of fact with

the purpose of inflicting harm upon Ambassador Reich.  By publishing and disseminating the

false statements, Defendants intended to besmirch Ambassador Reich's good name and

reputation in the community and cause others to terminate their business and other relationships with him and refuse to be associated with him.

374.    Defendants knew or reasonably should have known that the statements were false at the time they were published, and continue to be false today, and Defendants have no evidence to the contrary.

375.    The false and defamatory statements concerning Ambassador Reich were made maliciously, knowingly, willfully and in conscious disregard of Ambassador Reich's rights, and were specifically intended to – and did – cause damage to Ambassador Reich's character, reputation and business.  But for Defendants' actions, Ambassador Reich's character, reputation and business would not have been damaged.

376.    Each Defendant is liable to Ambassador Reich for the actions described herein, which were undertaken in furtherance of an ongoing conspiracy among all Defendants, and each Defendant took steps in furtherance of the conspiracy and each Defendant was aware that his co-conspirators were taking these actions.

377.    As a direct and proximate cause of Defendants' wrongful conduct, Ambassador Reich has suffered, and continues to suffer, substantial damages as a result of Defendants' defamatory statements.

378.    By reason of the foregoing, Ambassador Reich is entitled to compensatory and punitive damages in an amount to be determined at trial.

### CONSISTENT WITH THE COURT'S AUGUST 18, 2014 DECISION, PLAINTIFFS PLEAD THE EXISTENCE OF A CIVIL CONSPIRACY

379.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 378, inclusive, as if fully set forth herein.

380.     Each of the Defendants, together with the others, conspired with respect to Counts III through VI and acted in concert to commit unlawful acts, including acts of bribery, defamation and tortious interference.  Defendants conspired to engage in these actions with the unlawful objective of interfering with ORA's business relationships by impugning Ambassador Reich's integrity, credibility and reputation; undermining the confidence of ORA's clients and prospective clients; deterring ORA's clients and prospective clients from using ORA's services; and injuring Ambassador Reich in his livelihood.  Each of the Defendants understood the objectives of the scheme, and accepted them, and was an active and knowing participant in the conspiracy.

381.     Defendants' conspiracy was implemented through the commission of various wrongful and overt acts by each Defendant in furtherance of said conspiracy, including, but not limited to, publishing and disseminating false statements about Ambassador Reich and ORA, and committing other unlawful acts.

382.     As a direct and proximate result of the operation and execution of the conspiracy committed by Defendants, Plaintiffs have suffered and continue to suffer substantial damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment against Defendants as follows:

a.     Awarding compensatory damages in an amount to be determined at trial but not less than $2,000,000;

b.     Awarding treble damages as authorized by 18 U.S.C. § 1964;

c.     Awarding punitive damages in an amount to be determined at trial;

d.     Awarding Plaintiffs their costs and disbursements plus attorneys' fees; and

e.      Granting such other relief as the Court deems just and proper.


Dated:  New York, New York
        April __, 2015

                                        Respectfully submitted,

                                        SMITH VALLIERE PLLC


                                        By: _____
                                                Mark W. Smith
                                                Noelle Kowalczyk

                                        1221 Avenue of the Americas,
                                        42nd Floor
                                        New York, New York 10020
                                        Phone:  (212) 755-5200
                                        msmith@svlaw.com
                                        nkowalczyk@svlaw.com

                                        *Attorneys for Plaintiffs Otto J. Reich
                                        and Otto Reich Associates, LLC*